# EXHIBIT 1

michel valticos

guerric canonica
dipl. iei genève

olivier metzger
ll.m. harvard

romain canonica
ll.m. université de genève

bettina abihssira-aciman
ll.m. university of pennsylvania
admitted to the new york bar

marine panariello-valticos
–

théo badan

délia zreikat
ll.m. king's college london
avocats
–

eleonora favre-bulle

paloma croset
avocates-stagiaires
–

pierre de preux
conseil
ancien bâtonnier



canonica valticos
de preux +associés

avocats – attorneys at law

**CERTIFICATION**

I, Mr Romain Canonica, born on ████████ (Exhibit A), attorney-at-law at the law firm Canonica Valticos de Preux + Associés, Rue Pierre-Fatio 15, 1204 Geneva, make this certification based on my personal knowledge:

The Final Award is an award of the arbitrator, Prof. Blaise Carron, issued January 20, 2022 in the case number 300515-2020 (Swiss Rules) opposing Spineway SA and Strategos Group LLC.

A true and correct copy of the Final Award is attached as Exhibit B.

November 1st, 2022

Romain Canonica

Canonica Valticos
de Preux & Associés
15, rue Pierre-Fatio
Case postale
1211 Genève 3

# EXHIBIT A

Exhibit A



# EXHIBIT B

REÇU LE  2 1 JAN. 2022

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Affaire n° 300515-2020 (Swiss Rules)

# Sentence finale

du 20 janvier 2022

dans l'arbitrage opposant

**SPINEWAY SA**
7, Allée du Moulin Berger
Bâtiment 7
69130 Ecully
France

représentée par :

Me Romain Canonica, av.
Me Edouard Bertrand, av.
Canonica Valticos de Preux + Associés
15, rue Pierre-Fatio
1204 Genève
Suisse
rcanonica@cvpartners.ch
ebertrand@lamy-lexel.com

**Demanderesse**

à

**STRATEGOS GROUP LLC**
2701 Centerville Road
Wilmington
DE 19808
USA

représentée par :

Monsieur Luc GERARD
Carrera 2 # 11-7
Bogota
Colombie
luc.gerard@tribeca.com.co

**Défenderesse**

devant l'arbitre unique

Prof. Blaise Carron
Siège de l'arbitrage : Genève (Suisse)

**Arbitrage**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale      Page 2 sur 83

## Table des matières

I. Table des abréviations et des concepts définis ........................................................... 5

II. Introduction ..................................................................................................... 8

   A.   Parties ......................................................................................................... 8

      1. Demanderesse .......................................................................................... 8

      2. Défenderesse ............................................................................................ 8

   B.   Tribunal arbitral .......................................................................................... 9

   C.   Objet du Litige – Synthèse ............................................................................. 9

   D.   Convention d'arbitrage et compétence du Tribunal arbitral .......................... 10

   E.   Siège et langue de l'arbitrage, droit de procédure applicable ...................... 10

   F.   Droit de fond applicable ............................................................................. 11

III.   Conclusions des parties ................................................................................. 12

   A.   Conclusions de la Demanderesse .................................................................. 12

   B.   Conclusions de la Défenderesse .................................................................... 16

IV.   Histoire procédurale ...................................................................................... 17

V. Faits et positions des parties .............................................................................. 23

   A.   Personnes/Entités impliquées ...................................................................... 23

   B.   Période précédant la conclusion du Contrat ................................................. 24

   C.   Conclusion du Contrat et début d'exécution du Contrat ................................ 25

   D.   Invocation de la réalisation de la condition résolutoire par la Demanderesse ............. 30

   E.   Discussions postérieures .............................................................................. 32

VI.   Discussion ................................................................................................... 36

   A.   Compétence du Tribunal arbitral ................................................................. 36

   B.   Généralités ................................................................................................ 37

      1. Méthode et structure de la sentence .......................................................... 37

      2. Base, nature, prestations et rémunération contractuelles ............................. 38

      a) Question ................................................................................................. 38

      b) Positions des Parties ................................................................................ 38

      c) Discussion .............................................................................................. 39

      3. Droit applicable ....................................................................................... 40

      d) Question ................................................................................................. 40

      e) Positions des Parties ................................................................................ 40

      f) Discussion .............................................................................................. 40

   C.   Régime de l'art. 3.4 du Contrat .................................................................. 41

      1. Qualification de l'art. 3.4 du Contrat ......................................................... 41

      a) Question ................................................................................................. 41

**Arbitrage**     **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

b) Positions des Parties .................................................................................. 41

c) Discussion ................................................................................................. 42

2. Validité de l'art. 3.4 du Contrat ....................................................................... 46

a) Question ................................................................................................... 46

b) Positions des Parties .................................................................................. 46

c) Discussion ................................................................................................. 48

3. Applicabilité de l'art. 3.4 du Contrat (réalisation de la condition résolutoire) ............... 50

a) Question ................................................................................................... 50

b) Positions des Parties .................................................................................. 50

c) Discussion ................................................................................................. 54

4. Conséquence de l'applicabilité de l'art. 3.4 du Contrat ............................................. 59

a) Question ................................................................................................... 59

b) Positions des Parties .................................................................................. 59

c) Discussion ................................................................................................. 61

D.      Prétentions de la Demanderesse ........................................................................ 63

1. Prétention en versement de EUR 4'160'000.- et engagement à signer les ordres de

mouvements de titres afin de restituer l'intégralité des parts A et des parts B du Fonds  64

a) Question et méthodologie ............................................................................ 64

b) Positions des Parties .................................................................................. 64

c) Discussion ................................................................................................. 65

2. Prétention en versement de EUR 252'329.21 ....................................................... 67

a) Question et méthodologie ............................................................................ 67

b) Positions des Parties .................................................................................. 67

c) Discussion ................................................................................................. 68

3. Créances d'intérêts ....................................................................................... 71

a) Question et méthodologie ............................................................................ 71

b) Positions des Parties .................................................................................. 71

c) Discussion ................................................................................................. 72

E.      Récapitulatif concernant les prétentions ............................................................. 73

F.      Coûts de l'arbitrage et frais et dépens des Parties ................................................. 74

1. Question ..................................................................................................... 74

2. Position des Parties ....................................................................................... 74

3. Discussion ................................................................................................... 75

a) Montant des coûts de l'arbitrage ................................................................... 76

b) Montant des dépens des Parties .................................................................... 78

c) Montant des frais de l'arbitrage ..................................................................... 79

d) Répartition des frais de procédure et dépens .................................................... 80

e) Conclusion ................................................................................................ 81

G.      Autres conclusions prises par les Parties ............................................................. 81

1. Question ..................................................................................................... 81

**Arbitrage**       **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                    Page 4 sur 83

    2. Position des Parties.................................................................................... 82

    3. Discussion ............................................................................................... 82

VII.    Dispositif ..................................................................................................83

# I.   Table des abréviations et des concepts définis

| | |
|---|---|
| Accord de partenariat (commercial) | Accord de partenariat commercial et de distribution des produits du Cessionnaire sur les zones d'activité du Cédant (mentionné à l'art. 3.4 du Contrat) |
| act. [...] | Pièce n° [...] du dossier d'arbitrage |
| all. | Allégué |
| art. | article |
| Audience du 7 septembre 2021 | Audience d'audition de témoins, d'administration des preuves et de plaidoiries finales du 7 septembre 2021 |
| Avenant n° 1 | Avenant numéro un à la promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente conclue le 19 mars 2019, du 3 mai 2019 |
| Avenant n° 2 | Avenant numéro deux à la promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente conclue le 19 mars 2019, du 16 mai 2019 |
| CCfr. | Code civil français |
| Cédant | Strategos Group LLC (= Défenderesse) |
| Cessionnaire | Spineway SA (= Demanderesse) |
| P. CHABERT | Philippe Chabert, Directeur des opérations de la Demanderesse (durant la période pertinente pour la présente procédure) |
| Conclusions de la Demanderesse du 7 septembre 2021 | Conclusions déposées par la Demanderesse lors de l'Audience du 7 septembre 2021 (act. 31c) |
| Contrat | Promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente du 19 mars 2019 conclue entre la Défenderesse en qualité de cédant et de garant et la Demanderesse en qualité de cessionnaire (Pièce Dem-5) |
| Cour | Cour d'arbitrage du Swiss Arbitration Centre |
| Défenderesse | Strategos Group LLC |

| Demanderesse | Spineway SA |
|---|---|
| Demande | Mémoire de demande du 20 avril 2021 de la Demanderesse |
| Demande d'arbitrage | Cf. Notification d'arbitrage |
| Dem-Etat de frais rectificatif | État de frais rectificatif de la Demanderesse du 30 septembre 2021 |
| dir. | directeur(s) |
| éd. | éditeur(s) |
| ég. | également |
| Expertise Nourissat | Rapport d'expertise du Prof. Cyril Nourissat du 6 avril 2021 (EXP-Nourissat) |
| (le) Fonds | Fonds de titrisation luxembourgeois NATIONAL CLINICS, devenu ensuite INTEGRAL MEDICAL SOLUTIONS FUND (cf. précision dans l'Avenant n° 2) |
| i.f. | in fine |
| LDIP | Loi fédérale (suisse) sur le droit international privé du 18 décembre 1987 (RS 291) |
| L. GERARD | Luc Gérard Nyafe, représentant de la Défenderesse |
| F. LAUCK | Florence Lauck, responsable qualité et affaires réglementaires en charge du service clinique de la Demanderesse durant la période pertinente pour la présente procédure |
| NCC | National Clinics Centenario ou National Clinics Columbia SAS |
| Notification d'arbitrage | Demande d'arbitrage [=notification d'arbitrage] du 14 septembre 2020 de la Demanderesse |
| OP n° [...] | Ordonnance de procédure no [...] |
| Pièce Dem-[...] | Pièce déposée par la Demanderesse no [...] |
| Pièce DemL-[...] | Source juridique no [...] déposée par la Demanderesse |
| Plaidoiries finales | Plaidoiries finales du 7 septembre 2021 |
| PV | Procès-verbal |
| PV-[nom] | PV de l'audition de [nom] lors de l'Audience du 7 septembre 2021 |
| Règlement d'arbitrage | Règlement suisse d'arbitrage international dans sa version de juin 2012 |
| RSP | Règles spécifiques de procédure, contenues dans l'OP n° 1 du 2 mars 2021 |

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                    Page 7 sur 83

| S. LE ROUX | Stéphane Le Roux, président et représentant de la Demanderesse |
|---|---|
| Secrétariat | Secrétariat du Swiss Arbitration Centre |
| D. SIEGRIST | David Siegrist, directeur financier de la Demanderesse (durant la période pertinente pour la présente procédure) |
| spéc. | spécialement |
| Verbatim | Verbatim de l'audience du 7 septembre 2021, finalisé et revu tant par les Parties que par le Tribunal arbitral |

# II.   Introduction

## A. Parties

### 1. Demanderesse

1.    La **Demanderesse** est : Spineway SA[1].

2.    L'adresse de la Demanderesse est :

      7, Allée du Moulin Berger
      Bâtiment 7
      69130 Ecully
      France

3.    La Demanderesse est représentée par ses Conseils :

      Me Romain Canonica, av.
      Me Edouard Bertrand, av.
      Canonica Valticos de Preux + Associés
      15, rue Pierre Fatio
      1204 Genève
      Suisse
      rcanonica@cvpartners.ch
      ebertrand@lamy-lexel.com

### 2. Défenderesse

4.    La **Défenderesse** est : Strategos Group LLC[2].

5.    L'adresse de la Défenderesse est :

      2701 Centerville Road
      Wilmington
      DE 19808
      USA

---

[1]    Pièce Dem-1, p. 1 ss.
[2]    Pièce Dem-1, p. 3 ss.

6.    La Défenderesse est représentée par :
      Monsieur Luc Gérard
      Carrera 2 # 11-7
      Bogota
      Colombie
      luc.gerard@tribeca.com.co

## B.  Tribunal arbitral

7.    Le Tribunal arbitral est composé de l'Arbitre unique :
      Prof. Blaise Carron, avocat
      Dufourstrasse 33
      3005 Berne
      Suisse
      Email :   blaise.carron@unine.ch
      Tel :     +41 79 567 77 92

## C.  Objet du Litige – Synthèse

8.    Le litige trouve sa source dans la *« Promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente »* du 19 mars 2019 conclue entre la Défenderesse en qualité de Cédant et de Garant et la Demanderesse en qualité de Cessionnaire (ci-après : le **Contrat**)[3].

9.    Il a pour objet une prétention principale de la Demanderesse visant à constater/prononcer la résolution du Contrat et de ses avenants en application de l'article 3.4 du Contrat et à condamner la Défenderesse à verser à la Demanderesse la somme en principal de EUR 4'160'000.- au titre du prix partiel versé en exécution du Contrat et de ses avenants, outre intérêts au taux légal, contre l'engagement de restituer l'intégralité des parts A et B du Fonds dans un délai d'un mois après avoir reçu les sommes susmentionnées, ainsi qu'à condamner la Défenderesse à verser à la Demanderesse la somme de EUR 252'239.21 correspondant aux frais exposés par

---

[3]    Pièce Dem-5, *passim*.

la Demanderesse pour la négociation du Contrat, sa conclusion ainsi que pour la réalisation des audits[4].

10. La présente procédure est particulière en ce sens que la Défenderesse, bien que régulièrement citée et invitée à réitérées reprises à participer activement à la procédure arbitrale, ne l'a pas fait et est demeurée silencieuse et passive tout au long de la procédure.

## D. Convention d'arbitrage et compétence du Tribunal arbitral

11. Le Contrat contient la clause arbitrale suivante:

    « 10.2 Tous différends découlant de la présente Promesse ou en relation avec celle-ci seront tranchés définitivement suivant le Règlement de Conciliation et d'Arbitrage de la Chambre de Commerce Internationale de Genève par un (1) arbitre nommé conformément à ce Règlement (cet arbitre étant ci-après désigné le « Tribunal Arbitral ») »[5].

12. Cette clause devra être interprétée afin de déterminer si le Tribunal arbitral est compétent pour trancher ce litige (infra N 126 ss).

## E. Siège et langue de l'arbitrage, droit de procédure applicable

13. Conformément à l'art. 10.2 du Contrat, 2ème paragraphe, le « Tribunal Arbitral sera constitué à Genève (Suisse) [...] »[6].

14. Par conséquent, le siège du Tribunal arbitral est à Genève, Suisse.

15. Conformément à l'art. 10.2 du Contrat, 2ème paragraphe, « l'arbitrage aura lieu en langue française ».

16. La langue de l'arbitrage est donc le français.

17. Quant aux règles de procédure applicables, l'art. 10.2 du Contrat prévoit que « [t]ous différends découlant de la présente Promesse ou en relation avec celle-ci seront tranchés définitivement suivant le Règlement de Conciliation et d'Arbitrage de la

---

[4] Pour une description du litige en début de procédure, cf. Demande, p. 38 s.
[5] Pièce Dem-5, p. 24.
[6] Pièce Dem-5, p. 24.

*Chambre de Commerce Internationale de Genève [...] »[7].* Vu que le siège du tribunal arbitral se trouve en Suisse et qu'aucune des parties à la convention d'arbitrage n'avait, au moment de la conclusion de celle-ci son siège en Suisse, vu l'interprétation faite de la convention d'arbitrage (*infra* N 126 ss), les règles applicables sont donc les suivantes :

(i) l'Ordonnance de procédure n° 1 (ci-après : **OP n° 1**) concernant les règles spécifiques de procédure de 2 mars 2021 (ci-après : **RSP**) ;

(ii) le Règlement suisse d'arbitrage international dans sa version de juin 2012 (ci-après : **Règlement d'arbitrage**) ;

(iii) le chapitre 12 (art. 176 ss) de la Loi fédérale sur le droit international privé du 18 décembre 1987 (ci-après : **LDIP**).

## F.  Droit de fond applicable

18.  Conformément à l'art. 10.2 du Contrat, 3ème paragraphe, le « *Tribunal Arbitral devra trancher le litige en application du droit français* »[8].

19.  Par conséquent, le droit de fond applicable est le droit français.

Partie de page intentionnellement laissée blanche

---

[7]    Pièce Dem-5, p. 24.
[8]    Pièce Dem-5, p. 24.

# III.   Conclusions des parties

## A. **Conclusions de la Demanderesse**

20.  Dans la « Demande d'arbitrage » du 14 septembre 2020 (ci-après : la **Notification d'arbitrage**), la Demanderesse a pris les conclusions suivantes[9] :

*« Vu le règlement d'arbitrage,*

*Vu les articles 1304, 1304-2, 1304-3, 1304-7 1353-6 et 1353-7 du Code civil français,*

*Vu la jurisprudence citée,*

*Vu les pièces versées aux débats,*

*• **DIRE et JUGER** qu'aucun accord de partenariat n'a été conclu entre la société SPINEWAY et la société STRATEGOS GROUP LLC avant le 19 septembre 2019;*

*• **PRONONCER** la résolution de la promesse synallagmatique de vente d'achat du 19 mars 2019, de son avenant n°1 du 3 mai 2019 et de son avenant n°2 du 16 mai 2019 en application de la condition résolutoire prévue par l'article 3.4 de la promesse, laissée inchangée par les deux avenants ;*

*• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY la somme en principal de 4.160.000 €, au titre du prix partiel versé en exécution de la promesse et de ses avenants, outre intérêts au taux légal à compter du 19 septembre 2019, date d'accomplissement de la condition résolutoire;*

*• **DONNER ACTE** à la société SPINEWAY qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la société STRATEGOS GROUP LLC l'intégralité des parts A et des parts B du fonds Integral Medical Solutions Fund, et ce dans un délai d'un mois après avoir reçu l'intégralité de la somme de 4.160.000 €, outre intérêts au taux légal ;*

*• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY la somme de 252.329,21 € correspondant aux frais exposés par la société SPINEWAY pour la négociation de la promesse, sa conclusion ainsi que pour la réalisation des audits ;*

---

[9]    Notification d'arbitrage, p. 25.

• **CONDAMNER** la société STRATEGOS GROUP LLC à prendre à sa charge l'intégralité des coûts de l'arbitrage, y compris les honoraires et/ou débours dus à l'Association des Chambres de commerces suisses pour l'arbitrage et la médiation et au Tribunal arbitral ;

• **CONDAMNER** la société STRATEGOS GROUP LLC à prendre à sa charge les honoraires des conseils de la société SPINEWAY à hauteur de 120000 € HT, sujet à un éventuel ajustement ou complément. »

21.  Dans son mémoire de demande du 20 avril 2021 (ci-après : la **Demande**), la Demanderesse a pris les conclusions suivantes[10] :

« Vu le Règlement,
Vu l'ordonnance de procédure n°1 du 2 mars 2021
Vu les articles 1304, 1304-2, 1304-3, 1304-7 1352-6 et 1352-7 du Code civil français,
Vu la jurisprudence citée,
Vu les pièces, déclarations écrites et rapports d'expertise versés aux débats,

• **DIRE et JUGER** qu'aucun accord de partenariat n'a été conclu entre la société SPINEWAY et la société STRATEGOS GROUP LLC avant le 19 septembre 2019;

• **PRONONCER** là résolution de la promesse synallagmatique de vente d'achat du 19 mars 2019, de son avenant n°1 du 3 mai 2019 et de son avenant n°2 du 16 mai 2019, en application de la condition résolutoire prévue par l'article 3.4 de la promesse, laissée inchangée par les deux avenants ;

• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY la somme en principal de 4.160.000 € (quatre millions cent soixante mille euros), au titre du prix partiel versé en exécution de la promesse et de ses avenants, outre intérêts au taux légal à compter du 19 septembre 2019, date d'accomplissement de la condition résolutoire ;

• **DONNER ACTE** à la société SPINEWAY qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la société STRATEGOS GROUP LLC l'intégralité des parts A et des parts B du fonds Integral Medical Solutions Fund, et ce

---

[10]   Demande, p. 38, N 33.

dans un délai d'un mois après avoir reçu l'intégralité de la somme de 4.160.000 €
(quatre millions cent soixante mille euros), outre intérêts au taux légal ;

• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY
la somme de 252.329,21 € [deux cent cinquante [sic] mille trois cent vingt-neuf
euros et vingt et un centimes] outre la TVA pour les factures assujetties à cette taxe,
correspondant aux frais exposés par la société SPINEWAY pour la négociation de la
promesse, sa conclusion ainsi que pour la réalisation des audits ;

• **CONDAMNER** la société STRATEGOS GROUP LLC au paiement de l'intégralité des
coûts de l'arbitrage, y compris les honoraires et/ou débours dus à Swiss Chambers'
Arbitration Institution et au Tribunal arbitral et avancés par la société SPINEWAY ;

• **CONDAMNER** la société STRATEGOS GROUP LLC au paiement tous les frais de la
société SPINEWAY en lien avec la présente procédure arbitrale, ainsi que les
honoraires des conseils de la société SPINEWAY. »


22. Lors de sa plaidoirie finale du 7 septembre 2021 (ci-après : **Plaidoiries finales**) et
conformément au ch. 16 s. de l'OP n° 3 la Demanderesse a déposé, sous forme de
document écrit, les conclusions suivantes[11] :

« Vu le Règlement,

Vu les articles 1304, 1304-2, 1304-3, 1304-7 1352-6 et 1352-7 du Code civil
français,

Vu la jurisprudence citée,

Vu les pièces, déclarations écrites et rapports d'expertise,


• **DIRE et JUGER** qu'aucun accord de partenariat n'a été conclu entre la société
SPINEWAY et la société STRATEGOS GROUP LLC (avant le 19 septembre 2019);

• **CONSTATER ET/OU PRONONCER** la résolution de la promesse synallagmatique
de vente d'achat du 19 mars 2019, de son avenant n°1 du 3 mai 2019 et de son
avenant n°2 du 16 mai 2019, en application de l'article 3.4 de la promesse, laissée
inchangée par les deux avenants ;

---

[11]   Conclusions de la Demanderesse du 7 septembre 2021, Act. 31b, reproduites in :
       Plaidoiries finales, Verbatim, p. 133, l. 13 à p. 134 l. 18 (la reproduction comporte
       toutefois certaines erreurs).

• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY la somme en principal de 4.160.000 € (quatre millions cent soixante mille euros), au titre du prix partiel versé en exécution de la promesse et de ses avenants, outre intérêts au taux légal à compter du 16 octobre 2019, date d'accomplissement de la clause/condition résolutoire ;

• **DONNER ACTE** à la société SPINEWAY qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la société STRATEGOS GROUP LLC l'intégralité des parts A et des parts B du fonds Integral Medical Solutions Fund, et ce dans un délai d'un mois après avoir reçu l'intégralité de la somme de 4.160.000 € (quatre millions cent soixante mille euros), outre intérêts au taux légal ;

• **CONDAMNER** la société STRATEGOS GROUP LLC à verser à la société SPINEWAY la somme de 252.329,21 € [deux cent cinquante mille [sic] trois cent vingt-neuf euros et vingt et un centimes] outre la TVA pour les factures assujetties à cette taxe, correspondant aux frais exposés par la société SPINEWAY pour la négociation de la promesse, sa conclusion ainsi que pour la réalisation des audits ;

• **CONDAMNER** la société STRATEGOS GROUP LLC au paiement de l'intégralité des coûts de l'arbitrage, y compris les honoraires et/ou débours dus à Swiss Chambers' Arbitration Institution et au Tribunal arbitral et avancés par la société SPINEWAY ;

• **CONDAMNER** la société STRATEGOS GROUP LLC au paiement tous les frais [sic] de la société SPINEWAY en lien avec la présente procédure arbitrale, ainsi que les honoraires des conseils de la société SPINEWAY. »

23. Le 30 septembre 2021, lors du dépôt de l'état de frais rectificatif, à la suite d'une note d'honoraires et de frais modifiée provenant de la sténotypiste, la Demanderesse a déposé des conclusions en matière de frais et honoraires en demandant qu'il[12] :

« Plaise au Tribunal arbitral

- Condamner la société Strategos Group LLC à payer à la société Spineway SA les montants de CHF 23'424.70 (ou la contrevaleur, soit EUR 21'480.45) et EUR 110'857.06 (ou la contrevaleur, soit CHF 122'345.17) à titre de frais et honoraires ; et

---

[12]   Dem-Etat de frais rectificatif, p. 4.

*- Condamner la société Strategos Group LLC à payer à la société Spineway SA le montant de CHF 128'000.- (ou la contrevaleur, soit EUR 117'376.--) à titre d'honoraires et/ou débours de la Swiss Chambers' Arbitration Institution et du Tribunal arbitral et avancés par la société Spineway SA. »*

## B. Conclusions de la Défenderesse

24. La Défenderesse, qui a fait défaut tout au long de la procédure, n'a pas pris de conclusions.

---

Partie de page intentionnellement laissée blanche

---

# IV.   Histoire procédurale

25. La procédure arbitrale a été initiée et s'est déroulée chronologiquement de la manière suivante.

26. Le 14 septembre 2020, la Demanderesse a adressé une notification d'arbitrage (ci-après : **Notification d'arbitrage**) – intitulée *« Demande d'arbitrage »* et accompagnée de 35 pièces – au Swiss Arbitration Centre (appelé, jusqu'au 1er juin 2021, Swiss Chambers' Arbitration Institution – SCAI ; pour la clarté du propos, la sentence utilise uniformément la désignation du successeur juridique actuellement actif : « Swiss Arbitration Centre »).

27. Le 15 septembre 2020, le secrétariat du Swiss Arbitration Centre (ci-après : **le Secrétariat**) a accusé réception de la Notification d'arbitrage et a envoyé celle-ci par coursier à la Défenderesse avec son chargé de pièces, en lui fixant un délai de 30 jours pour soumettre une réponse à la Notification d'arbitrage ; le Secrétariat a également fixé un délai de 30 jours aux parties pour désigner conjointement un arbitre unique. L'envoi par coursier a été remis à la Défenderesse le 17 septembre 2020.

28. Le 27 octobre 2020, n'ayant pas reçu de réponse de la part de la Défenderesse et en l'absence d'une désignation conjointe d'un arbitre unique, le Secrétariat a informé les Parties qu'en application de l'art. 3(12) du Règlement d'arbitrage, il allait saisir la Cour d'arbitrage (ci-après : **la Cour**) pour décision à propos de l'administration de la procédure et pour la nomination de l'arbitre unique conformément à l'art. 7(3) du Règlement d'arbitrage.

29. Le 6 novembre 2020, le Secrétariat a informé que la Cour avait décidé d'administrer la présente procédure et allait procéder à la nomination de l'arbitre unique et a invité la Demanderesse à verser une avance provisoire de CHF 10'000.-.

30. Le 27 novembre 2020, le Swiss Arbitration Centre a accusé réception du paiement de l'avance de CHF 9'994.-, a informé les Parties que la Cour avait nommé l'Arbitre unique, et que le dossier avait été transmis à celui-ci.

31. Le 1er décembre 2020, le Tribunal arbitral a adressé un premier courriel aux Parties en leur décrivant les prochaines étapes de la procédure et en leur demandant d'en accuser réception. La Demanderesse a accusé réception le lendemain, au contraire de la Défenderesse qui n'a jamais accusé réception.

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

32. Le 10 décembre 2020, le Tribunal arbitral a fixé par courrier un délai pour le versement d'une avance de frais, répartie à hauteur de 50% par partie. Le courrier en question a été adressé par courriel aux représentants des deux parties, soit Me Canonica et Me Bertrand pour la Demanderesse (rcanonica@cvpartners.ch et ebertrand@lamy-lexel.com) et à M. Luc Gérard pour la Défenderesse (luc.gerard@tribeca.com.co). Le serveur de l'adresse électronique utilisée pour la Défenderesse a accusé réception du courriel. En outre, pour s'assurer de la réception par la Défenderesse, le courrier a également été adressé par coursier à l'adresse de la Défenderesse (2701 Centerville Road, Wilmington, 19808 Delaware, USA). L'envoi par coursier était accompagné d'un courrier explicatif en anglais spécifiant que les documents annexés relevaient d'une procédure d'arbitrage en cours, ceci afin de permettre le traitement du document par le secrétariat de la Défenderesse, au cas où celui-ci ne maîtriserait pas le français. Le système Track&Trace du coursier a confirmé la remise du courrier le 14 décembre 2020. Sauf mention expresse, ce système de notification (courriel aux deux parties et envoi par coursier à la Défenderesse) a été utilisé pour toutes les communications adressées par le Tribunal arbitral aux Parties.

33. Le 11 décembre 2020, le Tribunal arbitral a reçu le montant de CHF 9'970.84 de la part du Swiss Arbitration Centre.

34. Le 23 décembre 2020, le Tribunal arbitral a reçu le montant de CHF 51'000.- de la part de la Demanderesse.

35. Le 28 décembre 2020, le Tribunal arbitral a accusé réception de la part de l'avance de frais de la Demanderesse.

36. Le 4 janvier 2021, faute de paiement de la part de l'avance de frais par la Défenderesse, le Tribunal arbitral a fixé un délai pour le paiement du solde de l'avance de frais.

37. Le 28 janvier 2021, le Tribunal arbitral a reçu le montant de CHF 60'994.- de la part de la Demanderesse.

38. Le 29 janvier 2021, le Tribunal arbitral a accusé réception du solde de l'avance de frais.

39. Le 4 février 2021, le Tribunal arbitral a invité les Parties à se déterminer sur la conférence d'organisation de la procédure et sur le projet d'OP n° 1 concernant les RSP. Dans le même courrier, le Tribunal arbitral a précisé que le non-paiement de l'avance de frais n'empêchait pas la Défenderesse de participer à la procédure et a

expressément invité celle-ci à le faire. Cette invitation à participer à là procédure
adressée à la Défenderesse a généralement été répétée dans les courriers formels
adressés aux Parties.

40. Le 18 février 2021, la Demanderesse s'est déterminée dans le délai imparti par le
Tribunal arbitral. La Défenderesse ne s'est pas déterminée.

41. Le 22 février 2021, le Tribunal arbitral a précisé les modalités de la séance
d'organisation de la procédure en remettant un projet révisé d'OP n° 1 concernant
les RSP et de calendrier prévisionnel ainsi qu'un projet d'ordre du jour, invitant les
Parties à se déterminer à ce sujet.

42. Le 25 février 2021, la Demanderesse s'est déterminée par courriel. La Défenderesse
ne s'est jamais déterminée.

43. Le 1er mars 2021 a eu lieu, par visioconférence, la séance d'organisation de la
procédure. La Défenderesse n'a pas participé à la séance d'organisation de la
procédure.

44. Le 2 mars 2021, le Tribunal arbitral a adressé, par courriel uniquement, le procès-
verbal de la séance d'organisation de la procédure aux Parties, leur fixant un délai
au 12 mars 2021 pour faire part d'éventuels commentaires. Les Parties n'ont pas
adressé de commentaire.

45. Le 3 mars 2021, le Tribunal arbitral a adressé aux Parties l'OP n° 1 concernant les
RSP, ainsi que le calendrier prévisionnel de la procédure. L'envoi par coursier à la
Défenderesse contenait également le procès-verbal de la séance d'organisation de la
procédure.

46. Le 14 mars 2021, le Tribunal arbitral a communiqué au Swiss Arbitration Centre
l'OP n° 1 concernant les RSP, le calendrier prévisionnel de la procédure ainsi que le
PV de la séance d'organisation de la procédure.

47. Le 20 avril 2021, la Demanderesse a envoyé, par courriel et par coursier, son
mémoire de demande (ci-après : la **Demande**), accompagné de 32 pièces (Pièces
Dem-1 à Dem-32), de quatre témoignages écrits, d'un rapport d'expertise du Prof.
Nourissat (ci-après : l'**Expertise Nourissat**) et de neuf sources juridiques (Pièces
DemL-1 à DemL-9).

48. Le 21 avril 2021, la Demanderesse a renvoyé par recommandé la Demande au
Tribunal arbitral, car le département de sécurité du coursier avait bloqué l'envoi à
destination du Tribunal arbitral.

49.  Le 25 avril 2021, le Tribunal arbitral a accusé réception de la Demande par courriel et a rappelé que la Défenderesse devait déposer son mémoire de réponse d'ici au 7 juin 2021 ; le Tribunal arbitral a également invité la Défenderesse à se déterminer, dans son mémoire de réponse, sur la requête de production de document figurant dans la Demande.

50.  Le 27 avril 2021, la Demanderesse a remis au Tribunal arbitral la copie du bordereau du coursier ainsi que le suivi du tracking du coursier démontrant la remise de la Demande à la Défenderesse.

51.  Le 7 juin 2021, date fixée dans le calendrier prévisionnel pour l'envoi du mémoire de réponse par la Défenderesse, celle-ci n'a pas remis son mémoire de réponse.

52.  Le 7 juin 2021 également, le Swiss Arbitration Centre a informé les Parties, avec copie au Tribunal arbitral, que la Swiss Chambers' Arbitration Institution (SCAI) avait été transformée en une société anonyme et rebaptisée Swiss Arbitration Centre SA et que la procédure restait administrée selon le Règlement d'arbitrage.

53.  Le 13 juin 2021, respectivement le 14 juin 2021 pour l'envoi par coursier, se fondant sur l'art. 28 du Règlement d'arbitrage, le Tribunal arbitral a notifié l'OP n° 2 du 10 juin 2021 qui ordonne la poursuite de la procédure, adapte le calendrier prévisionnel en fixant un premier délai au 30 juin 2021 aux Parties pour requérir d'éventuelles mesures d'instruction et un second délai au 30 juin 2021 à la Défenderesse pour produire le document dont la production avait été requise par la Demanderesse ou pour se déterminer sur cette requête de production.

54.  Le 30 juin 2021, la Demanderesse s'est déterminée quant aux mesures d'instruction complémentaires. La Défenderesse ne s'est pas déterminée dans le délai fixé et n'a pas produit le document requis par la Demanderesse.

55.  Le 2 juillet 2021, le Tribunal arbitral a adressé un projet d'ordre du jour pour la séance d'organisation de la procédure, en fixant un délai aux Parties pour se déterminer à ce sujet.

56.  Le 9 juillet 2021, conformément au calendrier prévisionnel, une séance d'organisation de la suite de la procédure a eu lieu par visioconférence. La Demanderesse y a participé, la Défenderesse n'y a pas participé. Il existe un procès-verbal de la séance, remis aux Parties le 13 juillet 2021. Lors de cette séance, le Tribunal arbitral a fixé aux Parties un délai au 19 juillet 2021 pour se déterminer sur plusieurs questions relatives notamment à la notification des actes de procédure à la Défenderesse, aux

mesures d'instruction devant avoir lieu lors de l'audience des 7-8 septembre 2021, ainsi qu'au contenu du procès-verbal.

57. Le 19 juillet 2021, la Demanderesse s'est déterminée sur les sujets mentionnés au paragraphe précédent. La Défenderesse ne s'est pas déterminée.

58. Le 3 août 2021, le Tribunal arbitral a remis aux Parties un projet d'OP n° 3 concernant les directives d'audience, un projet d'OP n° 4 concernant les notifications additionnelles du dossier à la Défenderesse, une offre pour des services de sténotypie, ainsi qu'un échange de courriels avec le coursier. Il a fixé aux Parties un délai au 13 août 2021 pour se déterminer.

59. Le 5 août 2021, la Demanderesse s'est déterminée sur les sujets mentionnés au paragraphe précédent. La Défenderesse ne s'est pas déterminée.

60. Le 16 août 2021, le Tribunal arbitral a notifié aux Parties l'OP n° 3 concernant les directives d'audience (ci-après : **OP n° 3**) ainsi que l'OP n° 4 concernant les notifications additionnelles du dossier à la Défenderesse (ci-après : **OP n° 4**). Cette dernière ordonnance visait à tenter d'obtenir la participation de la Défenderesse en lui notifiant le dossier non seulement à son siège social en précisant l'identité de son « registered agent » mais aussi à l'adresse de son représentant en Colombie.

61. Le 7 septembre 2021 s'est tenue l'audience d'audition de témoins, d'administration des preuves et de plaidoiries finales (ci-après : l'**Audience du 7 septembre 2021**) à l'Hôtel Métropole, Quai Général-Guisan 23, 1204 Genève. L'audience a fait l'objet d'un verbatim qui fait partie du dossier[13]. Lors de cette audience, le Tribunal arbitral a prononcé la clôture de l'administration, à l'exception des éléments devant être encore échangés, notamment pour les frais et dépens[14].

62. Lors de l'audience du 7 septembre 2021, le Tribunal arbitral a invité les Parties à communiquer leurs états des frais en fixant un délai à cette fin. La Demanderesse s'est déterminée le 21 septembre 2021, puis a rectifié son état des frais le 30 septembre 2021, alors que la Défenderesse ne s'est pas déterminée.

63. Le 21 septembre 2021, la Demanderesse a requis une prolongation de délai pour communiquer une version non tronquée des sources juridiques utilisées dans

---

[13]    Act. 39b.
[14]    Verbatim, p. 110, l. 1-3.

l'Expertise Nourissat et réclamée par le Tribunal arbitral lors de l'Audience du 7 septembre 2021. Le Tribunal arbitral a admis la requête.

64.   Le 27 septembre 2021, la Demanderesse a remis une version plus lisible des sources juridiques utilisées dans l'Expertise Nourissat.

65.   Le 28 septembre 2021, le verbatim de l'audience du 7 septembre 2021, finalisé et revu tant par les Parties que par le Tribunal arbitral, a été communiqué aux Parties.

66.   Le 30 septembre 2021, la Demanderesse a remis un état de frais rectificatif, à la suite d'une note d'honoraires et de frais modifiée provenant de la sténotypiste.

67.   Le 5 octobre 2021, la Demanderesse a confirmé n'avoir aucun commentaire sur le transcript de l'audience du 7 septembre 2021.

68.   Le 28 octobre 2021, le Tribunal arbitral a notifié aux Parties l'OP n° 5 concernant la clôture de la procédure (ci-après : **OP n° 5**), dans laquelle il a prononcé la clôture des débats conformément à l'art. 29 al. 1 du Règlement d'arbitrage et au ch. 13 de l'OP n° 1.

69.   Le 27 décembre 2021, le Tribunal arbitral a soumis le projet de sentence au Secrétariat du Swiss Arbitration Centre conformément à l'art. 40 al. 4 du Règlement d'arbitrage.

70.   Le 14 janvier 2022, le Secrétariat a informé le Tribunal arbitral de la position de la Cour et a invité le Tribunal arbitral à lui faire parvenir un original de la sentence, conformément à l'art. 32 al. 6 du Règlement d'arbitrage.

Partie de page intentionnellement laissée blanche

## V.   Faits et positions des parties

71. Le Tribunal arbitral a pris connaissance de l'intégralité du dossier, y compris mais pas uniquement des écritures, des pièces, des témoignages écrits, de l'expertise, du procès-verbal de l'Audience du 7 septembre 2021 qui comprend les plaidoiries finales, des états de coûts. La sentence arbitrale ne citera pas nécessairement tous les documents consultés par le Tribunal arbitral mais s'appuiera sur ceux ayant permis de trancher le litige.

72. Cette section résume, dans un ordre chronologique, les principaux faits pertinents. Dans la mesure où des faits sont contestés, nécessitent une discussion particulière ou sont pertinents pour un aspect particulier de la discussion et de la décision du Tribunal arbitral, ils seront mentionnés spécifiquement ou répétés dans la section consacrée à la discussion juridique (*infra* N 126 ss).

## A. Personnes/Entités impliquées

73. **SPINEWAY SA** est la **Demanderesse**. Il s'agit d'une société anonyme à conseil d'administration de droit français, fondée en 2005, dont le siège est à Ecully (France), qui a pour activité la conception, la fabrication et la commercialisation, en France et dans le monde, de gammes d'implants et d'ancillaires chirurgicales destinées à traiter les pathologies de la colonne vertébrale[15].

74. **STRATEGOS GROUP** est la **Défenderesse**. Il s'agit d'une société de l'État du Delaware (USA), qui a son siège social à 2701 Centerville Road, Wilmington, 19808 Delaware, États-Unis, qui est immatriculée sous le numéro 6859944[16]. Selon la Demanderesse, la Défenderesse est représentée par Monsieur Luc GERARD NYAFE (ci-après : **L. GERARD**).

---

[15]   Pièce Dem-1, p. 1 s. ; Demande, all. 1 ; Plaidoiries finales, Verbatim, p. 111, l. 25-29.

[16]   Pièce Dem-1, p. 3 ss ; Demande, all. 2 ; Plaidoiries finales, Verbatim, p. 111, l. 11-24.

## B.  Période précédant la conclusion du Contrat

75.  En 2018, Monsieur Stéphane LE ROUX (ci-après : **S. LE ROUX**), président de la Demanderesse, a fait la connaissance de L. GERARD, propriétaire – notamment à travers la Défenderesse – de plusieurs entreprises dans l'énergie, les matières premières et la santé[17]. Une première rencontre a eu lieu entre les deux hommes, à Paris, Gare de Lyon[18].

76.  Lors de ces contacts, la Défenderesse, représentée par L. GERARD, était en train de constituer un fonds de titrisation de droit luxembourgeois NATIONAL CLINICS (ci-après : le **Fonds**), qu'elle allait détenir à 100% ; le compartiment A du Fonds devait notamment détenir 100% de LA National LLC (Latin America National Clinics), une société qui aurait elle-même détenue majoritairement la société NCC (National Clinics Colombia) SAS, laquelle détenait plusieurs cliniques en Colombie[19].

77.  Durant leurs discussions, qui ont eu lieu en novembre ou décembre 2018[20], S. LE ROUX et L. GERARD ont prévu de rapprocher la Demanderesse et la Défenderesse par une prise de participation de la Demanderesse dans une des sociétés détenues par L. GERARD[21].

78.  Le 18 décembre 2018, le Fonds et la Demanderesse ont rédigé une présentation conjointe, en anglais, intitulée *« Business Rationale – Executive Summary »* pour définir les principaux objectifs de chacune des Parties[22]. Cette présentation prévoyait, comme un des objectifs principaux pour la Demanderesse, le fait d'accélérer l'accroissement des ventes de la Demanderesse et un retour en termes de profitabilité centré sur un axe historique : l'Amérique latine[23].

79.  Le 21 décembre 2018, la Demanderesse a adressé à la Défenderesse une *« Lettre d'intérêt relative à l'ouverture de discussions entre les Groupes Strategos et Spineway »*, qui envisage une opération de rapprochement capitalistique et/ou

---

17   TEM-Le Roux, p. 2 s. ; PV-Le Roux, Verbatim, p. 21, l. 11-16.
18   PV-Le Roux, Verbatim, p. 19, l. 24-27.
19   Pièce Dem-5, p. 25, Annexe 1 ; Demande, all. 9 s. ; TEM-Le Roux, p. 2 ; PV-Le Roux, Verbatim, p. 20, l. 9 à p. 21, l. 2.
20   PV-Le Roux, Verbatim, p. 21, l. 20.
21   TEM-Le Roux, p. 3 ; PV-Le Roux, Verbatim, p. 21, l. 11-16.
22   Pièce Dem-3 ; TEM-Le Roux, p. 3.
23   Pièce Dem-3. Eg. Plaidoiries finales, Verbatim, p. 112, l. 22 ss.

industriel, en particulier avec la société LA National LLC[24]. Cette lettre a été contresignée par L. GERARD, qui a ajouté à la main « *Bon pour accord sur les termes de la présente lettre* »[25].

80. S'en est suivi une négociation menée, du côté de la Demanderesse, par S. LE ROUX, D. SIEGRIST et le conseil juridique de la Demanderesse ; la Défenderesse était, elle aussi, représentée par un conseil juridique établi à Paris[26].

## C. Conclusion du Contrat et début d'exécution du Contrat

81. Le 19 mars 2019, les Parties ont conclu une « *Promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente* » (ci-après : **le Contrat**), signée par S. LE ROUX pour la Demanderesse et par L. GERARD pour la Défenderesse[27].

82. Selon l'art. 2.1 du Contrat, « *[l]e Cédant [la Défenderesse] s'engage expressément et irrévocablement à céder au Cessionnaire [la Demanderesse], et le Cessionnaire s'engage expressément et irrévocablement à acquérir du Cédant, en plusieurs fois, dans un délai initial de 36 mois [...] 52% des Parts du Fonds [...] lorsque celui-ci lui en fera la demande, dans les conditions de la présente Promesse et en particulier contre paiement du Prix partiel [...]. Au titre de l'acquisition du solde des Parts relatif à 48% du capital social du Fonds (par voie d'achat ou d'apport), le Cédant a consenti une promesse unilatérale de vente au Cessionnaire, avec faculté pour ce dernier de ne pas l'exercer. [...]* ».

83. Selon l'art. 3.1 du Contrat, celui-ci était conclu sous deux conditions suspensives, dont la formulation était la suivante :

« *La conclusion satisfaisante d'un audit juridique, comptable et financier réalisé à la demande du Cessionnaire sur la valeur du Fonds et précisément sur la valeur des actifs et des passifs du Fonds, étant convenu entre les Parties que la conclusion satisfaisante de l'audit est définie comme un audit réalisé par le cabinet Mazars (ou l'un de ses correspondants) conduisant à une valorisation du Fonds non inférieure de*

---

[24] Pièce Dem-4.
[25] Pièce Dem-4, p. 2.
[26] PV-Le Roux, Verbatim, p. 22, l. 1-27.
[27] Pièce Dem-5.

**Arbitrage**   **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                   Page 26 sur 83

plus de 15 % à celle retenue pour fixer le *Prix Total Initial des Parts du Fonds*, soit EUR 80.000.000 ».

« *L'obtention par le Cessionnaire d'un accord de principe par un ou plusieurs investisseurs privés portant sur le financement du Prix Partiel correspondant à l'Exercice Initial de la Promesse, soit la somme de quatre millions cent-soixante mille euros (4.160.000 €), et sa mise à disposition effective au Cessionnaire en conformité avec toute délibération nécessaire de l'assemblée générale des actionnaires et/ou du Conseil d'administration et son abondement effectif, immédiat ou à terme, tout au long de la Période d'Exercice.* »[28].

84. L'art. 3.4 du Contrat prévoit que : « *A titre de condition résolutoire de la Promesse, les Parties conviennent de conclure, dans un délai de six (6) mois à compter de la Date de la Promesse, un accord de partenariat commercial et de distribution des produits du Cessionnaire sur les zones d'activité du Cédant* [ci-après : **l'Accord de Partenariat** ou **Accord de Partenariat commercial**]. *A défaut de conclusion effective de cet accord, pour des raisons autres que le simple refus du Cessionnaire de signer le contrat de partenariat équilibré proposé par le Cédant, dans le délai de six (6) mois (sauf prolongation de ce délai d'un commun accord entre les Parties), la présente Promesse sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre* »[29].

85. Selon l'art. 5.1 du Contrat, « *le paiement partiel résultant de l'Exercice initial de la Promesse sera échelonné en quatre (4) paiements prévus aux dates suivantes :*

- *au premier Jour Ouvré suivant la levée des Conditions suspensives : 1.000.000 d'euros ;*

- *au dernier Jour Ouvré du mois suivant la levée des Conditions suspensives : 1.000.000 d'euros ;*

- *au dernier Jour Ouvré du 2ᵉ mois suivant la levée des Conditions suspensives : 1.000.000 d'euros ;*

[28] Pièce Dem-5, art. 3.1.
[29] Pièce Dem-5, art. 3.4.

- au dernier Jour Ouvré du 3e mois suivant la levée des Conditions suspensives : 1.160.000 d'euros. »[30], soit un total de EUR 4'160'000.- »[31].

86. Selon l'art. 10.1 du Contrat, « [l]a Promesse est régie et interprétée conformément au droit français »[32].

87. Le 20 mars 2019, la Demanderesse a publié un communiqué de presse intitulé « Projet d'acquisition majeure en Amérique latine », qui précise que « [c]ette prise de participation devrait permettre à Spineway de renforcer ses positions sur l'Amérique Latine et d'accélérer significativement ses ventes sur la zone grace [sic] à la mise en place, dans les six prochains mois, d'un accord de partenariat. Cet accord étant une clause résolutoire de la Promesse »[33].

88. Le 3 mai 2019, les Partes ont conclu l'« Avenant numéro un à la promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente conclue le 19 mars 2019 » (ci-après : **l'Avenant n° 1**), qui modifiait notamment l'art. 3.1 du Contrat en rallongeant de sept jours le délai initial de 45 jours, en le faisant passer à 52 jours[34].

89. Du 26 avril 2019 au 17 mai 2019, trois rapports d'audit sur les différentes entités entrant dans le champ de l'opération concluaient à l'absence de points réellement bloquants[35].

90. Le 16 mai 2019, après avoir pris acte de ces rapports d'audit, les Parties ont conclu l'« Avenant numéro deux à la promesse synallagmatique de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale de vente conclue le 19 mars 2019 » (ci-après : **l'Avenant n° 2**), modifiant plusieurs dispositions du Contrat[36].

91. L'Avenant n° 2 introduisait notamment un nouvel art. 3.5 du Contrat disant que « [l]e Cessionnaire reconnaît que l'audit notamment juridique, comptable et financier effectué par ses soins a donné entière satisfaction au Cessionnaire à l'exception

---

[30]    Pièce Dem-5, art. 5.1.
[31]    Demande, all. 19.
[32]    Pièce Dem-5, art. 10.1.
[33]    Pièce Dem-6.
[34]    Pièce Dem-7.
[35]    Demande, all. 27; cf. Pièces Dem-8, Dem-9 et Dem-10.
[36]    Pièce Dem-11.

*exclusive de la liste des difficultés visées dans l'annexe 8 Bis et sous réserve de l'adoption du nouveau Prix Total Initial et du nouveau prix total pour 100% des Parts du Fonds, rendant caduque la condition suspensive visée à l'article 3.1. »*[37]

92. L'Avenant n° 2 indiquait la nouvelle dénomination du Fonds, à savoir *« Integral Medical Solutions Fund »*[38], le nombre total de parts composant le Fonds passait de 80'000 à 60'000[39], et le montant du capital du Fonds passait de 80 millions d'euros à 60 millions d'euros[40].

93. L'Avenant n° 2 modifiait l'échéancier du paiement initial contenu dans l'art. 5.1 du Contrat, à savoir :

    - *«au jour de la signature de l'Avenant 2 : 1.000.000 d'euros ;*

    - *au dernier Jour Ouvré du mois suivant le jour de la signature de l'Avenant 2 : 1.000.000 d'euros ;*

    - *au dernier Jour Ouvré du 2e mois suivant le jour de la signature de l'Avenant 2 : 1.000.000 d'euros ;*

    - *au dernier Jour Ouvré du 3e mois suivant le jour de la signature de l'Avenant 2 : 1.160.000 d'euros. »*[41].

94. L'Avenant n° 2 n'a en revanche pas modifié l'art. 3.4 du Contrat, qui prévoyait la condition résolutoire portant sur la signature d'un Accord de Partenariat (*supra* N 84)[42].

95. Toujours 16 mai 2019, en vertu du Contrat et des Avenants n° 1 et n° 2, la Demanderesse s'est vu transférer 750 parts A et 250 parts B du Fonds[43], en contrepartie du versement d'un million d'euros[44].

96. Par la suite, la Demanderesse a honoré les quatre échéances du paiement initial prévues à l'art. 5.1 du Contrat (*supra* N 93)[45].

---

[37]  Pièce Dem-11, p. 4.
[38]  Pièce Dem-11, p. 3, art. 1.
[39]  Pièce Dem-11, p. 3, art. 2, Parts A et B, et p. 8, art. 10.
[40]  Pièce Dem-11, p. 8, art. 10.
[41]  Pièce Dem-11, p. 5, art. 4.
[42]  Pièce Dem-11.
[43]  Pièces Dem-13.
[44]  Pièces Dem-12.
[45]  Pièces Dem-12, Dem-14, Dem-16 et Dem-18.

97. Le 1ᵉʳ juillet 2019, la Demanderesse s'est vu transférer 750 parts A et 250 parts B du Fonds[46], en contrepartie du versement d'un million d'euros effectué le 5 juillet 2019[47].

98. Le 1ᵉʳ août 2019, la Demanderesse s'est vu transférer 750 parts A et 250 parts B du Fonds[48], en contrepartie du versement d'un million d'euros effectué le 31 juillet 2019[49]

99. Le 4ᵉᵐᵉ bulletin, daté du 2 octobre 2019, n'a été transmis que le 17 juillet 2020 après de multiples relances de la part de la Demanderesse[50].

100. Entre le 28 mai 2019 et l'automne 2019, les Parties ont échangé et se sont rencontrés notamment pour concrétiser le partenariat et pour conclure l'Accord de Partenariat visé à l'art. 3.4 du Contrat (*supra* N 84)[51].

101. A la fin du mois de mai 2019, du 28 au 31 mai 2019[52], S. LE ROUX, PDG de la Demanderesse, s'est rendu en Colombie, accompagné de D. SIEGRIST, de P. CHABERT et de F. LAUCK, pour rencontrer L. GERARD et ses équipes[53].

102. P. CHABERT affirme avoir eu pour mission de discuter les possibilités de synergies entre la Demanderesse et la Défenderesse ou le Fonds en matière de Supply Chain[54].

103. F. LAUCK affirme avoir eu pour mission de prendre contact avec les responsables de National Clinics Colombia SAS, en particulier la responsable du service d'investigation clinique basée à l'Hôpital San Rafael pour présenter les besoins de la Demanderesse en matière d'investigations cliniques[55].

104. Le 3 juin 2019, S. LE ROUX adressait un courriel à L. GERARD en affirmant notamment « [...] *Nous avons pu identifier plusieurs synergies porteuses de vente*

---

[46]   Pièce Dem-15.
[47]   Pièce Dem-14.
[48]   Pièce Dem-17.
[49]   Pièce Dem-16.
[50]   Pièce Dem-31, p. 3 ss.
[51]   TEM-Le Roux, p. 4 ; PV-Le Roux, Verbatim, p. 16, l. 8 ss (pour la première date).
[52]   TEM-Le Roux, p. 4 s. ; PV-Le Roux, Verbatim, p. 26, l. 19-25.
[53]   TEM-Le Roux, p. 4 ; PV-Le Roux, Verbatim, p. 16, l. 8 ss à p. 17. l. 5 et p. 26, l. 18 ss à p. 27, l. 13 ; TEM-Siegrist, p. 2 ; PV-Siegrist, Verbatim, p. 101, l. 1-4 ; TEM-Chabert, p. 2 ; PV-Chabert, Verbatim, p. 89, l. 13-31 ; TEM-Lauck, p. 2 ; PV-Lauck, Verbatim, p. 75 l. 7-27.
[54]   TEM-Chabert, p. 2 ; PV-Chabert, Verbatim, p. 89, l. 12-31.
[55]   TEM-Lauck, p. 2 ; PV-Lauck, Verbatim, p. 78, l. 2-5 et p. 79, l. 14-18.

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                          Page 30 sur 83

*(tes equipes te feront retour j'en suis sur). Quelques recherches sont en cours au sein des equipes, et nous pourrons sous quelques jours appliquer des coefficients priorité en fonction de CA potentiel et facilité de mise en œuvre pour plusieurs axes de développements. Ceci devrait permettre de signer rapidement un accord de partenariat.* [...] *»* (sic) ; le courriel évoquait aussi le besoin d'aligner la stratégie financière pour les prochaines semaines/mois[56].

105. Le 4 juin 2019, L. GERARD répondait au courriel du 3 juin 2019 dans lequel il s'exprimait sur le financement, mais aussi sur les éléments de l'Accord de partenariat[57].

106. De juin 2019 à septembre 2019, les contacts électroniques entre les Parties ont porté sur le financement et divers autres sujets[58], sans que l'Accord de Partenariat n'ait fait l'objet d'échanges approfondis, ce qui entraînait une inquiétude dans les courriels de la Demanderesse[59].

107. Le 17 septembre 2019, S. LE ROUX de la Demanderesse écrivait encore à Juan Tobar du groupe de la Défenderesse pour lui expliquer que la Demanderesse disposait d'un certificat européen ISO équivalent au standard américain GMP et lui demandait d'expliquer comment NCC [National Clinics Columbia] prévoyait d'importer les produits de la Demanderesse[60].

108. Avant le 19 septembre 2019, les Parties ne sont pas parvenues à conclure l'Accord de Partenariat prévu par l'art. 3.4 du Contrat (*supra* N 84).

## D. Invocation de la réalisation de la condition résolutoire par la Demanderesse

109. Le 16 octobre 2019, la Demanderesse, par le biais de S. LE ROUX, a écrit à la Défenderesse, à l'adresse de L. GERARD à Bogota, en lui rappelant le contenu de

---

[56]   Pièce Dem-19 ; PV-Le Roux, Verbatim, p. 28, l. 27 à p. 29, l. 11.
[57]   Pièce Dem-20 ; pour l'accord de partenariat, Pièce Dem-20, ch. 6 et PV-Le Roux, Verbatim, p. 30, l. 9-15.
[58]   P.ex. PV-Lauck, Verbatim, p. 75 l. 21 ss à p. 76 l. 22.
[59]   Pièce Dem-21, p. 1 ss, en particulier p. 18 ; PV-Le Roux, Verbatim, p. 32, l. 15 à p. 34 l. 18.
[60]   Pièce Dem-22.

l'art. 3.4 du Contrat, en indiquant avoir fait les meilleurs efforts au cours des derniers mois aux fins de parvenir à l'Accord de Partenariat commercial, mais en soulignant qu'au grand désarroi de la Demanderesse, aucune proposition concrète n'avait permis d'aboutir à un tel Accord de Partenariat dans le délai indiqué à l'art. 3.4 du Contrat. Par conséquent, constatant cette absence, la Demanderesse était au regret de mettre en jeu l'art. 3.4 du Contrat et notifiait à la Défenderesse la résolution du Contrat[61]. Enfin, le courrier précisait que la Demanderesse procéderait, le 23 octobre 2019, à la signature des ordres de mouvement visant à transférer la propriété des 2250 parts A et 750 parts B du Fond déjà acquises et correspondant aux trois premiers versements de 1 million d'euros réalisés et soulignait qu'en dépit du versement de 1,16 million d'euros prévu à l'art. 5.1 du Contrat, la Demanderesse n'avait pas reçu les ordres des parts A et B du Fonds y afférents. Enfin, le courrier remerciait la Défenderesse de procéder au virement de 4,16 millions d'euros correspondant à l'ensemble des sommes versées au titre de paiement partiel à compter du 23 octobre 2019, et avant le 6 novembre 2019[62].

110. Le même jour, S. LE ROUX a adressé à L. GERARD un courriel comprenant le courrier décrit ci-dessus. Ce courriel comprend une indication que le contenu du message avait déjà été annoncé la veille lors d'une conversation téléphonique[63].

111. Le 18 octobre 2019, la Défenderesse aurait répondu en informant la Demanderesse que son conseil allait adresser de manière imminente un courrier[64].

112. Le 21 octobre 2019, le courrier du 16 octobre 2019, envoyé le 17 octobre 2019, a été délivré à l'adresse mentionnée[65].

113. Le 6 novembre 2019, la Demanderesse a adressé un courriel à la Défenderesse qui indiquait que dix-huit jours avaient passé sans réponse, que le Contrat était clair en prévoyant comme condition résolutoire la conclusion d'un Accord de Partenariat commercial, qu'en l'absence d'un tel Accord de Partenariat, le Contrat était « résilié *de facto* » et que les Parties devraient restituer les prestations. S. LE ROUX indiquait

---

[61]    Pièce Dem-23.
[62]    Pièce Dem-23, p.2.
[63]    Pièce Dem-25.
[64]    Pièce Dem-26.
[65]    Pièce Dem-24.

vouloir récupérer les sommes versées sans délai et compter sur un retour très rapide de L. GERARD[66].

## E.  **Discussions postérieures**

114. Le 28 novembre 2019, la Défenderesse a pris position, par courriel et par courrier recommandé, en se déclarant surprise tant sur la forme que sur le fond[67]. Sur la forme, la Défenderesse souligne que les Parties ont eu de nombreux contacts (réunions et conférences téléphoniques) au cours des derniers mois (mai à septembre 2019), sans que la Demanderesse n'ai pris la peine d'évoquer sa volonté de notifier la résolution du Contrat. Sur le fond, la Défenderesse est d'avis que l'interprétation que fait la Demanderesse de la condition résolutoire contenue à l'art. 3.4 du Contrat la rend potestative et donc nulle et de nul effet[68]. La Défenderesse affirme en outre que[69] :

   - de nombreuses réunions et discussions ont eu lieu soit par téléphone, soit *de visu* pour parvenir à un Accord de Partenariat en bonne et due forme, notamment une réunion du 29 au 31 mai à Bogota, lors de laquelle les résultats financiers et opérationnels des sociétés du groupe National Clinics Centenario ont été présentés, chacune des Parties ayant par la suite pu échanger sur les budgets définis pour 2019 dans le cadre d'un futur partenariat ;

   - à l'issue de cette réunion, les Parties ont défini un business plan, aux termes duquel il était convenu que NCC partage avec la Demanderesse la base de données concernant tous les achats d'appareils de chirurgie de la colonne vertébrale entre 2018 et 2019, le tout dans le cadre d'un futur partenariat ;

   - à l'issue de cette réunion, S. LE ROUX aurait confirmé par courriel *« qu'il existait bien plus de synergies entre les deux sociétés que celles envisagées initialement »* ;

---

[66]   Pièce Dem-26.
[67]   Pièce Dem-27.
[68]   Pièce Dem-27.
[69]   Pièce Dem-27, p. 1 s.

- au mois de juin 2019, un paiement anticipé de 100 MM de COP a été payé à Osteomedical, distributeur de la Demanderesse en Colombie, pour les appareils achetés par NCC, dans le but de faciliter les négociations avec ce distributeur, cela dans la perspective du futur partenariat ;

- à la fin juin 2019, deux personnes ont pu visiter les établissements de la Demanderesse et passer en revue l'aspect opérationnel, le business plan et le fonctionnement de la Demanderesse dans la perspective du futur partenariat ;

- le 9 juillet 2019, S. LE ROUX a pu s'entretenir avec les dirigeants de NCC et faire un point sur le business établi entre les deux Parties ;

- l'équipe de recherches du HUCSR a pu revoir les études cliniques de la Demanderesse en vue de la certification européenne, échanges qui ont duré jusqu'au mois d'octobre 2019, toujours dans la perspective d'un partenariat ;

- S. LE ROUX a pu rencontrer le Dr Diaz, neurochirurgien du groupe de la Défenderesse, pour examiner les données chiffrées du marché de la chirurgie de la colonne vertébrale en Colombie, toujours dans la perspective du partenariat ;

- le 2 septembre 2019, NCC a transmis à la Demanderesse le bilan consolidé du groupe à juin 2019, alors que le bilan consolidé n'est en principe établi qu'une fois par an au mois de décembre ;

- NCC était, au mois de juillet 2019, en contact avec l'organisme public Invima pour examiner les exigences et le processus requis quant à la fabrication des produits à importer et à l'infrastructure permettant le stockage conformément aux normes applicables et au respect des processus et procédures qualité requis ; à ce titre, la Demanderesse a transmis le certificat de bonnes pratiques de fabrication le 16 septembre 2019 et les discussions avec Invima se sont poursuivies jusqu'à fin octobre 2019, toujours dans la perspective du partenariat ;

- dans le cadre du partenariat, les Parties ont mis en place des équipes de chirurgiens spécialisés dans la colonne vertébrale et disposés à travailler avec les cliniques publiques dans le cadre de forfaits de chirurgie offrant la meilleure efficacité et la plus grande compétitivité sur le marché colombien et ont élaboré ensemble des forfaits adaptés à chaque pathologie de la colonne vertébrale sur la base des matériaux et des prix d'usine de la Demanderesse ;

- dans le cadre du partenariat, la Défenderesse a assisté à un congrès les 17 et 18 octobre 2019 où des bureaux ont été loués pour présenter l'offre mise en place par les Parties aux principaux décideurs des établissements publics de santé ;

- dans le cadre du partenariat, une équipe marketing a été mise en place pour développer et promouvoir le site internet « Breaking News NCC-Spineway »[70].

115. Toujours dans le même courrier du 28 novembre 2019, la Défenderesse indique que les principes de l'accord commercial entre les Parties étaient finalisés mais, qu'à sa surprise, à compter de septembre 2019, la Demanderesse n'a aucunement contribué à rendre possible le partenariat contemplé, *« niant pratiquement systématiquement à répondre* [aux] *propositions* [de la Défenderesse] *ou à* [...] *aider* [la Défenderesse] *pour faire avancer le processus alors que [les Parties étaient] sur le point de parvenir à un accord final de partenariat commercial et de distribution »* (sic)[71].

116. La Défenderesse reprochait à la Demanderesse d'avoir fait croire à une négociation de bonne foi durant six mois pour se ménager la possibilité de solliciter la résolution du Contrat sur le fondement du défaut de signature d'un tel accord. *« L'interprétation de cette condition résolutoire comme une clause à votre main la rend incontestablement potestative et donc nulle de plano. »*[72].

117. La Défenderesse reprochait à la Demanderesse d'avoir mis en avant le partenariat avec NCC pour lever des fonds auprès d'investisseurs et d'avoir adopté dans les négociations une attitude déloyale et de mauvaise foi pour construire un argumentaire afin de solliciter la résolution du Contrat, après avoir tiré profit de l'aura que générait le partenariat en cours de négociation pour lever des fonds[73].

118. La Défenderesse concluait son courrier en indiquant qu'elle considérait que le Contrat continuait de produire ses effets et que la Demanderesse engageait sa responsabilité tant vis-à-vis du marché que vis-à-vis de la Défenderesse en n'exerçant pas les obligations auxquelles elle était tenue en vertu du Contrat[74].

---

[70]   Pièce Dem-27, p. 3.
[71]   Pièce Dem-27, p. 3.
[72]   Pièce Dem-27, p. 3.
[73]   Pièce Dem-27, p. 3.
[74]   Pièce Dem-27, p. 4.

119. Durant les semaines qui ont suivi, la Défenderesse et la Demanderesse n'ont effectué aucune démarche pour concrétiser cet accord, la Demanderesse tirant de cette inactivité l'argument que la Défenderesse considérait également le Contrat comme résolu.

120. La Défenderesse n'a pas procédé à la restitution des sommes versées par la Demanderesse[75].

121. Par courrier recommandé du 7 mai 2020 adressé à la Défenderesse et à L. GERARD, les conseils de la Demanderesse ont rappelé l'accomplissement de la condition résolutoire et l'anéantissement de la promesse et de ses avenants[76]. Ils ont souligné que, faute de solution amiable comprenant la restitution des actions actuellement détenues par la Demanderesse et celle de tout ou partie des 4,16 millions d'euros versés, la Demanderesse saisirait le tribunal arbitral.

122. Le 11 mai 2020, les conseils de la Demanderesse ont doublé leur communication du 7 mai 2020 au moyen d'un courriel[77].

123. Le dossier ne contient pas de réponse en provenance de la Défenderesse ou de L. GERARD[78].

124. C'est ce qui a conduit la Demanderesse, le 14 septembre 2020, à déposer la Notification d'arbitrage pour faire valoir ses droits[79].

125. La Demanderesse précise avoir engagé des frais et honoraires importants pour la négociation et la conclusion du Contrat, ainsi que pour les différents audits ; ces frais se chiffrent à EUR 252'329,21 HT[80].

---

[75] TEM-Le Roux, p. 5 s.
[76] Pièce Dem-28.
[77] Pièce Dem-29.
[78] Demande, all. 61.
[79] Notification d'arbitrage, Act. 1.
[80] Pièce Dem-8, Dem-9, Dem-10 ; Pièce Dem-30.

# VI.   Discussion

## A.   Compétence du Tribunal arbitral

126. Le Tribunal arbitral vérifie d'office sa compétence.

127. Les conclusions principales de la Demanderesse portent sur l'existence et la réalisation d'une condition ou clause résolutoire, ainsi que la restitution des prestations déjà effectuées à l'autre Partie et à des tiers, de telle sorte à remettre les Parties dans l'état dans lequel elles se trouvaient avant la conclusion du Contrat.

128. Vu l'art. 10.2 du Contrat, il se justifie d'interpréter ladite clause afin de déterminer si le Tribunal arbitral est compétent.

129. La **Demanderesse** admet la compétence de l'Arbitre unique[81], alors que la **Défenderesse** ne s'est pas déterminée.

130. La formulation de l'art. 10.2 du Contrat, qui prévoit que « [t]*ous différends découlant de la présente Promesse ou en relation avec celle-ci seront tranchés définitivement suivant le Règlement de Conciliation et d'Arbitrage de la Chambre de Commerce Internationale de Genève par un (1) arbitre nommé conformément à ce Règlement (cet arbitre étant ci-après désigné le « Tribunal Arbitral »).*
*Le Tribunal Arbitral sera constitué à Genève (Suisse) et l'arbitrage aura lieu en langue française.*
*Le Tribunal arbitral devra trancher le litige en application du droit français* »[82].

131. Afin de déterminer si le présent Tribunal arbitral est compétent, il convient d'interpréter l'art. 10.2 du Contrat. L'art. 10.2 du Contrat est clair en ce sens que le litige doit être tranché par un arbitre. Seule la référence aux règles devant régir la procédure arbitrale requiert une clarification : en effet, l'art. 10.2 du Contrat fait référence au « *Règlement de Conciliation et d'Arbitrage de la Chambre de Commerce internationale de Genève* ». Or il n'existe pas de Chambre de Commerce internationale de Genève. Il y a en revanche la Chambre de Commerce, d'Industrie

---

81    Demande, p. 4.
82    Pièce Dem-5, p. 24.

et des services de Genève (CCIG) qui a un règlement d'arbitrage international commun avec d'autres chambres de commerce suisses, le Règlement d'arbitrage.

132. Lors de son interrogatoire, S. LE ROUX a indiqué que les Parties voulaient un arbitrage avec un Tribunal arbitral avec un siège neutre à Genève, que le détail de la clause a été négocié par les conseils juridiques des Parties[83].

133. En interprétant l'art. 10.2 du Contrat, le Tribunal arbitral parvient à la conclusion que cette disposition prévoit la compétence d'un Tribunal ayant son siège à Genève et que la procédure peut être soumise au Règlement d'arbitrage.

134. Par conséquent, le Tribunal arbitral est compétent pour trancher les conclusions formulées dans la présente procédure d'arbitrage.

## B.   Généralités

### 1. Méthode et structure de la sentence

135. Pour trancher le litige au fond, le Tribunal arbitral va procéder en sept étapes successives :

- dans un premier temps, il va qualifier juridiquement le contrat et la clause pertinente (*infra* N 151 ss) ;

- dans un deuxième temps, le Tribunal arbitral va vérifier si cette clause est valide (*infra* N 169 ss) ;

- dans un troisième temps, le Tribunal arbitral va examiner si les conditions de la clause pertinente sont remplies (*infra* N 179 ss) ;

- dans un quatrième temps, le Tribunal arbitral va déterminer si les conséquences juridiques tirées par la Demanderesse sont bien celles qui correspondent à la clause (*infra* N 206 ss) ;

- dans un cinquième temps, le Tribunal arbitral va trancher si les conclusions formulées par la Demanderesse sont justifiées (*infra* N 217 ss et N 232 ss) ;

---

[83]    PV-Le Roux, Verbatim, p. 35, l. 20 à p. 36 l. 6.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 43 of 255 PageID #: 53

- dans un sixième temps, le Tribunal arbitral va se déterminer sur les éventuelles créances d'intérêts (*infra* N 248 ss) ;

- dans un septième temps, le Tribunal arbitral va régler la question des frais et dépens (*infra* N 261 ss).

### 2. Base, nature, prestations et rémunération contractuelles

#### a) Question

136. Il s'agit de déterminer la nature du Contrat ainsi que les prestations et le mode de rémunération convenus par les Parties.

#### b) Positions des Parties

137. La position de la **Demanderesse** peut être résumée comme suit:

- Par le Contrat, que la Demanderesse qualifie de promesse synallagmatique de vente, la Demanderesse s'engage à acquérir, sur une période de 35 mois (prolongeable) une part majoritaire, soit 52% du capital du Fonds avec une possibilité d'acquérir les 48% restants[84].

- La vente est consentie pour un prix fixe. Pour les 52% du capital du Fonds, les modalités de paiement se déclinent comme suit : 1 million d'euros doit être versé le 1er jour ouvré suivant la levée des conditions suspensives, 1 autre million d'euros le dernier jour ouvré du mois suivant la levée des conditions suspensives, puis un troisième million d'euros, enfin un montant de 1,16 millions d'euros doit être versé au dernier jour ouvré du troisième mois suivant la levée des conditions suspensives[85].

- Le Contrat est conclu sous deux conditions suspensives et il comporte également une « condition » résolutoire[86].

138. La **Défenderesse** ne s'est pas déterminée.

---

[84]   Plaidoiries finales, Verbatim, p. 113, l. 12-15.
[85]   Plaidoiries finales, Verbatim, p. 113, l. 16-26.
[86]   Plaidoiries finales, Verbatim, p. 113, l. 27-31.

#### c)  **Discussion**

139. Les bases contractuelles sont les suivantes. Il y a d'abord le Contrat, intitulé
*« Promesse synallagmatique de vente et d'achat sous conditions suspensives assortie
d'une promesse unilatérale de vente en date du 19 mars 2019 entre Strategos Group
LLC en qualité de Cédant et de Garant et Spineway SA en qualité de Cessionnaire »*[87].
Il y a ensuite l'Avenant n° 1, intitulé *« Avenant numéro un à la promesse
synallagmatique de vente et d'achat sous conditions suspensives assortie d'une
promesse unilatérale de vente conclue le 19 mars 2019 »* du 3 mai 2019[88]. Il y a
enfin l'Avenant n° 2, intitulé *« Avenant numéro deux à la promesse synallagmatique
de vente et d'achat sous conditions suspensives assortie d'une promesse unilatérale
de vente conclue le 19 mars 2019 »* du 16 mai 2019[89].

140. En vertu de ces bases contractuelles, en particulier l'art. 2.1 du Contrat, la
Défenderesse devait exécuter les prestations principales suivantes : elle devait céder
à la Demanderesse, en plusieurs fois, dans un délai initial de 36 mois, 52% des Parts
du Fonds lorsque la Demanderesse lui en fera la demande, dans les conditions du
Contrat et en particulier contre paiement du prix. Quant à l'acquisition du solde des
Parts relatif à 48% du capital social du Fonds (par voie d'achat ou d'apport), la
Défenderesse a consenti une promesse unilatérale de vente à la Demanderesse, avec
faculté pour celle-ci de ne pas l'exercer (art. 2.1 du Contrat).

141. En vertu de ces bases contractuelles, en particulier l'art. 5.1 du Contrat modifié par
l'Avenant n° 2, la Demanderesse devait payer le prix selon l'échéancier suivant : au
jour de la signature de l'Avenant 2 : 1 million d'euros ; au dernier Jour Ouvré du
mois suivant le jour de la signature de l'Avenant 2 : 1 million d'euros ; au dernier
Jour Ouvré du 2e mois suivant le jour de la signature de l'Avenant 2 : 1 million
d'euros ; au dernier Jour Ouvré du 3e mois suivant le jour de la signature de
l'Avenant 2 : 1,16 million d'euros[90].

142. Le Contrat était soumis à deux conditions suspensives figurant à l'art. 3.1 du
Contrat : la première concernait la conclusion satisfaisante d'un audit juridique,
comptable et financier, et la seconde l'obtention par la Demanderesse d'un accord de

---

[87]  Pièce Dem-5.
[88]  Pièce Dem-7.
[89]  Pièce Dem-11.
[90]  Pièce Dem-11, p. 5, art. 4.

principe sur le financement du prix de la transaction. L'Avenant n° 2 introduisait notamment un nouvel art. 3.5 du Contrat disant que la Demanderesse reconnaissait que l'audit juridique, comptable et financier effectué par ses soins avait donné satisfaction, ce qui rendait caduque la condition suspensive visée à l'art. 3.1 du Contrat[91]. Par conséquent, le Contrat pouvait déployer ses effets.

143. Le Contrat comprenait également, à l'art. 3.4 du Contrat, une clause prévoyant une « *condition résolutoire de la Promesse* », sur laquelle nous reviendrons plus loin dans la discussion (*infra* N 151 ss), mais qui n'influence pas la qualification du Contrat.

144. En définitive, le Tribunal arbitral considère que le Contrat pertinent pour le présent litige peut être qualifié de promesse synallagmatique de vente[92], conformément à l'intitulé du Contrat.

### 3. Droit applicable

#### d)   Question

145. Il s'agit de déterminer le droit applicable au Contrat.

#### e)   Positions des Parties

146. La position de la **Demanderesse** peut être résumée comme suit:

- Le droit français est applicable au Contrat[93].

147. La **Défenderesse** ne s'est pas déterminée.

#### f)   Discussion

148. L'art. 10.1 du Contrat prévoit que « [l]a *Promesse est régie et interprétée conformément au droit français* ». Le Contrat date du 19 mars 2019.

149. C'est donc le droit français, tel qu'il existe au 19 mars 2019, qui constitue le droit matériel de référence pour traiter du présent litige ; par conséquent, le droit français des obligations, tenant notamment compte des modifications intervenues en octobre

---

[91]   Pièce Dem-11, p. 4.
[92]   Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 42, l. 14 s.
[93]   Plaidoiries finales, Verbatim, p. 121, l. 16-18.

2016, est pertinent. Notons que l'Expertise Nourissat parvient à la même conclusion[94].

150. Par conséquent, le Tribunal arbitral décide que le droit français, en particulier le Code civil français (ci-après : **CCfr.**) dans sa version intégrant la réforme du CCfr. de 2016, est applicable.

## C.   Régime de l'art. 3.4 du Contrat

### 1.  Qualification de l'art. 3.4 du Contrat

#### a)   Question

151. Il s'agit de déterminer la nature de l'art. 3.4 du Contrat.

#### b)   Positions des Parties

152. La position de la **Demanderesse** peut être résumée comme suit:

- La Demanderesse se fonde sur l'Expertise Nourissat qui envisage tant la qualification de condition résolutoire que celle de clause résolutoire[95] et qui conclut au fait que les deux qualifications sont susceptibles d'être approuvées[96]. L'Expertise Nourissat parvient à la conclusion que ce conflit de qualification n'a aucune conséquence sur les effets puisque, dans les deux cas, cela aboutit à la remise des Parties dans l'état dans lequel elles se trouvaient avant la conclusion du Contrat[97]. La différence théorique repose sur le fait que le caractère prétendument potestatif de l'art. 3.4 du Contrat n'a aucun effet si la qualification de clause résolutoire est retenue pour cette disposition contractuelle[98].

- L'art. 3.4 du Contrat peut être qualifié soit de *condition* résolutoire, soit de *clause* résolutoire. La condition résolutoire est notamment prévue aux art. 1304, 1304-

---

94   EXP-Nourissat, N 5. Eg. PV-Nourissat, Verbatim, p. 42, l. 18-28.
95   Demande, p. 20 ; EXP-Nourissat, N 11 ss.
96   Demande, p. 21 ; EXP-Nourissat, N 30.
97   Demande, p. 22 ; EXP-Nourissat, N 11 et 31.
98   Demande, p. 22; EXP-Nourissat, N 11 i.f.

**Arbitrage**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale _____ Page 42 sur 83

> 2 et 1304-3 CCfr., alors que la clause résolutoire est notamment régie par les
> art. 1224, 1225 et 1229 CCfr.[99]

- La Demanderesse, suivant en cela les conclusions de l'Expertise Nourissat[100],
  privilégie la qualification de clause résolutoire plutôt que celle de condition
  résolutoire mais s'en remet à la décision du Tribunal arbitral[101].

- L'argument favorisant l'existence d'une clause (plutôt qu'une condition)
  résolutoire est formel et tient au fait que l'art. 3.4 du Contrat figure au point 3
  du Contrat qui porte sur les « effets » du Contrat[102]. En outre, l'art. 3.4 du
  Contrat correspond aux définitions de la clause résolutoire données par la
  doctrine ; les Parties voulaient, en signant l'art. 3.4 du Contrat, obtenir leur
  remise en état si l'hypothèse de l'art. 3.4 du Contrat se réalisait[103]. Le verbe
  « résilié » utilisé dans l'art. 3.4 du Contrat doit être lu comme s'il signifiait
  « résolu »[104].

153. La Défenderesse ne s'est pas déterminée dans la procédure. En se fondant sur les
     pièces figurant au dossier, la position de la **Défenderesse** peut être résumée en ce
     sens qu'elle n'envisage l'art. 3.4 du Contrat que sous l'angle de la condition
     résolutoire, à l'exclusion d'une qualification de clause résolutoire[105].

#### c)   **Discussion**

154. Il s'agit ici de qualifier juridiquement l'art. 3.4 du Contrat, dont le contenu est le
     suivant : « A titre de condition résolutoire de la Promesse, les Parties conviennent de
     conclure, dans un délai de six (6) mois à compter de la Date de la Promesse, un
     accord de partenariat commercial et de distribution des produits du Cessionnaire sur
     les zones d'activité du Cédant. A défaut de conclusion effective de cet accord, pour
     des raisons autres que le simple refus du Cessionnaire de signer le contrat de
     partenariat équilibré proposé par le Cédant, dans le délai de six (6) mois (sauf

---

[99]   Demande, p. 20 s. ; Plaidoiries finales, Verbatim, p. 122, l. 1-27.
[100]  EXP-Nourissat, N 19.
[101]  Plaidoiries finales, Verbatim, p. 114, l. 24-25.
[102]  Plaidoiries finales, Verbatim, p. 127, l. 17-21. Eg. Pièce Dem-5, p. 10 ss.
[103]  Plaidoiries finales, Verbatim, p. 127, l. 22-26.
[104]  Plaidoiries finales, Verbatim, p. 126, l. 27-33.
[105]  Pièce Dem-27, p. 1 et 3.

*prolongation de ce délai d'un commun accord entre les Parties), la présente Promesse
sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat
des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire
lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre »[106].*

155. Selon l'art. 1304 CCfr., « [l]*'obligation est conditionnelle lorsqu'elle dépend d'un
événement futur et incertain. La condition* [...] *est résolutoire lorsque son
accomplissement entraîne l'anéantissement de l'obligation* ». L'instruction de la
cause, et en particulier l'audition de l'Expert Nourissat, a permis de clarifier le fait
que cette disposition peut s'appliquer tant à une obligation qu'à une convention[107].

156. Selon l'art. 1224 CCfr., « [l]*a résolution résulte soit de l'application d'une clause
résolutoire, soit* [...]. ». Selon l'art. 1225 CCfr., [l]*a clause résolutoire précise les
engagements dont l'inexécution entraînera la résolution du contrat.* [...] ».

157. La doctrine qualifie la « condition résolutoire » comme étant celle qui *« permet aux
parties de subordonner le maintien de leur contrat à la non-réalisation d'un
événement déterminé. Si l'événement érigé en condition survient, le contrat sera
censé n'avoir jamais existé »[108]*.

158. Quant à la « clause résolutoire », elle *« a pour objet d'anticiper et d'organiser les
modalités d'une éventuelle résolution du contrat* [...]. *Le fait générateur de la
résolution est alors soit la volonté unilatérale de l'une des parties, soit la survenance
d'un événement incertain. De manière plus précise, la pratique ne qualifie de clauses
résolutoires que celles qui organisent l'anéantissement rétroactif du contrat, motif
pris de ce que l'un des contractants n'exécuterait pas ses obligations »[109]*.

159. La différence entre « condition » et « clause » résolutoire tient notamment au fait
que, *« tandis que la condition résolutoire est un mécanisme relatif à la formation du
contrat, la clause résolutoire organise la sanction de sa mauvaise exécution »[110]*.

---

[106]  Pièce Dem-5, art. 3.4.

[107]  PV-Nourissat, Verbatim, p. 52, l. 27 ss à p. 54, l. 13.

[108]  W. Dross, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des
contrats de proit privé interne, 2ème éd., LexisNexis 2011, v° Condition résolutoire,
spéc. p. 110 s. Eg. EXP-Nourissat, N 10.

[109]  EXP-Nourissat, N 10, citant W. Dross, Clausier, Dictionnaire des clauses ordinaires
et extraordinaires des contrats de proit privé interne, 2ème éd., LexisNexis 2011, v°
Résolutoire (clause), spéc. p. 654 s.

[110]  J. Mestre/J.-C. Roda (dir.), Les principales clauses des contrats d'affaires, Lextenso
éd., 2011, n° 1664, p. 945. Eg. EXP-Nourissat, N 10.

**Arbitrage**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

<u>Sentence finale</u>                                                                    <u>Page 44 sur 83</u>

160. Selon l'Expertise Nourissat, l'enjeu de la qualification se situe moins dans les effets attachés à l'art. 3.4 du Contrat – qui sont similaires si ce n'est identiques – que dans la portée de l'argument soulevé par la Défenderesse, qui tient au caractère prétendument potestatif de la condition résolutoire[111].

161. Comme l'Expert Nourissat l'a confirmé lors de son audition, on ne peut avoir deux qualifications en même temps[112], tout en précisant qu'à son avis, dans la présente affaire, il y avait une indifférence de la qualification sur l'aspect des effets juridiques[113].

162. Partant, le Tribunal arbitral va procéder à la qualification de la clause en question. Pour fonder son opinion, le Tribunal arbitral retient les éléments suivants.

163. Premièrement, l'art. 3.4 du Contrat contient une condition au sens de l'art. 1304 CCfr., dans la mesure où le maintien du Contrat dépend bel et bien d'un événement futur incertain lors de sa conclusion, à savoir la conclusion de l'Accord de partenariat commercial dans le délai de six mois à compter de la date de signature du Contrat. Les Parties ont clairement exprimé leur volonté en ce sens dans l'art. 3.4 du Contrat[114]. S'agissant des effets, il s'agit en outre bien d'une condition résolutoire au sens de l'art. 1304 CCfr., dans la mesure où son accomplissement entraîne l'anéantissement du Contrat et de ses obligations, puisque l'art. 3.4 du Contrat prévoit que *« la présente Promesse sera résiliée et les Parties seront remises dans leur état initial »*[115].

164. Deuxièmement, l'art. 3.4 du Contrat a été négocié et rédigé par des conseils juridiques français expérimentés, dont on peut s'attendre à ce qu'ils soient rompus au droit français[116]. Le Tribunal arbitral retient que ces conseils expérimentés étaient rompus à la terminologie du CCfr., qui distingue clairement *condition* résolutoire aux art. 1304 ss CCfr. et *clause* résolutoire aux art. 1224, 1225 et 1229 CCfr. Or, l'art. 3.4

---

[111]  EXP-Nourissat, N 11.
[112]  PV-Nourissat, Verbatim, p. 50, l. 9-32 ; p. 62, l. 21-24.
[113]  PV-Nourissat, Verbatim, p. 62, l. 29-31.
[114]  Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 44, l. 15-20.
[115]  Pièce Dem-5, art. 3.4.
[116]  PV-Le Roux, Verbatim, p. 26, l. 8 à 10.

du Contrat débute par l'expression « [à] *titre de condition résolutoire de la Promesse* »[117], sans jamais utiliser l'expression de *clause* résolutoire.

165. Troisièmement, l'argument systématique de la Demanderesse et de l'Expert Nourissat consistant à dire que, vu que l'art. 3.4 du Contrat figure sous ch. 3 du Contrat consacré aux effets du Contrat *(« Effet de la promesse »)*[118], il faut privilégier la qualification de clause résolutoire, ne convainc pas le Tribunal arbitral. En effet, le ch. 3 du Contrat contient de nombreuses clauses ne traitant ni de l'exécution du Contrat ni de ses effets. Par exemple, l'art. 3.1 du Contrat, qui figure aussi sous le ch. 3 du Contrat *(« Effet de la promesse »)* et concerne deux conditions suspensives, n'a pas trait aux effets du Contrat mais prévoit un mécanisme relatif à la formation de celui-ci.

166. Quatrièmement, le soin apporté à la rédaction de l'art. 3.4 du Contrat pour souligner son caractère non potestatif est un indice supplémentaire démontrant que les rédacteurs du Contrat considéraient que l'art. 3.4 du Contrat était une *condition* résolutoire et non une *clause* résolutoire. En effet, le fait d'avoir précisé qu'« *à défaut de conclusion effective de cet accord, pour des raisons autres que le simple refus du Cessionnaire de signer le contrat de partenariat équilibré proposé par le Cédant* [...] »[119] démontre que les Parties ont consciemment tenté de mettre en évidence l'absence de potestativité dans l'art. 3.4 du Contrat (à ce sujet, *infra* N 172 ss).

167. Cinquièmement, la distinction faite par la littérature pratique – selon laquelle la condition résolutoire pourrait être distinguée de la clause résolutoire parce qu'elle aurait trait à un événement futur et incertain extérieur au contrat, alors que la clause résolutoire viserait non pas un élément extérieur au contrat et au co-cocontractant mais l'exécution même des obligations nées du contrat[120] – ne se trouve ni dans le Code civil français ni dans la littérature théorique, et n'a pas paru déterminante pour l'Expert Nourissat[121]. Par conséquent, le Tribunal arbitral ne retiendra pas ce critère pour qualifier l'art. 3.4 du Contrat.

---

[117]  Pièce Dem-5, art. 3.4.
[118]  PV-Nourissat, Verbatim, p. 58, l. 24-28 ; p. 59, l. 18-19.
[119]  Pièce Dem-5, art. 3.4 (mise en évidence par le Tribunal arbitral).
[120]  J. Mestre/J.-C. Roda (dir.), Les principales clauses des contrats d'affaires, Lextenso éd., 2011, n° 1664, p. 945. Eg. PV-Nourissat, Verbatim, p. 51, l. 25-29.
[121]  PV-Nourissat, Verbatim, p. 52, l. 2-18.

168. En définitive, pour tous les motifs exposés ci-dessus, le Tribunal arbitral considère, sans pour autant exclure la possibilité d'une qualification de clause résolutoire, que l'art. 3.4 du Contrat doit être qualifié de **condition résolutoire**.

### 2. Validité de l'art. 3.4 du Contrat

#### a)   Question

169. Il s'agit de déterminer si l'art. 3.4 du Contrat, tel qu'il a été qualifié ci-dessus, est valide.

#### b)   Positions des Parties

170. La position de la **Demanderesse** peut être résumée comme suit:

   -   L'art. 3.4 du Contrat est valable et l'argument de son caractère potestatif est non seulement infondé mais sans effet sur l'accomplissement de la condition résolutoire[122].

   -   L'art. 3.4 du Contrat constitue un élément essentiel du Contrat[123], au point qu'il a été expressément mentionné dans le communiqué de presse de la Demanderesse du 20 mars 2019[124].

   -   L'art. 3.4 du Contrat n'est pas arrivé au dernier moment, il figurait déjà dans les projets échangés entre les parties et leurs conseils juridiques[125]. La Demanderesse a, sur les conseils de son conseil juridique et à l'initiative de S. LE ROUX, insisté dès le début pour avoir une condition résolutoire intégrée dans le Contrat car, vu les activités naturelles différentes des Parties et vu l'ensemble des paramètres du partenariat à développer, il s'agissait de pouvoir construire quelque chose dans un temps assez court et d'avoir une porte de sortie si cela ne marchait pas[126].

---

[122]   Demande, p. 28.
[123]   Plaidoiries finales, Verbatim, p. 116, l. 2.
[124]   Pièce Dem-6. Eg. Plaidoiries finales, Verbatim, p. 114, l. 29 à p. 115, l. 3.
[125]   Plaidoiries finales, Verbatim, p. 114, l. 26-28, qui renvoient aux Pièces 33 et 34 de la Notification d'arbitrage.
[126]   PV-Le Roux, Verbatim, p. 15, l. 1-7, p. 23, l. 1-12. Plaidoiries finales, Verbatim, p. 115, l. 4-5.

- En dépit de deux avenants qui ont modifié des points essentiels du Contrat, l'art. 3.4 du Contrat n'a jamais été modifié, il est profondément ancré dans l'accord des Parties[127].

- S'il s'agit d'une *condition (et non d'une clause) résolutoire*, celle-ci n'a pas de caractère purement potestatif, car les Parties ont voulu se mettre à l'abri d'un tel risque en prenant le soin de souligner, en conformité avec le droit et la jurisprudence français, que la circonstance de la condition était bien le défaut de conclusion effective de l'Accord de Partenariat commercial pour des raisons autres que le simple refus de la Demanderesse. Cette condition ne dépendait donc pas de la seule volonté de la Demanderesse[128]. Cette condition n'est pas non plus simplement potestative car, selon l'art. 3.4 du Contrat, il suffit à la Défenderesse de proposer un Accord de Partenariat commercial équilibré pour faire échec à l'accomplissement de la condition résolutoire[129]. Cette condition n'offre pas non plus d'avantage disproportionné, déséquilibré au seul profit de la Demanderesse, dans la mesure où il permet de concrétiser l'objectif de développement des affaires de la Demanderesse, ce qui explique pourquoi celle-ci était prête à payer à la Défenderesse le prix de la participation dans le Fonds[130]. Enfin, la Demanderesse n'a pas adopté de comportement visant délibérément à anéantir l'exécution du Contrat, ce qui aurait pu remplir la condition de l'art. 1304-3 CCfr. ; au contraire, c'est la Demanderesse qui a tenté de construire le partenariat commercial[131].

- La Défenderesse n'a jamais allégué le caractère potestatif de l'art. 3.4 du Contrat jusqu'au courrier du 28 novembre 2019[132].

- A supposer que la condition soit potestative (ce qu'elle n'est pas), la nullité ne peut plus être invoquée en vertu de l'art. 1304-2 CCfr.[133].

---

[127]　Plaidoiries finales, Verbatim, p. 115, l. 6-27.
[128]　Demande, p. 27 ; Plaidoiries finales, Verbatim, p. 125, l. 24 ss à p. 126, l. 1-9.
[129]　Demande, p. 27 ; Plaidoiries finales, Verbatim, p. 126, l. 10-18.
[130]　Plaidoiries finales, Verbatim, p. 126, l. 19-30.
[131]　Plaidoiries finales, Verbatim, p. 126, l. 31 à p. 127 l. 14.
[132]　Plaidoiries finales, Verbatim, p. 119, l. 6-12. Eg. Pièce Dem-27.
[133]　Demande, p. 27.

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                    Page 48 sur 83

- S'il s'agit d'une *clause (et non d'une condition) résolutoire*, il n'y a pas à s'interroger sur le caractère éventuellement potestatif de l'art. 3.4 du Contrat pour apprécier sa validité[134].

171. La Défenderesse ne s'est pas déterminée dans la procédure. En se fondant sur les pièces figurant au dossier, notamment la Pièce Dem-27, la position de la **Défenderesse** peut être résumée comme suit: l'interprétation faite par le Demanderesse de la condition résolutoire, « *comme une clause à* [sa] *main* »[135], la rend potestative et donc nulle et de nul effet[136].

#### c) **Discussion**

172. Vu la qualification de *condition* résolutoire retenue (*supra* N 168), il convient d'analyser si l'art. 3.4 du Contrat est valable au regard du droit français.

173. Selon l'art. 1304-2 CCfr., « [e]*st nulle l'obligation contractée sous une condition dont la réalisation dépend de la seule volonté du débiteur. Cette nullité ne peut être invoquée lorsque l'obligation a été exécutée en connaissance de cause* »[137]. Ainsi que cela découle de l'instruction, cette disposition couvre tant les conditions purement potestatives que les conditions simplement potestatives[138].

174. Un auteur relève qu'« *en pratique, les parties soumettent systématiquement l'ensemble des obligations contractuelles naissant d'un contrat synallagmatique à la condition résolutoire : celle-ci est alors au pouvoir d'une partie qui fait nécessairement figure à la fois de créancier et de débiteur, ce qui rend cette limite textuelle sans portée* »[139]. Il rajoute que, lorsque la condition résolutoire est simplement potestative, c'est-à-dire qu'elle « *ne dépend pas directement de la*

---

[134]   Demande, p. 31 ; Plaidoiries finales, Verbatim, p. 128, l. 3-6.
[135]   Pièce Dem-27 p. 3.
[136]   Pièce Dem-27, p. 1 et p. 3.
[137]   Pièce DemL-2.
[138]   PV-Nourissat, Verbatim, p. 55, l. 19-26.
[139]   W. DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contrats de proit privé interne, 2ème éd., LexisNexis 2011, v° Condition résolutoire, spéc. p. 115.

*volonté du débiteur mais de la réalisation d'un événement qu'il tient en son pouvoir [...] la condition sera tenue par principe comme valable »*[140].

175. Se fondant sur l'analyse du texte de l'art. 3.4 du Contrat, le Tribunal arbitral procède aux constats suivants :

176. Premièrement, la condition résolutoire de l'art. 3.4 du Contrat consiste dans la conclusion effective d'un Accord de Partenariat commercial dans un délai de six mois à compter de la date de Conclusion du Contrat, telle que cette date figure sur la page de la signature du Contrat, c'est-à-dire le 19 mars 2019[141].

177. Deuxièmement, les Parties ont pris le soin de préciser que, pour que la condition résolutoire produise ses effets, il fallait que l'Accord de Partenariat commercial ne soit pas conclu *« pour des raisons autres que le simple refus du Cessionnaire de signer le contrat de partenariat équilibré proposé par le Cédant »*[142]. Cette précision démontre que les Parties ont pris soin de ne pas conférer un caractère potestatif à la clause[143]. D'une part, le simple refus de la Demanderesse de conclure l'Accord de Partenariat commercial ne permettait pas à la condition résolutoire de se réaliser ; en effet, si l'Accord de Partenariat commercial était *« équilibré »*, la Demanderesse n'était pas autorisée à le refuser. D'autre part, l'art. 3.4 du Contrat précisait qu'il revenait à la Défenderesse de proposer un Accord de Partenariat commercial équilibré et qu'un simple refus de la Demanderesse n'aurait donc pas entraîné la réalisation de la condition résolutoire. Cette possibilité offerte à la Défenderesse de proposer unilatéralement un Accord de Partenariat commercial établit également l'absence de caractère potestatif en faveur de la Demanderesse.

178. En définitive, le **Tribunal arbitral considère que l'art. 3.4 du Contrat est valable au regard du droit français**, en particulier qu'il ne constitue pas une clause résolutoire potestative au sens de l'art. 1304-2 CCfr.

---

[140] W. DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contrats de proit privé interne, 2ème éd., LexisNexis 2011, v° Condition résolutoire, spéc. p. 116.
[141] Pièce Dem-5, p. 24.
[142] Pièce Dem-5, art. 3.4.
[143] Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 46, l. 1-5 ; p. 68 l. 1-11.

**Arbitrage**     **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                                                   Page 50 sur 83

### 3. Applicabilité de l'art. 3.4 du Contrat (réalisation de la condition résolutoire)

#### a)   Question

179. Il s'agit de déterminer si les conditions sont réunies pour que l'art. 3.4 du Contrat s'applique au cas d'espèce.

#### b)   Positions des Parties

180. La position de la **Demanderesse** peut être résumée comme suit:

- La Demanderesse est d'avis que, si l'art. 3.4 du Contrat doit être qualifié de *condition* résolutoire, celle-ci est accomplie et la promesse est résolue[144].

- Si l'art. 3.4 du Contrat doit être qualifié de *clause* résolutoire, il y a inexécution prévue par la clause (absence de conclusion de l'Accord de Partenariat commercial et notification par la Demanderesse à la Défenderesse dans la lettre du 16 octobre 2019) et donc le Contrat est résolu de plein droit[145].

- L'art. 3.4 du Contrat constitue un élément essentiel du Contrat[146], au point qu'il a été expressément mentionné dans le communiqué de presse de la Demanderesse du 20 mars 2019[147]. La Demanderesse a précisé son importance tout au long de l'exécution contractuelle, notamment au retour du voyage en Colombie de fin mai 2019[148].

- L'art. 3.4 du Contrat prévoit la résolution du Contrat si un Accord de Partenariat commercial n'était pas signé dans un délai de 6 mois à compter de la date de la signature du Contrat pour des raisons autres qu'un simple refus de la Demanderesse de signer un contrat équilibré qui lui aurait été proposé par la Défenderesse. Or, l'Accord de Partenariat commercial n'a jamais été signé[149].

---

[144]   Demande, p. 26 et 30.
[145]   Demande, p. 31.
[146]   Plaidoiries finales, Verbatim, p. 116, l. 2.
[147]   Demande, p. 25 ; Pièce Dem-6. Eg. Plaidoiries finales, Verbatim, p. 114, l. 29 à p. 115, l. 3.
[148]   Demande, p. 26 ; Pièce Dem-19.
[149]   Plaidoiries finales, Verbatim, p. 120, l. 25 à p. 121, l. 4.

- L'Accord de Partenariat commercial qui devait être conclu devait porter sur l'importation et la distribution des produits de la Demanderesse en direct (c'est-à-dire sans importateur) auprès d'hôpitaux en Colombie et en dehors de la Colombie, sur le développement d'un réseau de vente multi-pays en Amérique latine, sur la création d'un centre de référence et de formation chirurgical au sein d'un des hôpitaux de la Défenderesse, sur l'utilisation d'un service d'études cliniques de l'hôpital San Rafael appartenant à la Défenderesse pour réaliser des suivis cliniques de patients opérés avec des produits de la Demanderesse[150].

- S'agissant de la centrale d'achats qui aurait dû importer les produits Spineway, les livrer, les fournir aux hôpitaux du groupe et organiser la chaîne logistique pour livrer d'autres établissements, la Demanderesse a dû constater, lors de la rencontre ayant eu lieu fin mai 2019 à Bogota, que celle-ci n'était pas vraiment organisée et que la Défenderesse lui proposait un plan B qui n'a jamais vraiment été concrétisé, ce que la Demanderesse a pu constater lors de la rencontre ayant eu lieu entre S. LE ROUX et L. GERARD fin juillet 2019 à Bruxelles[151].

- Au retour du séjour en Colombie de fin mai 2019, le 3 juin 2019, la Demanderesse a directement évoqué l'Accord de Partenariat commercial qui devait être signé[152].

- En septembre 2019, la Demanderesse a compris que l'Accord de Partenariat commercial ne serait jamais signé, faute de volonté de la Défenderesse.

- A l'échéance du délai pour la condition résolutoire (le 19 septembre 2019), aucun Accord de Partenariat commercial, qui aurait dû contenir une liste de l'importation des produits de la Demanderesse, la création d'un centre de chirurgie de la colonne vertébrale au sein de la clinique San Rafael et des études cliniques communes avec cet établissement[153], n'était conclu. Il n'y avait en particulier pas d'entreprise créée du côté de la Défenderesse pour l'importation de produits de la Demanderesse, et donc pas d'autorisation administrative et donc pas de possibilité d'importer des produits ; il n'y avait plus de contact avec

---

[150]   PV-Le Roux, Verbatim, p. 23, l. 21 à p. 24, l. 22.
[151]   PV-Le Roux, Verbatim, p. 16, l. 32 à p. 18, 1. 15.
[152]   Plaidoiries finales, Verbatim, p. 117, l. 10-17. Pièce Dem-19.
[153]   Plaidoiries finales, Verbatim, p. 118, l. 1-10.

le centre de chirurgie de référence et, pour les études cliniques, il y avait absence de réponse finale ou d'avancées par rapport aux problématiques ou aux questions techniques soulevées par la représentante de la Demanderesse[154].

- En l'absence d'un Accord de Partenariat commercial et sans perspective d'un tel Accord, la Demanderesse a décidé de prendre acte de la réalisation de la condition résolutoire prévue dans le Contrat et a adressé une lettre recommandée doublée d'un courriel le 16 octobre 2019 à la Défenderesse[155].

- Dans le courrier de la Défenderesse du 28 novembre 2019, celle-ci ne parle que d'un « futur partenariat et une perspective de partenariat », mais aucun projet d'Accord de Partenariat commercial n'est proposé, pas même un début de projet[156]. Or, en vertu de l'art. 3.4 du Contrat, un tel Accord de Partenariat commercial aurait dû être conclu ou, au moins, proposé par la Défenderesse[157]. La Défenderesse a donc implicitement reconnu l'accomplissement de la condition résolutoire puisque l'art. 3.4 du Contrat évoque la conclusion effective d'un contrat de partenariat ; de simples discussions ou l'hypothèse d'un accord vague et mal défini ne sont pas suffisantes[158].

- Par conséquent, si l'on retient la qualification de la *condition* résolutoire, il faut admettre qu'elle était accomplie et que le Contrat était résolu[159].

- Si l'on admet la qualification de *clause* résolutoire, il faut se demander si une mise en demeure préalable était nécessaire en vertu de l'art. 1225 CCfr. Premièrement, l'art. 3.4 du Contrat n'exige pas une telle mise en demeure mais prévoit que *« la présente Promesse sera résiliée et les Parties seront remises dans leur état initial »*[160]. Deuxièmement, la Défenderesse n'a jamais évoqué cet argument[161]. Troisièmement, la Demanderesse par S. LE ROUX a communiqué

---

[154]   PV-Le Roux, Verbatim, p. 35, l. 10-18.
[155]   Plaidoiries finales, Verbatim, p. 118, l. 20-31. Eg. Pièce Dem-23, p. 1 ; TEM-Le Roux, p. 5.
[156]   Demande, p. 24 ; Plaidoiries finales, Verbatim, p. 119, l. 16-20 et p. 125, l. 1-4. Eg. Pièce Dem-23, p. 1.
[157]   Plaidoiries finales, Verbatim, p. 129, l. 23-25.
[158]   Demande, p. 24 s.
[159]   Plaidoiries finales, Verbatim, p. 125, l. 14-16.
[160]   Plaidoiries finales, Verbatim, p. 128, l. 10-19.
[161]   Plaidoiries finales, Verbatim, p. 128, l. 20-24.

**Arbitrage**     **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

ses inquiétudes à la Défenderesse par L. GERARD[162]. Enfin, la Défenderesse, à la réception de la notification, n'a pas réagi en proposant un projet d'Accord de Partenariat commercial, elle a laissé les choses en l'état[163].

- Par conséquent, si l'on retient la qualification de clause résolutoire, elle est également acquise et effective et les Parties doivent être remises dans leur état initial[164].

181. La Défenderesse ne s'est pas déterminée dans la procédure. En se fondant sur les pièces figurant au dossier, notamment la Pièce Dem-27, la position de la **Défenderesse** peut être résumée comme suit:

- Il y a eu de nombreuses réunions et discussions soit par téléphone soit de visu, en France et en Colombie, pour parvenir à un Accord de Partenariat commercial[165].

- Sur la base de tous les échanges et de toutes les rencontres mentionnées en détail, les principes de l'Accord de Partenariat commercial entre les parties étaient finalisés[166].

- A compter de septembre 2019, la Demanderesse n'a aucunement contribué à rendre possible l'Accord de Partenariat commercial contemplé, « [se] niant pratiquement systématiquement » (sic) à répondre aux propositions de la Défenderesse ou à l'aider à faire avancer le processus alors que les parties étaient sur le point de parvenir à un accord final de partenariat commercial et de distribution[167].

- L'attitude de la Demanderesse dans les négociations de l'Accord de Partenariat commercial se révèle avoir été tout à fait déloyale et de parfaite mauvaise foi dans la mesure où elle n'avait pour vocation que de se construire un argumentaire pour solliciter la résolution du Contrat, après avoir tiré du profit de

---

[162]   Plaidoiries finales, Verbatim, p. 128, l. 25-28.
[163]   Plaidoiries finales, Verbatim, p. 128, l. 29-34.
[164]   Plaidoiries finales, Verbatim, p. 129, l. 1-4.
[165]   Pièce Dem-27, p. 1.
[166]   Pièce Dem-27, p. 3.
[167]   Pièce Dem-27, p. 3.

l'aura que générait l'Accord de Partenariat commercial en cours de négociation pour lever des fonds[168].

- Par conséquent, le Contrat continue de produire ses effets et le défaut d'exercice des obligations auxquelles la Demanderesse est tenue engage sa responsabilité vis-à-vis de la Défenderesse[169].

#### c) Discussion

182. Il convient d'abord d'examiner si les conditions de réalisation de la condition résolutoire prévue à l'art. 3.4 du Contrat sont remplies. Ensuite, conformément à l'art. 1304-3 CCfr., il faut vérifier que l'accomplissement de la condition résolutoire n'a pas été provoqué par la partie qui y avait intérêt.

183. L'art. 3.4 du Contrat prévoit les conditions de réalisation suivantes : « *les Parties conviennent de conclure, dans un délai de six (6) mois à compter de la Date de la Promesse, un accord de partenariat commercial et de distribution des produits du Cessionnaire sur les zones d'activité du Cédant* ».

184. En l'espèce, en vertu de l'art. 1.1 du Contrat, la « *Date de la Promesse désigne la date des présentes, telle qu'elle figure sur la page de signature de la Promesse* »[170]. Or la date figurant sur la page de signature du Contrat est le 19 mars 2019[171]. Par conséquent, le délai fixé à l'art. 3.4 du Contrat a expiré six mois après, soit le 19 septembre 2019.

185. Soulignons d'emblée que la Demanderesse a, dans sa Demande, requis de la Défenderesse la production de « *tout accord de partenariat commercial et de distribution des produits tel que prévu à l'art. 3.4* » du Contrat[172]. Le 24 avril 2021, le Tribunal arbitral a invité la Défenderesse à se déterminer sur la requête de production. Le 10 juin 2021, le Tribunal arbitral a ordonné à la Défenderesse de produire, d'ici au 30 juin 2021, l'Accord de Partenariat commercial dont la production

---

[168]    Pièce Dem-27, p. 3.
[169]    Pièce Dem-27, p. 4.
[170]    Pièce Dem-5, p. 5.
[171]    Pièce Dem-5, p. 24, qui mentionne « Fait à LYON, le 19 mars 2019, en deux (2) exemplaires originaux ».
[172]    Demande, p. 14, all. 44.

avait été requise par la Demanderesse. Or, la Défenderesse n'a ni fourni le document, ni offert des déterminations expliquant ou justifiant son refus.

186. En vertu de l'art. 28 al. 3 du Règlement d'arbitrage, « *[s]i l'une des parties, régulièrement invitée à produire des documents [...], ne les présente pas dans le délai fixé par le tribunal arbitral, sans démontrer d'empêchement légitime, le tribunal arbitral peut statuer sur la base des éléments de preuve dont il dispose.* » Par conséquent, le Tribunal arbitral doit se fonder sur les pièces du dossier pour trancher la question de la réalisation de la condition résolutoire de l'art. 3.4 du Contrat.

187. L'art. 3.4 du Contrat ne contient pas de précisions quant au contenu de l'Accord de Partenariat commercial. En revanche, les auditions tenues lors de l'Audience du 7 septembre 2021 ont permis d'obtenir des informations pertinentes.

188. Selon S. LE ROUX, l'Accord de Partenariat commercial devait concerner d'une part l'importation et la distribution des produits de la Demanderesse en direct auprès d'hôpitaux en Colombie, d'autre part le développement d'un réseau de vente multi-pays en Amérique latine ; un autre volet était la création d'un centre de référence et de formation chirurgical au sein de l'hôpital San Rafael de la Défenderesse ; un autre encore était l'utilisation du service d'études cliniques de l'hôpital San Rafael pour réaliser des suivis de patients opérés[173].

189. Ces explications ont été confirmées par les témoins qui ont participé aussi bien à la réunion qui s'est tenue entre les Parties fin mai 2019 à Bogota qu'aux échanges ayant suivi cette réunion entre juin et septembre 2019. La témoin F. LAUCK a confirmé avoir été chargée de la négociation de l'obtention de données cliniques sur les dispositifs médicaux de la Demanderesse[174]. Le témoin P. CHABERT a indiqué qu'il était chargé du développement du marché colombien en matière de *supply chain* et du développement du secteur importation-distribution[175].

190. Maintenant que le contenu de l'Accord de Partenariat commercial a été précisé et identifié, il convient de déterminer si un tel accord a été conclu durant le délai prévu à l'art. 3.4 du Contrat ou s'il ne l'a pas été.

---

[173]  PV-Le Roux, Verbatim, p. 23, l. 21 à p. 24, l. 5. Eg. Demande, p. 14, all. 44.
[174]  PV-Lauck, Verbatim, p. 78, l. 24 à p. 79, l. 30. Eg. TEM-Lauck, p. 2, N 2.
[175]  PV-Chabert, Verbatim, p. 86, l. 14 à p. 87 l. 9 ; p. 89, l. 13-31. Eg. TEM-Chabert, p. 2, N 2.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 61 of 255 PageID #: 71

191. Il ressort d'abord du dossier qu'aucun Accord de Partenariat commercial n'a été conclu. La Demanderesse l'allègue expressément[176]. Quant à la Défenderesse, son courrier du 28 novembre 2019 évoque des discussions en prévision d'un futur partenariat mais ne mentionne aucunement le fait qu'un Accord de Partenariat commercial aurait été conclu, encore moins signé[177].

192. Le 10 juin 2021, le Tribunal arbitral a fixé, dans l'OP n° 2, un second délai à la Défenderesse au 30 juin 2021 pour produire l'Accord de Partenariat ou pour se déterminer sur la requête de production. Dans le délai fixé, la Défenderesse ne s'est pas déterminée et n'a pas produit le document requis par la Demanderesse, dont la production avait été ordonnée par le Tribunal arbitral.

193. Il ressort ensuite de l'administration des preuves, en particulier de l'audition des Parties et des témoins lors de l'Audience du 7 septembre 2021 qu'aucun Accord de Partenariat n'a été conclu et qu'un tel Accord n'a jamais été proposé par la Défenderesse, contrairement à ce que prévoit l'art. 3.4 du Contrat[178].

194. La témoin F. LAUCK, en charge du volet de l'Accord de Partenariat commercial concernant l'obtention des données cliniques sur les dispositifs médicaux de la Demanderesse, a indiqué qu'après la réunion ayant eu lieu fin mai 2019 en Colombie, elle a eu des échanges avec sa personne de contact, Madame Milena Para, mais qu'elle n'a jamais pu entrer en contact avec des chirurgiens investigateurs et que, pour finir, ces échanges se sont révélés infructueux[179].

195. Le témoin P. CHABERT, en charge de discuter des possibilités de synergies en matière de *supply chain*, a indiqué que, contrairement à ce que la Défenderesse avait expliqué dans un premier temps, il n'y avait pas en Colombie de centrale d'achats détenue par la Défenderesse, ce qui rendait moins efficace la recherche de synergies et exigeait que la Demanderesse identifie elle-même des interlocuteurs[180]. Selon lui, il est apparu très vite que la centrale d'achats n'existait pas ou n'existait plus ; le

[176] Demande, p. 14, all. 44 ; TEM-Le Roux, p. 5 ; PV-Le Roux, Verbatim, p. 35, l. 5-19 ; non-production par la Défenderesse de la pièce requise.
[177] Pièce Dem-27.
[178] PV-Le Roux, Verbatim, p. 35, l. 5-19.
[179] PV-Lauck, Verbatim, p. 79, l. 14-30.
[180] PV-Chabert, Verbatim, p. 86 l. 14 à p. 87 l. 9 ; p. 89, l. 13-31 ; p. 92, l. 2-14.

dialogue a ainsi tourné court, faute d'avoir un interlocuteur de la Défenderesse pour parler de ce sujet[181].

196. L'absence de conclusion d'Accord de Partenariat commercial dans le délai contractuel prévu ressort également des propos de la Défenderesse figurant au dossier, en particulier le courrier du 28 novembre 2019. Dans ce courrier, la Défenderesse évoque certes les démarches effectuées en perspective d'un futur partenariat et indique *« que nous étions sur le point de parvenir à un accord final de partenariat commercial et de distribution »*[182]. En dépit du fait que la Défenderesse affirme que *« les principes de l'accord commercial étaient finalisés »*[183], le dossier ne contient aucun élément concret venant corroborer ces allégations. On ne trouve notamment ni document écrit faisant état d'un Accord de Partenariat commercial ni projet équilibré d'un tel document proposé par la Défenderesse à la Demanderesse, ainsi que le prévoit l'art. 3.4 du Contrat.

197. Par conséquent, le Tribunal arbitral constate le *« défaut de conclusion effective, pour des raisons autres que le simple refus du Cessionnaire de signer le contrat de partenariat équilibré proposé par le Cédant, dans le délai de six (6) mois »*[184] à partir de la conclusion du Contrat.

198. Maintenant que le Tribunal arbitral a établi que la condition résolutoire s'était réalisée, il lui faut encore vérifier que l'accomplissement de la condition résolutoire n'a pas été provoqué par la partie qui y avait intérêt, sans quoi cette condition serait réputée défaillie en vertu de l'art. 1304-3 CCfr.

199. Le Tribunal arbitral considère que ce n'est pas le cas. D'une part, les faits au dossier tendent à établir que la Demanderesse n'avait pas intérêt à l'accomplissement de la condition résolutoire. En effet, la Demanderesse avait plutôt intérêt à ce qu'un Accord de Partenariat commercial soit conclu et à ce qu'une véritable collaboration entre les deux Parties se mette en place afin de pouvoir développer son activité commerciale en Colombie et en Amérique latine plus largement. D'autre part, le Tribunal arbitral retient que ce n'est pas la Demanderesse qui a provoqué l'accomplissement de la condition résolutoire. Au contraire, c'est la Défenderesse qui n'a pas proposé d'Accord

---

[181]   PV-Chabert, Verbatim, p. 86 l. 22 à 33.
[182]   Pièce Dem-27, p. 3.
[183].  Pièce Dem-27, p. 3.
[184]   Pièce Dem-5, art. 3.4.

de Partenariat commercial équilibré dans le délai fixé contractuellement. Il a fallu les deux courriers de la Demanderesse des 16 octobre et 6 novembre 2019 pour que la Défenderesse réagisse par courrier du 28 novembre 2019, dans lequel elle n'explique nullement pourquoi elle n'a pas soumis de projet d'Accord de Partenariat commercial, contrairement aux exigences figurant à l'art. 3.4 du Contrat.

200. Le fait que la Demanderesse n'a pas provoqué l'accomplissement de la condition résolutoire est confirmé par deux éléments supplémentaires :

201. Lors de son interrogatoire mené durant l'Audience du 7 septembre 2021, le témoin P. CHABERT, en tant que directeur des opérations et personne chargée de la logistique, distribution, importation, gestion des stocks, des éventuelles commandes et des flux de produits[185], a indiqué qu'après plusieurs relances, la Demanderesse n'avait pu obtenir que des informations succinctes et peu exploitables qui ne permettaient pas de déterminer l'orientation d'une stratégie commerciale[186]. Il en résulte que les informations et les éléments en provenance de la Défenderesse étaient insuffisants pour permettre de conclure un Accord de Partenariat commercial ; on ne peut donc pas reprocher à la Demanderesse d'avoir provoqué la réalisation de la condition résolutoire.

202. Le 12 septembre 2019, S. LE ROUX a écrit à Carlos Florez – présenté comme le directeur responsable, dans le groupe de la Défenderesse, de la gestion des hôpitaux sur le plan financier – que les Parties devaient conclure l'Accord de Partenariat à très brève échéance (« *as we have to settle an Agreement with very short notice* »)[187]. Ce courriel démontre que la Demanderesse a tenté sérieusement, encore quelques jours avant l'échéance du délai de six mois, de provoquer la conclusion d'un Accord de Partenariat commercial. Rien dans le dossier ne vient établir une réaction de la Défenderesse dans les délais prévus contractuellement.

203. Par conséquent, la condition résolutoire n'a pas été provoquée par la partie qui y avait intérêt et n'est donc pas réputée défaillie en vertu de l'art. 1304-3 CCfr.

204. En définitive, le Tribunal arbitral considère que les Parties n'ont pas conclu d'Accord de Partenariat commercial dans le délai prévu à l'art. 3.4 du Contrat, et que les

---

[185] PV-Le Roux, Verbatim, p. 27, l. 11-13.
[186] PV-Chabert, Verbatim, p. 87, l. 24 ss à p. 88, l. 6. Eg. Plaidoiries finales, Verbatim, p. 117, l. 20-26.
[187] Pièce Dem-21, p. 18 ; PV-Le Roux, Verbatim, p. 33, l. 10 à p. 34, l. 22.

raisons pour cette absence de conclusion de l'Accord de Partenariat commercial sont autres que le simple refus de la Demanderesse de signer un Accord de Partenariat commercial équilibré proposé par la Défenderesse.

205. Par conséquent, les **conditions de l'art. 3.4 du Contrat sont remplies et le régime prévu dans cette disposition** – qui sera précisé dans les paragraphes suivants (*infra* N 206 ss) – **est applicable au cas présent**.

### 4. Conséquence de l'applicabilité de l'art. 3.4 du Contrat

#### a)   Question

206. Il s'agit de déterminer quelles sont les conséquences découlant de l'applicabilité de l'art. 3.4 du Contrat.

#### b)   Positions des Parties

207. La position de la **Demanderesse** peut être résumée comme suit:

- La Demanderesse, se fondant sur l'Expertise Nourissat, est d'avis que, quelle que soit la qualification retenue – condition résolutoire ou clause résolutoire – le Contrat doit être considéré comme résolu[188].

- Si l'art. 3.4 du Contrat doit être qualifié de *condition* résolutoire, celle-ci est accomplie et la promesse est résolue[189]. Si l'on retient la qualification de *clause* résolutoire, elle est également acquise et effective et les Parties doivent être remises dans leur état initial[190].

- Vu que, par courrier du 16 octobre 2019, la Demanderesse a dû prendre acte de la résolution du Contrat et de ses avenants en application de l'art. 3.4 du Contrat, elle a demandé à la Défenderesse la restitution des sommes versées, soit 4,16 millions d'euros tout en s'engageant, en contrepartie à signer les ordres de virement pour restituer les parts du Fonds à la Défenderesse[191].

---

[188]   Demande, p. 31.
[189]   Demande, p. 26 ; Plaidoiries finales, Verbatim, p. 127, l. 11-14.
[190]   Plaidoiries finales, Verbatim, p. 129, l. 1-4.
[191]   Plaidoiries finales, Verbatim, p. 118, l. 30 à p. 119, l. 3. Eg. Pièce Dem-23, p. 2.

- Le Tribunal arbitral, une fois qu'il a constaté l'accomplissement de la condition résolutoire, doit ordonner la remise en état initial dans lequel se trouvaient les Parties avant la signature du Contrat et, par voie de conséquence, condamner la Défenderesse à restituer le prix payé et les frais associés[192].

- En vertu de l'art. 1188 CCfr., il faut s'attacher à la volonté des Parties au-delà de la lettre retenue dans le Contrat[193].

- Vu que l'Accord de Partenariat commercial n'a pas été conclu, la volonté des Parties était de lier le sort du Contrat, des sommes versées en exécution de ce Contrat et des titres apportés en exécution de ce Contrat, à la conclusion de l'Accord de Partenariat commercial qui n'a jamais été conclu par les Parties ni même proposé par la Défenderesse[194].

- Il faut remettre les Parties dans l'état où elles se trouvaient avant le Contrat, comme si S. LE ROUX et L. GERARD ne s'étaient jamais rencontrés à la Gare de Lyon : il n'y aurait pas eu de paiement, pas eu d'apport de titres èt pas de frais liés à la négociation et aux audits[195].

- Par « indemnité » figurant à l'art. 3.4 du Contrat, il faut comprendre ce que S. LE ROUX a dit dans son interrogatoire : il ne doit pas y avoir de sanction, de dommages-intérêts, chacun reprend ce qu'il a apporté et on en reste là[196].

- Par conséquent, il faut restituer le prix de cession versé, soit les quatre versements faits en 2019, soit trois fois 1 million d'euros et une fois 1,16 million d'euros, qui n'ont jamais été restitués par la Défenderesse[197].

- A cette somme s'ajoutent les intérêts de retard en vertu de l'art. 1352-6 CCfr. qui prévoit que la « restitution d'une somme d'argent inclut des intérêts au taux

---

[192]   Plaidoiries finales, Verbatim, p. 121, l. 8-15.
[193]   Plaidoiries finales, Verbatim, p. 129, l. 12-17.
[194]   Plaidoiries finales, Verbatim, p. 129, l. 18-25.
[195]   Plaidoiries finales, Verbatim, p. 129, l. 26 à p. 130, l. 2.
[196]   Plaidoiries finales, Verbatim, p. 130, l. 3-17.
[197]   Plaidoiries finales, Verbatim, p. 130, l. 18-27.

*légal et des taxes acquittées entre les mains de celui qui l'a reçue »*, cette disposition étant d'ordre public[198].

- La Défenderesse doit aussi rembourser à la Demanderesse ses frais pour une somme de EUR 250'329,21 (recte : 252'329,31) HT[199].

- La Demanderesse, une fois qu'elle aura reçu les montants en retour, s'engage à signer des ordres de mouvement pour restituer les titres du Fonds, afin de défaire les choses et de divorcer d'avec la Défenderesse[200].

208. La Défenderesse ne s'est pas déterminée dans la procédure. En se fondant sur les pièces figurant au dossier, notamment la Pièce Dem-27, la position de la **Défenderesse** peut être résumée comme suit:

- La Défenderesse considère que le Contrat continue de produire ses effets et que la Demanderesse engage sa responsabilité[201].

### c)    **Discussion**

209. Le Tribunal arbitral a décidé ci-dessus (*supra* N 205) que les conditions de l'art. 3.4 du Contrat étaient remplies et que le régime prévu dans cette disposition était applicable. Reste donc à préciser le régime de la condition résolutoire, en commençant par décrire le régime légal, puis en le comparant au régime contractuel retenu par les Parties.

210. Selon l'art. 1304-7 CCfr., *« [l]'accomplissement de la condition résolutoire éteint rétroactivement l'obligation, sans remettre en cause, le cas échéant, les actes conservatoires et d'administration. »*

211. Selon l'art. 1304-7 àl. 2 CCfr., *« [l]a rétroactivité n'a pas lieu si telle est la convention des parties ou si les prestations échangées ont trouvé leur utilité au fur et à mesure de l'exécution réciproque du contrat »*. On distingue donc deux exceptions possibles au principe de rétroactivité en cas de réalisation de la condition résolutoire : d'une

---

[198]   Plaidoiries finales, Verbatim, p. 131, l. 5-16.
[199]   Plaidoiries finales, Verbatim, p. 132, l. 15-18.
[200]   Plaidoiries finales, Verbatim, p. 132, l. 26-30.
[201]   Pièce Dem-27, p. 4.

part, une convention des parties en ce sens, d'autre part, la situation où les prestations échangées ont été utiles au fur et à mesure de l'exécution réciproque.

212. S'agissant de la première exception, les Parties n'ont pas convenu de renoncer à la règle de la rétroactivité de la résolution. Une lecture de l'art. 3.4 du Contrat suffit pour s'en convaincre : le texte contractuel ne fait aucunement allusion à l'absence de rétroactivité ; au contraire, l'expression « *les Parties seront remises dans leur état initial* »[202] signifie que les Parties ont voulu l'effet rétroactif en cas de réalisation de la condition résolutoire.

213. S'agissant de la seconde exception, elle ne concerne pas l'hypothèse du présent Contrat qui, rappelons-le, est une promesse synallagmatique de vente et d'achat de titres, mais des prestations contractuelles qui ne peuvent pas être effacées rétroactivement, encore moins restituées, comme la mise à disposition d'un local durant un bail[203]. La seconde exception n'est donc pas applicable en l'espèce[204].

214. A teneur de l'art. 3.4 du Contrat, si la condition résolutoire se réalise, « *la présente Promesse sera résiliée et les Parties seront remises dans leur état initial* »[205]. A titre exemplatif, l'art. 3.4 du Contrat rajoute que « *l'achat des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre* »[206].

215. Le Tribunal arbitral constate que les effets prévus par l'art. 3.4 du Contrat sont classiques dans le cadre d'une condition résolutoire et correspondent largement au régime légal, notamment de l'art. 1304-7 CCfr., qui a une nature dispositive[207]. D'une part, l'existence du Contrat prend fin avec effet rétroactif et les Parties sont remises dans leur état initial. D'autre part, cela signifie en particulier que l'achat des Parts effectué par la Demanderesse tombe avec effet rétroactif et que la Demanderesse peut réclamer les sommes déjà versées à la Défenderesse. On notera que l'utilisation

[202] Pièce Dem-5, art. 3.4.
[203] F. TERRÉ/PH. SIMLER/Y. LEQUETTE/F. CHÉNEDÉ, *Droit civil, les obligations*, 12ème éd. refondue, Dalloz, 2018, en particulier p. 1425 s.
[204] F. TERRÉ/PH. SIMLER/Y. LEQUETTE/F. CHÉNEDÉ, *Droit civil, les obligations*, 12ème éd. refondue, Dalloz, 2018, en particulier p. 1425 s. Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 47, l. 11-32.
[205] Pièce Dem-5, art. 3.4.
[206] Pièce Dem-5, art. 3.4. Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 47, l. 3-5.
[207] PV-Nourissat, Verbatim, p. 47, l. 6-8 et p. 67, l. 5-15.

de l'expression « *la présente Promesse sera résiliée* » [208] ne modifie pas le régime légal : vu que l'art. 3.4 du Contrat prévoit expressément un effet rétroactif à cette résiliation, il s'agit en définitive d'une résolution dont le régime correspond à celui prévu par l'art. 1304-7 CCfr.[209].

216. Reste à déterminer si le régime contractuel décrit ci-dessus permet à la Demanderesse de formuler les prétentions contenues dans les conclusions de sa demande (*infra* N 217 ss).

## D.   Prétentions de la Demanderesse

217. Le présent chapitre traite des prétentions de la Demanderesse :

- Il s'agit d'abord de la prétention visant à condamner la Défenderesse à verser à la Demanderesse la somme en principal de EUR 4'160'000.-, au titre du prix partiel versé en exécution du Contrat, tout en donnant acte de l'engagement de la Demanderesse de restituer à la Défenderesse l'intégralité des parts A et des parts B du Fonds (*infra* N 218 ss).

- Il s'agit ensuite de la prétention visant à condamner la Défenderesse à verser la somme de EUR 252'329,21 (outre la TVA pour les factures assujetties à cette taxe) pour les frais exposés par la Demanderesse pour la négociation de la promesse, pour la conclusion de celle-ci ainsi que pour la réalisation des audits (*infra* N 232 ss).

- Il s'agit enfin de la prétention visant à condamner la Défenderesse au paiement des intérêts au taux légal à compter du 16 octobre 2019 sur la somme en principal de EUR 4'160'000.- (*infra* N 248).

Un récapitulatif clôt cette partie (*infra* N 260).

---

[208]  Pièce Dem-5, art. 3.4.
[209]  Notons que l'Expert Nourissat parvient à la même conclusion ; cf. PV-Nourissat, Verbatim, p. 63, l. 20-32.

1. **Prétention en versement de EUR 4'160'000.- et engagement à signer les ordres de mouvements de titres afin de restituer l'intégralité des parts A et des parts B du Fonds**

### a)  Question et méthodologie

218. Il s'agit de déterminer si la prétention de la Demanderesse en restitution de EUR 4'160'000.- au titre du prix partiel versé en exécution du Contrat et de ses avenants[210], est justifiée tant sur le principe que sur le montant.

219. Il s'agit également de déterminer s'il faut donner acte à la Demanderesse de son engagement à signer les ordres de mouvements de titres afin de restituer à la Défenderesse l'intégralité des parts A et des parts B du Fonds.

### b)  Positions des Parties

220. La **Demanderesse** réclame EUR 4'160'000.- (TTC) et demande que le Tribunal arbitral lui donne acte qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la Défenderesse l'intégralité des parts A et des parts B du Fonds, et ce dans un délai d'un mois après avoir reçu l'intégralité de la somme susmentionnée outre intérêts au taux légal[211], et le justifie comme suit :

   - Les art. 1304-7 CCfr. (condition résolutoire) et l'art. 1229 CCfr. (clause résolutoire) prévoient l'obligation de restituer les montants en principal[212].

   - L'art. 3.4 du Contrat prévoit que « [l]a *présente Promesse sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part et d'autre* »[213].

   - La Demanderesse a procédé à l'ensemble des paiements pour un montant de EUR 4'160'000.-, dont les ordres de virement sont contenus dans les pièces

---

[210]  Pièce Dem-5, p. 11 ; Pièce Dem-11, p 4 s.
[211]  Demande p. 38 ; Plaidoiries finales, Verbatim, p. 133, l. 25-27 ; p. 134, l. 2-7.
[212]  Demande, p. 32 ; Pièces DemL-6 et DemL-7.
[213]  Demande, p. 34.

Dem-12, 14, 16 et 18, ainsi que les pièces Dem-13, 15, 17 et 31 pour les transferts de parts du Fonds[214].

- Le montant de EUR 4'160'000.- n'a pas été restitué par la Défenderesse à la Demanderesse, en violation de l'art. 3.4 du Contrat[215].

221. La **Défenderesse** ne s'est pas déterminée à ce sujet dans la procédure mais il ressort des pièces du dossier qu'elle s'oppose à toute restitution puisqu'elle est d'avis que le Contrat continue de produire des effets[216].

#### c)   **Discussion**

222. En se fondant sur les développements précédents (*supra* N 151-216), le Tribunal arbitral tranche le litige comme suit :

223. Le fondement contractuel applicable est l'art. 3.4 du Contrat. Selon cette disposition, « *la présente Promesse sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre* »[217].

224. Le Tribunal arbitral a déjà constaté que l'art. 3.4 du Contrat reprend le mécanisme prévu à l'art. 1304-7 CCfr., qui prévoit que l'accomplissement de la condition résolutoire éteint rétroactivement le contrat, ce qui impose une restitution des prestations déjà effectuées en vertu du Contrat (*supra* N 215).

225. En l'espèce, le Tribunal arbitral considère comme prouvé que la Demanderesse a effectué, en vertu du Contrat, les versements suivants aux dates suivantes en faveur de la Défenderesse :

- EUR 1'000'000.-, le 15 mai 2019[218] ;

- EUR 1'000'000.-, le 5 juillet 2019[219] ;

---

[214]   Demande, p. 34 s. ; Plaidoiries finales, Verbatim, p. 116, l. 15-22.
[215]   Plaidoiries finales, Verbatim, p. 119, l. 21-22 et p. 121, l. 5-7.
[216]   Pièce Dem-27, p. 4.
[217]   Pièce Dem-5, art. 3.4.
[218]   Pièce Dem-12.
[219]   Pièce Dem-14.

-   EUR 1'000'000.-, le 31 juillet 2019[220] ;

-   EUR 1'160'000.-, le 27 septembre 2019[221].

226. En contrepartie de ces versements, le Tribunal arbitral considère comme prouvé que la Défenderesse a transféré à la Demanderesse les titres suivants aux dates suivantes, en vertu du Contrat :

-   750 parts A du Fonds et 250 parts B du Fonds, le 16 mai 2019[222] ;

-   750 parts A du Fonds et 250 parts B du Fonds, le 1er juillet 2019[223] ;

-   750 parts A du Fonds et 250 parts B du Fonds, le 1er août 2019[224] ;

-   870 parts A du Fonds et 250 parts B du Fonds, le 2 octobre 2019 (date du bulletin de transfert) ou le 17 juillet 2020 (courriel de la Défenderesse à la Demanderesse)[225].

227. En vertu du régime prévu par l'art. 3.4 du Contrat et en raison de la réalisation de la condition résolutoire prévue dans cette disposition, les Parties ont l'obligation de se restituer les prestations déjà effectuées en exécution du Contrat.

228. Par conséquent, la Défenderesse doit être condamnée à restituer à la Demanderesse la somme de EUR 4'160'000.- versée au titre du prix partiel en exécution du Contrat, parce que celui-ci est éteint rétroactivement en vertu de la réalisation de la condition résolutoire prévue à l'art. 3.4 du Contrat.

229. Vu le caractère synallagmatique du Contrat, la restitution des prestations par une partie n'a lieu que si l'autre partie restitue également les prestations reçues ou offre sérieusement de les restituer[226].

230. En l'espèce, la Demanderesse non seulement réclame la restitution du prix partiel versé à la Défenderesse, mais s'est aussi engagée à signer les ordres de mouvements de titres pour restituer les parts A et les parts B du Fonds à la Défenderesse. Cela

---

220   Pièce Dem-16.
221   Pièce Dem-18.
222   Pièce Dem-13.
223   Pièce Dem-15.
224   Pièce Dem-17.
225   Pièce Dem-31, p. 1 et 3.
226   MALAURIE PHILIPPE/AYNES LAURENT/STOFFEL-MUNCK PHILIPPE, Droit des obligations, 11ᵉ éd., LGDJ 2020, N 531.

ressort de son courrier recommandé du 16 octobre 2019[227], de la Demande[228], et de ses conclusions formulées lors des plaidoiries finales de l'Audition du 7 septembre 2021[229].

231. En conclusion, le **Tribunal arbitral condamne la Défenderesse à payer à la Demanderesse la somme en principal de EUR 4'160'000.-** au titre du prix partiel versé en exécution du Contrat et de ses avenants et donne acte à la Demanderesse qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la Défenderesse l'intégralité des parts A et des parts B du Fonds, dans un délai d'un mois après avoir reçu l'intégralité de la somme de EUR 4'160'000.- et des éventuels intérêts dus, qui font l'objet des discussions ci-dessous (*infra* N 248 ss).

## 2. Prétention en versement de EUR 252'329.21

### a) Question et méthodologie

232. Il s'agit de déterminer si la prétention de la Demanderesse en versement de EUR 252'329.21 au titre des frais exposés par la Demanderesse pour la négociation du Contrat, pour sa conclusion ainsi que pour la réalisation des audits est justifiée tant sur le principe que sur le montant.

### b) Positions des Parties

233. La **Demanderesse** demande le remboursement de EUR 252'329.21 outre la TVA pour les factures assujetties à cette taxe pour les frais exposés par la Demanderesse pour la négociation du Contrat, pour sa conclusion ainsi que pour la réalisation des audits[230]. Elle justifie sa prétention comme suit :

- La Demanderesse a engagé de nombreux frais, qui sont chiffrés dans la Demande à EUR 252'329.21 (HT)[231].

---

[227]  Pièce Dem-23, p. 2.
[228]  Demande, p. 16 all. 51 et p. 35 N 27.
[229]  Plaidoiries finales, Verbatim, p. 134, l. 2-7.
[230]  Demande p. 35 s. et 39 ; Plaidoiries finales, Verbatim, p. 134, l. 8-12.
[231]  Demande, p. 35 s. ; Plaidoiries finales, Verbatim, p. 120, l. 4-6, qui renvoient aux Pièces Dem-8, Dem-9, Dem-10 et Dem-30. Eg. Plaidoiries finales, Verbatim, p. 132, l. 15-18 (qui contient une erreur de montant).

- La résolution du Contrat justifie que les frais assumés par la Demanderesse, pour une opération résolue en raison de l'inaction fautive de la Défenderesse, lui soient remboursés[232].

- Vu que l'Accord de Partenariat commercial n'a pas été conclu, il faut remettre les Parties dans l'état où elles se trouvaient avant le Contrat, comme si S. LE ROUX et L. GERARD ne s'étaient jamais rencontrés à la Gare de Lyon : il n'y aurait pas eu de paiement, pas eu d'apport de titres et pas de frais liés à la négociation et aux audits[233].

- Le Contrat exclut les indemnités mais il dit aussi que les Parties doivent être remises en l'état antérieur où elles se trouvaient avant la signature du Contrat ; si le Contrat n'avait pas été signé, la Demanderesse n'aurait jamais exposé ces frais, n'aurait jamais négocié le Contrat, n'aurait jamais demandé à plusieurs société colombiennes de faire des audits. Les factures de ces frais se trouvent dans la Pièce Dem-30[234].

234. La **Défenderesse** ne s'est pas déterminée à ce sujet dans la procédure mais il ressort des pièces du dossier qu'elle s'oppose à tout paiement puisqu'elle est d'avis que le Contrat continue de produire des effets[235].

#### c)   **Discussion**

235. Après avoir rappelé le fondement contractuel, il s'agira de l'appliquer aux faits de la cause et d'en tirer les conclusions qui s'imposent.

236. Le régime légal des effets d'une condition résolutoire est dispositif et supplétif[236], raison pour laquelle il se justifie de se fonder en priorité sur le régime conventionnel prévu dans le Contrat.

237. A teneur de l'art. 3.4 du Contrat, « *la présente Promesse sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat des Parts effectué depuis*

---

[232]   Demande, p. 35 s.
[233]   Plaidoiries finales, Verbatim, p. 129, l. 26 à p. 130, l. 2 et p. 132, l. 1-4.
[234]   Plaidoiries finales, Verbatim, p. 132, l. 7-20.
[235]   Pièce Dem-27, p. 4.
[236]   PV-Nourissat, Verbatim, p. 67, l. 5-15.

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

Sentence finale                                                         Page 69 sur 83

*lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre* »[237].

238. En l'espèce, s'il ne fait aucun doute que les prestations échangées entre les Parties avant l'avènement de la condition résolutoire doivent être restituées, il convient d'interpréter le contenu de l'art. 3.4 du Contrat pour savoir si la Demanderesse est autorisée à réclamer de la Défenderesse le paiement de la somme de EUR 252'329.21 pour les frais de négociation du Contrat, pour les frais de conclusion ainsi que pour la réalisation des audits prévus dans le Contrat.

239. Le fondement contractuel pertinent pour analyser le bien-fondé de cette prétention est la partie de l'art. 3.4 du Contrat qui affirme « [...] *le tout sans indemnité de part, ni d'autre* ».

240. En vertu de l'art. 1188 CCfr., « [l]e *contrat s'interprète d'après la commune intention des parties plutôt qu'en s'arrêtant au sens littéral de ses termes. Lorsque cette intention ne peut être décelée, le contrat s'interprète selon le sens que lui donnerait une personne raisonnable placée dans la même situation* »[238].

241. Interrogé par le Tribunal arbitral, le représentant de la Demanderesse, S. LE ROUX, a affirmé que l'expression « *le tout sans indemnité de part, ni d'autre* » dans la clause 3.4 du Contrat signifie qu'en cas de manque à gagner pour la Demanderesse, elle ne pourrait pas réclamer de compensation pour le chiffre d'affaires non réalisé[239].

242. Faute d'autres éléments probants dans le dossier permettant d'identifier la commune intention des Parties lors de la conclusion du Contrat, faute également d'éléments probants confirmant que les déclarations de S. LE ROUX durant son audition du 7 septembre 2021 correspondent à la commune intention des Parties au moment de la conclusion du Contrat, le Tribunal arbitral ne retient pas l'interprétation de l'art. 3.4 du Contrat proposée par S. LE ROUX, puisqu'il ne s'agit que de l'intention d'une seule des Parties, la Demanderesse[240].

---

[237] Pièce Dem-5, art. 3.4.
[238] Dans ce sens ég., PV-Nourissat, Verbatim, p. 59, l. 29-31.
[239] PV-Le Roux, Verbatim, p. 25, l. 25 à p. 26, l. 7.
[240] Dans ce sens, P. MALAURIE/L. AYNÈS/P. STOFFEL-MUNCK, Droit des obligations, 11ème éd., LGDJ 2020, N 445, qui soulignent que ce ne peut être l'intention d'une seule partie.

243. Par conséquent, il convient de déterminer le sens que donnerait une personne raisonnable placée dans la même situation. Une lecture raisonnable de l'art. 3.4 du Contrat conduit le Tribunal arbitral à admettre que, si la condition résolutoire se réalise, les Parties ont une obligation réciproque de restituer les prestations que l'une a déjà exécutées en faveur de l'autre. En revanche, le fait que l'art. 3.4 du Contrat prévoit que la restitution des prestations aura lieu, « *le tout sans indemnité de part, ni d'autre* », doit être compris en ce sens que les Parties ne peuvent pas réclamer des dommages-intérêts pour les éventuels préjudices qu'elles ont subis en raison de la résolution du Contrat. L'Expert Nourissat, même s'il n'a pas été interrogé exactement sur ce point, semble aller également dans le même sens lorsqu'il affirme qu' « *à aucun moment, une quelconque indemnisation, sanction pécuniaire n'ait été stipulée par les Parties* [...] »[241].

244. Par conséquent, les éventuels efforts qu'une Partie aura fournis, ainsi que les dépenses qu'elle aura consenties en lien avec la négociation, la conclusion et l'exécution du Contrat résolu, ne peuvent pas faire l'objet d'une prétention en paiement d'une indemnité. En outre, et comme l'a justement souligné S. LE ROUX[242], il en va de même des éventuels gains manqués qu'une Partie pourrait faire valoir en lien avec la résolution rétroactive du Contrat découlant de la réalisation de la condition résolutoire.

245. En l'espèce, la Demanderesse réclame le paiement d'un montant de EUR 252'329.21 pour des frais qu'elle aurait supportés en lien avec la négociation du Contrat, la conclusion de celui-ci ainsi que pour la réalisation des audits prévus dans le Contrat. Nonobstant le fait que certaines factures (p.ex. Novances Corporate Finance) présentées par la Demanderesse ne permettent pas de définir précisément les prestations facturées, nonobstant également le fait que certaines factures (p.ex. AEC Partners) sont relatives à des prestations qui ne semblent pas être en lien direct avec la négociation du Contrat, avec la conclusion de celui-ci, ou avec la réalisation des audits prévus dans le Contrat, le Tribunal arbitral considère que tous ces montants constituent des prestations versées par la Demanderesse à des tiers, au nombre desquels Mazars Gourgue, Fernand Carle, Markos P. Spanos & Co Advocates, Parra Rodriguez Abogados S.A.S., Lamy Lexel, Pepper Hamilton LLP, Pinto Ruiz & Del Valle

---

[241]   PV-Nourissat, Verbatim, p. 64, l. 15 ss, en particulier l. 28-30.
[242]   PV-Le Roux, Verbatim, p. 25, l. 25 à p. 26, l. 7.

S.L., Novances Corporate Finance et AEC Partners, et qu'ils doivent être qualifiés d'« indemnités » au sens de l'art. 3.4 du Contrat.

246. En effet, la Demanderesse considère avoir subi une diminution de son patrimoine et ne réclame pas ces montants aux entités qui ont été les destinataires des versements mais à la Défenderesse ; il s'agit donc d'une prétention en dommages-intérêts contre la Défenderesse, que l'on doit qualifier d'« *indemnité* » au sens du Contrat. Vu la teneur de l'art. 3.4 du Contrat, cette qualification exclut toute possibilité de réclamation de ces montants par la Demanderesse à la Défenderesse.

247. Par conséquent, en vertu du régime contractuel retenu par les Parties à l'art. 3.4 du Contrat en cas de réalisation de la condition résolutoire, le **Tribunal arbitral rejette la prétention de la Demanderesse en paiement de la somme de EUR 252'329.21**.

### 3. Créances d'intérêts

#### a)  Question et méthodologie

248. Il s'agit de déterminer si la somme admise en principal (*supra* N 231 ss) est porteuse d'intérêts au taux légal et, si oui, à partir de quelle date.

#### b)  Positions des Parties

249. La **Demanderesse** réclame, pour la prétention en principal de EUR 4'160'000.-, des intérêts au taux légal à compter du 16 octobre 2019[243], qu'elle justifie comme suit :

    -   L'art. 1352-6 CCfr. prévoit que la « *restitution d'une somme d'argent inclut des intérêts au taux légal et des taxes acquittées entre les mains de celui qui l'a reçue* », cette disposition étant d'ordre public[244]. Or la Demanderesse réclame une somme d'argent.

    -   Le taux réclamé est le taux légal, qui est mis à jour chaque semestre par arrêté ministériel et dont la valeur figure dans la Demande[245].

---

[243]   Demande, p. 35 ; Plaidoiries finales, Verbatim, p. 134, l. 1.
[244]   Demande, p. 32 s. ; Plaidoiries finales, Verbatim, p. 131, l. 5-16 ; Pièce DemL-8.
[245]   Demande, p. 33 ; Pièce Dem-32 ; Plaidoiries finales, Verbatim, p. 131, l. 17-20.

- L'art. 1352-7 CCfr. prévoit que celui « *qui a reçu de bonne foi ne les doit qu'à compter du jour de la demande* »[246]. En l'espèce, la Défenderesse était de bonne foi puisqu'elle les a reçus au titre du Contrat ; en revanche, dès le 19 octobre 2019, date à laquelle la Demanderesse a pris acte de la résolution du Contrat et qui correspond à la demande de restitution, les intérêts au taux légal doivent commencer à courir[247].

250. La **Défenderesse** ne s'est pas déterminée à ce sujet dans la procédure, mais il ressort des pièces du dossier qu'elle s'oppose à tout paiement d'intérêts puisqu'elle est d'avis que le Contrat continue de produire des effets[248].

### c) Discussion

251. Selon l'art. 1352-6 CCfr., « [l]*a restitution d'une somme d'argent inclut les intérêts au taux légal et les taxes acquittées entre les mains de celui qui l'a reçue* ».

252. Dans le cas présent, les motifs précédemment exposés ont permis de déterminer que la Défenderesse doit restituer une somme d'argent (EUR 4'160'000.-) à la Demanderesse (*supra* N 231). En vertu de l'art. 1352-6 CCfr., la Défenderesse doit s'acquitter de l'intérêt au taux légal sur le montant énoncé ci-dessus.

253. Reste à déterminer le point de départ (*dies a quo*) de ces intérêts.

254. Pour la créance en restitution du prix partiel de EUR 4'160'000.- versé en exécution du Contrat et de ses avenants, la Demanderesse fixe le point de départ des intérêts au taux légal en date du 16 octobre 2019[249].

255. Selon l'art. 1352-7 CCfr., « [c]*elui qui a reçu de mauvaise foi doit les intérêts, les fruits qu'il a perçus ou la valeur de la jouissance à compter du paiement. Celui qui a reçu de bonne foi ne les doit qu'à compter du jour de la demande* ».

256. En l'espèce, la Demanderesse n'allègue pas que la Défenderesse était de mauvaise foi lorsqu'elle a reçu les diverses tranches de paiement pour un montant total de EUR 4'160'000.-. Les éléments du dossier ne mènent pas à une conclusion différente.

---

[246] Demande, p. 32 ; Pièce DemL-9.
[247] Plaidoiries finales, Verbatim, p. 131, l. 21-32.
[248] Pièce Dem-27, p. 4.
[249] Plaidoiries finales, Verbatim, p. 133, l. 25 à p. 134, l. 1.

257. Le 16 octobre 2019, la Demanderesse a adressé un courrier recommandé ainsi qu'un courriel à la Défenderesse. Cet envoi mentionne que la Demanderesse demande à la Défenderesse « *de procéder au virement des 4 160 000 euros correspondant à l'ensemble des sommes versées au titre du paiement partie résultant de l'Exercice Initial de la Promesse, conformément à l'article 5.1 de la Promesse, sur le compte bancaire de Spineway à compter du 23 octobre 2019, et avant le 6 novembre 2019* »[250]. Le courrier recommandé a été réceptionné le 21 octobre 2019[251]. Le courriel a été adressé le 16 octobre 2019 à 17h10[252].

258. A la lecture des pièces du dossier et plus particulièrement du courrier recommandé du 16 octobre 2019[253], la Demanderesse a réclamé le paiement du montant de EUR 4'160'000.- à partir du 23 octobre 2019, accordant en cela un sursis à la Défenderesse, ce qui a pour effet de retarder le point de départ des intérêts légaux. Par conséquent, il convient de fixer le point de départ des intérêts au 23 octobre 2019.

259. Par conséquent, la créance de la Demanderesse envers la Défenderesse en restitution de la somme d'argent de EUR 4'160'000.- doit **inclure les intérêts légaux à partir du 23 octobre 2019**.

## E.   **Récapitulatif concernant les prétentions**

260. Il découle des développements qui précèdent que le Tribunal arbitral a tranché les prétentions de la Demanderesse comme suit :

(i) La prétention de la Demanderesse envers la Défenderesse en restitution du montant de EUR 4'160'000.– est admise, avec intérêts au taux légal à partir du 23 octobre 2019, tout en donnant à la Demanderesse acte de son engagement à signer les ordres de mouvements de titres afin de restituer à la Défenderesse l'intégralité des parts A et des parts B du Fonds dans un délai d'un mois après

---

[250]   Pièce Dem-23, p. 2.
[251]   Pièce Dem-24.
[252]   Pièce Dem-25.
[253]   Pièce Dem-23, p. 2.

avoir reçu l'intégralité de la somme de EUR 4'160'000 outre intérêts au taux légal ;

(ii) La prétention de la Demanderesse envers la Défenderesse en restitution du montant de EUR 252'329.21 est rejetée.

## F.    Coûts de l'arbitrage et frais et dépens des Parties

### 1. Question

261. Le Tribunal arbitral doit répartir les coûts de l'arbitrage, qui comprennent en particulier d'une part les honoraires et frais du Tribunal arbitral et, d'autre part, les frais et dépens des parties.

### 2. Position des Parties

262. La **Demanderesse** a conclu, dans ses plaidoiries finales, à ce que la Défenderesse soit condamnée à payer à la Demanderesse au paiement de l'intégralité des coûts de l'arbitrage, y compris les honoraires et/ou débours dus à Swiss Chambers' Arbitration et au Tribunal arbitral et avancés par la Demanderesse[254].

263. Dans son état de frais rectificatif du 30 septembre 2021, la Demanderesse conclut à ce que le Tribunal arbitral condamne la Défenderesse à payer à la Demanderesse les montants de CHF 23'424.70 (ou la contrevaleur, soit EUR 21'480.45) et EUR 110'857.06 (ou la contrevaleur, soit CHF 122'345.17) à titre de frais et honoraires ; en outre, le Tribunal arbitral doit condamner la Défenderesse à payer à la Demanderesse le montant de CHF 128'000.- (ou la contrevaleur, soit EUR 117'376.-) à titre d'honoraires et/ou débours de la Swiss Chambers' Arbitration Institution et du Tribunal arbitral et avancés par la Demanderesse[255].

264. Elle justifie sa position comme suit :

- Elle se fonde sur les art. 38 et 40 Règlement d'arbitrage[256].

---

[254]   Plaidoiries finales, Verbatim, p. 134, l. 13-15.
[255]   Dem-Etat de frais rectificatif, p. 4.
[256]   Demande, p. 36 s.

- Elle justifie ses conclusions par les comportements des Parties[257].

- Dans son décompte de frais adressé le 21 septembre 2021 et corrigé le 30 septembre 2021, la Demanderesse fait valoir des honoraires et frais pour EUR 110'857.06 et CHF 23'424.70, dont :

  (i) CHF 21'632.20 et EUR 94'887,46 de frais et honoraires d'avocats au 21 septembre 2021,

  (ii) CHF 1'000.- et EUR 1'000.- de frais à intervenir,

  (iii) CHF 2'122.- (*pro memoria*) pour la salle d'audience à Genève, car ce montant est déjà contenu dans une facture de Me Canonica, conseil de la Demanderesse,

  (iv) EUR 3'748.30.- pour les frais et honoraires de la sténotypiste,

  (v) CHF 449.50, CHF 343.-, EUR 40.44 et EUR 38.50 pour les frais de la Demanderesse, et

  (vi) EUR 11'142.36 pour les frais et honoraires de l'expert Nourissat.

- Dans le même décompte, la Demanderesse fait aussi valoir des avances de frais procéduraux pour un total de CHF 128'000.-, dont :

  (i) CHF 6'000.- pour les frais d'enregistrement du Swiss Arbitration Centre,

  (ii) CHF 122'000.- pour frais et honoraires du Tribunal arbitral.

265. La **Défenderesse** ne s'est pas déterminée à ce sujet dans la procédure.

### 3. Discussion

266. Selon l'art. 38 Règlement d'arbitrage, la sentence doit contenir une détermination des frais de l'arbitrage. Le terme de « frais » comprend uniquement : (a) les honoraires des membres du tribunal arbitral, indiqués séparément pour chaque arbitre et tout secrétaire, et fixés par le tribunal arbitral lui-même conformément aux articles 39 et 40(3) à (5) du Règlement d'arbitrage ; (b) les frais de déplacement et autres dépenses faites par le tribunal arbitral et tout secrétaire ; (c) les frais encourus pour toute expertise ou pour toute autre assistance requise par le tribunal arbitral ; (d) les frais de déplacement et autres indemnités des témoins, dans la mesure où ces dépenses ont été approuvées par le tribunal arbitral ; (e) les frais en matière de représentation ou d'assistance juridique, si de tels frais ont été réclamés

---

[257]   Demande p. 37 s.

durant la procédure d'arbitrage et dans la mesure où le tribunal arbitral en juge le montant raisonnable ; (f) les frais d'enregistrement et les frais administratifs conformément à l'Annexe B (Barème des frais) du Règlement d'arbitrage ; (g) les frais d'enregistrement, les frais et dépenses de tout arbitre d'urgence, et les frais d'expertise et de toute autre assistance requise par l'arbitre d'urgence, déterminés selon l'article 43(9) du Règlement d'arbitrage.

267. Après avoir arrêté le montant des coûts de l'arbitrage (*infra* N 268 ss) et le montant des dépens (*infra* N 280 ss), qui constituent les frais de l'arbitrage au sens de l'art. 38 du Règlement d'arbitrage, le Tribunal arbitral procédera à la répartition des coûts de procédure et des dépens (*infra* N 288 ss).

### a)    Montant des coûts de l'arbitrage

268. Selon l'art. 39 al. 1 du Règlement d'arbitrage, les honoraires et dépenses du tribunal arbitral doivent être raisonnables, compte tenu du montant litigieux, de la complexité de l'affaire soumise à l'arbitrage, du temps passé et de toutes autres circonstances pertinentes du cas d'espèce, y compris la cessation de la procédure arbitrale en cas de transaction.

269. Le montant litigieux : Le montant litigieux est de EUR 4'412'329.21.

270. Les honoraires et frais du Tribunal arbitral : Le Tribunal arbitral a étudié le dossier, préparé et dirigé une conférence d'organisation de la procédure ainsi qu'une conférence d'organisation de l'audition de témoins et de plaidoiries finales, rendu cinq ordonnances de procédure et procédé à de nombreuses notifications de documents, préparé et mené une audience d'audition de témoins et de plaidoiries finales, ainsi que clôt la procédure et rédigé la présente sentence.

271. La non-participation de la Défenderesse a certes limité le nombre d'écritures à traiter, mais le Tribunal arbitral souligne le caractère complexe de la procédure en raison même de l'absence de participation de la Défenderesse : il a ainsi fallu effectuer des démarches particulières en matière d'organisation initiale de l'arbitrage (faute de proposition commune des parties), de conduite de l'arbitrage (p.ex. notifications complexes, multiples et coûteuses tout au long de la procédure, en particulier pour les ordonnances de procédure et pour les autres communications) et de rédaction de la sentence (examen approfondi du dossier afin de vérifier l'état de fait pertinent, les conditions légales applicables et examen du degré de preuve suffisant, tout en respectant le principe de disposition et la maxime des débats). A ce titre, le Tribunal arbitral souligne les efforts et les frais exceptionnels relatifs à l'accompagnement de

la notification des documents procéduraux dus au défaut de la Défenderesse et aux complications découlant de la pandémie COVID-19. Il a en effet fallu qu'un assistant juriste consacre près de 54,5 heures aux préparatifs et à l'accompagnement de la notification par coursier des différents documents de la procédure.

272. Le Tribunal arbitral a consacré 199,35 heures à la présente procédure.

273. En application des critères figurant à l'art. 39 al. 1 du Règlement d'arbitrage, le Tribunal arbitral fixe ses honoraires à CHF 109'391.14. Cette détermination des coûts a été approuvée par la Cour le 14 janvier 2022, conformément à l'art. 40 al. 4 du Règlement d'arbitrage.

274. Les frais. L'activité du Tribunal arbitral a entraîné les frais suivants :

| Frais | Montant (CHF) |
|---|---|
| Frais bancaires pour les avances consignées | 140.00 |
| Frais pour l'audience du 7 septembre 2021 (hôtel, repas, déplacement...) pour l'arbitre et ses auxiliaires | 1'161.00 |
| Frais de port (courrier postal, coursier...) | 1'672.50 |
| Autre frais (copies...) | 101.20 |
| **TOTAL** | **3'074.70** |

275. En résumé, le Tribunal arbitral a consacré le nombre d'heures suivant et a eu des frais correspondant au montant suivant :

| | **Heures** | **Honoraires (CHF)** |
|---|---|---|
| **TOTAL** | 199.35 heures | 109'391.14 |

276. Les frais administratifs. Selon l'Annexe B du Règlement d'arbitrage (Barème des frais ; éd. 2012), le montant des frais administratifs se montent à CHF 9'499.- et sont dus au Swiss Arbitration Centre, en sus des frais d'enregistrement.

**Arbitrage**　　　**SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

277. Les avances de frais fournies par les Parties. Les Parties ont payé les avances de frais suivantes requises par le Tribunal arbitral :

| Partie | Avance (CHF) |
|---|---|
| Demanderesse | 121'964.84 |
| Défenderesse | 0.00 |

278. Il convient d'y rajouter les frais d'enregistrement non remboursables du Swiss Arbitration Centre pour un montant de CHF 6'000.-.

279. Les coûts totaux de l'arbitrage sont résumés dans le tableau suivant ; les coûts doivent être déduits de l'avance de frais effectuée par les Parties (à savoir CHF 121'964.84) et des frais d'enregistrement (à savoir CHF 6'000.-) :

| Thème | Montant (CHF) |
|---|---|
| Honoraires du Tribunal arbitral | 109'391.14 |
| Frais du Tribunal arbitral | 3'074.70 |
| Frais administratifs | 9'499.00 |
| **SOUS-TOTAL** | 121'964.84 |
| Frais d'enregistrement non remboursables | 6'000.00 |
| **TOTAL des coûts de l'arbitrage** | 127'964.84 |

**b)　Montant des dépens des Parties**

280. Les **dépens** des Parties comprennent les honoraires de leurs Conseils et les frais relatifs à la défense de leurs intérêts, en particulier les frais liés à la logistique des audiences, aux expertises diligentées sous l'égide du Tribunal arbitral, aux honoraires et frais des experts de parties, aux éventuelles indemnités pour les personnes entendues et aux autres frais.

281. Suivant la classification retenue ci-dessus, le Tribunal arbitral constate que la **Demanderesse** fait valoir les dépens suivants :

(i)　Frais et Honoraires des Conseils en CHF　　　　　CHF　　21'632.20
(ii)　Frais et Honoraires des Conseils en EUR　　　　　EUR　　94'887.46
(iii)　Estimation des frais et honoraires d'avocats à intervenir　CHF　　1'000.00

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

| | | | |
|---|---|---|---|
| (iv) | Estimation des frais et honoraires d'avocats à intervenir | EUR | 1'000.00 |
| (v) | Frais et Honoraires de la sténotypiste | EUR | 3'748.30 |
| (vi) | Frais d'experts (Nourissat) | EUR | 11'142.36 |
| (vii) | Autres frais en CHF | CHF | 792.50 |
| (viii) | Autres frais en EUR | EUR | 78.94 |
| **TOTAL des montants en CHF** | | CHF | 23'424.70 |
| **TOTAL des montants en EUR** | | EUR | 110'857.06 |

282. S'agissant des montants, il convient de les maintenir dans leur monnaie originale, à savoir en francs suisses (CHF) et en euros (EUR), en dépit du fait que la Demanderesse propose, pour chaque montant, sa contre-valeur dans l'autre monnaie.

283. S'agissant des montants (iii) et (iv) relatifs à des frais et honoraires des Conseils à intervenir, il s'agit de sommes relativement modestes justifiées au regard des étapes encore à venir après le 21 septembre 2021, en particulier celles qui ont eu lieu le 30 septembre 2021 et le 28 octobre 2021. Le Tribunal arbitral considère que de tels frais peuvent être réclamés par une partie, et les admet donc en tant que dépens de la Demanderesse.

284. Les autres montants (i), (ii), (v), (vi), (vii) et (viii) ne requièrent pas de développement particulier. Ils sont justifiés par pièces et le Tribunal arbitral les considère comme raisonnables et justifiés au sens de l'art. 38 let. e du Règlement d'arbitrage.

285. Par conséquent, additionnant les montants retenus, le Tribunal arbitral arrête les dépens de la Demanderesse à CHF 23'424.70 et à EUR 110'857.06.

**c)   Montant des frais de l'arbitrage**

286. Les frais de l'arbitrage comprennent les coûts de l'arbitrage ainsi que les dépens des parties.

287. Par conséquent, on a la situation suivante :

| Thème | Montant |
|---|---|
| Coûts de l'arbitrage | CHF 127'964.84 |
| Dépens de la Demanderesse | CHF 23'424.70 |
| | EUR 110'857.06 |
| Dépens de la Défenderesse | Inexistants |
| **TOTAL** | CHF 151'389.54 |
| | EUR 110'857.06 |

#### d)   Répartition des frais de procédure et dépens

288. Pour répartir les frais de procédure et dépens, le Tribunal arbitral tient compte du sort des conclusions et des circonstances particulières de l'affaire :

    (i)  S'agissant du sort des conclusions, le Tribunal arbitral est entré en matière sur toutes les conclusions de la Demanderesse. Celle-ci a obtenu gain de cause pour la plupart de ses conclusions (EUR 4'160'000.- sur EUR 4'412'329.21, soit 94,28 % du total des prétentions), sans toutefois obtenir la totalité des montants réclamés notamment en ce qui concerne les frais pour la négociation de la promesse, sa conclusion ainsi que pour la réalisation des audits. Les conclusions de la Demanderesse rejetées par le Tribunal arbitral ont toutefois nécessité une administration des preuves et un traitement juridique légèrement moins complexes que les conclusions rejetées par le Tribunal arbitral.

    (ii) Quant aux circonstances particulières, le Tribunal arbitral considère que la Demanderesse n'a pas complexifié, ralenti ou renchéri la procédure de manière particulière, notamment en formulant des requêtes incidentes dénuées de chances de succès. S'agissant de la Défenderesse, son défaut durant toute la procédure et l'absence de déterminations et d'allégués propres n'a pas facilité le traitement de la cause ; toutefois, le Tribunal arbitral est d'avis que ces difficultés sont compensées par l'absence d'allégués et de réquisitions de preuves en provenance de la Défenderesse.

289. Au vu des circonstances particulières mentionnées et compte tenu du sort des conclusions, le Tribunal arbitral considère appropriée la répartition suivante des frais de procédure et des dépens :

    - La Demanderesse a le droit de réclamer à la Défenderesse 95% des frais de procédure et des dépens supportés pour la présente procédure arbitrale.

    - La Défenderesse doit supporter la totalité de ses éventuels dépens encourus dans la présente procédure arbitrale.

### e) Conclusion

290. Pour les motifs figurant ci-dessus, le Tribunal arbitral ordonne à la Défenderesse de rembourser les montants suivants à la Demanderesse à titre de frais de l'arbitrage supportés par la Demanderesse dans le cadre de cet arbitrage :

    - **CHF 143'820.05** (= 95% de CHF 151'389.54) ;

    - **EUR 105'314.20** (= 95% de EUR 110'857.06).

## G.   Autres conclusions prises par les Parties

### 1. Question

291. Le Tribunal arbitral doit encore trancher les conclusions de la Demanderesse non encore traitées en tant que telles, à savoir :

    - « DIRE et JUGER qu'aucun accord de partenariat n'a été conclu entre la société SPINEWAY et la société STRATEGOS GROUP LLC (avant le 19 septembre 2019) »[258] ;

    - « Constater et/ou prononcer la résolution de la promesse synallagmatique de vente d'achat du 19 mars 2019, de son avenant n°1 du 3 mai 2019 et de son avenant n°2 du 16 mai 2019, en application de l'article 3.4 de la promesse, laissée inchangée par les deux avenants »[259].

---

[258]   Conclusions de la Demanderesse du 7 septembre 2021.
[259]   Conclusions de la Demanderesse du 7 septembre 2021.

**Arbitrage**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Swiss Arbitration Centre Affaire n° 300515-2020 (Swiss Rules)

### 2. Position des Parties

292. La **Demanderesse** formule ces demandes dans ses conclusions formelles.

293. La **Défenderesse** ne s'est pas déterminée à ce sujet dans la procédure.

### 3. Discussion

294. Le Tribunal arbitral constate qu'il a dû trancher, sous forme de question préliminaire, tant la première (« *DIRE et JUGER qu'aucun accord de partenariat n'a été conclu entre la société SPINEWAY et la société STRATEGOS GROUP LLC (avant le 19 septembre 2019)* ») que la seconde (« *Constater et/ou prononcer la résolution de la promesse synallagmatique de vente d'achat du 19 mars 2019, de son avenant n°1 du 3 mai 2019 et de son avenant n°2 du 16 mai 2019, en application de l'article 3.4 de la promesse, laissée inchangée par les deux avenants* ») des conclusions, afin d'apprécier le bien-fondé des prétentions en paiement de la Demanderesse. Le Tribunal arbitral a admis la prétention de la Demanderesse en restitution du montant de EUR 4'160'000.-, en constatant de manière liminaire le fait qu'aucun Accord de Partenariat commercial au sens de l'art. 3.4 du Contrat n'avait été conclu dans le délai prévu par le Contrat, et en constatant que le Contrat et ses Avenants n° 1 et n° 2 étaient résolus, en application de l'art. 3.4 du Contrat. Pour ces raisons, le Tribunal arbitral considère qu'il n'est pas nécessaire de faire figurer le résultat de son raisonnement dans le dispositif de la sentence arbitrale.

Partie de page intentionnellement laissée blanche

## VII.   Dispositif

Sur la base des considérants qui précèdent, le Tribunal arbitral :

1.  CONDAMNE la société STRATEGOS GROUP LLC à verser à la société SPINEWAY SA la somme en principal de EUR 4'160'000.- (quatre millions cent soixante mille euros), outre intérêts au taux légal à compter du 23 octobre 2019 ;

2.  DONNE ACTE à la société SPINEWAY SA qu'elle s'engage à signer les ordres de mouvements de titres afin de restituer à la société STRATEGOS GROUP LLC l'intégralité des parts A et des parts B du fonds Integral Medical Solutions Fund, et ce dans un délai d'un mois après avoir reçu l'intégralité de la somme de EUR 4'160'000.- (quatre millions cent soixante mille euros), outre intérêts au taux légal ;

3.  ARRÊTE les coûts de l'arbitrage à CHF 127'964.84 (cent vingt-sept mille neuf cent soixante-quatre francs suisses et quatre-vingt-quatre centimes), prélevés sur les avances de frais effectuées par les Parties ;

4.  ARRÊTE les dépens de SPINEWAY SA à CHF 23'424.70 (vingt-trois mille quatre cent vingt-quatre francs suisses et soixante-dix centimes) et EUR 110'857.06 (cent dix mille huit cent cinquante-sept euros et six centimes) ;

5.  CONDAMNE STRATEGOS GROUP LLC à rembourser à SPINEWAY SA les montants suivants au titre des frais d'arbitrage :

    -   CHF 143'820.05 (cent quarante-trois mille huit cent vingt francs suisses et cinq centimes) ;

    -   EUR 105'314.20 (cent cinq mille trois cent quatorze euros et vingt centimes) ;

6.  REJETTE toutes autres conclusions des Parties dans la mesure où elles sont recevables.

Siège de l'arbitrage : Genève, Suisse, le 20 janvier 2022

**Le Tribunal arbitral (arbitre unique)**

Prof. Blaise Carron

# EXHIBIT 2



100 Park Avenue, 16ᵗʰ Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK      )
                       )          ss:
COUNTY of NEW YORK     )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "Sentence finale" issued by Professor Blaise Carron on January 20, 2022 -- originally written in *French*-- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 12/8/2022

Sworn to and signed before ME
this 8ᵗʰ day of December, 2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Notary Public



Your
legal
translation
partner

New York, NY | Washington DC | Houston, TX | San Francisco, CA | Hong Kong

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**

Case No. 300515-2020 (Swiss Rules)

# Final Award

January 20, 2022

In Arbitration Proceedings with the Following Parties:

**SPINEWAY SA**
7, Allée du Moulin Berger
Bâtiment 7
69130 Ecully
France

Represented by:

Mr. Romain Canonica, attorney at law
Mr. Edouard Bertrand, attorney at law
Canonica Valticos de Preux + Associés
15, rue Pierre-Fatio
1204 Geneva
Switzerland
rcanonica@cvpartners.ch
ebertrand@lamy-lexel.com

**Plaintiff**

vs.

**STRATEGOS GROUP LLC**
2701 Centerville Road
Wilmington
DE 19808
USA

Represented by:

Mr. Luc Gerard
Carrera 2 #11-7
Bogota
Colombia
luc.gerard@tribeca.com.co

**Defendant**

Before the Sole Arbitrator

Prof. Blaise Carron

Seat of Arbitration: Geneva (Switzerland)

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 92 of 255 PageID #: 102

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                 Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                    Page 2 of 83

## Table of Contents

I.     Table of Definitions of Abbreviations and Concepts ....................................................5

II.    Introduction...................................................................................................................8

    A.     **Parties** ...............................................................................................................8

      1.   **Plaintiff**...........................................................................................................8

      2.   **Defendant**.......................................................................................................8

    B.     **Arbitral Tribunal** ...............................................................................................9

    C.     **Object of the Dispute – Summary**....................................................................9

    D.     Arbitration Agreement and Jurisdiction of the Arbitral Tribunal ............................10

    E.     Seat and Language of the Arbitration; Applicable Procedural Law.......................10

    F.     **Applicable Substantive Law** ............................................................................11

III.   Conclusions of the Parties .........................................................................................12

    A.     **Conclusions of the Plaintiff**.............................................................................12

    B.     **Conclusions of the Defendant**.........................................................................16

IV.    History of the Proceedings..........................................................................................17

V.     Facts and Positions of the Parties ..............................................................................23

    A.     **Individuals/Entities Involved**...........................................................................23

    B.     **Period Preceding the Execution of the Contract**............................................24

    C.     **Execution of the Contract and Initial Performance of the Contract**.......................25

    D.     **Application of the Resolutory Condition Sought by the Plaintiff**............................30

    E.     **Further Discussions**.........................................................................................32

VI.    Discussion ..................................................................................................................36

    A.     **Jurisdiction of the Arbitral Tribunal**................................................................36

    B.     **General** .............................................................................................................37

      1.   **Method and Structure of the Award**...............................................................37

      2.   **Contractual Basis, Nature, Performances and Compensations**...............................38

        a)   **Question**.....................................................................................................38

        b)   **Positions of the Parties**..............................................................................38

        c)   **Discussion**.................................................................................................39

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 93 of 255 PageID #: 103

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                    Page 3 of 83

  **3.** **Applicable Law** ....................................................................40

   **d)** **Question** ..................................................................40

   **e)** **Positions of the Parties**..........................................40

   **f)** **Discussion** .............................................................40

 **C.** **Regime of Art. 3.4 of the Contract** ..............................................41

  **1.** **Characterization of Art. 3.4 of the Contract** ..........................41

   **a)** **Question**..................................................................41

   **b)** **Positions of the Parties**..........................................41

   **c)** **Discussion**..............................................................42

  **2.** **Validity of Art. 3.4 of the Contract** ......................................46

   **a)** **Question**..................................................................46

   **b)** **Positions of the Parties**..........................................46

   **c)** **Discussion**..............................................................48

  **3.** **Applicability of Art. 3.4 of the Contract (Materialization of the Resolutory Condition)**...........................................................................................49

   **a)** **Question**..................................................................49

   **b)** **Positions of the Parties**..........................................49

   **c)** **Discussion**..............................................................53

  **4.** **Consequences of the Applicability of Art. 3.4 of the Contract** ...............58

   **a)** **Question**..................................................................58

   **b)** **Positions of the Parties**..........................................58

   **c)** **Discussion**..............................................................61

 **D.** **The Claims of the Plaintiff** .........................................................62

  **1.** **Claim for the Payment of EUR 4,160,000 and the Undertaking to Sign Security Transfer Orders to Return the Totality of the A and B Units of the Fund** ......63

   **a)** **Question and Methodology**......................................63

   **b)** **Positions of the Parties**..........................................63

   **c)** **Discussion**..............................................................64

  **2.** **Claim for the payment of EUR 252,329.21** ...........................66

   **a)** **Question and Methodology**......................................66

   **b)** **Positions of the Parties**..........................................66

   **c)** **Discussion**..............................................................67

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 94 of 255 PageID #: 104

Arbitration          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                     Page 4 of 83

     **3.**    **Interests Accrued**.................................................................................................70

      **a)**   **Question and Methodology**.........................................................................70

      **b)**   **Positions of the Parties**............................................................................70

      **c)**   **Discussion**................................................................................................71

  **E.**    **Summary of the Claims**...................................................................................72

  **F.**    **Costs of Arbitration and Costs and Expenses of the Parties**.........................72

    **1.**    **Question**...........................................................................................................72

    **2.**    **Positions of the Parties**..................................................................................73

    **3.**    **Discussion**.......................................................................................................74

      **a)**   **Amount of Expenses for the Arbitration**...................................................74

      **b)**   **Amount of the Legal Costs of the Parties**.................................................77

      **c)**   **Amount of the Costs of Arbitration**..........................................................78

      **d)**   **Allocation of Procedural Expenses and Legal Costs**...............................78

      **e)**   **Conclusion**................................................................................................79

  **G.**    **Other Conclusions of the Parties**...................................................................79

    **1.**    **Question**...........................................................................................................79

    **2.**    **Positions of the Parties**..................................................................................80

    **3.**    **Discussion**.......................................................................................................80

**VII.**   Operative Part of the Arbitral Award...........................................................................82

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 95 of 255 PageID #: 105

**Arbitration**       **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                      Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                      Page 5 of 83

| I. | Table of Definitions of Abbreviations and Concepts |
|---|---|

| al. | also |
|---|---|
| all. | alleged |
| Amendment No. 1 | Amendment number one to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019, dated May 3, 2019 |
| Amendment No. 2 | Amendment number two to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019, dated May 16, 2019 |
| Arbitration Notification | Request for Arbitration (= Arbitration Notification) of September 14, 2020 filed by the Plaintiff |
| Arbitration Rules | Swiss Rules of International Arbitration, version of June 2012 |
| Art. | Article |
| Transferor | Strategos Group LLC (= Defendant) |
| Claim | Statement of Claim of April 20, 2021 of the Plaintiff |
| Closing Arguments | Closing arguments of September 7, 2021 |
| Conclusions of the Plaintiff of September 7, 2021 | Conclusions filed by the Plaintiff during the Hearing of September 7, 2021 (Act. 31c) |
| Contract | Bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019 between the Defendant in his capacity of Transferor and the Plaintiff in his capacity of Transferee (Plaintiff Exhibit 5) |
| Court | Arbitration Court of the Swiss Arbitration Centre |

| | |
|---|---|
| D. SIEGRIST | David Siegrist, Chief Financial Officer of the Plaintiff (during the applicable period for these proceedings) |
| Defendant | Strategos Group LLC |
| Dir. | Director(s) |
| Ed. | Editor(s) |
| espec. | especially |
| Ex. […] | Exhibit No. […] of the arbitration case file |
| Exhibit Plaint.-[…] | Exhibit No. […] filed by the Plaintiff |
| Exhibit Plaint.L-[…] | Legal source No. […] filed by the Plaintiff |
| F. LAUCK | Florence Lauck, Quality and Regulatory Affairs Officer in charge of the clinical department of the Plaintiff during the applicable period for these proceedings |
| FrCC | French Civil Code |
| Fund | Luxemburg securitization fund NATIONAL CLINICS, now named INTEGRAL MEDICAL SOLUTIONS FUND (see additional details in Amendment No. 2) |
| Hearing of September 7, 2021 | Hearing of witnesses with submission of evidence and final pleadings on September 7, 2021 |
| i.f. | in fine |
| L. GERARD | Luc Gérard Nyafe, representative of the Defendant |
| Minutes | Minutes of proceedings |
| Minutes-[name] | Minutes of the hearing of [name] during the Hearing of September 7, 2021 |
| NCC | National Clinics Centenario or National Clinics Columbia SAS |

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 97 of 255 PageID #: 107

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                        Page 7 of 83

| | |
|---|---|
| Nourissat Expert's Report | Expert's Report from Prof. Cyril Nourissat of April 6, 2021 (EXP-Nourissat) |
| P. CHABERT | Philippe Chabert, Director of Operations for the Plaintiff (during the applicable period for these proceedings) |
| Partnership Agreement (Commercial) | Commercial partnership and distribution agreement for the products of the Transferee in the Transferor's working areas (mentioned in Art. 3.4 of the Contract) |
| PILA | (Swiss) Federal Act on Private International Law of December 18, 1987 (RS 291) |
| Plaint.-Amended Statement of Costs | Amended statement of costs of the Plaintiff of September 30, 2021 |
| Plaintiff | Spineway SA |
| PO No. | Procedural Order No. [...] |
| Request for Arbitration | See Arbitration Notification |
| S. LE ROUX | Stéphane Le Roux, President and representative of the Plaintiff |
| Secretariat | Secretariat of the Swiss Arbitration Centre |
| SPR | Specific Procedural Rules included in PO No. 1 of March 2, 2021 |
| Verbatim Report | Verbatim report of the Hearing of September 7, 2021, finalized and reviewed by the Parties and the Arbitral Tribunal |

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 98 of 255 PageID #: 108

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                      Page 8 of 83

## II.   Introduction

### A.  Parties

#### 1.  Plaintiff

1.  The **Plaintiff** is: Spineway SA[1].

2.  The address of the Plaintiff is:

    7, allée du Moulin Berger

    Bâtiment 7

    69130 Ecully

    France

3.  The Plaintiff is represented by its counsel:

    Mr. Romain Canonica, attorney at law

    Mr. Edouard Bertrand, attorney at law

    Canonica Vaiticos de Preux + Associés

    15, rue Pierre Fatio

    1204 Geneva

    Switzerland

    rcanonica@cvpartners.ch

    ebertrand@lamy-lexel.com

#### 2.  Defendant

4.  The **Defendant** is: Strategos Group LLC[2].

5.  The address of the Defendant is:

    2701 Centerville Road

    Wilmington

    DE 19808

---

[1] Exhibit Plaint.-1, p. 1 ss.

[2] Exhibit Plaint.-1, p. 3 ss.

Case 1:22-mc-00604-RGA-JLH  Document 1-1  Filed 12/22/22  Page 99 of 255 PageID #: 109

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                    Page 9 of 83

USA

6.  The Defendant is represented by:

Mr. Luc Gérard

Carrera 2 #11-7

Bogota

Colombia

luc.gerard@tribeca.com.co

## B.  Arbitral Tribunal

7.  The Arbitral Tribunal includes a sole Arbitrator:

Prof. Blaise Carron, attorney at law

Dufourstrasse 33

3005 Berne

Switzerland

Email: blaise.carron@unine.ch

Tel.: +41 79 567 77 92

## C.  Object of the Dispute – Summary

8.  The dispute results from the "*bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell*" of March 19, 2019, entered into between the Defendant, in his capacity as Transferor and, and the Demandant, in his capacity as Transferee (hereinafter referred to as the "**Contract**")[3].

9.  Its object is the primary claim of the Plaintiff, whose aim is to have the Contract and its amendments established/declared rescinded pursuant to Article 3.4 of the Contract, and to order the Defendant to pay to the Plaintiff, as principal, EUR 4,160,000, as the partial price paid under the Contract and its amendments, in addition to interests at the applicable

---

[3] Exhibit Plaint.-5, *passim*.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 100 of 255 PageID #: 110

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award          Page 10 of 83

legal rate, in exchange for the undertaking to return the totality of the A and B units of the Fund within one month of receiving the abovementioned amounts, as well as to order the Defendant to pay to the Plaintiff the sum of EUR 252,239.21 for the expenses incurred by the Plaintiff to negotiate and execute the Contract, and to perform the audits[4].

10. These proceedings have a distinctive character due to the fact that the Defendant was regularly subpoenaed and was repeatedly asked to take an active part in the arbitral procedure, but refrained from doing so and remained silent and passive all throughout the procedure.

## D. Arbitration Agreement and Jurisdiction of the Arbitral Tribunal

11. The Contract includes the following arbitration clause:

"*10.2 Any dispute resulting from or related to this Promise will be resolved via a final decision issued in accordance with the Mediation and Arbitration Rules of the Geneva International Chamber of Commerce by one (1) arbitrator appointed pursuant to these Rules (such arbitrator being hereinafter referred to as the 'Arbitral Tribunal')*"[5].

12. It will be necessary to interpret this clause to ascertain whether the Arbitral Tribunal has jurisdiction over this dispute (*infra* N 126 ss).

## E. Seat and Language of the Arbitration; Applicable Procedural Law

13. Pursuant to Art. 10.2 of the Contract, 2nd paragraph, the "*Arbitral Tribunal will be constituted in Geneva (Switzerland) [...]*"[6].

14. The sear of the Arbitral Tribunal is therefore in Geneva, Switzerland.

15. Pursuant to Art. 10.2 of the Contract, 2nd paragraph, "*the arbitration will be conducted in French*".

---

[4] For a description of the dispute at the beginning of the proceedings, see Claim, p. 38 s.

[5] Exhibit Plaint.-5, p. 24

[6] Exhibit Plaint.-5, p. 24

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 101 of 255 PageID #: 111

**Arbitration**       **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                          Page 11 of 83

16. The language of the Arbitration is therefore the French language.

17. Concerning the applicable procedural rules, Art. 10.2 of the Contract states that "*any dispute resulting from or related to this Promise will be resolved via a final decision issued in accordance with the Mediation and Arbitration Rules of the Geneva International Chamber of Commerce [...]*"[7]. Since the seat of the Arbitral Tribunal is in Switzerland and that none of the parties to the arbitration agreement had seen its interpretation at the time of its execution (*infra* N 126 ss), the following rules apply:

    (i)   Procedural Order No. 1 (hereinafter referred to as "**PO No. 1**") concerning the specific procedural rules of March 2, 2021 (hereinafter referred to as "**SPR**");

    (ii)  Swiss Rules of International Arbitration, version of June 2012 (hereinafter referred to as "**Arbitration Rules**");

    (iii) Chapter 12 (Art. 176 ss) of the Federal Act on Private International Law of December 18, 1987 (hereinafter referred to as "**PILA**").

## F. Applicable Substantive Law

18. Pursuant to Art. 10.2 of the Contract, 3rd paragraph, the "*Arbitral Tribunal will resolve the dispute pursuant to French law*"[8].

19. The applicable substantive law is therefore French law.

Part of this page was intentionally left blank

---

[7] Exhibit Plaint.-5, p. 24
[8] Exhibit Plaint.-5, p. 24

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 102 of 255 PageID #: 112

Arbitration        SPINEWAY SA vs. STRATEGOS GROUP LLC
                   Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                              Page 12 of 83

## III.    Conclusions of the Parties

### A. Conclusions of the Plaintiff

20. In the "Request for Arbitration" of September 14, 2020 (hereinafter referred to as the
"**Arbitration Notification**"), the Plaintiff issued the following conclusions[9]:

"*Considering the Arbitration Rules,*

*Considering Articles 1304, 1304-2, 1304-3, 1304-7, 1353-6, and 1353-7 of the French Civil Code,*

*Considering the mentioned case law,*

*Considering the exhibits submitted during the hearing,*

• ***STATE AND RULE*** *that no partnership agreement was entered into between the company SPINEWAY and the company STRATEGOS GROUP LLC before September 19, 2019;*

• ***ORDER*** *the rescission of the bilateral promise to sell and purchase of March 19, 2019, of its Amendment No. 1 of May 3, 2019, and of its Amendment No. 2 of May 16, 2019, pursuant to the resolutive condition included in Article 3.4 of the promise, which remained unaffected by any of the two amendments;*

• ***ORDER*** *the company STRATEGOS GROUP LLC to pay to the company SPINEWAY, as principal, €4,160,000, as the partial price paid under the promise and its amendments, in addition to interests at the applicable legal rate starting from September 19, 2019, date when the resolutory condition was met;*

• ***ACKNOWLEDGE*** *that the company SPINEWAY undertook to sign the security transfer orders in order to return to the company STRATEGOS GROUP LLC the totality of the A units and B units of the fund named Integral Medical Solutions Fund within one month of receiving €4,160,000 in whole, in addition to interests at the applicable legal rate;*

• ***ORDER*** *the company STRATEGOS GROUP LLC to pay to the company SPINEWAY the sum of €252,239.21 for the expenses incurred by the company SPINEWAY to negotiate and execute the promise, and to perform the audits;*

---

[9] Arbitration Notification, p. 25

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 103 of 255 PageID #: 113

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                 Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 13 of 83

*• **ORDER** the company STRATEGOS GROUP LLC to bear all arbitration costs, including the fees and/or disbursed expenses due to the Swiss Chambers' Arbitration Institution and to the Arbitral Tribunal;*

*• **ORDER** the company STRATEGOS GROUP LLC to bear the counsel fees of the company SPINEWAY for an amount of €120,000, excluding taxes, subject to any potential adjustment or addition."*

21. In his Statement of Claim of April 20, 2021 (hereinafter referred to as the "**Claim**"), the Plaintiff issued the following conclusions[10]:

*"Considering the Rules,*

*Considering Procedural Order No. 1 of March 2, 2021,*

*Considering Articles 1304, 1304-2, 1304-3, 1304-7, 1352-6, and 1352-7 of the French Civil Code,*

*Considering the mentioned case law,*

*Considering the exhibits, written statements and expert's reports submitted during the hearing,*

*• **STATE AND RULE** that no partnership agreement was entered into between the company SPINEWAY and the company STRATEGOS GROUP LLC before September 19, 2019;*

*• **ORDER** the rescission of the bilateral promise to sell and purchase of March 19, 2019, of its Amendment No. 1 of May 3, 2019, and of its Amendment No. 2 of May 16, 2019, pursuant to the resolutive condition included in Article 3.4 of the promise, which remained unaffected by any of the two amendments;*

*• **ORDER** the company STRATEGOS GROUP LLC to pay to the company SPINEWAY, as principal, €4,160,000 (four million one hundred and sixty thousand euros), as the partial price paid under the promise and its amendments, in addition to interests at the applicable legal rate starting from September 19, 2019, date when the resolutory condition was met;*

*• **ACKNOWLEDGE** that the company SPINEWAY undertook to sign the security transfer orders in order to return to the company STRATEGOS GROUP LLC the totality of the A and B units of the fund named Integral Medical Solutions Fund within one month of*

---

[10] Claim, p. 38, N 33.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 104 of 255 PageID #: 114

**Arbitration**              **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                              Page 14 of 83

*receiving €4,160,000 (four million one hundred and sixty thousand euros) in whole, in addition to interests at the applicable legal rate;*

• ***ORDER*** *the company STRATEGOS GROUP LLC to pay to the company SPINEWAY the sum of €252,239.21 (two hundred thousand two hundred and thirty nine euros and twenty-one cents), in addition to VAT for any invoice subject to this tax, for the expenses incurred by the company SPINEWAY to negotiate and execute the promise, and to perform the audits;*

• ***ORDER*** *the company STRATEGOS GROUP LLC to pay for all arbitration costs, including the fees and/or disbursed expenses due to the Association of Swiss Chambers' Arbitration Institution and to the Arbitral Tribunal, and advanced by the company SPINEWAY;*

• ***ORDER*** *the company STRATEGOS GROUP LLC to pay all fees incurred by the company SPINEWAY in connection with these arbitration proceedings, as well as the counsel fees of the company SPINEWAY."*

22. In his closing arguments of September 7, 2021 (hereinafter referred to as "**Closing Arguments**") and pursuant to Ch. 16 s. of PO No. 3, the Plaintiff filed the following conclusions in the form of a written document[11]:

*"Considering the Rules,*

*Considering Articles 1304, 1304-2, 1304-3, 1304-7, 1352-6, and 1352-7 of the French Civil Code,*

*Considering the mentioned case law,*

*Considering the exhibits, written statements and expert's reports,*

• ***STATE AND RULE*** *that no partnership agreement was entered into between the company SPINEWAY and the company STRATEGOS GROUP LLC (before September 19, 2019);*

• ***ESTABLISH AND/OR ORDER*** *the rescission of the bilateral promise to sell and purchase of March 19, 2019, of its Amendment No. 1 of May 3, 2019, and of its Amendment No. 2 of May 16, 2019, pursuant to Article 3.4 of the promise, which remained unaffected by any of the two amendments;*

---

[11] Conclusions of the Plaintiff of September 7, 2021, Act. 31b, reproduced in: Closing Arguments, Verbatim Report, p. 133, l. 13 to p. 134 l. 18 (the reproduction includes some mistakes).

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 105 of 255 PageID #: 115

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 15 of 83

• *ORDER* the company STRATEGOS GROUP LLC to pay to the company SPINEWAY, as principal, €4,160,000 (four million one hundred and sixty thousand euros), as the partial price paid under the promise and its amendments, in addition to interests at the applicable legal rate starting from October 16, 2019, date when the resolutory clause/condition was met;

• *ACKNOWLEDGE* that the company SPINEWAY undertook to sign the security transfer orders in order to return to the company STRATEGOS GROUP LLC the totality of the A units and B units of the fund named Integral Medical Solutions Fund within one month of receiving €4,160,000 (four million one hundred and sixty thousand euros) in whole, in addition to interests at the applicable legal rate;

• *ORDER* the company STRATEGOS GROUP LLC to pay to the company SPINEWAY the sum of €252,239.21 (two hundred thousand two hundred and thirty nine euros and twenty-one cents), in addition to VAT for any invoice subject to this tax, for the expenses incurred by the company SPINEWAY to negotiate and execute the promise, and to perform the audits;

• *ORDER* the company STRATEGOS GROUP LLC to pay for all arbitration costs, including the fees and/or disbursed expenses due to the Association of Swiss Chambers' Arbitration Institution and to the Arbitral Tribunal, and advanced by the company SPINEWAY;

• *ORDER* the company STRATEGOS GROUP LLC to pay all fees incurred by the company SPINEWAY in connection with these arbitration proceedings, as well as the counsel fees of the company SPINEWAY."

23. On September 30, 2021, when filing the Amended Statement of Costs due to an amended fee and cost bill issued by the stenographer, the Plaintiff filed conclusions about fees and costs, requesting the following[12]:

"May it please the Court:

- To order the company Strategos Group LLC to pay to the company Spineway SA the amounts of CHF 23,424.70 (or its countervalue of EUR 21,480.45) and EUR 110,857.06 (or its countervalue of CHF 122,345.17) as fees and costs; and

[12] Plaint.-Amended Statement of Costs, p. 4

*- To order the company Strategos Group LLC to pay to the company Spineway SA the amount of CHF 128,000 (or its countervalue of EUR 117,376) as fees and/or disbursed expenses due to the Swiss Chambers' Arbitration Institution and to the Arbitral Tribunal, and advanced by the company Spineway SA."*

### B. Conclusions of the Defendant

24. The Defendant, who refrained from taking part in any part of the proceedings, did not issue any conclusions.

Part of this page was intentionally left blank

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 107 of 255 PageID #: 117

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                   Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                        Page 17 of 83

## IV.   History of the Proceedings

25. The arbitration proceedings were initiated and conducted chronologically as follows.

26. On September 14, 2020, the Plaintiff sent an arbitration notification (hereinafter referred to as the "**Arbitration Notification**") named "*Request for Arbitration*", with 35 exhibits, to the Swiss Arbitration Centre (formerly Swiss Chambers' Arbitration Institution, or SCAI, until June 1st, 2021; for the sake of clarity, the award uses consistently the name of its currently active legal successor, i.e. "Swiss Arbitration Centre").

27. On September 15, 2020, the secretariat of the Swiss Arbitration Centre (hereinafter referred to as the "**Secretariat**") acknowledged receipt of the Arbitration Notification, and forwarded it with the exhibits to the Defendant by courier, requesting a response to the Arbitration Notification within 30 days. The Secretariat also requested that the Parties jointly appoint a sole arbitrator within 30 days. The request was delivered by courier to the Defendant on September 17, 2020.

28. On October 27, 2020, since the Defendant had not responded and a sole arbitrator had not been jointly appointed, the Secretariat notified to the Parties that, pursuant to Art. 3(12) of the Arbitration Rules, it was going to request that the Arbitration Court (hereinafter referred to as the "**Court**") issue a decision concerning the administration of the proceedings and the appointment of the sole arbitrator, in accordance with Art. 7(3) of the Arbitration Rules.

29. On November 6, 2020, the Secretariat stated that the Tribunal had decided to administer these proceedings and was going to appoint the sole arbitrator, inviting the Plaintiff to pay a provisional advance of CHF 10,000.

30. On November 27, 2020, the Swiss Arbitration Centre acknowledged receipt of the payment of CHF 9,994 as provisional advance, and informed the Parties that the Court had appointed the sole arbitrator and had forwarded the case file to him.

31. On December 1, 2020, the Arbitral Tribunal sent a first email to the Parties describing the next steps of the proceedings and requesting that they acknowledge receipt. The Plaintiff acknowledged receipt the following day, but the Defendant did not.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 108 of 255 PageID #: 118

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                                    Page 18 of 83

32. On December 10, 2020, the Arbitral Tribunal sent a payment request for an expense advance to be shared by the Parties at 50%. The request was sent by email to the representatives of both Parties, i.e. Mr. Canonica and Mr. Bertrand for the Plaintiff (rcanonica@cvpartners.ch and ebertrand@lamy-lexel.com), and Mr. Luc Gérard for the Defendant (luc.gerard@tribeca.com.co). The server of the email address used for the Defendant acknowledged receipt of the email. In addition, to ensure that the Defendant would receive the message, it was also sent by courier to the Defendant's address (2701 Centerville Road, Wilmington, 19808 Delaware, USA). The courier delivery included a letter in English explaining that the attached documents related to an ongoing arbitration case, which would allow the secretariat of the Defendant to process the delivery if they did not understand French. The courier's Track & Trace system confirmed that the package was delivered on December 14, 2020. Unless otherwise specified, this notification method (email sent to both Parties, followed by courier delivery to the Defendant) was used for all communications addressed by the Arbitral Tribunal to the Parties.

33. On December 11, 2020, the Arbitral Tribunal received CHF 9,970.84 from the Swiss Arbitration Centre.

34. On December 23, 2020, the Arbitral Tribunal received CHF 51,000 from the Plaintiff.

35. On December 28, 2020, the Arbitral Tribunal acknowledged receipt of the expense advance from the Plaintiff.

36. On January 4, 2021, since the Defendant had not paid the expense advance, the Arbitral Tribunal set a deadline for the payment of the expense advance balance.

37. On January 28, 2021, the Arbitral Tribunal received CHF 60,994 from the Plaintiff.

38. On January 29, 2021, the Arbitral Tribunal acknowledged receipt of the expense advance balance.

39. On February 4, 2021, the Arbitral Tribunal invited the Parties to make a decision on the meeting to organize the proceedings and on the draft PO No. 1 concerning the SPRs. In the same letter, the Arbitral Tribunal specified that the non-payment of the expense advance did not prevent the Defendant from taking part in the proceedings, and invited the Defendant to do so. This invitation for the Defendant to take part in the proceedings was generally repeated in formal letters sent to the Parties.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 109 of 255 PageID #: 119

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 19 of 83

40. On February 18, 2021, the Plaintiff issued a decision within the timeframe prescribed by the Arbitral Tribunal. The Defendant did not make a decision.

41. On February 22, 2021, the Arbitral Tribunal specified the conditions of the meeting to organize the proceedings by sending a revised draft PO No. 1 concerning the SPRs, an estimated schedule and a draft agenda. It also invited the Parties to express their opinion on these points.

42. On February 25, 2021, the Plaintiff sent his opinion by email. The Defendant did not express his opinion.

43. On March 1, 2021, the meeting to organize the proceedings was held via videoconference. The Defendant did not participate in the meeting to organize the proceedings.

44. On March 2, 2021, the Arbitral Tribunal sent the minutes of the meeting to organize the proceedings via email to the Parties, and requested their comments by March 12, 2021. The Parties did not provide any comments.

45. On March 3, 2021, the Arbitral Tribunal sent to the Parties the PO No. 1 concerning the SPRs and the estimated schedule of the proceedings. The courier delivery addressed to the Defendant also included the minutes of the meeting to organize the proceedings.

46. On March 14, 2021, the Arbitral Tribunal submitted to the Swiss Arbitration Centre the PO No. 1 concerning the SPRs, the estimated schedule of the proceedings and the minutes of the meeting to organize the proceedings.

47. On April 20, 2021, the Plaintiff sent, both via email and courier delivery, his Statement of Claim (hereinafter referred to as the "**Claim**") with 32 exhibits (Exhibit Plaint.-1 to Plaint.-32), four written witness statements, an expert's report from Prof. Nourissat (hereinafter referred to as "**Nourissat Expert's Report**"), and nine legal sources (Exhibits Plaint.L-1 to Plaint.L-9).

48. On April 21, 2021, the Plaintiff send the Claim via certified mail to the Arbitral Tribunal, since the courier's security department had blocked the delivery to the Arbitral Tribunal.

49. On April 25, 2021, the Arbitral Tribunal acknowledged receipt of the Claim via email and reminded the Defendant that he had to file its response by June 7, 2021. The Arbitral

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 110 of 255 PageID #: 120

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                              Page 20 of 83

Tribunal also invited the Defendant to make a determination, in his response, on the request to produce documents included in the Claim.

50. On April 27, 2021, the Plaintiff submitted to the Arbitral Tribunal a copy of the courier's delivery slip and the courier's tracking document which showed that the Claim had been delivered to the Defendant.

51. On June 7, 2021, which was the deadline set in the estimated schedule, the Defendant had not sent his response.

52. On June 7, 2021 as well, the Swiss Arbitration Centre informed the Parties, with a copy to the Arbitral Tribunal, that the Swiss Chambers' Arbitration Institution (SCAI) had been converted in an anonymous corporation and renamed Swiss Arbitration Centre SA, but that the proceedings would still be administered according to the Arbitration Rules.

53. On June 13, 2021, and on June 14, 2021 for the courier delivery, pursuant to Art. 28 of the Arbitration Rules, the Arbitral Tribunal notified PO No. 2 of June 10, 2021, whereby the proceedings were ordered to proceed and the estimated schedule was adjusted, with a first deadline set on June 30, 2021 for the Parties to request any discovery measures, and a second deadline set on June 30, 2021 for the Defendant to produce the document requested by the Plaintiff or to issue an opinion on this request.

54. On June 30, 2021, the Plaintiff issued a decision on additional discovery measures. The Defendant did not express an opinion by the deadline and did not produce the document requested by the Plaintiff.

55. On July 2, 2021, the Arbitral Tribunal sent a draft agenda for the meeting to organize the proceedings and set a deadline for the Parties to express their opinion on this matter.

56. On July 9, 2021, according to the estimated schedule, a meeting to organize the proceedings was held via videoconference. The Plaintiff participated in the meeting, but the Defendant did not. The minutes of the meeting were sent to the Parties on July 13, 2021. During this meeting, the Arbitral Tribunal set a deadline on July 19, 2021 for the Parties to express their opinion on several issues, including the notification of procedural acts to the Defendant, the discovery measures to be taken during the hearing of September 7 and 8, 2021, and the content of the minutes.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 111 of 255 PageID #: 121

**Arbitration**       **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                  Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 21 of 83

57. On July 19, 2021, the Plaintiff issued his opinion on the issues mentioned in the previous paragraph. The Defendant did not express any opinion.

58. On August 3, 2021, the Arbitral Tribunal sent to the Parties a draft PO No. 3 concerning the hearing guidelines, a draft PO No. 4 concerning additional case notifications to the Defendant, an offer of stenography services, and an email exchange with the courier. It set a deadline on August 13, 2021 for the Parties to express their opinion.

59. On August 5, 2021, the Plaintiff issued his opinion on the issues mentioned in the previous paragraph. The Defendant did not express any opinion.

60. On August 16. 2021, the Arbitral Tribunal notified to the Parties the PO No. 3 concerning the hearing guidelines (hereinafter referred to as "**PO No. 3**") and the PO No. 4 concerning additional case notifications to the Defendant (hereinafter referred to as "**PO No. 4**"). The aim of this last order was to obtain the participation of the Defendant by notifying the case not only at his registered address and to his "registered agent," but also at the address of his representative in Colombia.

61. On September 7, 2021, the hearing of witnesses, the submission of evidence and the hearing of closing arguments (hereinafter referred to as the "**Hearing of September 7, 2021**") took place at Hôtel Métropole, Quai Général-Guisan 23, 1204 Geneva. A verbatim report of this hearing was prepared and included in the case file[13]. During the hearing, the Arbitral Tribunal closed the proceedings, except for certain elements that remained to be exchanged, including for costs and expenses[14].

62. During the Hearing of September 7, 2021, the Arbitral Tribunal requested that the Parties submit their statements of costs and set a deadline to this effect. The Plaintiff submitted it on September 21, 2021, and submitted an amended statement of costs on September 30, 2021. The Defendant did not submit any statement.

63. On September 21, 2021, the Plaintiff requested an extension to submit a complete version of the legal sources used in Nourissat Expert's Report, which had been requested by the

---

[13] Act. 39b.

[14] Verbatim Report, p. 110, l. 1-3.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 112 of 255 PageID #: 122

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                          Page 22 of 83

Arbitral Tribunal during the Hearing of September 7, 2021. The Arbitral Tribunal granted this request.

64. On September 27, 2021, the Plaintiff submitted a more legible version of the legal sources used in Nourissat Expert's Report.

65. On September 28, 2021, the verbatim report of the Hearing of September 7, 2021, which had been finalized and reviewed by the Parties and by the Arbitral Tribunal, was sent to the Parties.

66. On September 30, 2021, the Plaintiff submitted an Amended Statement of Costs due to an amended fee and cost bill issued by the stenographer.

67. On October 5, 2021, the Plaintiff confirmed that he had no comments to make on the transcript of the Hearing of September 7, 2021.

68. On October 28, 2021, the Arbitral Tribunal notified to the Parties the PO No. 5 concerning the closing of the proceedings (hereinafter referred to as "**PO No. 5**"), whereby it declared closed the proceedings pursuant to Art. 29 par. 1 of the Arbitration Rules and to Ch. 13 of PO No. 1.

69. On December 27, 2021, the Arbitral Tribunal submitted the draft award to the Secretariat of the Swiss Arbitration Centre pursuant to Art. 40 par. 4 of the Arbitration Rules.

70. On January 14, 2022, the Secretariat informed the Arbitral Tribunal of the Court's position, and requested that the Arbitral Tribunal send an original version of the award, in accordance with Art. 32 par. 6 of the Arbitration Rules.

Part of this page was intentionally left blank

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 113 of 255 PageID #: 123

**Arbitration**               **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                  Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 23 of 83

## V.   Facts and Positions of the Parties

71. The Arbitral Tribunal reviewed the case file in its entirety, including, without limitation, the records, the exhibits, the written witness statements, the expert's reports, the minutes of the Hearing of September 7, 2021, which includes closing arguments and statements of costs. The arbitral award will not necessarily refer to all the documents reviewed by the Arbitral Tribunal, but will rely on those documents that had a bearing on the decision.

72. This section summarizes in chronological order the main relevant facts. Where certain facts are challenged, require a more detailed discussion, or are relevant for a specific aspect of the discussion and of the decision of the Arbitral Tribunal, they will be mentioned specifically or repeatedly in the section discussing legal matters (*infra* N 126 ss).

### A. Individuals/Entities Involved

73. **SPINEWAY SA** is the **Plaintiff**. It is an anonymous corporation operating with a board of directors and constituted under French law in 2005, with registered offices in Ecully (France). Its business includes the design, manufacture and marketing of a range of surgical implants and ancillary products designed to treat spinal disorders[15].

74. **STRATEGOUS GROUP** is the **Defendant**. It is a Delaware corporation (USA) with registered offices at 2701 Centerville Road, Wilmington, 19808 Delaware, United States, registered under number 6859944 [16]. According to the Plaintiff, the Defendant is represented by Mr. Luc GERARD NYAFE (hereinafter referred to as "**L. GERARD**").

---

[15] Exhibit Plaint.-1, p. 1 s.; Claim, all. 1; Closing Arguments, Verbatim Report, p. 111, l. 25-29.

[16] Exhibit Plaint.-1, p. 3 ss.; Claim, all. 2; Closing Arguments, Verbatim Report, p. 111, l. 11-24.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 114 of 255 PageID #: 124

Arbitration            SPINEWAY SA vs. STRATEGOS GROUP LLC
                       Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                    Page 24 of 83

## B. Period Preceding the Execution of the Contract

75. In 2018, Mr. Stéphane LE ROUX (hereinafter referred to as "**S. LE ROUX**"), President of the Plaintiff, made the acquaintance of L. GERARD. The latter was the owner, including through the Defendant, of several companies in the energy, raw material and health industries[17]. The first meeting between them took place in Paris, Gare de Lyon[18].

76. During these contacts, the Defendant, represented by L. GERARD, was creating a securitization fund under Luxembourg law, i.e. NATIONAL CLINICS (hereinafter referred to as the "**Fund**"), which he was to own at 100%. Compartment A of the Fund was to own 100% of LA National LLC (Latin America National Clinics), a company which would in turn be the majority shareholder of NCC SAS (National Clinics Colombia), the owner of several clinics in Colombia[19].

77. During their discussions, which took place around November or December 2018[20], S. LE ROUX and L. GERARD planned a collaboration between the Plaintiff and the Defendant through an equity investment of the Plaintiff in one of the companies held by L. GERARD[21].

78. On December 18, 2018, the Fund and the Plaintiff drafted a joint presentation in English titled "*Business Rationale – Executive Summary*" to define the main objectives of each Party[22]. This presentation specified that one of the main objectives of the Plaintiff was the acceleration of the growth of the Plaintiff's sales and a profitable return in a historical region, i.e. Latin America[23].

79. On December 21, 2018, the Plaintiff sent to the Defendant an "*Interest Letter concerning the start of discussions between the groups Strategos and Spineway*" to consider an equity and/or industrial partnership transaction, including with the company LA National

---

[17] TEM-Le Roux, p. 2 s.; Minutes-Le Roux, Verbatim Report, p. 21, l. 11-16.

[18] Minutes-Le Roux, Verbatim Report, p. 19, l. 24-27.

[19] Exhibit-Plaint.-5, p. 25, Appendix 1; Claim, all. 9 s; TEM-Le Roux, p. 2; Minutes-Le Roux, Verbatim Report, p. 20, l. 9 to p. 21, l. 2.

[20] Minutes-Le Roux, Verbatim Report, p. 21, l. 20.

[21] TEM-Le Roux, p. 3; Minutes-Le Roux, Verbatim Report, p. 21, l. 11-16.

[22] Exhibit Plaint.-3; TEM-Le Roux, p. 3.

[23] Exhibit Plaint.-3. Al. Closing Arguments, Verbatim Report, p. 112, l. 22 ss.

LLC[24]. This letter was countersigned by L. GERARD, who added a handwritten note: "*Read and approved for the terms of this letter*"[25].

80. This was followed by negotiations conducted, for the Plaintiff, by S. LE ROUX, D. SIEGRIST and the legal counsel of the Plaintiff. The Defendant was also represented by a legal counsel based in Paris[26].

## C. Execution of the Contract and Initial Performance of the Contract

81. On March 19, 2019, the Parties executed a "*bilateral promise of sale and purchase under conditions precedent combined with a unilateral promise to sell*" (hereinafter referred to as the "**Contract**"), which was signed by S. LEROUX. for the Plaintiff and L. GERARD for the Defendant[27].

82. According to Art. 2.1 of the Contract, "*the Transferor [the Defendant] expressly and irrevocably undertakes to transfer to the Transferee [the Plaintiff], and the Transferee expressly and irrevocably undertakes to purchase from the Transferor, in several installments, within an initial period of 36 months [...], 52% of the Fund Units [...] when requested to do so, in the conditions of this Promise, including in exchange for the payment of the Partial Price [...]. In exchange for the acquisition of the remaining Units representing 48% of the Fund's share capital (through a purchase or a capital contribution), the Transferor consented to a unilateral promise to sell to the Transferee, the latter being entitled not to exercise it. [...]*"

83. According to Art. 3.1 of the Contract, the Contract was entered into under two suspensive conditions defined as follows:

"*The satisfactory performance of a legal, accounting and financial audit at the request of the Transferee on the value of the Fund, including on the value of the assets and liabilities of the Fund, being agreed between the Parties that the satisfactory performance of the audit is defined as an audit conducted by the firm Mazars (or one of its partners) and*

---

[24] Exhibit Plaint.-4.

[25] Exhibit Plaint.-4, p. 2.

[26] Minutes-Le Roux, Verbatim Report, p. 22, l. 1-27.

[27] Exhibit Plaint.-5.

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP** LLC
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                                                                    Page 26 of 83

*resulting in a valuation of the Fund which will not be lower by more than 15% than the value used to set the Initial Total Price of the Fund Units, i.e. EUR 80,000,000.*"

"*The procurement by the Transferee of an agreement in principle from one or more private investors for financing the Partial Price applicable to the Initial Exercise of the Promise, i.e. four million one hundred and sixty thousand euros (€4,160,000), and its delivery to the Transferee in accordance with any required deliberation of the shareholders' general meeting and/or the bord of directors, with an effective immediate or term contribution all throughout the Exercise Period.*"[28]

84. Art. 3.4 of the Contract states the following: "*As a resolutory condition of the Promise and within six (6) months from the date of the Promise, the Parties agree to enter into a commercial partnership agreement for the distribution of the Transferee's products in the Transferor's business areas* [hereinafter referred to as the "**Partnership Agreement**" or the "**Commercial Partnership Agreement**"]. *In default of such Agreement for reasons other than a mere refusal of the Transferee to sign the balanced partnership agreement proposed by the Transferor within the period of six (6) months (except in case of an extension of this timeframe with the approval of all Parties), this Promise will be terminated, and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties[29].*"

85. According to Art. 5.2 of the Contract, "*the partial payment resulting from the Initial Exercise of the Promise will be spread in four (4) installments at the following dates:*

- On the first business day after the date when the suspensive conditions are lifted: 1,000,000 euros;

- On the last business day of the month following the date when the suspensive conditions are lifted: 1,000,000 euros;

- On the last business day of the 2nd month following the date when the suspensive conditions are lifted: 1,000,000 euros;

---

[28] Exhibit Plaint.-5, Art. 3.1.

[29] Exhibit Plaint.-5, Art. 3.4.

- *On the last business day of the 3rd month following the date when the suspensive conditions are lifted: 1,160,000 euros.*[30]" *This represents a total of EUR 4,160,000.*[31]"

86. According to Art. 10.1 of the Contract, "*the Promise is governed by and construed under French law*"[32].

87. On March 20, 2019, the Plaintiff issued a press release titled "*Major Acquisition Planned in Latin America*", which specified that "*this equity investment should allow Spineway to strengthen its positions in Latin America and to accelerate significantly its sales on the region through a partnership agreement to be put in place in the next six months, this agreement being a resolutory clause of the Promise.*[33]"

88. On May 3, 2019, the Parties entered into the "*Amendment number one to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019*" (hereinafter referred to as "**Amendment No. 1**"), which amended Art. 3.1 of the Contract by extending by seven additional days the initial 45-day timeframe, which thus was increased to 52 days[34].

89. Between April 26, 2019 and May 17, 2019, three audit reports concerning various in-scope entities concluded that there were no significant impediments[35].

90. On May 16, 2019, after reviewing these audit reports, the Parties entered into the "*Amendment number two to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019*" (hereinafter referred to as "**Amendment No. 2**"), which several provisions of the Contract[36].

91. In particular, Amendment No. 2 introduced in the Contract a new Art. 3.5 stating that "*the Transferee recognizes that the legal, accounting and financial audit conducted at his request was entirely satisfactory to the Transferee, except for the list of difficulties included in Appendix 8 Bis, and subject to the adoption of the new Initial Total Price and of the new*

---

[30] Exhibit Plaint.-5, Art. 5.1.
[31] Claim, all. 19.
[32] Exhibit Plaint.-5, Art. 10.1.
[33] Exhibit Plaint.-6.
[34] Exhibit Plaint.-7.
[35] Claim, all. 27; see Exhibit Plaint.-8, Plaint.9 and Plaint.-10.
[36] Exhibit Plaint.-11.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 118 of 255 PageID #: 128

Arbitration          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
              Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                              Page 28 of 83

*total price for 100% of the Fund Units, which voids the suspensive condition included in Article 3.1.[37]"*

92.  Amendment No. 2 specified that the Fund's new name was "*Integral Medical Solutions Fund*"[38], that the total number of Fund units was decreased from 80,000 to 60,000[39], and that the capital of the Fund was decreased from 80 million euros to 60 million euros[40].

93.  Amendment No. 2 adjusted the initial payment schedule specified in Art. 5.1 of the Contract as follows:

-    *On the day when Amendment 2 is signed: 1,000,000 euros;*

-    *On the last business day of the month following the date when Amendment 2 is signed: 1,000,000 euros;*

-    *On the last business day of the 2nd month following the date when Amendment 2 is signed: 1,000,000 euros;*

-    *On the last business day of the 3rd month following the date when Amendment 2 is signed: 1,160,000 euros.[41]"*

94.  However, Amendment No. 2 did not amend Art. 3.4 of the Contract, which included the resolutory condition related to the signing of a Partnership Agreement (*supra* N 84)[42].

95.  On May 16, 2019, pursuant to the Contract and Amendments No. 1 and No. 2, the Plaintiff received the transfer of 750 A units and 250 B units of the Fund[43], in exchange for a payment of one million euros[44].

96.  Thereafter, the Plaintiff complied with the four installments of the initial payment specified in Art. 5.1 of the Contract (*supra* N 93)[45].

---

[37] Exhibit Plaint.-11, p. 4.
[38] Exhibit Plaint.-11, p. 3, Art. 1.
[39] Exhibit Plaint.-11, p. 3, Art. 2, Parts A and B, and p. 8, Art. 10.
[40] Exhibit Plaint.-11, p. 8, Art. 10.
[41] Exhibit Plaint.-5, Art. 5.1.
[42] Exhibit Plaint.-11.
[43] Exhibit Plaint.-13.
[44] Exhibit Plaint.-12.
[45] Exhibit Plaint.-11, Plaint.14, Plaint.-16 and Plaint.-18.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 119 of 255 PageID #: 129

Arbitration          SPINEWAY SA vs. STRATEGOS GROUP LLC
                     Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                          Page 29 of 83

97. On July 1, 2019, the Plaintiff received the transfer of 750 A units and 250 B units of the Fund[46], in exchange for a payment of one million euro made on July 5, 2019[47].

98. On August 1, 2019, the Plaintiff received the transfer of 750 A units and 250 B units of the Fund[48], in exchange for a payment of one million euro made on July 31, 2019[49].

99. The 4th bulletin, dated October 2, 2019, was only sent on July 17, 2020, after multiple requests from the Plaintiff[50].

100. Between May 28, 2019 and the fall of 2019, the Parties had discussions and met together, including to finalize the partnership and sign the Partnership Agreement specified in Art. 3.4 of the Contract (*supra* N 84)[51].

101. At the end of May 2019, between May 28 and May 31, 2019[52], S. LE ROUX, President of the Plaintiff, travelled to Colombia with D. SIEGRIS, P. CHABERT and F. LAUCK to meet L. GERARD and his teams[53].

102. P. CHABERT claims that his transferment was to discuss potential supply chain synergies between the Plaintiff and the Defendant or the Fund[54].

103. F. LAUCK claims that her transferment was to contact the managers of National Clinics Colombia SAS, including the head of the clinical investigation department based in San Rafael Hospital, to explain the needs of the Plaintiff in terms of clinical investigations[55].

104. On June 3, 2019, S. LE ROUX sent an email to L. GERARD, claiming that "*[…] We were able to identify several synergies with a sales potential (I am sure that your teams will give you feedback on that). Your teams are currently researching several opportunities, and, in a few days, we will be able to apply priority coefficients based on the CA potential and*

---

[46] Exhibit Plaint.-15.

[47] Exhibit Plaint.-14.

[48] Exhibit Plaint.-15.

[49] Exhibit Plaint.-14.

[50] Exhibit Plaint.-31, p. 3 ss.

[51] TEM-Le Roux, p. 4; Minutes-Le Roux, Verbatim Report, p. 16, l. 8 ss (for the first date).

[52] TEM-Le Roux, p. 4 s.; Minutes-Le Roux, Verbatim Report, p. 26, l. 1-25).

[53] TEM-Le Roux, p. 4; Minutes-Le Roux, Verbatim Report, p. 16, l. 8 ss to p. 17 l. 5 and p. 26, l. 18 ss to p. 27, l. 13; TEM-Siegrist, p. 2; Minutes-Siegrist, Verbatim Report, p. 101, l. 1-4; TEM-Chabert, p. 2; Minutes-Chabert, Verbatim Report, p. 89, l. 13-31; TEM-Lauck, p. 2; Minutes-Lauck, Verbatim Report, p. 75 l. 7-27.

[54] TEM-Chabert, p. 2; Minutes-Chabert, Verbatim Report, p. 89, l. 12-31.

[55] TEM-Lauck, p. 2; Minutes-Lauck, Verbatim Report, p. 78, l. 2-5 and p. 79, l. 14-18.

the ease of implementation in various development areas. This should allow us to sign a partnership agreement soon. [...]" (sic); the email also mentioned the need to align the financial strategy for the upcoming weeks/months[56].

105. On June 4, 2019, L. GERARD replied to the email from June 3, 2019, including on the financing and various elements of the Partnership Agreement[57].

106. From June 2019 to September 2019, the emails exchanged between the Parties addressed financing and various other topics[58], without any in-depth discussion of the Partnership Agreement, which gave rise to some concern in the Plaintiff's emails[59].

107. On September 17, 2019, S. LE ROUX, from the Plaintiff, wrote again to Juan Tobar, from the Defendant, to explain that the Plaintiff held a European ISO certificate equivalent to the US GMP standard. He also asked how NCC [National Clinics Columbia] planned to import the Plaintiff's products[60].

108. The Parties were not able to enter into the Partnership Agreement specified in Art. 3.4 of the Contract (supra N 84) before September 19, 2019.

## D. Application of the Resolutory Condition Sought by the Plaintiff

109. On October 16, 2019, the Plaintiff, through S. LE ROUX, wrote to the Defendant, at the address of L. GERARD in Bogota, to remind him of the content of Art. 3.4 of the Contract, specifying that he had done his best efforts in the previous months to achieve the Commercial Partnership Agreement, but adding that, to the Plaintiff's dismay, no concrete proposal had enabled such a Partnership Agreement to be entered into as contemplated in Art. 3.4 of the Contract. Therefore, in such a case, the Plaintiff had no option but to seek the application of Art. 3.4 of the Contract and to notify to the Defendant the rescission of

---

[56] Exhibit Plaint.-19; Minutes-Le Roux, Verbatim Report, p. 28, l. 27 to p. 29, l. 11.

[57] Exhibit Plaint.-20; for the Partnership Agreement, Exhibit Plaint.-20, Ch. 6 and minutes-Le Roux, Verbatim Report, p. 30, l. 9-15.

[58] E.g. Minutes-Lauck, Verbatim Report, p. 75 L. 21 ss to. p. 76 l. 22.

[59] Exhibit Plaint.-21, p. 1 ss, in particular p. 18; Minutes-Le Roux, Verbatim Report, p. 32, l. 15 to p. 34, l. 18.

[60] Exhibit Plaint.-22.

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                             Page 31 of 83

the Contract[61]. In addition, the email specified that, on October 23, 2019, the Plaintiff would sign orders to transfer the ownership of the 2250 A units and 750 B units of the Fund that had already been acquired, which correspondent to the first three payments of 1 million euros already made, adding that, in spite of a payment of 1.16 million euros pursuant to Art. 5.1 of the Contract, the Plaintiff had not received the orders for the corresponding A and B units of the Fund. Finally, the email requested that the Defendant transfer 4.16 million euros for all the sums paid as partial payments from October 23, 2019 to November 6, 2019[62].

110. On the same day, S. LE ROUX sent to L. GERARD an email which included the abovementioned message. This email suggests that the content of the message had already been announced the day before, during a telephone conversation[63].

111. On October 18, 2019, the Defendant allegedly responded by informing the Plaintiff that his counsel was about to send him a letter[64].

112. On October 21, 2019, a letter dated October 16, 2019 and sent on October 17, 2019 was delivered to the mentioned address[65].

113. On November 6, 2019, the Plaintiff sent an email to the Defendant, stating that eighteen days had elapsed with no response, that the Contract clearly indicated that the execution of a Commercial Partnership Agreement was a resolutory condition, and that without such an Agreement, the Contract was "*de facto* terminated" and that the Parties were bound to return the performances granted. S. LE ROUX added that he wanted to recover the amounts paid immediately and that he was expecting a very prompt response from L. GERARD[66].

---

[61] Exhibit Plaint.-23.
[62] Exhibit Plaint.-23, p. 2.
[63] Exhibit Plaint.-25.
[64] Exhibit Plaint.-26.
[65] Exhibit Plaint.-24.
[66] Exhibit Plaint.-26.

## E. Further Discussions

114. On November 28, 2019, the Defendant sent an email and a certified letter, stating his surprise at the form and the merits of the decision[67]. Concerning the form, the Defendant mentioned that the Parties had had many contacts (meetings and telephone conferences) during the previous months (from May to September 2019), and that the Plaintiff never bothered to express his desire to notify the rescission of the Contract. Concerning the merits, the Defendant alleged that the Plaintiff's interpretation of the resolutory condition included in Art. 3.4 of the Contract renders it potestative, and thus void and ineffective[68]. In addition, the Defendant alleged that[69]:

- Many meetings and discussions took place by telephone or *de visu* to reach a duly executed Partnership Agreement, including a meeting from May 29 to May 31 in Bogota, where the financial and operational results of the companies of the group National Clinics Cenetario were presented, and each Party had thereafter the opportunity to discuss the budgets set for 2019 in view of a future partnership;

- After this meeting, the Parties developed a business plan whereby they agreed that NCC would share with the Plaintiff the database used to record all the purchases of spine surgery devices between 2018 and 2019, in view of a future partnership;

- After this meeting, S. LE ROUX allegedly confirmed by email "*that there are many more synergies between both companies than those initially considered*;"

- In June 2019, an advance payment of 100 million COP was made to Osteomedical, a distributor of the Plaintiff in Colombia, for the devices purchased by NCC, in order to facilitate negotiations with this distributor, in view of a future partnership;

- At the end of June 2019, two persons had the opportunity to visit the Plaintiff's facilities and to review his operations, his business plan and his activities in view of a future partnership;

---

[67] Exhibit Plaint.-27.

[68] Exhibit Plaint.-27.

[69] Exhibit Plaint.-27, p. 1 s.

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 33 of 83

- On July 9, 2019, S. LE ROUX spoke with the management of NCC and took stock of the relationship between the Parties;

- The research team from HUCSR had the opportunity to review the Plaintiff's clinical studies to obtain the European certification, and the exchanges lasted until October 2019, still in view of a future partnership;

- S. LE ROUX met with Mr. Diaz, neurosurgeon of the Defendant's group, to review the data and figures on the spine surgery market in Colombia, still in view of a future partnership;

- On September 2, 2019, NCC submitted to the Plaintiff the consolidated balance sheet of the Group dated June 2019, in spite of the fact that the consolidated balance sheet is usually prepared once a year, in December;

- In July 2019, NCC was in contact with the public agency Invima in order to determine the requirements and process to follow to manufacture the products to be imported and the required storage infrastructure in compliance with all applicable standards and required quality processes and procedures; in this regard, the Plaintiff submitted the certificate of good manufacturing practices on September 16, 2019, and the discussions with Invima continued until the end of October 2019, still in view of a future partnership;

- In view of the partnership, the Parties created spinal surgeon teams who were willing to work with public clinics and with fixed amount packages for surgeries which would offer the best efficiency and the highest competitivity on the Colombian market, and those teams developed together packages suitable for each spinal disorder on the basis of the Plaintiff's materials and factory prices;

- In view of the partnership, the Defendant attended a convention on October 17 and 18, 2019, and rented offices to showcase the offer developed by the Parties to the main decision makers of public health institutions;

- In view of the partnership, a marketing team was created to develop and promote the website "Breaking News NCC-Spineway"[70].

---

[70] Exhibit Plaint.-27, p. 3.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 124 of 255 PageID #: 134

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
            Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                        Page 34 of 83

115. In the same email from November 28, 2019, the Defendant specified that the principles of the commercial agreement between the Parties had been finalized, but added that, to his surprise, from September 2019, the Plaintiff did not contribute anything to make possible the contemplated partnership, "*refusing almost consistently to respond to the proposals* [of the Defendant] *or to [...] help* [the Defendant] *to move the process forward, although* [the Parties were] *about to reach a final commercial and distribution agreement*" (sic)[71].

116. The Defendant reproached the Plaintiff for pretending to negotiate in good faith during six months for the sole purpose of having the opportunity to request the rescission of the Contract for the non-signing of the Agreement. "*The interpretation of this resolutory condition as a clause subject to your sole will renders it unquestionably potestative and thus void de plano.*[72]"

117. The Defendant reproached the Plaintiff for contemplating a partnership with NCC only to raise funds from investors and for negotiating unfairly and in bad faith in order to have a reason to request the rescission of the Contract, after taking advantage of the expectations raised by the negotiation of a potential partnership to raise funds[73].

118. The Defendant concluded his message by stating that, in its view, the Contract was still having an impact and that the Plaintiff was liable to the market and to the Defendant if he did not fulfill the obligations that he was bound to perform under the Contract[74].

119. During the following weeks, the Defendant and the Plaintiff did not take any steps to materialize this agreement, and the Plaintiff assumed that this inactivity meant that the Defendant also considered that the Contract had been rescinded.

120. The Defendant did not return the amounts paid by the Plaintiff[75].

121. In a certified mail dated May 7, 2020 addressed to the Defendant and to L. GERARD, the Plaintiff's counsel reiterated that the resolutory condition had been met and that the promise and its amendments had been terminated[76]. They added that, in the absence of

---

[71] Exhibit Plaint.-27, p. 3.
[72] Exhibit Plaint.-27, p. 3.
[73] Exhibit Plaint.-27, p. 3.
[74] Exhibit Plaint.-27, p. 4.
[75] TEM-Le Roux, p. 5 s.
[76] Exhibit Plaint.-28.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 125 of 255 PageID #: 135

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 35 of 83

an amicable solution involving the return of the shares held by the Plaintiff and the return of all or part of the 4.16 million euros that had been paid, the Plaintiff would file a case before the Arbitral Tribunal.

122. On May 11, 2020, the Plaintiff's counsel sent an email to reiterate the message sent on May 7, 2020[77].

123. The case file does not include a response from the Defendant or from L. GERARD[78].

124. Therefore, on September 14, 2020, the Plaintiff filed the Arbitration Notification to defend his rights[79].

125. The Plaintiff specifies that he incurred significant costs and expenses for negotiating and executing the Contract, as well as for the various audits, for an amount of EUR 252,329.21 without tax[80].

---

[77] Exhibit Plaint.-29.
[78] Claim, all. 61.
[79] Arbitration Notification, Act. 1.
[80] Exhibit Plaint.-8, Plaint.-9, Plaint.-10, Plaint.-30.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 126 of 255 PageID #: 136

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                    Page 36 of 83

## VI.    Discussion

### A. Jurisdiction of the Arbitral Tribunal

126. The Arbitral Tribunal always verifies its jurisdiction.

127. The Plaintiff's main conclusions relate to the existence and the satisfaction of a resolutory condition or clause, as well as to the return of the performances already granted to the other Party and to third parties, so that the Parties may revert to the status that existed before the Contract was executed.

128. Considering Art. 10.2 of the Contract, it is necessary to interpret the aforementioned clause to determine whether the Arbitral Tribunal has jurisdiction.

129. The **Plaintiff** recognizes the jurisdiction of the sole Arbitrator[81], and the **Defendant** did not express his opinion on this matter.

130. Art. 10.2 of the Contract states the following: "*Any dispute resulting from or related to this Promise will be resolved via a final decision issued in accordance with the Mediation and Arbitration Rules of the Geneva International Chamber of Commerce by one (1) arbitrator appointed pursuant to these Rules (such arbitrator being hereinafter referred to as the 'Arbitral Tribunal').*

*The Arbitral Tribunal will be constituted in Geneva (Switzerland) and the arbitration will be conducted in French.*

*The Arbitral Tribunal will resolve the dispute pursuant to French law.[82]*"

131. To ascertain whether this Arbitral Tribunal has jurisdiction, it is necessary to interpret Art. 10.2 of the Contract. Art. 10.2 of the Contract states clearly that one arbitrator must resolve the dispute. The only point to be clarified is the reference to the rules governing the arbitration proceedings, as Art. 10.2 of the Contract mentions the "*Mediation and Arbitration Rules of the Geneva International Chamber of Commerce,*" but there is no Geneva International Chamber of Commerce. However, the Geneva Chamber of

---

[81] Claim, p. 4.
[82] Exhibit Plaint.-5, p. 24.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 127 of 255 PageID #: 137

| Arbitration | SPINEWAY SA vs. STRATEGOS GROUP LLC |
| | Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules) |
| Final Award | Page 37 of 83 |

Commerce, Industry and Services (CCIG) uses international arbitration rules in common with other Swiss chambers of commerce, i.e. the Arbitration Rules.

132. During his examination, S. LE ROUX stated that the Parties wished to have an arbitration with an Arbitral Tribunal whose neutral seat would be in Geneva, and that this clause had been negotiated by the legal counsel in Paris[83].

133. When interpreting Art. 10.2 of the Contract, the Arbitral Tribunal concludes that this provision allows for the jurisdiction of a Tribunal whose seat is in Geneva and for proceedings governed by the Arbitration Rules.

134. Therefore, the Arbitral Tribunal has jurisdiction to settle the issues raised in these arbitration proceedings.

## B. General

### 1. Method and Structure of the Award

135. To resolve the dispute on the merits, the Arbitral Tribunal will follow seven successive steps:

- First, it will characterize the legal nature of the Contract and of the relevant clause (*infra* N 151 ss);

- Second, the Arbitral Tribunal will verify whether this clause is valid (*infra* N 169 ss);

- Third, the Arbitral Tribunal will review the conditions of the relevant clause to ensure that they are met (*infra* N 179 ss);

- Fourth, the Arbitral Tribunal will determine whether the legal consequences claimed by the Plaintiff are in alignment with those indicated in the clause (*infra* N 206 ss);

- Fifth, the Arbitral Tribunal will establish whether the conclusions formulated by the Plaintiff are justified (*infra* N 217 ss and N 232 ss);

---

[83] Minutes-Le Roux, Verbatim Report, p. 35, l. 20 to p. 36 l.6.

- Sixth, the Arbitral Tribunal will determine whether there are interests due (*infra* N 248 ss);

- Seventh, the Arbitral Tribunal will settle the issue of legal costs and expenses (*infra* N 261 ss).

## 2. Contractual Basis, Nature, Performances and Compensations

### a) Question

136. The question at issue is identifying the nature of the Contract as well as the performances and compensation methods agreed by the Parties.

### b) Positions of the Parties

137. The **Plaintiff**'s position may be summarized as follows:

- Pursuant to the Contract, that the Plaintiff considers as a bilateral promise to sell, the Plaintiff undertakes to acquire, over a period of 35 months (with the possibility to extend), a majority participation in the Fund's capital, i.e. 52%, with the option to acquire the remaining 48%[84].

- The sale is agreed for a fixed price. For the 52% of the Fund's capital, payment terms are as follows: 1 million euros to be paid on the 1st business day after the date when suspensive conditions are lifted, 1 additional million euros on the last business day of the month following the date when suspensive conditions are lifted, 1 additional million euros, and finally the amount of 1.16 million euros to be paid on the last business day of the third month following the date when suspensive conditions are lifted[85].

- The Contract is entered into under two suspensive conditions, and it also includes a resolutory "condition"[86].

138. The **Defendant** did not express his position.

---

[84] Closing Arguments, Verbatim Report, p. 113, l. 12-15.

[85] Closing Arguments, Verbatim Report, p. 113, l. 16-26.

[86] Closing Arguments, Verbatim Report, p. 113, l. 27-31.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 129 of 255 PageID #: 139

**Arbitration**    **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                                            Page 39 of 83

### c) Discussion

139. The contractual bases are the following: first of all the Contract, titled "*bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019 between Strategos Group LLC, in his capacity of Transferor, and Spineway SA, in his capacity of Transferee*"[87], then Amendment No. 1, titled "*Amendment number one to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019*", dated May 3, 2019[88], and finally Amendment No. 2, titled "*Amendment number two to the bilateral promise to sell and purchase under suspensive conditions with a unilateral promise to sell entered into on March 19, 2019*", dated May 16, 2019[89].

140. Under these contractual bases, including Art. 2.1 of the Contract, the Defendant was responsible for the following main performances: transferring to the Plaintiff, in several installments, within an initial period of 36 months, 52% of the Fund Units, at the Plaintiff's request, in the conditions of the Contract, including in exchange for the payment of the price. Concerning the acquisition of the remaining Units corresponding to 48% of the Fund's share capital (through a purchase or a capital contribution), the Defendant agreed to a unilateral promise to sell to the Plaintiff, with the option not to exercise it (Art. 2.1 of the Contract).

141. Under these contractual bases, including Art. 5.1 of the Contract amended by Amendment No. 2, the Plaintiff was responsible for paying the price according to the following schedule: 1 million euros on the day when Amendment No. 2 was signed, 1 million euros on the last business day of the month following the day when Amendment No. 2 was signed, 1 million euros on the last business day of the 2nd month following the day when Amendment No. 2 was signed, 1.16 million euros on the last business day of the 3rd month following the day when Amendment No. 2 was signed[90].

142. The Contract was subject to two suspensive conditions included in Art. 3.1: the first one required the satisfactory performance of a legal, accounting and financial audit, and the

---

[87] Exhibit Plaint.-5.

[88] Exhibit Plaint.-7.

[89] Exhibit Plaint.-11.

[90] Exhibit Plaint.-11, p. 5, Art. 4.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 130 of 255 PageID #: 140

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                      Page 40 of 83

second one required the procurement by the Plaintiff of an agreement in principle for financing the transaction price. Amendment No. 2 also introduced a new Art. 3.5 in the Contract whereby the Plaintiff recognized that the legal, accounting and financial audit conducted at his request was satisfactory, which voided the suspensive condition included in Art. 3.1 of the Contract[91]. The Contract could thus become effective.

143. The Contract also included, in Art. 3.4, a clause stipulating a "*resolutory condition of the Promise*," which we will discuss hereinafter (*infra* N 151 ss), but has no bearing on the characterization of the Contract.

144. The Arbitral Tribunal ultimately considers that the disputed Contract can be characterized as a bilateral promise to sell[92], as indicated by its title.

### 3. Applicable Law

#### d) Question

145. The question at issue is the determination of the law applicable to the Contract.

#### e) Positions of the Parties

146. The **Plaintiff**'s position may be summarized as follows:

- The law applicable to the Contract is French law[93].

147. The **Defendant** did not express his position

#### f) Discussion

148. Art. 10.1 of the Contract states that "*the Promise is governed by and construed under French law.*" The Contract is dated March 19, 2019.

149. Therefore, French law, as it existed on March 19, 2019, is the substantive law to refer to in order to resolve this dispute, and in particular, the French law of obligations, with its

---

[91] Exhibit Plaint.-11, p. 4.

[92] It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim Report, p. 42, l. 14 s.

[93] Closing Arguments, Verbatim Report, p. 121, l. 16-18.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 131 of 255 PageID #: 141

| Arbitration | SPINEWAY SA vs. STRATEGOS GROUP LLC |
| | Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules) |

Final Award                                                                  Page 41 of 83

amendments of October 2016, is the relevant law. It should be noted that Nourissat Expert's Report reaches the same conclusion[94].

150. Therefore, the Arbitral Tribunal rules that French law, and in particular the French Civil Code (hereinafter referred to as "**FrCC**"), in its version including the amendment of 2016, is applicable.

## C. Regime of Art. 3.4 of the Contract

### 1. Characterization of Art. 3.4 of the Contract

#### a) Question

151. The question at issue is the nature of Art. 3.4 of the Contract.

#### b) Positions of the Parties

152. The **Plaintiff**'s position may be summarized as follows:

- The Plaintiff relies on Nourissat Expert's Report, which addresses both the nature of resolutory conditions and the nature of resolutory clauses[95], concluding that both characterizations can be approved[96]. Nourissat Expert's Report concludes that this conflict of characterization has no consequences on the effects, since in both cases, the Parties revert to the initial status that existed before the Contract was executed[97]. The theoretical difference is due to the fact that the allegedly potestative nature of Art. 3.4 has no effect if the characterization as resolutory clause is used for this contractual provision[98].

- Art. 3.4 of the Contract may be described either as a resolutory *condition* or as a resolutory *clause*. The resolutory condition is specified in Art. 1304, 1304-2 and 1304-

---

[94] EXP-Nourissat, N 5. Al. Minutes-Nourissat, Verbatim Report, p. 42, l. 18-28.
[95] Claim, p. 20; EXP-Nourissat, N 11 ss.
[96] Claim, p. 21; EXP-Nourissat, N 30.
[97] Claim, p. 22; EXP-Nourissat, N 11 and 31.
[98] Claim, p. 22; EXP-Nourissat, N 11 i.f.

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
              Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                            Page 42 of 83

3 FrCC, whereas the resolutory condition is governed by Art. 1224, 1225 and 1229 FrCC[99].

- The Plaintiff, according to the conclusions of Nourissat Expert's Report[100], favors the characterization as resolutory clause instead of resolutory condition, but will accept the decision of the Arbitral Tribunal on this point[101].

- The argument for the existence of a resolutory clause (instead of a condition) is formal and is based on the fact that Art. 3.4 of the Contract is included under point 3 of the Contract, which addresses the "*effects*" of the Contract[102]. Moreover, Art. 3.4 of the Contract complies with the definitions of a resolutory clause provided by legal doctrine: by signing Art. 3.4 of the Contract, the Parties' intention was to obtain a reversal to their original status if the hypothetical case mentioned in Art. 3.4 were to materialize[103]. The verb "*terminated*" used in Art. 3.4 of the Contract must be construed as "*rescinded*"[104].

153. The Defendant did not express his position during the proceedings. Based on the exhibits of the case, the **Defendant**'s position may be summarized as stating that Art. 3.4 of the Contract should be considered as a resolutory condition and not as a resolutory clause[105].

### c) Discussion

154. The issue is related to the legal characterization of Art. 3.4 of the Contract, whose content is the following: "*As a resolutory condition of the Promise and within six (6) months from the date of the Promise, the Parties agree to enter into a commercial partnership agreement for the distribution of the Transferee's products in the Transferor's business areas. In default of such Agreement for reasons other than a mere refusal of the Transferee to sign the balanced partnership agreement proposed by the Transferor within the period of six (6) months (except in case of an extension of this timeframe with the approval of all Parties), this Promise will be terminated, and the Parties will revert to their*

---

99
100
101
102
103
104
105

*initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties.[106]*"

155. According to Art. 1304 FrCC, "*the obligation is conditional when it depends on a future and uncertain event. The condition […] is resolutory when its satisfaction results in the voiding of the obligation.*" The examination of the case, and in particular the hearing of the expert Nourissat, showed that this provision can be applied to both an obligation and an agreement[107].

156. According to Art. 1224 FrCC, "*the rescission results from the application of a resolutory clause or […].*" According to Art. 1225 FrCC, "*the resolutory clause identifies the obligations whose non-performance will result in the rescission of the contract. […].*"

157. The doctrine defines a "resolutory condition" as a condition that "*allows the parties to subject the continued effectiveness of their contract to the non-occurrence of a given event. If the event identified as a condition occurs, the contract will be deemed has having never existed.[108]*"

158. Concerning the "*resolutory clause,*" its "*intent is to anticipate and organize the conditions of a potential contract rescission […]. The fact which results in the rescission is the unilateral will of one of the parties or the occurrence of an uncertain event. More specifically, the practice defines as resolutory clauses only those that organize the retroactive voiding of the contract on the basis that one of the contracting parties did not perform his obligations.[109]*"

159. The difference between a resolutory "condition" and a resolutory "clause" is due to the fact that, "*while the resolutory clause is a mechanism related to the formation of the contract, the resolutory condition organizes the penalty for a non-performance*"[110].

---

[106] Exhibit Plaint.-5, Art. 3.4.

[107] Minutes-Nourissat, Verbatim Report, p. 52, l. 27 ss to p. 54, l. 13.

[108] W DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contracts de droit privé interne, 2nd edition, LexisNexis 20112, v° Condition résolutoire, spec. p. 110 s. Al. EXP-Nourissat, N 10.

[109] EXP-Nourissat, N 10, quoting W DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contracts de droit privé interne, 2nd edition, LexisNexis 20112, v° Résolutoire (clause), spec. p. 654 s.

[110] J. Mestre/J.-C. Roda (dir.), Les principales clauses des contrats d'affaires, Lextenso ed. 2011, No. 1664, p. 945, Al. EXP-Nourissat, N 10.

**Arbitration**    **SPINEWAY SA vs. STRATEGOS GROUP** LLC
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award

Page 44 of 83

160. According to Nourissat Expert's Report, the relevance of this characterization does not
stem from the effects of Art. 3.4 of the Contract, since those effects are similar, or even
identical, but rather from the scope of the argument raised by the Defendant concerning
the potestative nature of the resolutory condition[111].

161. As confirmed by the expert Nourissat during his hearing, two characterizations cannot be
used at the same time[112]. He also specified that, in his opinion, in the present case, the
characterization did not matter in terms of legal effects[113].

162. Consequently, the Arbitral Tribunal will characterize the aforementioned clause on the
basis of the following points.

163. First of all, Art. 3.4 of the Contract includes a condition in the meaning of Art. 1304 FrCC,
since the continued effectiveness of the Contract does depend on an event that was future
and uncertain at the time of its execution. This event was the execution of the Commercial
Partnership Agreement within six months after signing the Contract. The Parties clearly
expressed their will to this effect in Art. 3.4 of the Contract[114]. In addition, considering the
effects, it is indeed a resolutory condition in the meaning of Art. 1304 FrCC, since its
materialization results in the voiding of the Contract and its obligations, as Art. 3.4 of the
Contract states that "*this Promise will be terminated, and the Parties will revert to their
initial status*"[115].

164. Secondly, Art. 3.4 of the Contract was negotiated and drafted by experienced French
attorneys, and they should be expected to be well-versed in French law[116]. The Arbitral
Tribunal believes that these experienced attorneys were thoroughly familiar with the
terminology used in the FrCC, which clearly differentiates resolutory *conditions* in
Art. 1304 ss FrCC from resolutory *clauses* in Art. 1224, 1225 and 1229 FrCC. Now,

---

[111] EXP-Nourissat, N 11.

[112] Minutes-Nourissat, Verbatim Report, p. 50, l. 9-32; p. 62, l. 21-24.

[113] Minutes-Nourissat, Verbatim Report, p. 62, l. 29-31.

[114] It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim
Report, p. 44, l. 15-20.

[115] Exhibit Plaint-5, Art. 3.4.

[116] Minutes-Le Roux, Verbatim Report, p. 26, l. 8 to 10.

Art. 3.4 of the Contract begins with the phrase "*[a]s a resolutory condition of the Promise[117]*," without ever using the term "resolutory *clause*."

165. Thirdly, the Arbitral Tribunal is not convinced by the argument consistently used by the Plaintiff and the expert Nourissat, whereby the characterization as a resolutory clause should be favored due to the placement of Art. 3.4 of the Contract in Ch. 3 of the Contract, which addresses the effects of the Contract ("*Effects of the Promise*")[118]. As a matter of fact, Ch. 3 of the Contract includes many clauses that do not address the performance of the Contract nor its effects. For example, Art. 3.1 of the Contract, which is also included under Ch. 3 of the Contract ("*Effects of the Promise*") and mentions two suspensive conditions, is unrelated to the effects of the Contract, as it defines a mechanism on its formation.

166. Fourthly, the careful formulation of Art. 3.4 of the Contract, which highlights its non-potestative nature, is an additional clue indicating that the drafters of the Contract considered Art. 3.4 of the Contract as a resolutory *condition* and not as a resolutory *clause*. Indeed, the phrase "*in default of such Agreement for reasons other than a mere refusal of the Transferee to sign the balanced partnership agreement proposed by the Transferor*"[119], shows that the Parties intentionally tried to highlight the non-potestative nature of Art. 3.4 of the Contract (see *infra* N 172 ss).

167. Fifthly, the distinction made in practical literature whereby a resolutory condition relates to a future and uncertain event unrelated to the contract, while a resolutory clause does not address any element exterior to the contract and to the contracting party, but on the contrary is related to the obligations resulting from the contract[120], has no basis in the French Civil Code nor in theoretical literature, and did not seem to be a determining factor for the expert Nourissat[121]. Therefore, the Arbitral Tribunal will not use this criterion to characterize Art. 3.4 of the Contract.

---

[117] Exhibit Plaint.-5, Art. 3.4.

[118] Minutes-Nourissat, Verbatim Report, p. 58, l. 24-28; p. 59, l. 18-19.

[119] Exhibit plaint.5, Art. 3.4 (highlighted by the Arbitral Tribunal).

[120] J. Mestre/J.-C. Roda (dir.), Les principales clauses des contrats d'affaires, Lextenso ed. 2011, No. 1664, p. 945,

Al. Minutes-Nourissat, Verbatim Report, p. 52, l. 2-. N 10.

[121] Minutes-Nourissat, Verbatim Report, p. 52, l. 2-18.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 136 of 255 PageID #: 146

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award        Page 46 of 83

168. As a result, for all the above mentioned reasons, but without entirely discarding the possibility of characterization as a resolutory clause, the Arbitral Tribunal considers that Art. 3.4 of the Contract should be characterized as a **resolutory condition**.

## 2. Validity of Art. 3.4 of the Contract

### a) Question

169. The question at issue is the validity of the characterization of Art. 3.4 of the Contract, as specified above.

### b) Positions of the Parties

170. The **Plaintiff**'s position may be summarized as follows:

- – Art. 3.4 of the Contract is valid, and the argument about its potestative nature is not only groundless, but also irrelevant as to the satisfaction of the resolutory condition[122].

- – Art. 3.4 of the Contract constitutes an essential element of the Contract[123], so much so that it was expressly mentioned in the Plaintiff's press release of March 20, 2019[124].

- – Art. 3.4 of the Contract was not included at the last moment, but was already featured in the draft versions exchanged by the Parties and their legal counsel[125]. Since the beginning, acting on the advice of his legal counsel and at the initiative of S. LE ROUX, the Plaintiff insisted that a resolutory condition should be included in the Contract, since the operations of the Parties were quite different and, considering all the factors in play for the partnership, the goal was to build something in a relatively short timeframe while having an exit door if things did not work out[126].

---

[122] Claim, p. 28

[123] Closing Arguments, Verbatim Report, p. 116, I. 2.

[124] Exhibit Plaint.-6. Al. Closing Arguments, Verbatim Report, p. 114, I. 29 to p. 115, I. 3.

[125] Closing Arguments, Verbatim Report, p. 114, I. 26-28, which refer to Exhibits 33 and 34 of the Arbitration Notification.

[126] Minutes-Le Roux, Verbatim Report, p. 15, I. 1-7, p. 23, I. 1-12. Closing Arguments, Verbatim Report, p. 115, I. 4-5.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 137 of 255 PageID #: 147

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 47 of 83

- Although two amendments were executed to modify essential points of the Contract, Art. 3.4 of the Contract was never amended, as it was deeply engrained in the agreement between the Parties[127].

- If it is a *resolutory condition* (and not a *clause*), it does not have a purely potestative nature, as the Parties intended to protect themselves from such a risk by carefully specifying, in accordance with French law and jurisprudence, that the event constituting the condition was the non-signing of the Commercial Partnership Agreement for reasons other than the mere will of the Plaintiff[128]. This condition is not purely potestative either, since according to Art. 3.4 of the Contract, the Defendant only needs to offer a balanced Commercial Partnership Agreement to cause the resolutory condition not to be met[129]. This condition does not offer any disproportionate or unbalanced benefit to the advantage of the Plaintiff, as it allows the Plaintiff to meet its business development goals, which explains why he was willing to pay the Defendant for an equity investment in the Fund[130]. Finally, the Plaintiff did not adopt a behavior that would intentionally be aimed at voiding the Contract, which could have satisfied the condition set in Art. 1304-3 FrCC; on the contrary, the Plaintiff is the one who attempted to build the commercial partnership[131].

- The Defendant never alleged the potestative nature of Art. 3.4 of the Contract until the communication of November 28, 2019[132].

- Assuming that the condition is potestative (which it is not), it becomes impossible to claim that it is invalid under Art. 1304-2 FrCC[133].

- If it is a *resolutory clause* (and not a *condition*), the issue of the potestative nature of Art. 3.4 of the Contract becomes irrelevant to determine its validity[134].

---

[127] Closing Arguments, Verbatim Report, p. 115, l. 6-27.
[128] Claim, p. 27; Closing Arguments, Verbatim Report, p. 125, l. 24 ss to p. 126, l. 1-9.
[129] Claim, p. 27; Closing Arguments, Verbatim Report, p. 126, l. 10-18.
[130] Closing Arguments, Verbatim Report, p. 126, l. 19-30.
[131] Closing Arguments, Verbatim Report, p. 126, l. 31 to p. 127 l. 14.
[132] Closing Arguments, Verbatim Report, p. 119, l. 6-12. Al. Exhibit Plaint.-27.
[133] Claim, p. 27.
[134] Claim, p. 31; Closing Arguments, Verbatim Report, p. 128, l. 3-6.

171. The Defendant did not express his position during the proceedings. Based on the exhibits of the case, including Exhibit Plaint.-27, the **Defendant**'s position may be summarized as follows: the Plaintiff's interpretation of the resolutory condition, "*as a clause subject to his sole will,*"[135] renders it potestative, and thus void and ineffective.[136]

### c) Discussion

172. Considering the characterization as a resolutory *condition* (*supra* N 168), it becomes necessary to determine whether Art. 3.4 of the Contract is valid under French law.

173. According to Art. 1304-2 FrCC, "*[t]he obligation contracted under a condition whose materialization depends on the sole will of the debtor is invalid. This invalidity cannot be claimed when the obligation was performed with full knowledge of the facts*"[137]. As shown in the examination, this provision covers both purely potestative conditions and simply potestative conditions[138].

174. An author stated that, "*in practice, the parties consistently make all contractual obligations resulting from a bilateral contract subject to the resolutory condition: this condition is thus under the control of one party, who necessarily acts both as creditor and debtor, which makes this textual limit inapplicable*"[139]. He adds that, when the resolutory condition is simply potestative, that is when it "*does not depend directly on the will of the debtor, but on the materialization of an event under his control [...] the condition will in principle be deemed valid*"[140].

175. After analyzing the content of Art. 3.4 of the Contract, the Arbitral Tribunal issues the following findings:

176. First, the resolutory condition in Art. 3.4 of the Contract consists in the signing of a Commercial Partnership Agreement within six months after the date when the Contract

---

[135] Exhibit Plaint.-27.

[136] Exhibit Plaint.-27, p. 1 and p. 3.

[137] Exhibit Plaint.L-2.

[138] Minutes-Nourissat, Verbatim Report, p. 55, I. 19-26.

[139] W DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contracts de droit privé interne, 2nd edition, LexisNexis 20112, v° Condition résolutoire, spec. p. 115.

[140] W DROSS, Clausier, Dictionnaire des clauses ordinaires et extraordinaires des contracts de droit privé interne, 2nd edition, LexisNexis 20112, v° Condition résolutoire, spec. p. 116

**Arbitration**    **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                   Page 49 of 83

was executed, as this date appears on the Contract's signature page, i.e. March 19, 2019[141].

177. Secondly, the Parties carefully specified that, for the resolutory condition to become effective, the Commercial Partnership Agreement should not have been executed "*for reasons other than a mere refusal of the Transferee to sign the balanced partnership agreement proposed by the Transferor*"[142]. This detail shows that the Parties were keen not to make the clause potestative[143]. On the one hand, a mere refusal by the Plaintiff to sign the Commercial Partnership Agreement was not enough to satisfy the resolutory condition, as if the Commercial Partnership Agreement was "*balanced*," the Plaintiff was not entitled to refuse. On the other hand, Art. 3.4 of the Contract specified that the Defendant was responsible for offering a balanced Commercial Partnership Agreement, and that a mere refusal by the Plaintiff would not result in the materialization of the resolutory condition. The opportunity offered to the Defendant to offer unilaterally a Commercial Partnership Agreement also shows the absence of any potestative character in favor of the Plaintiff.

178. As a result, the **Arbitral Tribunal considers that Art. 3.4 of the Contract is valid under French law**, in particular since it does not constitute a potestative resolutory clause in the meaning of Art. 1304-2 FrCC.

## 3. Applicability of Art. 3.4 of the Contract (Materialization of the Resolutory Condition)

### a) Question

179. The question at issue is the satisfaction of the conditions for applying Art. 3.4 of the Contract.

### b) Positions of the Parties

180. The **Plaintiff**'s position may be summarized as follows:

---

[141] Exhibit Plaint.-5, p. 24.

[142] Exhibit Plaint.-5, Art. 3.4.

[143] It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim Report, p. 46, l. 1-5; p. 68, l. 1-11.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 140 of 255 PageID #: 150

**Arbitration**         **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                        Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                              Page 50 of 83

- The Plaintiff claims that, if Art. 3.4 of the Contract should be characterized as a resolutory *condition*, this condition is met, and the promise is thus rescinded[144].

- If Art. 3.4 of the Contract should be characterized as a resolutory *clause*, the non-performance specified in the clause has occurred (non-signing of the Commercial Partnership Agreement and notification by the Plaintiff to the Defendant in the letter dated October 16, 2018), and the Contract is legally rescinded[145].

- Art. 3.4 of the Contract constitutes an essential element of the Contract[146], so much so that it was expressly mentioned in the Plaintiff's press release of March 20, 2019[147]. The Plaintiff highlighted its importance all throughout the contractual performance period, including on the return from the trip to Colombia at the end of May 2019[148].

- Art. 3.4 of the Contract states that the Contract will be rescinded if a Commercial Partnership Agreement is not executed within six months after the date when the Contract was signed for reasons other than a mere refusal of the Plaintiff to sign a balanced contract offered by the Defendant. In fact, the Commercial Partnership Agreement was never signed[149].

- The Commercial Partnership Agreement that was to be signed was to cover the direct importation and exportation of the Plaintiff's products (i.e. without an import agent) from hospitals in Colombia and elsewhere, the development of a multi-country sales network in Latin America, the creation of a surgical reference and training center in one of the Defendant's hospitals, the use of a clinical research department at the Defendant-owned San Rafael Hospital to perform the clinical monitoring of patients who underwent surgery with the Plaintiff's products[150].

- Since this was to be a group purchasing organization responsible for importing Spineway products, delivering them, supplying them to the hospitals of the group and organizing the supply chain for deliveries to other facilities, the Plaintiff must have

---

[144] Claim, p. 26 and 30.
[145] Claim, p. 31.
[146] Closing Arguments, Verbatim Report, p. 116, l. 2.
[147] Claim, p. 25; Exhibit Plaint.-6. Al. Closing Arguments, Verbatim Report, p. 114, l. 29 to p. 115, l. 3.
[148] Claim, p. 26; Exhibit Plaint.-19.
[149] Closing Arguments, Verbatim Report, p. 120, l. 25 to p. 121, l. 4.
[150] Minutes-Le Roux, Verbatim Report, p. 23, l. 21 to p. 24, l. 22.

**Arbitration**

**SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award

Page 51 of 83

noticed, during the meeting that took place at the end of May 2019 in Bogota, that this organization was not well organized and that the Defendant was suggesting a plan B that never was implemented in practice, as the Defendant was able to observe during the meeting between S. LEROUX and L. GERARD at the end of July 2019 in Brussels[151].

- On June 3, 2019, right after the trip to Colombia that took place at the end of May 2019, the Plaintiff explicitly mentioned the Commercial Partnership Agreement that was supposed to be signed[152].

- In September 2019, the Plaintiff understood that the Commercial Partnership Agreement would never be signed due to a lack of will of the Defendant.

- At the expiration of the timeframe set for the resolutory condition (on September 19, 2019), the Commercial Partnership Agreement that was supposed to include a list of the Plaintiff's products to import, the creation of a spinal surgery center at San Rafael Hospital, and common clinical research projects with this facility[153], had not been signed. In particular, the Defendant had not created any corporation to import the Plaintiff's products and had not secured any administrative approvals, which made it impossible to import the products. There was no longer any contact with the reference surgical center and, for clinical research, no final response had been received and there had been no advance made to overcome the challenges or the technical issues raised by the Plaintiff's representative[154].

- In the absence of a Commercial Partnership Agreement and without any prospect of signing any such Agreement, the Plaintiff decided to formally acknowledge the materialization of the resolutory condition specified in the Contract, and sent a certified letter an email to the Defendant on October 16, 2019[155].

- In his message dated November 28, 2019, the Defendant merely speaks of a "future partnership and prospective partnership", but does not propose any potential

---

[151] Minutes-Le Roux, Verbatim Report, p. 16, l. 32 to p. 18, l. 15.

[152] Closing Arguments, Verbatim Report, p. 117, l. 10-17. Exhibit Plaint.-19.

[153] Closing Arguments, Verbatim Report, p. 118, l. 1-10.

[154] Minutes-Le Roux, Verbatim Report, p. 35, l. 10-18.

[155] Closing Arguments, Verbatim Report, p. 118, l. 20-31. Al. Exhibit Plain.-23, p. 1; TEM-Le Roux, p. 5.

Arbitration      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award      Page 52 of 83

Commercial Partnership Agreement, not even in draft form[156]. Now, pursuant to Art. 3.4 of the Contract, this Commercial Partnership Agreement should have been signed or, at the very least, offered by the Defendant[157]. Therefore, the Defendant implicitly acknowledged that the resolutory condition had been met, since Art. 3.4 of the Contract mentions the effective signing of a partnership contract, and mere discussions or vague assumptions concerning an ill-defined agreement are not sufficient[158].

- Therefore, if the characterization as a resolutory *condition* is used, it must be admitted that this condition was met and that the Contract was rescinded[159].

- If the characterization as a resolutory *clause* is used instead, it is doubtful that a previous formal notice was required under Art. 1225 FrCC. First of all, Art. 3.4 of the Contract does not require such a notice, stating that "*this Promise will be terminated, and the Parties will revert to their initial status.*[160]" Secondly, the Defendant never raised this argument[161]. Thirdly, the Plaintiff, through S. LE ROUX, expressed his concerns to the Defendant through L. GERARD[162]. Finally, after receiving the notification, instead of offering a draft of the Commercial Partnership Agreement, the Defendant let things stand as they were[163].

- As a result, if the characterization as a resolutory clause is used, this condition is met and effective, and the Parties must revert to their initial status[164].

181. The Defendant did not express his position during the proceedings. Based on the exhibits of the case, including Exhibit Plaint.-27, the **Defendant**'s position may be summarized as follows:

[156] Claim, p. 24; Closing Arguments, Verbatim Report, p. 119, l. 16-20 and p. 125, l. 1-4. Al. Exhibit Plaint.-23, p. 1.
[157] Closing Arguments, Verbatim Report, p. 129, l. 23-25.
[158] Claim, p. 24 s.
[159] Closing Arguments, Verbatim Report, p. 125, l. 14-16.
[160] Closing Arguments, Verbatim Report, p. 128, l. 10-19.
[161] Closing Arguments, Verbatim Report, p. 128, l. 20-24.
[162] Closing Arguments, Verbatim Report, p. 128, l. 25-28.
[163] Closing Arguments, Verbatim Report, p. 128, l. 29-34.
[164] Closing Arguments, Verbatim Report, p. 129, l. 1-4.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 143 of 255 PageID #: 153

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                  Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                          Page 53 of 83

- May meetings and discussions took place by telephone or *in visu*, in France and in Colombia, to reach the Commercial Partnership Agreement[165].

- On the basis of the exchanges and the meetings mentioned in detail, the principles of the Commercial Partnership Agreement between the Parties had been finalized[166].

- From September 2019, the Plaintiff did not contribute anything to make possible the contemplated partnership, "*refusing almost consistently*" [sic] to respond to the proposals of the Defendant or to help the Defendant to move the process forward, although the Parties were about to reach a final commercial and distribution agreement[167].

- The Plaintiff's attitude during the negotiations for the Commercial Partnership Agreement was entirely unfair and showed his bad faith, since his only aim was to build a sold argument to request the rescission of the Contract after taking advantage of the expectations raised by the negotiation of the potential Commercial Partnership Agreement to raise funds[168].

- Therefore, the Contract remains effective, and the Plaintiff is liable toward the Defendant for failing to perform his obligations[169].

### c) Discussion

182. In the first place, it is necessary to determine whether the conditions that would result in the materialization of the resolutory condition specified in Art. 3.4 of the Contract are met. Then, in accordance with Art. 1304-3 FrCC, it is necessary to verify that the interested party is not responsible for triggering that resolutory condition.

183. Art. 3.4 of the Contract specifies the following condition: "*within six (6) months from the date of the Promise, the Parties agree to enter into a commercial partnership agreement for the distribution of the Transferee's products in the Transferor's business areas.*"

---

[165] Exhibit Plaint.-27, p. 1.
[166] Exhibit Plaint.-27, p. 3.
[167] Exhibit Plaint.-27, p. 3.
[168] Exhibit Plaint.-27, p. 3.
[169] Exhibit Plaint.-27, p. 4.

Case 1:22-mc-00604-RGA-JLH    Document 1-1    Filed 12/22/22    Page 144 of 255 PageID #: 154

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                      Page 54 of 83

184. In this case, under Art. 1.1 of the Contract, the "*date of the Promise refers to the date of this document, as it appears on the Promise's signature page*"[170]. The date that appears on the Contract's signature page is March 19, 2019[171]. The timeframe set in Art. 3.4 of the Contract thus expired six months later, i.e. on September 19, 2019.

185. Right from the beginning, it should be noted that, in his Claim, the Plaintiff requested that the Defendant produce "*any commercial partnership and distribution agreement for the products as contemplated in Art. 3.4*" of the Contract[172]. On April 24, 2021, the Arbitral Tribunal asked the Defendant to state his position on the requestion to produce documents. On June 10, 2021, the Arbitral Tribunal ordered that the Defendant produce, by June 30, 2021, the Commercial Partnership Agreement requested by the Plaintiff. The Defendant did not submit the document and did not submit any explanation to justify his refusal.

186. Pursuant to Art. 38 par. 3 of the Arbitration Rules, "*[i]f one of the parties who has regularly been invited to produce documents […], does not submit them in the timeframe set by the arbitral tribunal, without showing any legitimate impediment, the arbitral tribunal may issue a ruling based on the evidence at its disposal*". Therefore, the Arbitral Tribunal must use the exhibits available in the case file to rule on the materialization of the resolutory condition mentioned in Art. 3.4 of the Contract.

187. Art. 3.4 of the Contract does not include any details about the content of the Commercial Partnership Agreement. However, relevant information was obtained during the hearing of September 7, 2021.

188. According to S. LE ROUX, the Commercial Partnership Agreement was meant to cover, on the one hand, the direct importation and exportation of the Plaintiff's products from hospitals in Colombia, and on the other hand, the development of a multi-country sales network in Latin America. It was also aimed at the creation of a surgical reference and training center at the Defendant-owned San Rafael Hospital, and at the use of a clinical

---

[170] Exhibit Plaint.-5, p. 5.
[171] Exhibit Plaint.-5, p. 24, which mentions "Made in Lyon, on March 19, 2019, in two (2) original counterparts".
[172] Claim, p. 14, all. 44.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 145 of 255 PageID #: 155

**Arbitration**                 **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                  Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                Page 55 of 83

research department at San Rafael Hospital to perform the clinical monitoring of patients who underwent surgery[173].

189. These explanations were confirmed by witnesses who also took part in the meeting held between the Parties at the end of May 2019 in Bogota and in the communications that followed, between June and September 2019. The witness F. LAUCK confirmed that she was responsible for negotiating the acquisition of clinical data on the Plaintiff's medical devices[174]. The witness P. CHABERT stated that he was in charge of developing the supply chain on the Colombian market and the importation-distribution sector[175].

190. Since the content of the Commercial Partnership Agreement has now been specified and identified, it is necessary to determine whether such an agreement was entered into during the timeframe prescribed in Art. 3.4 of the Contract.

191. The case file shows that no Commercial Partnership Agreement was entered into, which is what the Plaintiff expressly alleges [176]. The Defendant, in his message from November 28, 2019, mentions discussions in view of a future partnership, but does not state that a Commercial Partnership Agreement had been entered into, let alone or signed[177].

192. On June 10, 2021, via PO No. 2, the Arbitral Tribunal set a second deadline, i.e. June 30, 2021, for the Defendant to produce the Partnership Agreement or to express his position on the request to produce the document. The Defendant did not issue his decision, nor did he produce the document requested by the Plaintiff and that he had been ordered to produce by the Arbitral Tribunal by this deadline.

193. The evidence submitted, including the statements of the Parties and of the witnesses during the Hearing of September 7, 2021, shows that no Partnership Agreement has been

---

[173] Minutes-Le Roux, Verbatim Report, p. 23, l. 21 to p. 24, l. 5. Al. Claim, p. 14, all. 44.

[174] Minutes-Lauck, Verbatim Report, p. 78, l. 24 to p. 79, l. 30. Al. TEM-Lauck, p. 2, N 2.

[175] Minutes-Chabert, Verbatim Report, p. 86, l. 14 to 0. 87, l. 9; p. 89, l. 13-31. Al. TEM-Chabert, p. 2, N 2.

[176] Claim, p. 14, all. 44; TEM-Le Roux, p. 5; Minutes-Le Roux, Verbatim Report, p. 35, l. 5-19; non-producing of the required evidence by the Defendant.

[177] Exhibit Plaint.-27.

**Arbitration**

**SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award

Page 56 of 83

entered into, and that, contrary to Art. 3.4 of the Contract, the Defendant never proposed such an Agreement[178].

194. The witness F. LAUCK, who was in charge of the part of the Commercial Partnership Agreement addressing the acquisition of clinical data on the Plaintiff's medical devices, stated that, after the meeting that took place at the end of May 2019 in Colombia, she discussed with her contact person, Mrs. Milena Para, but that she was never able to get in touch with the investigator surgeons, and that ultimately, those discussions ended up in nothing[179].

195. The witness P. CHABERT, who was responsible for discussing potential supply chain synergies, stated that, contrary to what the Defendant had initially claimed, the Defendant did not have any group purchasing organization in Colombia, which made the search for synergies less efficient, since the Plaintiff now had to identify her own contacts[180]. He also stated that he soon realized that the group purchasing organization did not exist or no longer existed; the dialogue thus came to a sudden halt, since he could not identify any contact working for the Defendant to discuss this[181].

196. The statements of the Defendant included in the case file, including in the letter of November 28, 2019, also show that the Commercial Partnership Agreement was not entered into in the specified contractual timeframe. In the letter, the Defendant mentions certain steps that were taken in view of a future partnership, specifying that *"we were about to reach a final commercial and distribution agreement"*[182]. Although the Defendant claims that *"the principles of the commercial agreement between the Parties had been finalized"*[183], the case file does not include any concrete evidence to support these allegations. There is no document establishing the existence of a Commercial Partnership Agreement or the drafting of a balanced agreement proposed by the Defendant to the Plaintiff, as specified in Art. 3.4 of the Contract.

---

[178] Minutes-Le Roux, Verbatim Report, p. 35, l. 5-19.

[179] Minutes-Lauck, Verbatim Report, p. 79, l. 14-30.

[180] Minutes-Chabert, Verbatim Report, p. 86, l. 14 to p. 87 l. 9, l. 13-31; p. 92, l. 2-14.

[181] Minutes-Chabert, Verbatim Report, p. 86, l. 22 to 33.

[182] Exhibit Plaint.-27, p. 3.

[183] Exhibit Plaint.-27, p. 3.

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award          Page 57 of 83

197. Therefore, the Arbitral Tribunal establishes the " *default of such Agreement for reasons other than a mere refusal of the Transferee to sign the balanced partnership agreement proposed by the Transferor within the period of six (6) months[184]*" after the Contract was executed.

198. Now that the Arbitral Tribunal has established that the resolutory condition was met, it must verify that the satisfaction of the resolutory condition was not triggered by the interested party, which would make this condition fail pursuant to Art. 1304-3 FrCC.

199. The Arbitral Tribunal considers that such is not the case. On the one hand, the facts included in the case file tend to show that the satisfaction of the resolutory condition did not present any interest for the Plaintiff. On the contrary, the Plaintiff's interest was in entering into the Commercial Partnership Agreement and initiating a genuine collaboration between both Parties in order to develop his business in Colombia and more generally in Latin America. On the other hand, the Arbitral Tribunal observes that the Plaintiff did not trigger the materialization of the resolutory condition, as the Plaintiff was responsible for offering a balanced Commercial Partnership Agreement, but did not do so by the prescribed deadline. It's only after two messages from the Plaintiff, on October 16 and November 6, 2019, that the Defendant responded with a letter on November 28, 2019, where he did not even explain why he had not submitted a draft Commercial Partnership Agreement, as was stipulated in Art. 3.4 of the Contract.

200. There are two more elements confirming that the Plaintiff did not cause the resolutory condition to materialize:

201. During his examination at the Hearing of September 7, 2021, the witness P. CHABERT, in his capacity of director of operations and manager in charge of logistics, distribution, importation, inventory management, order placement and product flows[185], stated that, after repeated requests, the Plaintiff was only able to obtain few and non-actionable information that would not allow him to guide his commercial strategy[186]. The information and elements provided by the Defendant were thus insufficient to enter into a Commercial

---

[184] Exhibit Plaint.-5, Art. 3.4.

[185] Minutes-Le Roux, Verbatim Report, p. 27, l. 11-13.

[186] Minutes-Chabert, Verbatim Report, p. 87, l. 24 ss to p. 88, l. 6. Al. Closing Arguments, Verbatim Report, p. 117, l. 20-26.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 148 of 255 PageID #: 158

**Arbitration**                        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                       Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                                          Page 58 of 83

Partnership Agreement, and the Plaintiff could not be accused of triggering the materialization of the resolutory clause.

202. On September 12, 2019, S. LE ROUX wrote to Carlos Florez, who was described as the director in charge of the financial management of hospitals for the Defendant's group, to explain that the Parties "*needed to settle an Agreement with very short notice*"[187]. This email shows that the Plaintiff made serious efforts to reach the Commercial Partnership Agreement, even with only a few days left before the deadline. The case file does not include any evidence showing that the Plaintiff responded before the contractual deadline.

203. As a result, the resolutory condition was not triggered by the interested party and is not considered as failed pursuant to Art. 1304-03 FrCC.

204. In the end, the Arbitral Tribunal considers that the Parties did not enter into the Commercial Partnership Agreement within the timeframe specified in Art. 3.4 of the Contract, and that the reasons for not signing this Commercial Partnership Agreement are not a mere refusal of the Plaintiff to sign a balanced Commercial Partnership Agreement offered by the Defendant.

205. Therefore, the **conditions of Art. 3.4 of the Contract are met, and the regime described in this provision**, which will be detailed in the following paragraphs (*infra* N 206 ss), **is applicable to the present case.**

## 4. Consequences of the Applicability of Art. 3.4 of the Contract

### a) Question

206. The question at issue is the consequences of the applicability of Art. 3.4 of the Contract.

### b) Positions of the Parties

207. The **Plaintiff**'s position may be summarized as follows:

---

[187] Exhibit Plaint.-21, p. 18, Minutes-Le Roux, Verbatim Report, p. 33, L. 10 to p. 34, L. 22.

- The Plaintiff's opinion, which is based on Nourissat Expert's Report, is that independently of the characterization as resolutory condition or resolutory clause, the Contract must be considered as rescinded[188].

- If Art. 3.4 of the Contract should be characterized as a resolutory *condition*, this condition is met, and the promise is rescinded[189]. If it should be characterized as a resolutory *clause*, it is also valid and effective, and the Parties must revert to their initial status[190].

- Considering that, in his letter of October 16, 2019, the Plaintiff formally acknowledged the rescission of the Contract and its amendments pursuant to Art. 3.4 of the Contract, he requested that the Defendant return the paid amounts, i.e. 4,16 million euros, undertaking as well to sign transfer orders to return the Fund's units to the Defendant[191].

- After establishing the satisfaction of the resolutory condition, the Arbitral Tribunal must order that the Parties revert to the initial status they had before signing the Contract, and must thus order that the Defendant return the price paid and all associated costs[192].

- Pursuant to Art. 1188 FrCC, the intent of the Parties must be considered beyond the letter of the Contract[193].

- Since the Commercial Partnership Agreement was not entered into, the Parties' intent was to subject the Contract, as well as the amounts paid and the securities transferred under it, to the execution of the Commercial Partnership Agreement, which was never signed by the Parties nor even proposed by the Defendant[194].

- The Parties must revert to their initial status before they signed the Contract, as if S. LEROUX and L. GERARD had never met in Gare de Lyon, as if no payment was ever

---

[188] Claim, p. 31.
[189] Claim, p. 26; Closing Arguments, Verbatim Report, p. 127, l. 11-14.
[190] Closing Arguments, Verbatim Report, p. 129, l. 1-4.
[191] Closing Arguments, Verbatim Report, p. 118, l. 30 to p. 119, l. 3. Al. Exhibit Plaint.-23, p. 2..
[192] Closing Arguments, Verbatim Report, p. 121, l. 8-15
[193] Closing Arguments, Verbatim Report, p. 129, l. 12-17.
[194] Closing Arguments, Verbatim Report, p. 129, l. 18-25.

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                                 Page 60 of 83

made, no securities were ever transferred, and no costs were incurred for the negotiation and the audits[195].

- The term "compensation" included in Art. 3.4 of the Contract must be construed in accordance with what S. LE ROUX stated during his examination: there should be no penalty, no damages, each one gets back what he contributed, and that's the end of it[196].

- Therefore, the paid transfer price must be returned, i.e. the four payments made in 2019, or three times one million euros plus 1.16 million euros. The Defendant never returned those amounts[197].

- These amounts must be accompanied by late interests in accordance with Art. 1352-6 FrCC, which specifies that the "*return of monies includes interests at the legal rate and any paid taxes from the party who received the monies*", as this is a statutory public provision[198].

- The Defendant must also reimburse the Plaintiff for his costs, i.e. EUR 250,329.21 (amended: EUR 252,329.31), taxes excluded[199].

- Once he has received the returned amounts, the Plaintiff undertakes to sign transfer orders to return the Fund's securities in order to undo what was done and completely sever his relationship with the Defendant[200].

208. The Defendant did not express his position during the proceedings. Based on the exhibits of the case, including Exhibit Plaint.-27, the **Defendant**'s position may be summarized as follows:

- The Defendant considers that the Contract remains effective, and that the Plaintiff remains liable[201].

---

[195] Closing Arguments, Verbatim Report, p. 129, l. 26 to p. 130, l. 2.
[196] Closing Arguments, Verbatim Report, p. 130, l. 3-17.
[197] Closing Arguments, Verbatim Report, p. 130, l. 18-27.
[198] Closing Arguments, Verbatim Report, p. 131, l. 5-16.
[199] Closing Arguments, Verbatim Report, p. 132, l. 15-18.
[200] Closing Arguments, Verbatim Report, p. 132, l. 26-30.
[201] Exhibit Plaint.-27, p. 4.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 151 of 255 PageID #: 161

**Arbitration**                    **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                        Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                           Page 61 of 83

### c) Discussion

209. As mentioned above (*supra* N 205), the Arbitral Tribunal ruled that the conditions of Art. 3.4 of the Contract were met, and that the regime contemplated by this provision was applicable. The regime of the resolutory condition must now be identified by describing the legal regime and comparing it with the contractual regime selected by the Parties.

210. According to Art. 1304-7 FrCC, "*t]he satisfaction of the resolutory condition voids retroactively the obligation, without affecting, as applicable, any conservatory or administrative act.*"

211. According to Art. 1304-7 par. 2 FrCC, "*[t]he retroactivity does not occur if agreed by the parties or if the exchanged performances proved to be useful during the reciprocal performance of the contract*". There are thus two possible exceptions to the retroactivity principle when the resolutory condition is met: one the one hand, the parties must agree to it, and on the other hand, the exchanged performances proved to be useful during the reciprocal performance.

212. Concerning the first exception, the Parties did not agree to waive the retroactivity rule for the rescission. Reading Art. 3.4 of the Contract is enough to prove it: the contractual text does not mention any absence of retroactivity; on the contrary, the phrase "*the Parties revert to their initial status*"[202] means that the Parties intended to apply the retroactive effect in case of satisfaction of the resolutory condition.

213. As for the second exception, it is not relevant to this Contract, which is, as a reminder, a bilateral promise to sell and purchase securities, that is contractual benefits which could not be retroactively erased, and even less returned, such as the provision of facilities under a lease[203]. As a result, the second exception does not apply to the present case[204].

---

[202] Exhibit Plaint.-5, Art. 3.4.

[203] F TERRÉ/PH. SIMLER/Y. LEQUETTE/F. CHÉNEDÉ, Droit civil, les obligations, 12th ed. amended, Dalloz, 2018, in particular p. 1425 s.

[204] F TERRÉ/PH. SIMLER/Y. LEQUETTE/F. CHÉNEDÉ, Droit civil, les obligations, 12th ed. amended, Dalloz, 2018, in particular p. 1425 s. It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim Report, p. 47, l. 11-32.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 152 of 255 PageID #: 162

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 62 of 83

214. As specified in Art. 3.4 of the Contract, if the resolutory condition materializes, *"this Promise will be terminated, and the Parties will revert to their initial status"*[205]. As an example, Art. 3.4 of the Contract adds that *"Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties[206]*.

215. The Arbitral Tribunal notes that the effects specified in Art. 3.4 of the Contract are common for a resolutory condition and broadly correspond to the legal regime, including Art. 1304-7 FrCC, which has the character of a provision[207]. On the one hand, the existence of the Contract ends with a retroactive effect, and the Parties revert to their initial status. On the other hand, this means that the purchase of Units by the Plaintiff is cancelled, with a retroactive effect, and that the Plaintiff is entitled to recover the amounts already paid to the Defendant. It should be noted that the use of the phrase *"this Promise will be terminated[208]"* does not change the legal regime: since Art. 3.4 specifies expressly a retroactive effect for this termination, it is actually a rescission whose regime is the one contemplated in Art. 1304-7 FrCC[209].

216. It is now necessary to determine whether the contractual regime describe above allows the Plaintiff to present the claims submitted in his conclusions (*infra* N 2517 ss).

## D. The Claims of the Plaintiff

217. This chapter addresses the claims of the Plaintiff:

- The first claim seeks an order for the Defendant pay to the Plaintiff, as principal, EUR 4,160,000, as the partial price paid under the Contract, and an acknowledgement that the Plaintiff undertakes to return to the Defendant the totality of the A and B units of the Fund (*infra* N 218 ss).

---

[205] Exhibit Plaint.-5, Art. 3.4.

[206] Exhibit Plaint.-5, Art. 3.4. It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim Report, p. 47, l. 3-5.

[207] Minutes-Nourissat, Verbatim Report, p. 47, l. 6-8 and p. 67, l. 5-15

[208] Exhibit Plaint.-5, Art. 3.4.

[209] It should be noted that the expert Nourissat reaches the same conclusion; see Minutes-Nourissat, Verbatim Report, p. 63, l. 20-32.

**Arbitration**    **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award    Page 63 of 83

- The next claim seeks an order for the Defendant to pay the sum of EUR 252,239.21 (in addition to the VAT for any invoices subject to this tax) for the expenses incurred by the Plaintiff to negotiate and execute the Contract, and to perform the audits (*infra* N 232 ss).

- The last claim seeks an order for the Defendant to pay interests at the legal rate starting from October 16, 2019 on the principal amount of EUR 4,160,000 (*infra* N 248).

This section closes with a summary (*infra* N 260).

## 1. Claim for the Payment of EUR 4,160,000 and the Undertaking to Sign Security Transfer Orders to Return the Totality of the A and B Units of the Fund

### a) Question and Methodology

218. The question at issue is the justification of the Plaintiff's claim for the return of EUR 4,160,000 as partial price paid under the Contract and its amendments[210], both on the merits and as regards the amount itself.

219. It is also necessary to determine if it is necessary to acknowledge that the Plaintiff undertakes to sign security transfer orders to return to the Defendant the totality of the A and B units of the Fund.

### b) Positions of the Parties.

220. The **Plaintiff** claims a payment of EUR 4,160,000 (all taxes included) and requests that the Arbitral Tribunal acknowledges that he undertakes to sign security transfer orders to return to the Defendant the totality of the A and B units of the Fund within one month after receiving the entire abovementioned sum, in addition to interests at the legal rate[211], with the following justification:

- Art. 1304-7 FrCC (resolutory condition) and Art. 1229 FrCC (resolutory clause) specify the obligation to return principal amounts[212].

---

[210] Exhibit Plaint.-5, p. 11; Exhibit Plaint.-11, p. 4 s.

[211] Claim p. 38; Closing Arguments, Verbatim Report, p. 133, l. 25-27; p. 134, l. 2-7.

[212] Claim, p. 32; Exhibits Plaint,L-6 and Plaint.L-7.

- Art. 3.4 of the Contract states that "*[t]his Promise will be terminated, and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties[213].*"

- The Plaintiff made all the payments for a total of EUR 4,160,000. The corresponding transfer orders are included in Exhibits Plaint.-12, 14, 16 and 18, as well as in Exhibits Plaint.-13, 15, 17 and 31 for the transfers of Fund units[214].

- The amount of EUR 4,160,000 was not returned by the Defendant to the Plaintiff, in violation of Art. 3.4 of the Contract[215].

221. The **Defendant** did not express his position during the proceedings. However, based on the exhibits of the case, it seems that he objects to any return, since he considers the Contract to be still effective[216].

### c) Discussion

222. Based on previous developments (*supra* N 151-216), the Arbitral Tribunal resolves the dispute as follows:

223. The applicable contractual basis is Art. 3.4 of the Contract. This provision states that "*[t]his Promise will be terminated, and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties[217].*"

224. The Arbitral Tribunal already found that Art. 3.4 of the Contract uses the mechanism specified in Art. 1304-7 FrCC, whereby the satisfaction of the resolutory condition voids retroactively the Contract, which results in an obligation to return any performances carried out under the Contract (*supra* N 215).

---

[213] Claim, p. 34.
[214] Claim p. 34 s; Closing Arguments, Verbatim Report, p. 116, l. 15-22.
[215] Closing Arguments, Verbatim Report, p. 119, l. 21-22 and p. 121, l. 5-7.
[216] Exhibit Plaint.-27, p. 4.
[217] Exhibit Plaint.-5, Art. 3.4.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 155 of 255 PageID #: 165

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                     Page 65 of 83

225. In this case, the Arbitral Tribunal considers that, as shown by the evidence, the Plaintiff made the following payments to the Defendant, under the Contract, at the following dates:

-   EUR 1,000,000 on May 15, 2019[218];

-   EUR 1,000,000 on July 5, 2019[219];

-   EUR 1,000,000 on July 31, 2019[220];

-   EUR 1,160,000 on September 27, 2019[221].

226. In exchange for these payments, the Arbitral Tribunal considers that, as shown by the evidence, the Defendant transferred to the Plaintiff the following securities, under the Contract, at the following dates:

-   750 A units of the Fund and 250 B units of the Fund, on May 16, 2019[222];

-   750 A units of the Fund and 250 B units of the Fund, on July 1, 2019[223];

-   750 A units of the Fund and 250 B units of the Fund, on August 1, 2019[224];

-   870 A units of the Fund and 250 B units of the Fund, on October 2, 2019 (date of the transfer bulletin), or on July 17, 2020 (email from the Defendant to the Plaintiff)[225].

227. Under the regime contemplated in Art. 3.4 of the Contract and considering that the resolutory condition specified by this provision was met, the Parties have the obligation to return the performances already carried out under the Contract.

228. Therefore, the Defendant must be ordered to return to the Plaintiff the sum of EUR 4,160,000 paid as partial price under the Contract, since it was rescinded retroactively due to the satisfaction of the resolutory condition specified in Art. 3.4 of the Contract.

---

[218] Exhibit Plaint.-12.
[219] Exhibit Plaint.-14.
[220] Exhibit Plaint.-16.
[221] Exhibit Plaint.-18.
[222] Exhibit Plaint.-13.
[223] Exhibit Plaint.-15.
[224] Exhibit Plaint.-17.
[225] Exhibit Plaint.-31, p. 1 and 3.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 156 of 255 PageID #: 166

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 66 of 83

229. Considering the bilateral nature of the Contract, the restitution of performances by one Party can take place only of the other Party also returns the performances received or makes a serious offer to return them[226].

230. In this case, the Plaintiff not only requests a return of the partial price paid to the Defendant, but also undertakes to sign security transfer orders to return the A units and the B units of the Fund to the Defendant, as shown in his certified mail of October 16, 2019[227], in the Claim[228], and in the conclusions submitted during closing arguments at the Hearing of September 7, 2021[229].

231. In conclusion, the **Arbitral Tribunal orders that the Defendant pay to the Plaintiff the principal amount of EUR 4,160,000** as partial price paid under the Contract and its amendments, and acknowledges that the Plaintiff undertakes to sign security transfer orders in order to return to the Defendant the totality of the A units and the B units of the Fund within one month of receiving the entire amount of EUR 4,160,000, in addition to any interests accrued, as discussed below (*infra* N 248 ss).

## 2. Claim for the payment of EUR 252,329.21

### a) Question and Methodology

232. The question at issue is the justification of the Plaintiff's claim for the payment of EUR 252,329.21 as expenses incurred by the Plaintiff to negotiate and execute the Contract, and to conduct the audits, both on the merits and as regards the amount itself.

### b) Positions of the Parties

233. The **Plaintiff** requests the reimbursement of EUR 252,329.21, in addition to VAT for any invoices subject to this tax, for the expenses incurred by the Plaintiff to negotiate and execute the Contract, and to conduct the audits[230], with the following justification:

---

[226] MALAURIE PHILIPPE/AYNES LAURENT/STOFFEL-MUNCK PHILIPPE, Droit des obligations, 11th ed. LGDJ 2020, N 531.

[227] Exhibit Plaint.-23, p. 2.

[228] Claim, p. 16 all, 51 and o. 35 N 27.

[229] Closing Arguments, Verbatim Report, p. 145, l. 2-7.

[230] Claim p. 35 s. and 39; Closing Arguments, Verbatim Report, p. 134, l. 8-12.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 157 of 255 PageID #: 167

Arbitration                    SPINEWAY SA vs. STRATEGOS GROUP LLC
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                                Page 67 of 83

- The Plaintiff incurred many expenses which amount to EUR 252,329.21 (excluding taxes), as specified in the Claim[231].

- The rescission of the Contract, which results from the faulty inaction of the Defendant, justifies the reimbursement of the expenses incurred by the Plaintiff[232].

- Given that the Commercial Partnership Agreement was not executed, the Parties must revert to their original status before the Contract, as if S. LEROUX and L. GERARD had never met in Gare de Lyon, as if no payment was ever made, no securities were ever transferred, and no costs were incurred for the negotiation and the audits[233].

- Although the Contract excludes any compensation, it also states that the Parties should revert to their initial status that existed before the Contract was signed; if the Contract had not been signed, the Plaintiff would have never incurred those expenses, would never have negotiated the Contract and would never have requested that various Colombian firms conduct the audits. The invoice for these expenses is attached in Exhibit Plaint.-30[234].

234. The **Defendant** did not express his position during the proceedings. However, based on the exhibits of the case, it seems that he objects to any payment, since he considers the Contract to be still effective[235].

### c) Discussion

235. The contractual basis should be reviewed and applied to the facts in hand in order to reach the proper conclusions.

236. The legal regime governing the effects of a resolutory condition is that of a supplementary provision[236], which is why it is appropriate to use the regime specified in the Contract.

---

[231] Claim p. 35 s.; Closing Arguments, Verbatim Report, p. 120, I. 4-6, which refer to Exhibits-Plaint.-8, Plaint.-9, Plaint.-10 and Plaint.-30. Al. Closing Arguments, Verbatim Report, p. 132, I. 15-18 (which includes a mistake in the amount).
[232]

[233] Closing Arguments, Verbatim Report, p. 129, I. 26 to p. 130, I. 2.
[234]

[235] Exhibit Plaint.-27, p. 4.
[236] Minutes-Nourissat, Verbatim Report, p. 67, I. 5-15.

**Arbitration** **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award

Page 68 of 83

237. Art. 3.4 of the Contract states that "*this Promise will be terminated, and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, without any additional compensation from any of the Parties*[237].

238. In this case, it is obvious that the performances exchanged between the Parties before the occurrence of the resolutory condition must be returned. However, it becomes necessary to interpret the content of Art. 3.4 to determine whether the Plaintiff is entitled to request from the Plaintiff a payment of EUR 252,329.21 for the expenses incurred to negotiate and execute the Contract, as well as to conduct the audits specified in the Contract.

239. The relevant contractual basis needed to assess the merits of this claim is the section of Art. 3.4 which specifies "*without any additional compensation from any of the Parties.*"

240. Pursuant to Art. 1188 FrCC, "*[t]he contract must be construed according to the parties' common intent rather than from a literal interpretation of its terms. When it is impossible to discern the intent, the contract must be interpreted according to the meaning that a reasonable person would ascribe to it in the same situation*"[238].

241. The Arbitral Tribunal examined the Plaintiff's representative, S. LE ROUX, who alleged that the phrase "*without any additional compensation from any of the Parties*" in clause 3.4 of the Contract means that, in case of economic loss for the Plaintiff, he will not be entitled to claim a compensation for his lost revenue[239].

242. In the absence of any evidence to identify the common intent of the Parties when they executed the Contract and to confirm the allegations of S. LE ROUX during the Hearing of September 7, 2021 concerning the Parties' common intent when they executed the Contract, the Arbitral Tribunal does not rely on the interpretation of Art. 3.4 of the Contract suggested by S. LE ROUX, since it only reflects the intent of one of the Parties, i.e. the Plaintiff[240].

---

[237] Exhibit Plaint.-5, Art. 3.4.

[238] In this regard, al. Minutes-Nourissat, Verbatim Report, p. 59, l. 29-31.

[239] Minutes-Le Roux, Verbatim Report, p. 25, l, 25 to p. 26, l. 7.

[240] In this regard, P. MALAURIE/L. AYNÈS/P. STOFFEL-MUNCK, Droit des obligations, 11th ed., LGDJ 2020, N 445, which specifies that it cannot be the intent of only one party.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 159 of 255 PageID #: 169

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                    Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                    Page 69 of 83

243. Consequently, it becomes necessary to determine the meaning that a reasonable person would ascribe to it in the same situation. After a reasonable reading of Art. 3.4 of the Contract, the Arbitral Tribunal acknowledges that, if the resolutory condition is met, the Parties have the reciprocal obligation to return the performances already carried out to one another. However, the expression "*without any additional compensation from any of the Parties*" in Art. 3.4 of the Contract, as applied to the return of the performances, must be understood as meaning that the Parties are not entitled to damages for any harm incurred as a result of the rescission of the Contract. Although he was not examined exactly on this point, the expert Nourissat seems to concur when stating that "*at no time did the Parties ever stipulate any kind of compensation or monetary penalty*"[241].

244. Therefore, any efforts made, and any expenses incurred by a Party as part of the negotiation, the execution and the performance of the rescinded Contract cannot be claimed as a compensation due. In addition, as was rightly highlighted by S. LE ROUX[242], the same applies to any loss of revenue claimed by a Party as a result of the retroactive rescission of the Contract due to the materialization of the resolutory condition.

245. In this case, the Plaintiff requests the payment of EUR 252,329.21 for expenses allegedly incurred to negotiate and execute the Contract, as well as to conduct the audits specified in the Contract. Notwithstanding the fact that certain invoices (e.g. Novances Corporate Finance) submitted by the Plaintiff cover services that do not seem to be directly related to the negotiations for the Contract, to its execution, or to the audits conducted under the Contract, the Arbitral Tribunal finds that all these amounts were paid by the Plaintiff to third parties, including Mazars Gourgue, Fernand Carle, Markos P. Spanos & Co Advocates, Parra Rodriguez Abogados S.A.S., Lamy Lexel, Pepper Hamilton LLP, Pinto Ruiz & Del Valle S.L., Novances Corporate Finance, and AEC Partners, and that they must be characterized as "compensation" in the meaning of Art. 3.4 of the Contract.

246. The Plaintiff alleges a decrease in his assets, but instead of claiming these amounts from the entities to whom he made the payments, he claims them from the Defendant, which thus constitutes a claim for damages against the Defendant and should be characterized as "*compensation*" in the meaning of the Contract. Considering the content of Art. 3.4 of

---

[241] Minutes-Nourissat, Verbatim Report, p. 64, l. 15 ss, in particular l. 28-30.

[242] Minutes-Le Roux, Verbatim Report, p. 25, l. 25 to p. 26, l. 7.

Case 1:22-mc-00604-RGA-JLH  Document 1-1  Filed 12/22/22  Page 160 of 255 PageID #: 170

the Contract, this characterization precludes the Plaintiff from claiming these amounts from the Defendant.

247. Therefore, under the contractual regime selected by the Parties in Art. 3.4 of the Contract in case of materialization of the resolutory condition, the **Arbitral Tribunal rejects the claim of the Plaintiff for the payment of EUR 252,329.21**.

### 3. Interests Accrued

#### a) Question and Methodology

248. The question at issue is the accrual of interest on the principal amount (*supra* N 231 ss) at the legal rate, and if interest is accrued, from what date.

#### b) Positions of the Parties

249. The **Plaintiff** claims interests accrued at the legal rate on the principal amount of EUR 4,160,000 starting from October 16, 2019[243], with the following justification:

- Art. 1352-6 FrCC specifies that the "*return of monies includes interests at the legal rate and any paid taxes from the party who received the monies*", as this is a statutory public provision[244]. The Plaintiff does claim monies.

- The claimed rate is the legal rate, which is updated semi-annually via a ministerial decree and whose value is specified in the Claim[245].

- Art. 1352-7 FrCC states that the party "*who received the monies in good faith only owes interest from the date of the claim*"[246]. In this case, the Defendant acted in good faith, since he received the monies pursuant to the Contract. However, interests started accruing at the legal rate on October 19, 2019, which is the date when the Plaintiff sent a formal notice about the rescission of the Contract and when the claim for the return of the funds was made[247].

[243] Claim, p. 35; Closing Arguments, Verbatim Report, p. 134, l. 1.
[244] Claim, p. 32 s; Closing Arguments, Verbatim Report, p. 131, l. 5-16; Exhibit Plaint.L-8.
[245] Claim, p. 33; Exhibit Plaint.-32; Closing Arguments, Verbatim Report, p. 131, l. 17-20.
246
247

Case 1:22-mc-00604-RGA-JLH  Document 1-1  Filed 12/22/22  Page 161 of 255 PageID #: 171

Arbitration                     SPINEWAY SA vs. STRATEGOS GROUP LLC
                   Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 71 of 83

250. The **Defendant** did not express his position during the proceedings. However, based on the exhibits of the case, it seems that he objects to any payment, since he considers the Contract to be still effective[248].

### c) Discussion

251. According to Art. 1352-6 FrCC, the "*return of monies includes interests at the legal rate and any paid taxes from the party who received the monies*".

252. In the present case, the abovementioned elements led to the determination that the Defendant must return monies (EUR 4,160,000) to the Plaintiff (*supra* N 231). Under Art. 1352-6 FrCC, the Defendant must pay interest at the legal rate on the abovementioned amount.

253. The date from which interests start accruing (*dies a quo*) must now be determined.

254. For the amount due as restitution of the partial price of EUR 4,160,000, which was paid pursuant to the Contract and its amendments, the Plaintiff sets October 16, 2019 as the starting point for the accrual of interest at the legal rate[249].

255. According to Art. 1352-7 FrCC, "*[a] party who received monies in bad faith owes interest, the profits resulting from the payment or the value of the enjoyment starting from the date of payment. A party who received the monies in good faith only owes interest from the date of the claim.*"

256. In this case, the Plaintiff does not allege that the Defendant acted in bad faith when it received the various installments for a total amount of EUR 4,160,000. The evidence available does not lead to a different conclusion.

257. On October 16, 2019, the Plaintiff sent a certified letter and an email to the Defendant, whereby he requested that the Defendant "*transfer the EUR 4,160,000 euros corresponding to the totality of the sums paid for the partial payment resulting from the Initial Exercise of the Promise, in accordance with Article 5.1 of the Promise, to the bank account of Spineway, starting on October 23, 2019, and before November 6, 2019*"[250].

---

[248] Exhibit Plaint.-27, p. 4.

[249] Closing Arguments, Verbatim Report, p. 133, l. 25 to p. 134, l. 1.

[250] Exhibit Plaint.-23, p. 2.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 162 of 255 PageID #: 172

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
              Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 72 of 83

The certified delivery was received on October 21, 2019[251]. The email was transmitted on October 16, 2019 at 5:10 PM[252].

258. As shown by the exhibits available in the case file, and in particular the certified letter sent on October 16, 2019[253], the Plaintiff claimed the payment of the amount of EUR 4,160,000 starting on October 23, 2019, thus granting an extension to the Defendant, which postpones the starting point for accrual of legal interests. The starting point for the accrual of interests should thus be October 23, 2019.

259. Therefore, the amount due by the Defendant to the Plaintiff as restitution of the EUR 4,160,000 must **include legal interests accrued from October 23, 2019**.

### E. Summary of the Claims

260. The preceding developments show that the Arbitral Tribunal issued the following rulings concerning the claims of the Plaintiff:

(i)    The claim of the Plaintiff against the Defendant for the return of the amount of EUR 4,160,000 is granted, with interests at the legal rate accrued from October 23, 2019, and the Plaintiff's undertaking to sign security transfer orders to return to the Defendant the totality of the A units and the B units of the Fund within one month after receipt of the amount of EUR 4,160,000 in whole, in addition to interests at the legal rate, is acknowledged;

(ii)   The claim of the Plaintiff against the Defendant for the return of the amount of EUR 252,329.21 is rejected.

### F. Costs of Arbitration and Costs and Expenses of the Parties

1. **Question**

---

[251] Exhibit Plaint.-24.
[252] Exhibit Plaint.-25.
[253] Exhibit Plaint.-23, p. 2.

Case 1:22-mc-00604-RGA-JLH  Document 1-1  Filed 12/22/22  Page 163 of 255 PageID #: 173

**Arbitration**          **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                        Page 73 of 83

261. The question at issue is the allocation of the costs of arbitration, which include, on the one hand, the fees and costs of the Arbitral Tribunal, and on the other hand, the costs and expenses of the Parties.

## 2. Positions of the Parties

262. The **Plaintiff**, in his Closing Arguments, concluded that the Defendant must be ordered to pay to the Plaintiff the totality of the costs of arbitration, including the fees and disbursed expenses due to the Swiss Chamber's Arbitration Institution and to the Arbitral Tribunal, and advanced by the Plaintiff[254].

263. In his Amended Statement of Costs of September 30, 2021, the Plaintiff concludes that the Arbitral Tribunal must order the Defendant to pay to the Plaintiff the amounts of CHF 23,424.70 (or its countervalue of EUR 21,480.45) and EUR 110,857.06 (or its countervalue of CHF 122,345.17) as fees and costs, and order the Defendant to pay to the Plaintiff the amount of CHF 128,000 (or its countervalue of EUR 117,376) as fees and/or disbursed expenses due to the Swiss Chambers' Arbitration Institution and to the Arbitral Tribunal, and advanced by the Plaintiff[255].

264. He justifies his position as follows:

- His position is based on Art. 38 and 40 of the Arbitration Rules[256].

- His conclusions are justified by the behavior of the Parties[257].

- In his detailed statement of costs sent on September 21, 2021 and amended on September 30, 2021, the Plaintiff shows fees and costs for EUR 110,857.06 and CHF 23,424.70, including:

    (i)    CHF 21,632.20 and EUR 94,887.46 as counsel fees and costs on September 21, 2021,

    (ii)   CHF 1,000 and EUR 1,000 as costs to be incurred,

    (iii)  CHF 2,122 (*pro memoria*) for the courtroom in Geneva, since this amount is already included in an invoice from Mr. Canonica, counsel for the Plaintiff,

---

[254] Closing Arguments, Verbatim Report, p. 134, l. 13-15.
[255] Plaint.-Amended Statement of Costs, p. 4.
[256] Claim, p. 36 s.
[257] Claim, p. 37 s.

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 164 of 255 PageID #: 174

**Arbitration**      **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                        Page 74 of 83

- (iv)   EUR 3,748.30 for the fees and costs of the stenographer,
- (v)    CHF 449.50, CHF 343, EUR 40.44 and EUR 38.50 as costs of the Plaintiff, and
- (vi)   EUR 11,142.36 for the fees and costs of the expert Nourissat.

- In the same detailed statement, the Plaintiff also claims advances for procedural costs for a total of CHF 128,000, including:
  - (i)    CHF 6,000 as registration fees with the Swiss Arbitration Centre,
  - (ii)   CHF 122,000 as fees and costs for the Arbitral Tribunal.

265. The **Defendant** did not express his position on this point during the proceedings.

### 3. Discussion

266. According to Art. 38 of the Arbitration Rules, the award must contain a determination of the costs of arbitration. The term "costs" only includes: (a) the fees of the members of the arbitral tribunal, to be stated separately for each arbitrator and, if applicable, for any secretary, to be determined by the arbitral tribunal in accordance with Article 39 and 40(3) to (5) of the Arbitration Rules; (b) the travel and other expenses incurred by the arbitral tribunal and, if applicable, by any secretary; (c) the costs of expert advice and of other assistance required by the arbitral tribunal; (d) the costs of witnesses and experts, to the extent such costs are approved by the arbitral tribunal; (e) the legal and other costs incurred in connection with the arbitration, if such costs were claimed during the arbitration proceedings and the arbitral tribunal determines the amount of such costs to be reasonable; (f) the registration fee and the administrative costs in accordance with Appendix B (Schedule of Costs); (g) the registration fee, the fees and expenses of any emergency arbitrator, and the costs of expert advice and of other assistance required by such emergency arbitrator, determined in accordance with Article 43(9) of the Arbitration Rules.

267. After determining the amount of expenses (*infra* N 268 ss) and the amount of legal costs (*infra* N 280 ss), which constitute the costs of arbitration in the meaning of Art. 38 of the Arbitration Rules, the Arbitral Tribunal will allocate the procedural costs and expenses (*infra* N 288 s).

### a) Amount of Expenses for the Arbitration

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 165 of 255 PageID #: 175

**Arbitration**                  **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                  Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                              Page 75 of 83

268. According to Art. 39 par. 1 of the Arbitration Rules, the fees and expenses of the arbitral tribunal must be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter of the arbitration, the time spent and any other relevant circumstances of the case, including the termination of the arbitration proceedings in case of settlement.

269. Amount in dispute. The amount in dispute is EUR 4,412,329.21.

270. Fees and expenses of the Arbitral Tribunal. The Arbitral Tribunal reviewed the case, prepared and conducted a meeting to organize the proceedings and a meeting to organize the hearing of witnesses and closing arguments, issued five procedural orders and sent many notifications, prepared and conducted a session for the hearing of witnesses and of closing arguments, closed the proceedings and drafted this award.

271. Although the non-participation of the Defendant limited the quantity of documents to be processed, the Arbitral Tribunal wishes to highlight the added complexity of the proceedings due to the non-participation of the Defendant: specific steps had to be taken for organizing the arbitration in the beginning (since there was no common proposal from the Parties), for conducting the arbitration (e.g. complex, multiple and costly notifications all throughout the proceedings, in particular for procedural orders and other communications), and for drafting the award (in-depth review of the case to verify the relevance of facts, any applicable legal conditions and the sufficiency of evidence, while complying with the principle of non ultra petita and ex-officio assessment). In this regard, the Arbitral Tribunal wishes to highlight the efforts and exceptional costs incurred to monitor the notification of procedural documents due to the defaults of the Defendant and the complications related to the COVID-19 pandemic. A legal assistant had to spend nearly 54.5 hours to prepare and monitor the notifications of various procedural documents delivered by courier.

272. The Arbitral Tribunal spent 199.35 hours for these proceedings.

273. In application of the criteria specified in Art. 39 of the Arbitration Rules, the Arbitral Tribunal sets its fees at CHF 109.391,14. This determination of costs was approved by the Court on January 14. 2022, pursuant to Art. 40 par. 4 of the Arbitration Rules.

274. Expenses. The Arbitral Tribunal incurred the following expenses for its work:

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                          Page 76 of 83

| Expenses | Amount (CHF) |
|---|---|
| Bank fees for deposited advances | 140.00 |
| Expenses incurred for the hearing of September 7, 2021 (hotel, meals, travel) for the arbitrator and his assistants | 1,161.00 |
| Mail charges (postal mail, courier...) | 1,672.50 |
| Other expenses (copies...) | 101.20 |
| **TOTAL** | **3,074.70** |

275. In summary, the Arbitral Tribunal spent the following number of hours, and his fees correspond to the following amount:

| | Hours | Fees (CHF) |
|---|---|---|
| **TOTAL** | 199.35 hours | 109,391.14 |

276. Administrative costs. According to Appendix B of the Arbitration Rules (Schedule of Costs; ed. 2012), the amount of administrative costs is CHF 9,499. This amount is due to the Swiss Arbitration Centre in addition to the registration fee.

277. Expenses advanced by the Parties. The Parties paid advances on the following expenses required by the Arbitral Tribunal:

| Party | Advance (CHF) |
|---|---|
| Plaintiff | 121,964.84 |
| Defendant | 0.00 |

278. The non-refundable registration fee due to the Swiss Arbitration Centre should be added for an amount of CHF 6,000.

279. The total costs of the arbitration are summarized in the following table. The expenses advanced by the Parties (i.e. CHF 121,964.84) and the registration fee (i.e. CHF 6,000) should be deducted from the costs:

Case 1:22-mc-00604-RGA-JLH  Document 1-1  Filed 12/22/22  Page 167 of 255 PageID #: 177

**Arbitration**                    **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award                                                    Page 77 of 83

| **Description** | **Amount (CHF)** |
|---|---|
| Fees of the Arbitral Tribunal | 109,391.14 |
| Expenses of the Arbitral Tribunal | 3,074.70 |
| Administrative costs | 9,499.00 |
| **SUBTOTAL** | 121,964.84 |
| Non-refundable registration fee | 6,000.00 |
| **TOTAL costs of arbitration** | 127,964.84 |

### b) Amount of the Legal Costs of the Parties

280. The **legal costs** of the Parties include their counsel fees and the expenses incurred to defend their interests, including the expenses related to logistics for the hearings, to the expert reports obtained at the direction of the Arbitral Tribunal, the fees and expenses of the experts of the Parties, any compensation paid to the individuals examined, and any other expenses.

281. According to the abovementioned classification, the Arbitral Tribunal acknowledges that the Plaintiff claims the following legal costs:

| | | | |
|---|---|---|---|
| (i) | Fees and expenses of his counsel in CHF | CHF | 21,632.20 |
| (ii) | Fees and expenses of his counsel in EUR | EUR | 94,887.46 |
| (iii) | Estimated future fees and expenses of his counsel | CHF | 1,000.00 |
| (iv) | Estimated future fees and expenses of his counsel | EUR | 1,000.00 |
| (v) | Fees and expenses of the stenographer | EUR | 11,142.36 |
| (vi) | Other expenses in CHF | CHF | 792.50 |
| (vii) | Other expenses in EUR | EUR | 78.94 |
| **TOTAL amount in CHF** | | CHF | 23,424.70 |
| **TOTAL amount in EUR** | | EUR | 110,857.06 |

282. These amounts should be kept in their original currency, i.e. in Swiss francs (CHF) and in euros (EUR), even though the Plaintiff indicates a countervalue in the other currency for each amount.

Case 1:22-mc-00604-RGA-JLH   Document 1-1   Filed 12/22/22   Page 168 of 255 PageID #: 178

| Arbitration | SPINEWAY SA vs. STRATEGOS GROUP LLC |
|---|---|
| | Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules) |
| Final Award | Page 78 of 83 |

283. The amounts (iii) et (iv) of the future fees and expenses of the counsel are modest and justified sums for the steps to be taken after September 21, 2021, including for those that were taken between September 30, 2021 and October 28, 2021. The Arbitral Tribunal considers that such amounts can be claimed by a party and admits them as legal costs of the Plaintiff.

284. The other amounts (i), (ii), (v), (vi), (vii) and (viii) do not require any particular discussion. They are supported by exhibits and the Arbitral Tribunal considers them to be reasonable and justified in the meaning of Art. 38 let. e of the Arbitration Rules.

285. Therefore, after adding the selected amounts, the Arbitral Tribunal sets the legal costs of the Plaintiff at CHF 23,424.70 and EUR 110,857.06.

### c) Amount of the Costs of Arbitration

286. The costs of arbitration include the expenses of the arbitration and the legal costs of the Parties.

287. The situation is thus as follows:

| Description | Amount |
|---|---|
| Expenses of the Arbitration | CHF 127,964.84 |
| Legal costs of the Plaintiff | CHF 23,424.70 |
| | EUR 110,857.06 |
| Legal costs of the Defendant | Nonexistent |
| **TOTAL** | CHF 151,389.54 |
| | EUR 110,857.06 |

### d) Allocation of Procedural Expenses and Legal Costs

288. To allocate the procedural expenses and legal costs, the Arbitral Tribunal takes into consideration the conclusions and the specific circumstances of the case:

    (i)    As regards the conclusions, the Arbitral Tribunal addressed all of the Plaintiff's conclusions. The Plaintiff prevailed on the majority of his conclusions (EUR 4,160,000 out of EUR 4,412,329.21, i.e. 94.28% of the total amount claimed), but was not granted the totality of amounts claimed, including the

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 169 of 255 PageID #: 179

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
              Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                        Page 79 of 83

expenses incurred to negotiate and execute the Promise, and to conduct the audits. The conclusions of the Plaintiff that were rejected by the Arbitral Tribunal required a review of the evidence and a legal treatment that were slightly less complex than for the conclusions rejected by the Arbitral Tribunal.

(ii)    As regards the specific circumstances, the Arbitral Tribunal considers that the Plaintiff did not render the proceedings more complex, slower or longer in any particular way, for example by submitting frivolous requests without any chance of success. As for the Defendant, his default during the proceedings and the absence of determinations and of allegations did not facilitate the review of the case. However, the Tribunal considers that these difficulties are offset by the absence of allegations and evidence from the Defendant.

289. Given the already mentioned specific circumstances and conclusions, the Arbitral Tribunal finds appropriate the following allocation of procedural expenses and legal costs:

-   The Plaintiff is entitled to claim from the Defendant 95% of the costs of procedural expenses and legal costs that he incurred for these arbitration proceedings.

-   The Defendant will bear the totality of his own legal costs incurred for these arbitration proceedings.

### e) Conclusion

290. Based on the abovementioned grounds, the Arbitral Tribunal orders that the Defendant reimburse to the Plaintiff the following amounts as arbitration costs incurred by the Plaintiff for these arbitration proceedings:

-   **CHF 143,820.05** (= 95% of CHF 151,389.54);

-   **EUR 105,314.20** (= 95% of EUR 110,857.06).

### G. Other Conclusions of the Parties

#### 1. Question

291. The Arbitral Tribunal still needs to issue a ruling on the conclusions of the Plaintiff that remain to be reviewed:

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 170 of 255 PageID #: 180

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
                       Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)
Final Award                                                             Page 80 of 83

- "*STATE AND RULE that no partnership agreement was entered into between the company SPINEWAY and the company STRATEGOS GROUP LLC (before September 19, 2019)*"[258];

- "*ESTABLISH AND/OR ORDER the rescission of the bilateral promise to sell and purchase of March 19, 2019, of its Amendment No. 1 of May 3, 2019, and of its Amendment No. 2 of May 16, 2019, pursuant to Article 3.4 of the promise, which remained unaffected by any of the two amendments*"[259].

## 2. Positions of the Parties

292. The **Plaintiff** submits these claims in his closing arguments.

293. The **Defendant** did not express his position on this point during the proceedings.

## 3. Discussion

294. The Arbitral Tribunal finds that, as a preliminary matter, it had to issue a ruling on both the first conclusion ("*STATE AND RULE that no partnership agreement was entered into between the company SPINEWAY and the company STRATEGOS GROUP LLC (before September 19, 2019)*") and the second conclusion (*ESTABLISH AND/OR ORDER the rescission of the bilateral promise to sell and purchase of March 19, 2019, of its Amendment No. 1 of May 3, 2019, and of its Amendment No. 2 of May 16, 2019, pursuant to Article 3.4 of the promise, which remained unaffected by any of the two amendments*") in order to assess the merits of the claims for payment of the Plaintiff. The Arbitral Tribunal granted the claim of the Plaintiff for the return of the amount of EUR 4,160,000, by his preliminary finding that no Commercial Partnership Agreement had been entered into in the meaning of Art. 3.4 of the Contract within the timeframe specified in the Contract, and by his finding that the Contract and its Amendments No. 1 and No. 2 had been rescinded pursuant to Art. 3.4 of the Contract. For these reasons, the Arbitral Tribunal considers that it is not necessary to include the result of his reasoning in the operative part of the arbitral award.

---

[258] Conclusions of the Plaintiff of September 7, 2021.
[259] Conclusions of the Plaintiff of September 7, 2021.

Part of this page was intentionally left blank

Case 1:22-mc-00604-RGA-JLH Document 1-1 Filed 12/22/22 Page 172 of 255 PageID #: 182

**Arbitration**        **SPINEWAY SA vs. STRATEGOS GROUP LLC**
Swiss Arbitration Centre - Case No. 300515-2020 (Swiss Rules)

Final Award        Page 82 of 83

## VII.   Operative Part of the Arbitral Award

On the basis of the abovementioned grounds, the Arbitral Tribunal:

1. ORDERS the company STRATEGOS GROUP LLC to pay to the company SPINEWAY SA, as principal, the sum of EUR 4,160,000 (four million one hundred and sixty thousand euros), in addition to interests at the applicable legal rate starting from October 23, 2019;

2. ACKNOWLEDGES that the company SPINEWAY SA undertakes to sign the security transfer orders in order to return to the company STRATEGOS GROUP LLC the totality of the A units and the B units of the fund named Integral Medical Solutions Fund within one month of receiving the sum of EUR 4,160,000 (four million one hundred and sixty thousand euros) in whole, in addition to interests at the applicable legal rate;

3. SETS the costs of arbitration at CHF 127,964.84 (one hundred twenty seven thousand nine hundred and sixty four Swiss francs and eight four cents), deducted from the expenses paid in advance by the Parties;

4. SETS the legal costs of SPINEWAY SA at CHF 23,424.70 (twenty three thousand four hundred and twenty four Swiss francs and seventy cents) and EUR 110,857.06 (one hundred ten thousand eight hundred and fifty seven euros and six cents);

5. ORDERS STRATEGOS GROUP LLC to reimburse to SPINEWAY SA the following amounts as costs of arbitration:
   - CHF 143,820.05 (one hundred forty three thousand eight hundred and twenty Swiss francs and five cents),
   - EUR 105,314.20 (one hundred five thousand three hundred and fourteen euros and twenty cents);

6. REJECTS all other conclusions of the Parties that may be admissible.

Seat of the arbitration: Geneva, Switzerland, January 20, 2022

**The Arbitral Tribunal (Sole Arbitrator)**

[signature]
Prof. Blaise Carron

**EXHIBIT 3**



Ecully, le 15 decembre 2022

Je soussigné Stephane LE ROUX, majeur, sain de corps et d'esprit, presentement President-Directeur General de la Société Anonyme SPINEWAY, atteste en toute bonne foi que :

1. Le 19 mars 2019, les entreprises Spineway SA et Strategos Group llc ont signé une « Promesse bilaterale de vente et d'achat sous conditions précédentes, combinée à une promesse unilatérale de vente (le « Contrat »)
2. Une copie certifiée conforme du Contrat est jointe en annexe A.

Certificat remis a l'interessé pour faire valoir ce que de droit.

PDG

SPINEWAY
7 allée Moulin Berger
69130 Ecully - France
Tél: +33(0)4 72 77 01 52
SA au Capital de 440 526€
SIRET 484 163 985 00035

Stephane LE ROUX

SPINEWAY SA - Technoparc, bâtiment 7, Allée Moulin Berger · 69 130 ECULLY - FRANCE
Tel : +33 (0)4 72 77 01 52 · Fax : +33 (0)4 78 38 10 17 · e-mail : Info@spineway.com · www.spineway.com
société immatriculée au RCS 484 163 985 00035

# EXHIBIT A



---

## PROMESSE SYNALLAGMATIQUE DE VENTE ET D'ACHAT SOUS CONDITIONS SUSPENSIVES ASSORTIE D'UNE PROMESSE UNILATERALE DE VENTE

---

### EN DATE DU 19 MARS 2019

Entre

**STRATEGOS GROUP LLC**

*en qualité de Cédant et de Garant*

et

**SPINEWAY SA**

*en qualité de Cessionnaire*



2

## TABLE DES MATIERES

| | | |
|---|---|---|
| 1. | DEFINITIONS - INTERPRETATION | 4 |
| 2. | OBJET DE LA PROMESSE | 8 |
| 3. | EFFET DE LA PROMESSE | 10 |
| 4. | DUREE DE LA PROMESSE | 11 |
| 5. | EXERCICE DE LA PROMESSE | 11 |
| 6. | REALISATION DE LA CESSION DES PARTS | 13 |
| 7. | DECLARATIONS DU CESSIONNAIRE | 16 |
| 8. | DECLARATIONS ET GARANTIES DU GARANT | 16 |
| 9. | STIPULATIONS DIVERSES | 20 |
| 10. | DROIT APPLICABLE - LITIGES | 23 |

## LISTE DES ANNEXES

| | |
|---|---|
| Annexe 1 | Répartition du capital du Fonds à la date des présentes et Organigramme |
| Annexe 8.6.1 | Comptes de Référence |



3

CETTE PROMESSE DE VENTE EST CONCLUE ENTRE LES SOUSSIGNES :

1.   **STRATEGOS GROUP LLC**, société de l'Etat du Delaware (Etats-Unis), dont le siège
     social est situé 2701 Centerville Road, Wilmington, 19808 Delaware, Etats-Unis,
     immatriculée sous le numéro 6859944 représentée par Monsieur Luc GERARD, né le ███
     ███ à Boende (République Démocratique du Congo), de nationalité belge,
     demeurant Carrera 2 # 11-7, Bogota, Colombie,

     Agissant tant en son nom propre qu'au nom et pour le compte de l'intégralité des titulaires
     de 100% des parts A et de 100 % des parts B émises par le fonds National Clinics tel que
     défini ci-après,

     ci-après désigné le « **Cédant** » ou le « **Garant** »,

                                                        **DE PREMIERE PART,**

ET

2.   **SPINEWAY**, société anonyme de droit français au capital de 2.684.406,60 euros, dont le
     siège social est situé 7 Allée du Moulin Berger Bâtiment 7, 63130 Ecully, immatriculée au
     registre du commerce et des sociétés de Lyon sous le numéro 484 163 985, représentée par
     Monsieur Stéphane LE ROUX, dûment habilité à l'effet des présentes, sur délibérations du
     Conseil d'administration du 11 mars 2019,

     ci-après désignée le « **Cessionnaire** ».

                                                        **DE DEUXIEME PART.**

     Le Cédant et le Cessionnaire sont ci-après dénommés individuellement une « **Partie** » et
     collectivement les « **Parties** ».

**IL A ETE PREALABLEMENT EXPOSE CE QUI SUIT :**

(A)  Aux termes des présentes, le Cédant doit détenir 55.000 parts A et 25.000 parts B,
     représentant l'intégralité des parts émises par le fonds National Clinics, fonds de titrisation,
     en cours de formation, de droit luxembourgeois au sens de la loi du 22 mars 2004 relative à
     la titrisation, (le « **Fonds** »), ou de toute personne morale qui se substituerait dans
     l'hypothèse où les Parties identifieraient un véhicule juridique aboutissant aux mêmes
     résultats juridiques, économiques et fiscal que la création du Fonds détenant les
     participations des sociétés LA National LLC et SM, représenté par sa société de gestion, le
     société National Clinics Management Company, société anonyme de droit luxembourgeois
     en cours de formation, représentée par Monsieur Luc Gerard, en qualité de fondateur et de
     bénéficiaire économique (la « **Société de Gestion** »), .

(B)  Le compartiment A du Fonds détiendra 100 % des actions de la société Latin American
     National Clinics - LA National LLC, société de l'Etat du Delaware (Etats-Unis), au capital
     de US$7.887.932 , dont le siège social est situé 2701 Centerville Road, Wilmington, 19808
     Delaware, Etats-Unis, immatriculée sous le numéro 6911127 (« **LA National LLC** »),
     représentant 100% du capital social et des droits de vote de LA National LLC à la date des
     présentes, selon l'organigramme joint en Annexe 1.

(C)  Le compartiment B du Fonds détiendra 100 % des actions de la société S.M.S. Strategic
     Medical Solutions Limited, société de droit chypriote, au capital de 1.000 euros, dont le

4

siège social est situé 2-4 Arch. Makarios III Avenue Capital Center – 9th Floor 1505 Nicosia, Chipre, immatriculée au Registre du Commerce de Nicosie sous le numéro HE 161675 (« **S.M.S** »), représentant 100% du capital social et des droits de vote de S.M.S à la date des présentes, selon l'organigramme joint en **Annexe 1**.

(D)     Le Cessionnaire a exprimé son intérêt pour une acquisition d'au moins 52% et d'au plus 100% des parts du Fonds, ou de toute personne morale qui se substituerait dans l'hypothèse indiquée dans le paragraphe (A) ci-avant, auprès du Cédant et le Cédant a manifesté son intérêt pour la cession d'au moins 52% et d'au plus 100 % des parts du Fonds au profit du Cessionnaire.

(E)     Le Cessionnaire ne dispose pas, à la date des présentes, d'un financement lui permettant d'acquérir 100% des Parts (tel que ce terme est défini à l'Article 1.1 ci-dessous) auprès du Cédant et a souhaité bénéficier d'un engagement de cession portant, dans un premier temps, sur 52% des Parts, exerçable en plusieurs fois, dans un délai de trois (3) ans avec une possibilité de prorogation d'une durée maximale d'un (1) an, puis dans un second temps, selon accord des Parties d'une cession et/ou d'un apport des 48% des Parts restantes, sous réserve, en cas d'apport, du vote favorable des actionnaires du Cessionnaire en assemblée générale extraordinaire, dans un délai de deux (2) ans à compter de l'acquisition initiale des 52% des Parts.

(F)     Les Parties ont ainsi convenu de conclure la présente promesse ((a) synallagmatique de vente et d'achat portant sur 52% des parts et (b) unilatérale de vente portant sur les 48% des Parts restantes) (la « **Promesse** ») afin de définir les termes et conditions dans lesquels (i) le Cédant s'engage à céder au moins 52% et au plus 100% des Parts au Cessionnaire et (ii) le Cessionnaire s'engage, sous réserve du respect des Conditions Suspensives prévues ci-après, à acquérir 52% au moins des Parts et bénéficie d'une option d'achat portant sur le solde correspondant à 48% des Parts, auprès du Cédant.


**EN CONSEQUENCE DE QUOI, IL A ETE CONVENU CE QUI SUIT :**

1.     **DEFINITIONS - INTERPRETATION**

1.1     **Définitions**

Pour les besoins de cette Promesse, les termes débutant par une majuscule et cités ci-après ont la signification suivante :

« **Affilié** »          désigne, s'agissant de toute personne ou entité (une « **Personne** »), toute personne qui Contrôle cette Personne, est Contrôlée par cette Personne ou est sous le Contrôle d'une personne ou entité Contrôlant cette Personne.

« **Article** »          désigne un article de la Promesse.

« **Autorité** »        désigne tout organisme international, européen, marocain, multinational ou transnational, gouvernement, Etat, région, département, municipalité, collectivité territoriale ou toute autre subdivision politique ou administrative et toute autre personne ou autorité exerçant, le cas échéant sur délégation, un pouvoir exécutif, législatif, judiciaire, réglementaire ou administratif.

5

| | |
|---|---|
| « Bilan du Fonds » | Désigne le bilan (actif / passif) d'ouverture du Fonds à la date des présentes joint en Annexe 8.7.1. |
| « Cession » | désigne toute cession de Parts par le Cédant au Cessionnaire au titre de l'Exercice de la Promesse. |
| « Comptes de Référence » | désigne les comptes (bilan, compte de produits et charges et annexes) arrêtés par LA National LLC à la date la plus récente, les comptes (bilan, compte de produits et charges et annexes) arrêtés par S.M.S à la date la plus récente, et les comptes (bilan, compte de produits et charges et annexes) arrêtés par chacune des Filiales à la date la plus récente. |
| « Condition(s) Suspensive(s) » | a le sens qui lui est attribué à l'Article 3.1 des présentes. |
| « Contrôle » | désigne le contrôle exercé par une ou plusieurs personne(s) sur une personne ou entité au sens de l'article L. 233-3 du Code de commerce français, et le verbe « Contrôler » s'interprète en conséquence. |
| « Cours Normal des Affaires » | désigne, pour chaque Société Cible, la gestion par ladite Société Cible, de ses activités dans le cadre d'une gestion courante et conforme aux usages et pratiques antérieurs. |
| « Date d'Expiration Totale » | désigne le 19 mars 2024 (5 ans à compter de la Date de la Promesse), en ce compris l'éventuelle Prorogation de la Période d'Exercice dans les conditions visées à l'Article 5.3. |
| « Date d'Expiration Partielle » | désigne le 19 mars 2022 (3 ans à compter de la Date de la Promesse), sous réserve d'ajustement en cas de Prorogation de la Période d'Exercice dans les conditions visées à l'Article 5.3. |
| « Date de la Promesse » | désigne la date des présentes, telle qu'elle figure sur la page de signature de la Promesse. |
| « Date de Transfert » | a le sens qui lui est attribué à l'Article 6.1 des présentes. |
| « Déclarations » | a le sens qui lui est attribué à l'Article 8 des présentes. |
| « Exercice Initial de la Promesse » | désigne l'exercice initial de la Promesse portant nécessairement sur 2.860 Parts A du Fonds et sur 1.300 Parts B du Fonds, conformément aux dispositions de l'Article 5 des présentes. |
| « Exercice Corrélatif de la Promesse» ou « Exercice de la Promesse » | désigne tout exercice postérieur à l'Exercice Initial de la Promesse portant nécessairement sur 90% des Parts Initiales du Fonds conformément aux dispositions de l'Article 5 des présentes. |
| « Exercice Social » | désigne l'exercice social du Fonds clos le 31 décembre de chaque année. |
| « Filiales » | désigne toutes les entités détenues directement ou indirectement par LA National LLC et/ou S.M.S mentionnées sur l'organigramme joint en Annexe 1. |

6

| | |
|---|---|
| « Fonds » | a le sens qui lui est attribué au paragraphe (A) du préambule des présentes. |
| « Garant » | a le sens qui lui est attribué aux comparutions de la présente Promesse. |
| « Groupe » | désigne, s'agissant d'une personne (la « Personne »), ladite Personne et l'ensemble de ses Affiliés. |
| « Impôts » | désigne (i) tout impôt, taxe, droit, imposition, redevance, prélèvement, retenue à la source, contribution ou charge de quelque nature que ce soit et toute cotisation sociale (qu'elle soit salariale ou patronale) imposée par toute Autorité ou tout autre organisme compétent, qu'il ou elle soit payable directement ou par retenue ou autrement, en ce inclus tout impôt sur les sociétés, impôt sur le revenu, taxe foncière, droit de douane, taxe sur la valeur ajoutée, taxes sur les salaires, cotisations ou charges sociales à l'égard de la sécurité sociale ou de tout organisme équivalent, des allocations familiales et des différents organismes de retraite et de chômage, ainsi que tout intérêt, amende ou pénalité y afférent, et (ii) tout paiement ou remboursement fait au bénéfice de toute Fonds en sa qualité de Fonds de tête d'un groupe d'intégration fiscale. |
| « Jour Ouvré » | signifie tout jour autre que le samedi, le dimanche ou tout autre jour férié en France ou au Luxembourg. |
| « LA National LLC» | a le sens qui lui est attribué au paragraphe (B) du préambule des présentes. |
| « Notification de Cession » | a le sens qui lui est attribué à l'Article 9.3 des présentes. |
| « Notification d'Exercice » | a le sens qui lui est attribué à l'Article 5.4 des présentes. |
| « Nouveau Cessionnaire » | a le sens qui lui est attribué à l'Article 9.2 des présentes. |
| « Parts » | désigne les Parts Initiales et, le cas échéant, tous Titres du Fonds qui viendront s'y substituer ou s'y ajouter conformément aux stipulations des Articles 2.2 à 2.4 des présentes. |
| « Parts A » | désigne les 55.000 Parts A émises par le compartiment A du Fonds |
| « Parts B » | désigne les 25.000 Parts B émises par le compartiment B du Fonds |
| « Parts Cédées » | désigne toutes Parts du Fonds que le Cessionnaire acquerra auprès du Cédant en vertu d'Exercice(s) de la Promesse, conformément aux termes de la Promesse. |
| « Parts Concernées » | désigne, pour chaque Exercice Corrélatif de la Promesse, le nombre de Parts visées dans la Notification d'Exercice égal à un trente-deuxième des Parts A et à un trente-deuxième des Parts B |

7

(déduction faite des Parts A et B cédées au cours de l'Exercice Initial de la Promesse), sous réserve d'ajustement en cas de Prorogation de la Période d'Exercice dans les conditions visées à l'Article 5.3.

« Parts Initiales »   désigne 28.600 (vingt-huit mille six cents) Parts A et 13.000 (treize mille) Parts B du Fonds, représentant 52 % du capital social du Fonds dont le Cédant est propriétaire à la date des présentes, conformément à la répartition figurant en Annexe 1.

« Pénalité »   a le sens qui lui est attribué à l'Article 5.5 des présentes.

« Période d'Exercice »   a le sens qui lui est attribué à l'Article 5.2 des présentes.

« Période de Suspension »   a le sens qui lui est attribué à l'Article 6.4 des présentes.

« Personne »   désigne toute personne physique ou morale ainsi que tout organisme de placement collectif, Fonds en participation, trust ou fondation, ou toute autre entité de quelque nature que ce soit, avec ou sans personnalité morale.

« Principes Comptables »   désigne, s'agissant des comptes sociaux du Fonds ou de LA National LLC ou de S.M.S ou de l'une ou l'autre des Filiales, les principes, règles et méthodes comptables applicables dans la juridiction concernée.

« Prix par Part »   signifie un montant égal au rapport entre (i) le Prix Total Initial et (ii) le nombre de Parts Initiales, soit EUR 1.000 (mille) tel qu'il pourra être ajusté conformément aux stipulations de l'Article 2.2 des présentes

« Prix Partiel »   désigne le prix à verser par le Cessionnaire au Cédant en cas d'Exercice de la Promesse pour un nombre de Parts Concernées, calculé comme suit :

Prix par Part * nombre de Parts Concernées

« Prix Total Initial »   désigne le prix à verser par le Cessionnaire au Cédant portant sur les Parts Initiales uniquement, à savoir EUR 41.600.000 (quarante-et-un millions six cent mille euros) pour 28.600 Parts A et 13.000 Parts B du Fonds, soit 52% du capital social du Fonds.

« Prorogation de la Période d'Exercice »   a le sens qui lui est attribué à l'Article 5.3 des présentes

« Réalisation »   désigne le transfert par le Cédant au Cessionnaire de la propriété des Parts Cédées lors du premier Exercice de la Promesse.

« Sociétés Cibles »   a le sens qui lui est attribué à l'Article 8 des présentes.

« S.M.S »   a le sens qui lui est attribué au paragraphe (B) du préambule des présentes.

8

| | |
|---|---|
| « Société de Gestion » | a le sens qui lui est attribué au paragraphe (A) du préambule des présentes. |
| « Sûreté » | désigne tout privilège, nantissement, gage avec ou sans dépossession, autre sûreté réelle ou personnelle, clause de réserve de propriété, acte de fiducie (*trust*), droit de préemption ou de préférence, hypothèque, qu'il soit volontairement encouru ou qu'il découle de l'application de la loi et qui comprend, sans y être limité, tout accord à consentir éventuellement l'un ou l'autre des éléments qui précèdent, tout contrat de vente conditionnelle ou éventuelle ou tout autre accord de rétention de titre incluant tout droit de rétention ou une location de cette nature. |
| « Titres » | désigne relativement à une entité donnée, les Parts ou parts de l'entité, quelle qu'en soit la catégorie, et tout titre, droit, valeur mobilière, donnant droit, de manière immédiate ou différée (y compris l'usufruit ou la nue-propriété d'Parts de cette entité), par conversion, souscription, option ou par tout autre moyen possible, à un droit financier ou à un droit de vote dans ladite entité, y compris, notamment, tout bon de souscription d'Parts émis par cette entité, ainsi que tout droit préférentiel de souscription dans le cadre d'une émission de Titres de ladite entité. |

## 1.2 Interprétation

1.2.1 Toute référence à la Promesse s'entend de la Promesse et de ses annexes, qui en font partie intégrante, et les références faites au préambule, aux articles, aux paragraphes et aux annexes s'entendent du préambule, des articles, des paragraphes et des annexes de la Promesse.

1.2.2 Les titres ne sont indiqués que pour faciliter la lecture et ne doivent pas affecter l'interprétation de cette Promesse.

1.2.3 Les références au singulier doivent inclure les références au pluriel et vice versa, sauf si le contexte le requiert ou le permet autrement, et les mots présentant un genre particulier doivent comprendre tous les genres.

1.2.4 A moins que le contexte nécessite qu'il en soit autrement, toute référence à une disposition légale s'entend de la disposition telle qu'elle existe et s'applique au jour de la conclusion de la Promesse.

1.2.5 Toute référence à un autre document s'entend de ce document tel qu'il existe au jour de la conclusion de la Promesse.

1.2.6 Les exemples qui viennent à la suite des termes « inclure », « incluant », « notamment », « en particulier » et de tous les autres termes ayant le même sens ne sont pas limitatifs.

## 2. OBJET DE LA PROMESSE

2.1 Le Cédant s'engage expressément et irrévocablement à céder au Cessionnaire, et le Cessionnaire s'engage expressément et irrévocablement à acquérir du Cédant, en plusieurs fois, dans un délai initial de 36 mois et au maximum de 48 mois, en cas de Prorogation de la Période d'Exercice, les Parts Initiales, soit au moins 28.600 Parts A du Fonds et au moins 13.000 Parts B du Fonds représentant 52% des Parts du Fonds (dont le nombre figurera dans la Notification d'Exercice visée à l'Article 5.4 ci-dessous), lorsque

9

celui-ci lui en fera la demande, dans les conditions de la présente Promesse et en particulier contre paiement du Prix Partiel pour chaque Exercice de la Promesse, tel qu'ajusté conformément à l'Article 2.2, le cas échéant, selon les modalités de paiement visées à l'Article 6.3 ci-dessous.

Au titre de l'acquisition du solde des Parts relatif à 48% du capital social du Fonds (par voie d'achat ou d'apport), le Cédant a consenti une promesse unilatérale de vente au Cessionnaire, avec faculté pour ce dernier de ne pas l'exercer.

A compter de l'acquisition de l'intégralité des Parts Initiales, les Parties se réuniront dans les quatre-vingt-dix (90) jours suivant la Date d'Expiration Partielle en vue de convenir de la cession et/ou de l'apport portant sur le solde de la participation au capital du Cédant dans le Fonds (i) selon le même Prix par Part, (ii) selon un cours moyen de bourse de l'action Spineway à déterminer entre les Parties et (iii) selon un calendrier à convenir entre elles. En cas d'apport en nature, sous réserve de l'accord des actionnaires du Cessionnaire en assemblée générale extraordinaire, le Cessionnaire s'engagera expressément à acquérir, dans un délai maximum de 12 mois à compter de la Date d'Expiration Partielle, le solde des Parts soit 48% du Fonds, en procédant à une augmentation de capital par apport en nature des Parts avec suppression du droit préférentiel des actionnaires au profit du Cédant.

2.2    La présente Promesse porte ainsi sur les Parts Initiales ainsi que sur tous les Titres qui seraient émis par le Fonds en complément ou en substitution des Parts Initiales ou des Parts, le cas échéant.

En particulier, si entre la Date de la Promesse et toute Date de Transfert :

(a)    Le Fonds réalise une augmentation de capital par incorporation de réserves, bénéfices ou primes d'émission, les parts nouvelles dont le Cédant deviendra propriétaire en raison de la détention de Parts s'ajouteront à ses Parts, étant précisé que dans ce cas, le Prix par Parts applicable aux Exercices postérieurs à l'augmentation de capital considérée sera égal au rapport entre (i) la différence entre le Prix Total Initial et la somme des Prix Partiels payés par le Cessionnaire au Cédant antérieurement à l'augmentation de capital considérée et (ii) le nombre de Parts détenues par le Cédant postérieurement à l'augmentation de capital considérée ;

(b)    le Fonds réalise une augmentation de capital par incorporation de réserves, bénéfices ou primes d'émission et augmentation de la valeur nominale des Parts du Fonds, la valeur nominale des Parts sera ainsi augmentée, sans modification du Prix par Part ;

(c)    le Fonds modifie la composition de son capital par regroupement ou division de Parts, la Promesse portera alors sur l'ensemble des Titres attribués ou remis, à l'issue de ces opérations, en échange des Parts encore détenues par le Cédant, étant précisé que, dans ce cas, le Prix par Parts applicable aux Exercices postérieurs au regroupement ou à la division considérée sera égal au rapport entre (i) la différence entre le Prix Total Initial et la somme des Prix Partiels payés par le Cessionnaire au Cédant antérieurement au regroupement ou à la division considéré et (ii) le nombre de Titres détenus par le Cédant postérieurement au regroupement ou à la division considéré ;

(d)    le Fonds procède à un paiement de dividendes en Parts, la Promesse portera alors aussi sur les Parts nouvelles dont le Cédant deviendra propriétaire (en raison de la détention des Parts) à la suite du paiement de ce dividende, étant précisé que dans ce cas, le Prix par Parts applicable aux Exercices postérieurs au paiement de dividendes en Parts considéré sera égal au rapport entre (i) la différence entre le Prix Total Initial et la somme des Prix Partiels payés par le Cessionnaire au Cédant antérieurement au paiement de dividendes en Parts considéré et (ii) le nombre de Parts détenues par le Cédant postérieurement au paiement de dividendes en Parts considéré.

10

2.3   Si le Fonds réalise une ou plusieurs augmentation(s) de capital en numéraire (soit directement, soit à la suite de l'exercice de bons de souscription ou de tous types de valeurs mobilières composées donnant accès au capital du Fonds), les Parts souscrites par le Cédant, le cas échéant, seront également l'objet de la Promesse à un prix égal à la partie de leur prix de souscription effectivement libérée par le Cédant.

2.4   En cas d'opération exceptionnelle concernant le Fonds (autre que celles visées ci-dessus aux Articles 2.2 à 2.3) telle que notamment, augmentation de capital par voie d'apport en nature, réduction de capital (par réduction du nombre de Parts ou diminution de la valeur nominale des Parts), fusion, scission, transformation du Fonds en un fonds ou entité d'une autre forme, apport partiel d'actif, le Cédant notifiera sans délai au Cessionnaire, dans les conditions de l'Article 9.3, le projet d'évènement exceptionnel, ses caractéristiques, ses conséquences sur le capital du Fonds et sa répartition, ainsi que les moyens dont le Cédant propose la mise en œuvre pour préserver les intérêts du Cessionnaire au titre de la Promesse dans la mesure où ils seraient affectés par ladite opération.

Le Cessionnaire disposera d'un délai de vingt (20) Jours Ouvrés à compter de la notification visée au paragraphe précédent, afin de faire connaître, par notification au Cédant dans les conditions de l'Article 9.3, son acceptation des mesures proposées par le Cédant. En cas de refus du Cessionnaire, ce dernier devra notifier au Cédant ses observations sur les mesures proposées et les justifications de ses observations, ainsi que les mesures dont le Cessionnaire demande la mise en œuvre pour la préservation de ses intérêts au titre de la Promesse.

Dans l'hypothèse où le Cédant n'accepterait pas la mise en œuvre des mesures proposées par le Cessionnaire et où les Parties ne parviendraient pas à un accord sur les mesures à mettre en œuvre pour la préservation des intérêts du Cessionnaire au titre de la Promesse, elles soumettront leur désaccord à un expert. L'expert sera désigné d'un commun accord par les Parties. A défaut d'accord des Parties sur la désignation de l'expert dans un délai de dix (10) Jours Ouvrés, ou si l'expert ainsi désigné refuse sa mission, un expert sera désigné à la requête de la partie la plus diligente, par le Centre International d'Expertise conformément aux dispositions relatives à la nomination des experts du Règlement d'Expertise de la Chambre de Commerce Internationale.

L'expert sera chargé de déterminer, après examen des mesures proposées par le Cédant et des commentaires du Cessionnaire, les mesures devant être mises en œuvre pour la préservation des droits du Cessionnaire au titre de la Promesse. Les conclusions de l'expert devront être rendues dans un délai maximum de vingt (20) Jours Ouvrés à compter de sa désignation et seront définitives et, comme telles, ne seront susceptibles d'aucun recours. Les frais et honoraires de l'expert seront supportés pour moitié par le Cédant et pour moitié par le Cessionnaire.

3.   **EFFET DE LA PROMESSE**

3.1   La Promesse produira ses effets dans un délai d'un (1) Jour Ouvré à compter de la date de réalisation, dans un délai de quarante-cinq (45) jours à compter de la Date de la Promesse, des conditions suivantes (« **Condition(s) Suspensive(s)** ») :

-   la conclusion satisfaisante d'un audit juridique, comptable et financier réalisé à la demande du Cessionnaire sur la valeur du Fonds et précisément sur la valeur des actifs et des passifs du Fonds, étant convenu entre les Parties que la conclusion satisfaisante de l'audit est définie comme un audit réalisé par le cabinet Mazars (ou l'un de ses correspondants) conduisant à une valorisation du Fonds non inférieure de plus de 15 % à celle retenue pour fixer le Prix Total Initial des Parts du Fonds, soit EUR 80.000.000.

-   l'obtention par le Cessionnaire d'un accord de principe par un ou plusieurs investisseurs privés portant sur le financement du Prix Partiel correspondant à l'Exercice Initial de la

11

Promesse, soit la somme de quatre millions cent-soixante mille euros (4.160.000 €), et sa mise à disposition effective au Cessionnaire en conformité avec toute délibération nécessaire de l'assemblée générale des actionnaires et/ou du Conseil d'administration et son abondement effectif, immédiat ou à terme, tout au long de la Période d'Exercice.

3.2     A défaut de réalisation de l'audit du seul fait du Cessionnaire à l'issue du délai de quarante-cinq (45) jours à compter de la Date de la Promesse, la Promesse produira ses effets, sous réserve de la réalisation de l'autre Condition Suspensive prévue à l'Article 3.1 ci-dessus.

3.3     Dans l'hypothèse où (i) l'audit réalisé à la demande du Cessionnaire conduirait à une valorisation du Fonds inférieure de plus de 15 % à celle retenue pour fixer le Prix Total Initial des Parts du Fonds et/ou (ii) de non levée des Conditions Suspensives listées à l'Article 3.1 ci-dessus, la Promesse deviendra caduque et de nul effet, sans aucune indemnité de part et d'autre, sauf décision commune des Parties de proroger ce délai susvisé de trente (30) jours.

3.4     A titre de condition résolutoire de la Promesse, les Parties conviennent de conclure, dans un délai de six (6) mois à compter de la Date de la Promesse, un accord de partenariat commercial et de distribution des produits du Cessionnaire sur les zones d'activité du Cédant. A défaut de conclusion effective de cet accord, pour des raisons autres que le simple refus du Cessionnaire de signer le contrat de partenariat équilibré proposé par le Cédant, dans le délai de six (6) mois (sauf prolongation de ce délai d'un commun accord entre les Parties), la présente Promesse sera résiliée et les Parties seront remises dans leur état initial. Notamment, l'achat des Parts effectué depuis lors sera résilié et les sommes versées par le Cessionnaire lui seront restituées par le Cédant, le tout sans indemnité de part, ni d'autre.

4.      DUREE DE LA PROMESSE

La Promesse est consentie à compter de la Date de la Promesse et demeurera en vigueur jusqu'à la Date d'Expiration Totale.

5.      EXERCICE DE LA PROMESSE

5.1     Exercice

La Promesse devra être exercée par le Cessionnaire, (i) dans le délai d'un (1) Jour Ouvré suivant la levée des Conditions Suspensives en vertu de l'Article 3.1, par un Exercice Initial de la Promesse et (ii) le dernier Jour Ouvré de chaque mois à compter du 1er août 2019, par un Exercice Corrélatif de la Promesse, jusqu'à ce que le Cessionnaire ait exercé la Promesse pour 52% des Parts détenues par le Cédant.

Le paiement partiel résultant de l'Exercice Initial de la Promesse sera échelonné en quatre (4) paiements prévus aux dates suivantes :

-    au premier Jour Ouvré suivant la levée des Conditions Suspensives : 1.000.000 d'euros ;

-    au dernier Jour Ouvré du mois suivant la levée des Conditions Suspensives : 1.000.000 d'euros ;

-    au dernier Jour Ouvré du 2e mois suivant la levée des Conditions Suspensives : 1.000.000 d'euros ;

-    au dernier Jour Ouvré du 3e mois suivant la levée des Conditions Suspensives : 1.160.000 d'euros.

12

**5.2     Période d'Exercice**

Pour la Cession des Parts Initiales, la Promesse devra être exercée par le Cessionnaire, en trente-six (36) fois, au cours d'une période de trois (3) années (la « **Période d'Exercice** ») débutant à compter de la levée des Conditions Suspensives visées à l'Article 3.1., sous réserve d'ajustement en cas de Prorogation de la Période d'Exercice dans les conditions visées à l'Article 5.3 ci-dessous.

**5.3     Prorogation de la Période d'Exercice**

Au cours de la Période d'Exercice et sous réserve que le Cessionnaire ait au moins acquis les 2.860 Parts A et les 1.300 Parts B au titre de l'Exercice Initial de la Promesse, pour un montant au moins égal à la somme globale de quatre millions cent soixante mille euros (4.160.000,00 €), le Cessionnaire pourra discrétionnairement demandé au Cédant de proroger cette Période d'Exercice pendant une durée maximale de 12 mois à compter de sa notification dans les conditions visées à l'Article 9.3 (la « **Prorogation de la Période d'Exercice** »).

Dans cette hypothèse, le nombre de Parts A et B Initiales restant à céder sur Exercice de la Promesse sera ajusté en vertu des formules suivantes :

$$\text{où :} \quad N_A = \frac{A}{M}$$

- "$N_A$" est défini comme le nombre de Parts A Concernées ;
- "A" est défini comme le Solde des Parts A Initiales restant à céder ;
- "M" est défini comme le Nombre de mois restant jusqu'à la Date d'Expiration Partielle.

$$\text{où :} \quad N_B = \frac{B}{M}$$

- "$N_B$" est défini comme le nombre de Parts B Concernées ;
- "B" est défini comme le Solde des Parts B Initiales restant à céder ;
- "M" est défini comme le Nombre de mois restant jusqu'à la Date d'Expiration Partielle.

**5.4     Modalités d'Exercice de la Promesse**

L'Exercice de la Promesse résultera de la notification par le Cessionnaire au Cédant, pour la première Notification d'Exercice, au premier Jour Ouvré suivant la levée des Conditions Suspensives, pour les Notifications d'Exercice suivantes, le dernier Jour Ouvré de chaque mois, au cours de la Période d'Exercice, et dans les conditions de l'Article 9.3, de son Exercice de la Promesse (la « **Notification d'Exercice** ») ; la Notification d'Exercice devra indiquer le nombre de Parts Concernées pour lequel la Promesse est exercée au titre de la Notification d'Exercice considérée.

**5.5     Pénalité**

Dans le cas où le Cessionnaire disposerait du financement du solde du Prix Initial restant à payer, soit la somme globale de trente-sept millions quatre-cent-quarante mille euros (37.440.000 €) et n'exercerait pas la Promesse dans les délais et selon les modalités prévues par l'Article 5.4 des présentes - et après une période de 30 jours au cours de laquelle le Cessionnaire sera invitée par le Cédant, par tous moyens, à régulariser son obligation d'Exercice de la Promesse - le Cessionnaire devra payer au Cédant une pénalité égale à (i) EUR 4.160.000 (quatre million cent soixante mille) déduction faite des paiements effectués par le Cessionnaire au Cédant depuis la Date de la Promesse jusqu'au jour du paiement

13

intégral des Parts au titre de l'Exercice Initial - lesdites sommes payées par le Cessionnaire étant convertie par le fait de cet article en indemnité pure et simple au profit du Cédant incluse dans la pénalité de EUR 4.160.000 (quatre millions cent soixante mille) - auquel s'ajoutera (ii) une somme égale 10 % du Prix Partiel qui aurait dû être payé par le Cessionnaire au Cédant au titre de l'Exercice qui n'a pas fait l'objet d'une Notification d'Exercice accompagné du paiement du Prix Partiel dans les délais et selon les conditions prévues par l'Article 5.4 des présentes (la « Pénalité »).

L'alinéa ci-dessus n'est pas applicable en cas de Période de Suspension dans les conditions visées à l'Article 6.4 ci-après.

La Pénalité devra être payée dans un délai de 8 jours à compter du dernier Jour Ouvré du mois suivant le mois au cours duquel le Cessionnaire n'a pas notifié l'Exercice de la Promesse, par virement au profit du compte bancaire du Cédant (dont les coordonnées auront été notifiées au Cessionnaire).

A défaut de paiement par virement dans le délai précité, la Pénalité sera considérée comme une créance certaine, liquide et exigible du Cédant sur le Cessionnaire, susceptible d'être utilisée par le Cédant pour la libération d'actions nouvelles à émettre par le Cessionnaire.

5.6     **Apport en Nature**

Les Parties se réuniront dans les quatre-vingt-dix (90) jours suivant la Date d'Expiration Partielle en vue de convenir de la cession et/ou de l'apport portant sur le solde de la participation au capital du Cédant dans le Fonds selon le même Prix par Part et selon un calendrier à convenir entre elles. En cas d'apport en nature, sous réserve de l'accord des actionnaires du Cessionnaire en assemblée générale extraordinaire, le Cédant s'engagera à apporter au Cessionnaire (i) 48 % des Parts A du Fonds et 48% des Parts B du Fonds, le tout (i) selon le même Prix par Part, (ii) selon un cours moyen de bourse de l'action Spineway à déterminer entre les Parties et (iii) selon un calendrier à convenir entre elles.

6.      **REALISATION DE LA CESSION DES PARTS**

6.1     **Date de Transfert**

A chaque Exercice de la Promesse conformément à l'Article 5 ci-dessus, la cession des Parts Concernées au profit du Cessionnaire interviendra au plus tard le dixième (10ème) Jour Ouvré suivant la date de la Notification d'Exercice, à une date dénommée la « **Date de Transfert** ».

A la Date de Transfert, le Cédant cédera au Cessionnaire, et le Cessionnaire acquerra auprès du Cédant, les Parts Concernées, libres de toute Sûreté, avec l'ensemble des droits et obligations y attachés, étant convenu que le Cessionnaire aura droit aux dividendes des Parts Concernées dont la Date de Transfert se situe au cours d'un Exercice Social N, quel qu'il soit, à compter de l'Exercice Social N, étant précisé que lesdits dividendes seront distribués au cours de l'Exercice Social N+1. Par exception, le Cédant conservera une partie des dividendes attachés à l'Exercice Social N relativement à ces Parts Concernées qui seront distribués au cours de l'Exercice Social N+1, calculée *prorata temporis*. Dans cette hypothèse, le montant desdits dividendes à verser au Cédant ("Dc") sera déterminé par application de la formule suivante :

$$Dc = Dt \times \left( \frac{T}{365} \right)$$

où :



14

- "Dt" est défini comme le montant total des dividendes attachés à l'Exercice Social N relativement aux aux Parts Concernées qui seront distribués au cours de l'Exercice Social N+1 ;
- "T" est défini comme le nombre total de jours s'étant écoulé entre le 1er jour de l'Exercice Social N et la Date de Transfert.

6.2    **Documents à remettre à la suite d'Exercices de la Promesse**

A la suite de chaque Exercice de la Promesse, les actes et opérations suivants interviendront dans l'ordre ci-après à la Date de Transfert des Parts Concernées :

(i)     le Cessionnaire procédera au paiement du Prix Partiel, dans les conditions visées à l'Article 6.3 ci-dessous ;

(ii)    le Cédant remettra au Cessionnaire deux (2) exemplaires originaux - dûment signés par le Cédant et légalisés - du bulletin de transfert relatif à la cession des Parts Concernées au profit du Cessionnaire ;

(iii)   le Cessionnaire remettra au Cédant un (1) exemplaire original - dûment signé par le Cessionnaire et légalisé - du bulletin de transfert relatif à la cession des Parts Concernées au profit du Cessionnaire ;

(iv)    le Cédant fera en sorte que la Société de Gestion procède à l'inscription de la cession des Parts Concernées au nom du Cessionnaire dans le registre des transferts du Fonds ;

(v)     le Cédant fera en sorte que la Société de Gestion remette au Cessionnaire une copie certifiée conforme du registre des transferts du Fonds (ainsi mis à jour de la cession des Parts Concernées au profit du Cessionnaire).

6.3    **Modalités de paiement des Prix Partiels**

Le Cessionnaire devra payer les Prix Partiels en numéraire et (i) en euros par virement au profit du compte bancaire du Cédant (dont les coordonnées auront été notifiées préalablement à la Date de Transfert considérée au Cessionnaire) ou (ii) par compensation avec toutes créances détenues par le Cessionnaire à l'encontre du Cédant.

6.4    **Transfert de propriété**

Sous réserve du respect des Articles 6.2 et 6.3 ci-dessus et du complet paiement du Prix Partiel, les Parties conviennent expressément que le Cessionnaire aura, à compter de la Date de Transfert relative à chaque Exercice de la Promesse, la pleine propriété des Parts Concernées en cas d'Exercice de la Promesse, qui seront acquises avec l'ensemble des droits et obligations qui y sont attachés, sous réserve de la distribution des dividendes au titre des Parts Concernées dont la Date de Transfert se situe au cours d'un Exercice Social N et qui seront versés lors de l'Exercice N+1, dont la répartition sera effectuée *prorata temporis* entre le Cédant et le Cessionnaire conformément aux stipulations de l'Article 6.1 ci-dessus.

Dans les cas ci-après :

1. Si (i) le Cessionnaire n'a pas obtenu le financement demandé au titre du paiement du solde du Prix Initial à payer, soit la somme de trente-sept millions quatre-cent-quarante mille euros (37.440.000 €) et si (ii) le Cessionnaire a au moins acquis les 2.860 Parts A et les 1.300 Parts B, au titre de l'Exercice Initial de la Promesse et pour un montant au moins égal, à la somme globale de quatre millions cent soixante mille euros (4.160.000),



15

2. Si, pour des raisons techniques indépendantes de sa volonté (baisse du cours de l'action SPINEWAY devenant inférieur à la valeur nominale ou à la valeur contractuelle prévue dans le contrat de financement, défaut de liquidité sur le cours rendant impossible l'exécution du contrat de financement, défaut de quorum et/ou de majorité au cours des assemblée générales des actionnaires du Cessionnaire, suspension du cours décidée par les autorités de tutelle, etc.), le Cessionnaire n'est pas en mesure d'obtenir (i) la poursuite du financement demandé au titre du paiement du solde du prix des Parts Initiales déduction faite de la somme de EUR 4.160.000 (quatre millions cent soixante mille), soit la somme de trente-sept millions quatre-cent-quarante mille euros (37.440.000 €), (ii) le financement demandé au titre du paiement partiel résultant de l'Exercice Initial de la Promesse, et (iii) leur mise à disposition effective tout au long de la Promesse,

la Promesse de Cession sera automatiquement suspendue pour une durée de maximale de six (6) mois à compter de sa notification par le Cessionnaire au Cédant dans les conditions de l'article 9.3 (« **Période de Suspension** »).

Durant cette Période de Suspension, la Pénalité prévue à l'Article 5.5 ne sera pas applicable.

Au cours de cette Période de Suspension, les Parties feront leurs meilleurs efforts en vue de :

- rechercher le financement demandé au titre du paiement du solde du paiement partiel résultant de l'Exercice Initial de la Promesse et au titre du paiement du Prix Initial à payer, soit la somme de trente-sept millions quatre-cent-quarante mille euros (37.440.000 €) auprès d'un ou plusieurs investisseurs privés afin de résoudre le point 1. ci-avant.

- rechercher une solution afin de résoudre la/les difficulté(s) technique(s) visée(s) au point 2. ci-avant.

A défaut d'aboutir d'une solution adéquate et pérenne à l'issue de cette Période de Suspension de six (6) mois pour des raisons objectives et indépendantes de la volonté des Parties, la cession des Parts Concernées et du solde des Parts restantes sous Promesse de Cession sera annulée, et la Promesse deviendra caduque sans indemnité de part, ni d'autre.

S'agissant des Parts déjà acquises par le Cessionnaire en vertu de la Promesse, les Parties s'engagent de bonne foi à faire leurs efforts raisonnables pour trouver une liquidité relative à la participation détenue par le Cessionnaire dans le capital du Fonds.

6.5   **Actions de la Société de Gestion**

Le Cédant s'engage à céder au Cessionnaire (i) 50 % des actions de la Société de Gestion, aussitôt que le Cessionnaire aura acquis 80% des 55.000 Parts A du Fonds, soit 44.000 Parts A du Fonds et 80% des 25.000 Parts B du Fonds, soit 20.000 Parts B du Fonds dans le cadre de la Promesse et (ii) le solde de 50 % des actions de la Société de Gestion aussitôt que le Cessionnaire aura acquis l'intégralité des Parts du Fonds dans le cadre de la Promesse.

La cession des actions de la Société de Gestion se fera sur la base d'un prix unitaire de EUR 1 (un) par action, soit un prix global pour 100% des actions de la Société de Gestion de EUR 100 (cent).

Il est expressément convenu, qu'aussitôt la cession de 50 % des actions de la Société de Gestion réalisée au profit du Cessionnaire, tant la Société de Gestion que le Fonds seront gérés par le Cédant et le Cessionnaire de telle sorte que (i) l'intégralité des décisions votées par les actionnaires de la Société de Gestion et l'intégralité des décisions prises par le ou les administrateurs de la Société de Gestion comme (ii) l'intégralité des décisions de gestion du Fonds ou relatives à la composition du capital du Fonds ou à l'endettement du Fonds, soient




16

systématiquement prises à l'unanimité des actionnaires de la Société de Gestion, précisément du Cessionnaire et du Cédant.

A compter de l'acquisition d'au moins 28.600 Parts A du Fonds et au moins 13.000 Parts B du Fonds représentant 52% des Parts du Fonds résultant du paiement effectué au titre de l'Exercice Initial de la Promesse, le Cessionnaire bénéficiera de droits d'information renforcées notamment en termes de *reporting*, d'information, de consultation ou de droits de veto sur certaines décisions importantes au sein des sociétés opérationnelles du Cédant dans les conditions à convenir entre les Parties et sans que cela puisse contrevenir aux dispositions statutaires ou extra-statutaires existantes.

La présente disposition vaut pacte d'actionnaires entre le Cédant et le Cessionnaire et régira, à ce titre, les relations entre le Cédant et le Cessionnaire au sein de la Société de Gestion et pour le compte du Fonds aussi jusqu'à ce qu'un nouveau pacte d'actionnaires soit formalisé entre eux.

7.    **DECLARATIONS DU CESSIONNAIRE**

7.1    Le Cessionnaire déclare au Cédant que la Promesse ne contrevient à aucun engagement ou obligation auquel il serait lié.

7.2    Le Cessionnaire déclare au Cédant que la signature de la présente Promesse et l'exécution des obligations qui en résultent ont été valablement autorisées par les organes sociaux du Cessionnaire et aucune autre autorisation ou formalité n'est requise à cet effet. La présente Promesse constitue un engagement valable, ayant force obligatoire à son encontre conformément à ses termes.

8.    **DECLARATIONS ET GARANTIES DU GARANT**

Le Garant, en tant qu'actionnaire direct et indirect du Fonds, de LA National LLC, de S.M.S et des Filiales (les « **Sociétés Cibles** »), déclare et garantit que les déclarations stipulées dans le présent Article 8 (les « **Déclarations** ») sont exactes et sincères (i) à la date de la Promesse ou, s'agissant de toute Déclaration faite spécifiquement à une certaine date, à cette date et (ii) à l'exception des Déclarations faites spécifiquement à une certaine date, lesquelles ne devront être exactes et sincères qu'à cette date, à chaque Date de Transfert (tant que, postérieurement à ladite Date de Transfert, la participation du Cessionnaire dans le capital du Fonds ne vienne pas à excéder 50%) comme si elles avaient été pareillement données à chacune de ces Dates de Transfert. Le Garant reconnaît que les Déclarations constituent un élément déterminant du consentement du Cessionnaire à toute Cession.

8.1    **Capacité**

Le Garant a le pouvoir et la capacité de conclure la présente Promesse et exécuter les obligations qui en résultent. La signature par le Garant de la présente Promesse et l'exécution des obligations qui en résultent ont été valablement autorisées et aucune autre autorisation ou formalité n'est requise du Garant à cet effet. La présente Promesse constitue un engagement valable, ayant force obligatoire à son encontre conformément à ses termes.

8.2    **Absence de conflit**

La Promesse ne contrevient à aucun engagement ou obligation auquel il serait lié.

8.3    **Actionnariat du Fonds - Propriété et libre cessibilité des Parts Cédées**

8.3.1    A la date des présentes, les 55.000 Parts A et les 25.000 Parts B émises par le Fonds représentent l'intégralité des parts émises par le Fonds.

17

8.3.2    Les Parts Cédées ont été valablement émises et souscrites et sont intégralement libérées. Les
         Parts Cédées sont toutes des Parts de la même catégorie, conférant les mêmes droits et
         obligations à leurs titulaires.

8.3.3    Il n'existe pas, à la date des présentes, de Titres du Fonds autres que les Parts Initiales et, à
         l'exception de la Promesse, il n'existe aucun engagement ou accord conférant à quelque
         personne que ce soit un quelconque droit d'acquérir ou de souscrire ou de se voir attribuer ou
         émettre tout Titre du Fonds et, hormis le Garant au titre des Parts, personne ne détient de
         droit sur les bénéfices ou le boni de liquidation du Fonds. Aucune décision n'a été prise par
         les organes sociaux du Fonds à l'effet d'émettre ou d'attribuer des Titres. Le Fonds n'a pas
         émis d'obligations ou de titres de créances.

8.3.4    Le Garant dispose de la pleine et entière propriété de l'intégralité des Parts Cédées, libres de
         toute Sûreté et librement cessibles au Cessionnaire, et le Cessionnaire disposera à compter de
         la Réalisation de la pleine et entière propriété de l'intégralité des Parts Cédées et de
         l'ensemble des droits qui y sont attachés, sous réserve des stipulations de l'Article 6.4. Il
         n'existe aucun litige ou réclamation relative aux droits du Garant sur les Parts Cédées ou la
         capacité ou aux droits du Garant de céder les Parts Cédées et personne n'est susceptible de
         revendiquer la propriété des Parts Cédées ou un quelconque autre droit sur les Parts Cédées.

8.4      **Sociétés Cibles**

8.4.1    Chaque Société Cible a été régulièrement constituée, est dûment immatriculée et existe
         valablement conformément aux Lois et Règlements qui lui sont applicables et a le pouvoir et
         la capacité d'exercer ses activités de la manière dont elles sont actuellement exercées ou dont
         il est actuellement envisagé qu'elles soient exercées.

8.4.2    Aucune Société Cible n'est ni n'a été en état de cessation des paiements. Aucune résolution
         n'a été approuvée et aucune réunion n'a été convoquée à l'effet de procéder à la dissolution
         ou à la liquidation d'une Société Cible. Aucune Société Cible ne fait ou n'a déjà fait l'objet
         d'une procédure de conciliation, sauvegarde (y compris de sauvegarde accélérée),
         redressement judiciaire ou liquidation judiciaire ou autre procédure similaire, en ce inclus
         toute procédure ou mesure de prévention et règlement amiable des difficultés des entreprises,
         en application des Lois et Règlements applicables en pareille matière, et aucune demande,
         requête ou déclaration en vue de l'ouverture d'une telle procédure n'est intervenue. Aucune
         Société Cible n'a conclu d'accord ou n'a initié, ou n'envisage d'initier, de discussions avec ses
         créanciers en vue d'une annulation ou d'un rééchelonnement de tout ou partie de ses dettes.

8.4.3    Le Fonds dispose de la pleine et entière propriété, libre de toute Sûreté, de Titres de LA
         National LLC représentant 100 % du capital et des droits de vote de LA National LLC à la
         date des présentes.

8.4.4    Le Fonds dispose de la pleine et entière propriété, libre de toute Sûreté, de Titres de S.M.S
         représentant 100 % du capital et des droits de vote de S.M.S à la date des présentes.

8.4.5    LA National LLC dispose de la pleine et entière propriété directe et indirecte, libre de toute
         Sûreté, de Titres des Filiales mentionnées dans l'organigramme joint en **Annexe 1**.

8.4.6    S.M.S dispose de la pleine et entière propriété directe et indirecte, libre de toute Sûreté, de
         Titres des Filiales mentionnées dans l'organigramme joint en **Annexe 1**.

8.4.7    En dehors des Titres de LA National LLC et des Titres de S.M.S détenus par le Fonds, et en
         dehors des Titres des Filiales détenus par LA National LLC et/ou par S.M.S, ce dernier ne
         détient, directement ou indirectement, aucune participation dans aucune autre Personne.

18

**8.4.8**   Il n'existe aucun engagement ou accord conférant à quelque personne que ce soit un quelconque droit d'acquérir ou de souscrire ou de se voir attribuer ou émettre des Titres de LA National LLC et/ou de S.M.S (en ce compris au titre de plans d'attribution d'options de souscription ou d'acquisition d'actions ou d'attribution d'actions   gratuites ou de plans similaires), et, hormis les titulaires des Titres émis par LA National LLC et/ou S.M.S, personne ne détient de droit sur les bénéfices, le boni de liquidation ou les droits de vote de LA National LLC et/ou S.M.S. Ni LA National LLC ni S.M.S n'a émis d'obligations ou de titres de créances.

**8.4.9**   Les Titres émis par chaque Société Cible ont été valablement émis et intégralement libérés et sont tous des actions ou autres titres de capital ordinaires, de la même catégorie, conférant les mêmes droits et obligations à leurs titulaires, et il n'existe pas de Titres d'une Société Cible autres que ces actions ou autres titres de capital. Tous les apports en nature au bénéfice des Sociétés Cibles ont été dûment libérés. Aucune décision n'a été prise par les organes sociaux d'une Société Cible à l'effet d'émettre ou d'attribuer des Titres, ou d'en autoriser l'émission ou l'attribution, après la date de la présente Promesse. Aucune des Société Cible n'a émis d'actions à droits de vote multiple et il n'existe aucune limitation au droit de vote attaché aux actions émises par les Sociétés Cibles en application de leurs statuts ou en application des Lois et Règlements applicables.

**8.4.10**   Aucune Société Cible ne détient de Titres ou n'est membre ou participant d'une quelconque personne autre qu'une autre Société Cible ni n'est ou ne peut être soumise à une quelconque obligation d'acquérir de tels Titres ou de devenir membre ou participant d'une telle personne. Aucune Société Cible (i) ne détient ni n'a détenu de Titres, ou n'a été membre ou participant, d'une quelconque personne où la responsabilité des actionnaires, associés, membres ou participants est indéfinie et/ou solidaire, ni n'est ou ne peut être soumise à une quelconque obligation d'acquérir ou de devenir membre ou participant d'une telle personne, (ii) n'est ni n'a été mandataire social ou dirigeant de fait d'une autre personne (y compris d'une autre Société Cible).

**8.5**   **Effets de la Cession**

La signature et l'exécution de la présente Promesse n'affecteront ni la situation juridique, ni les droits et obligations des Sociétés Cibles, ni la capacité des Sociétés Cibles à poursuivre leurs activités, et n'entraîneront plus particulièrement aucune des conséquences suivantes :

(a)   l'obligation pour une Société Cible de payer une somme de quelque nature que ce soit ou une quelconque pénalité ou indemnité ou la remise en cause ou la réduction d'une subvention, d'un avantage financier ou d'une quelconque autre aide consentie à une Société Cible ;

(b)   la modification ou la résiliation d'une convention à laquelle une Société Cible est partie ou bénéficiant à une Société Cible ou l'applicabilité ou l'inapplicabilité d'un quelconque terme d'une telle convention ou un remboursement anticipé au titre d'obligations contractuelles d'une Société Cible ;

(c)   la possibilité pour quiconque de se prévaloir d'un droit ou de se dégager d'une obligation vis-à-vis d'une Société Cible, et notamment la possibilité pour un tiers de se prévaloir ou d'exiger l'octroi d'une garantie, d'une sûreté ou de tout autre engagement ayant un effet équivalent ou de se dégager d'une garantie, sûreté ou tout autre engagement ayant un effet équivalent émis au profit d'une Société Cible ;

(d)   la modification, l'annulation, la suspension, le retrait ou le non-renouvellement d'une Autorisation nécessaire pour l'exercice régulier de leurs activités par les Sociétés Cibles ;

19

(e)    la modification de la situation des salariés et/ou des mandataires sociaux des Sociétés Cibles ;

(f)    une quelconque obligation de paiement d'un Impôt ni un quelconque changement en matière d'Impôts pour une Société Cible, en ce compris l'impossibilité pour une Société Cible d'utiliser ses déficits fiscaux et crédits d'Impôts ou un quelconque effet sur les déficits et crédits d'Impôts déjà imputés.

8.6    **Comptes de Référence - Livres et registres**

8.6.1    Une copie complète des Comptes de Référence et du Bilan du Fonds ainsi que des rapports des commissaires aux comptes y afférents figure en **Annexe 8.6.1**. Les Comptes de Référence ont été établis conformément aux Lois et Règlements applicables et aux Principes Comptables et ont été certifiés sans réserve par les commissaires aux comptes respectifs des Sociétés Cibles. La façon dont les Principes Comptables ont été appliqués par chaque Société Cible est décrite de façon exacte et complète dans les annexes des Comptes de Référence de cette Société Cible et ces Principes Comptables ont été appliqués sur une base constante et cohérente d'un exercice sur l'autre sous réserve de ce qui est indiqué dans les annexes de ces Comptes de Référence.

8.6.2    Les Comptes de Référence et le Bilan du Fonds sont réguliers et sincères et (i) s'agissant des Comptes de Référence consistant en des comptes consolidés, donnent une image fidèle du patrimoine et de la situation financière de le Société Cible concernée et des personnes comprises dans son périmètre de consolidation à la date de ces Comptes de Référence ainsi que de leurs résultats pour l'exercice clos à la date de ces Comptes de Référence, (ii) s'agissant des Comptes de Référence consistant en des comptes sociaux, donnent une image fidèle du patrimoine et de la situation financière de le Société Cible concernée à la date de ces Comptes de Référence ainsi que de son résultat pour l'exercice clos à la date de ces Comptes de Référence ou (iii) s'agissant du Bilan du Fonds, donnent une image fidèle des actifs du Fonds et de sa situation financière à la date du Bilan du Fonds.

8.6.3    Sauf ce qui est indiqué ou provisionné dans le Bilan du Fonds, les Comptes de Référence ou indiqué dans les annexes des Comptes de Référence, aucune Société Cible n'a une quelconque dette ou obligation existante, conditionnelle ou éventuelle à l'exception des dettes et obligations encourues depuis la date des Comptes de Référence dans le Cours Normal des Affaires.

8.6.4    Les Livres et Registres sont complets, exacts et à jour et ont été tenus conformément aux Lois et Règlements et en bon père de famille. Les Livres et Registres sont disponibles et sous le contrôle des Sociétés Cibles.

8.7    **Evènements depuis la date de la Promesse**

Depuis la date de clôture du dernier exercice social des Sociétés Cibles et jusqu'à la date de Réalisation :

(a)    les Sociétés Cibles ont exercé leurs activités en bon père de famille et dans le Cours Normal des Affaires ; et

(b)    aucune Société Cible n'a effectué une des opérations suivantes ni ne s'est engagée à effectuer une telle opération :

- décider de distribuer, ou mettre en paiement, tout dividende ou autre forme de distribution (en numéraire ou en nature), ou racheter ou annuler tout ou partie des Titres de l'une quelconque des Sociétés Cibles ;



20

- souscrire, ou garantir un emprunt, ou une autre forme d'endettement de quelque nature que ce soit, à l'exception de tout apport en comptes-courants ou prêts d'actionnaire nécessaires au financement des activités des Sociétés Cibles, ou octroyer une Sûreté affectant les Titres de l'une quelconque des Sociétés Cibles, ou tout actif de l'une quelconque des Sociétés Cibles ;

- conclure un contrat d'un montant excédant cinq cent mille (500.000) euros (ou la contre-valeur dans la devise utilisée) hors taxes, ou représentant un engagement de l'une quelconque des Sociétés Cibles excédant cinq cent mille (500.000) euros (ou la contre-valeur dans la devise utilisée) hors taxes ;

- participer à une fusion ou à un apport partiel d'actifs ;

- acquérir, céder ou autrement transférer tout ou partie des Titres de toute personne ;

- acquérir, céder ou autrement transférer un fonds de commerce ou un immeuble ou tout actif substantiel nécessaire à la construction et/ou à l'exploitation de l'une quelconque des Sociétés Cibles ;

- engager une procédure précontentieuse, ou contentieuse, que celle-ci soit judiciaire, administrative ou arbitrale.

9.   STIPULATIONS DIVERSES

9.1   Confidentialité

Aucune des Parties ne divulguera et ne laissera divulguer tout ou partie du contenu de la Promesse à un tiers, sauf accord préalable de l'autre Partie. Cet engagement ne saurait toutefois en aucune façon restreindre la possibilité pour une Partie de communiquer dans le cadre des pratiques de marché cette Promesse :

(i)   pour le Cessionnaire, à ses dirigeants, administrateurs, salariés, établissements financiers et conseils concernés, ainsi qu'aux dirigeants, administrateurs, ou salariés des sociétés de son Groupe et aux administrateurs de son Groupe, si elle le juge utile ou nécessaire dans le cadre de l'exercice de ses droits, à condition qu'ils s'engagent à respecter la présente clause de confidentialité (ou soient tenus par la déontologie qui leur est applicable à une telle confidentialité) ;

(ii)   pour le Cédant, à ses conseils, à condition qu'il s'engagent à respecter la présente clause de confidentialité (ou soient tenus par la déontologie qui leur est applicable à une telle confidentialité) ;

(iii)   aux autorités compétentes en vertu d'une obligation légale ou réglementaire applicable ou d'une décision de justice ou encore dans le cadre de la mise en œuvre judiciaire des stipulations de la présente Promesse, étant précisé que les Parties feront leur possible pour se mettre d'accord sur le contenu de cette communication et que toute communication devra être précédée d'une notification à l'autre Partie si cela est permis par l'autorité compétente et la loi ou la réglementation applicable ;

(iv)   dans le cadre des rapports périodiques ou des présentations à des analystes financiers ou à des investisseurs du Cédant, ou comme autrement nécessaire pour satisfaire à ses obligations légales ou réglementaires en tant que Fonds cotée en bourse ;

(v)   à un acquéreur potentiel de Titres, ou à toute personne partie à un document relatif à un financement du Fonds ou de LA National LLC ou de S.M.S, à condition qu'ils s'engagent à respecter la présente clause de confidentialité ;

21

(vi)    si les informations concernées ont déjà été régulièrement portées à la connaissance du public.

**9.2    Successeurs et ayant-droits**

La présente Promesse s'appliquera au bénéfice des Parties, et les liera ainsi que leurs successeurs, et ayant-droits respectifs, étant précisé, toutefois, que le Cédant ne pourra céder ni déléguer l'un quelconque de ses droits et obligations aux termes de la présente Promesse sans l'accord préalable écrit du Cessionnaire et que le Cessionnaire ne pourra céder ni déléguer l'un quelconque de ses droits et obligations aux termes de la présente Promesse sans l'accord préalable écrit du Cédant.

**9.3    Notifications**

9.3.1    Pour l'exécution des stipulations de la Promesse :

(i)    toutes les notifications sont faites pour chacune des Parties par lettre recommandée avec demande d'avis de réception, par acte extrajudiciaire, par porteur ou par courrier électronique confirmé par lettre recommandée avec demande d'avis de réception (ou tout procédé équivalent pour les notifications internationales), adressé à l'adresse et à l'attention du destinataire mentionnées à l'Article 9.3.3 (ou à toute autre adresse ou à l'attention de toute autre personne telle que notifiée par le destinataire à l'autre Partie conformément aux stipulations du présent article) ;

(ii)    tous les délais sont francs et décomptés sauf, s'il est précisé autrement, en jours calendaires et courent à compter de la réception des notifications (le cachet de la poste faisant foi).

9.3.2    Pour les besoins des présentes :

(i)    tout changement d'adresse ou de représentant d'une Partie pour les besoins de la Promesse devra être notifié par la personne concernée à l'autre Partie ainsi qu'il est prévu ci-dessus ;

(ii)    les notifications adressées par porteur seront présumées avoir été faites à leur date de remise au destinataire, telle qu'attestée par le reçu de livraison ;

(iii)    les notifications faites par courrier recommandé avec avis de réception seront présumées avoir été faites à la date de leur première présentation à l'adresse du destinataire ;

(iv)    les notifications faites par courrier électronique seront présumées avoir été faites à la date d'envoi du courrier électronique, sous réserve de confirmation par courrier recommandé avec avis de réception (ou tout procédé équivalent pour les notifications internationales) expédiée le même jour.

9.3.3    Pour les besoins de la Promesse, les adresses des Parties sont les suivantes :

-    pour le **Cédant** :

A l'attention de Luc GERARD

Avenida Calle 82 # 12-18 Of. 804, Bogota, Colombie

E-mail : luc.gerard@tribeca.com.co

-    pour le **Cessionnaire** :



22

SPINEWAY

A l'attention de Stéphane LE ROUX

7 Allée du Moulin Berger, Bâtiment 7, 69130 Ecully

E-mail : slr@spineway.com

9.4    **Information Privilégiée – Abus de Marché**

Les Parties reconnaissent que la présente Promesse est constitutive d'une information privilégiée au sens de l'article 7 du Règlement européen n°596/2014 du 16 avril 2014 (ci-après « **MAR** ») (c'est-à-dire, une information à caractère précis qui n'a pas été rendue publique, qui concerne, directement ou indirectement, la société SPINEWAY, ou un ou plusieurs de ses instruments financiers, et qui, si elle était rendue publique, serait susceptible d'influencer de façon sensible le cours des instruments financiers concernés ou le cours des instruments financiers qui leur sont liés) (ci-après « **Information Privilégiée** »), dont la communication doit être rendue publique dès que possible.

En cas de différé de communication de l'Information Privilégiée par le Cessionnaire, dans le respect des conditions visées à l'article 17.4 de MAR, à savoir : (i) la publication immédiate est susceptible de porter atteinte aux intérêts légitimes de l'émetteur, (ii) le retard de la publication n'est pas susceptible d'induire le public en erreur et (iii) l'émetteur est en mesure d'assurer la confidentialité de ladite information, et en application de l'article 14 du Règlement MAR, toute personne ayant connaissance de ladite Information Privilégiée s'interdit, jusqu'à ce que l'information perde son caractère privilégié :

–   d'effectuer ou tenter d'effectuer des opérations d'initiés ;

–   de recommander à une autre personne d'effectuer des opérations d'initiés ou inciter une autre personne à effectuer des opérations d'initiés ; ou

–   de divulguer de manière illicite des informations privilégiées, c'est-à-dire ces informations à une autre personne, sauf lorsque cette divulgation a lieu « dans le cadre normal de l'exercice d'un travail, d'une profession ou de fonctions ».

Les opérations d'initiés sont entendues largement par l'article 8 de MAR et recouvrent notamment :

–   le fait pour une personne, détenant une Information privilégiée, d'en faire usage « en acquérant ou en cédant, pour son propre compte ou pour le compte d'un tiers, directement ou indirectement, des instruments financiers auxquels cette information se rapporte » ; et

–   le fait d'utiliser les recommandations ou incitations formulées par une personne détenant une Information privilégiée si la personne sait, ou devrait savoir, que celle-ci est fondée sur des informations privilégiées ;

En cas de violation de ces règles d'abstention, l'AMF peut infliger aux contrevenants une sanction pécuniaire dont le montant peut aller jusqu'à 100 millions d'euros ou, si des profits ont été réalisés, au décuple du montant de ceux-ci.

Le Cessionnaire s'engage à établir une liste d'initiés au titre de l'Information Privilégiée dans le format défini aux articles 18 de MAR et 2.5 du règlement d'exécution (UE) 2016/347 de la Commission du 10 mars 2016.

23

Enfin, les Parties prennent acte que sont également prohibées les opérations constitutives d'une manipulation de marché au sens de l'article 12 de MAR.

**9.5    Amendement de la Promesse**

La présente Promesse ne pourra être modifiée que par écrit dûment signé par chacune des Parties.

**9.6    Absence de renonciation**

Aucune tolérance, inaction ou inertie d'une Partie ne pourra être interprétée comme renonciation à ses droits aux termes de la Promesse.

**9.7    Inapplicabilité des stipulations**

Dans l'hypothèse où l'une ou plusieurs des stipulations de la Promesse serai(en)t ou deviendrai(en)t nulle(s), illégale(s) ou jugée(s) inapplicable(s) pour quelque raison que ce soit, la validité, la légalité ou l'applicabilité de toute autre stipulation de la Promesse n'en serait aucunement affectée ou altérée, à moins que ces autres stipulations n'en fassent partie intégrante ou soient clairement indissociables des stipulations invalidées ou jugées inapplicables.

Dans l'hypothèse d'une telle nullité, illégalité ou inapplicabilité, les Parties s'efforceront en toute bonne foi de trouver un accord sur les modifications à apporter à la Promesse afin de lui donner, dans toute la mesure du possible, un effet correspondant à leur commune intention, telle qu'exprimée par la Promesse.

Plus généralement, dans l'éventualité où l'une quelconque des stipulations de la Promesse ne pourrait trouver application pour quelque motif que ce soit, les Parties s'engagent à se concerter et à renégocier la stipulation concernée de manière à atteindre les mêmes objectifs économiques en conservant un équilibre contractuel identique.

**9.8    Frais**

Chacune des Parties supportera tous les frais et dépenses engagés par elle à l'occasion des présentes et des opérations prévues aux présentes, notamment les honoraires et débours de tout tiers dont les services auront été utilisés par ladite Partie.

**9.9    Intégralité de l'accord**

La Promesse constitue l'entier et unique accord des Parties sur les stipulations qui en sont l'objet. En conséquence, elle remplace et annule tout accord, convention, échange de lettres ou accord verbal qui aurait pu intervenir entre les Parties antérieurement à la date des présentes et relatif au même objet.

**9.10   Exemplaires**

Cette Promesse a été conclue en plusieurs exemplaires, dont chacun constitue un original et qui ensemble doivent être considérés comme constituant un seul et unique document.

**10.    DROIT APPLICABLE - LITIGES**

10.1    La Promesse est régie et interprétée conformément au droit français.

24

**10.2**      Tous différends découlant de la présente Promesse ou en relation avec celle-ci seront tranchés définitivement suivant le Règlement de Conciliation et d'Arbitrage de la Chambre de Commerce Internationale de Genève par un (1) arbitre nommé conformément à ce Règlement (cet arbitre étant ci-après désigné le "**Tribunal Arbitral**").

         Le Tribunal Arbitral sera constitué à Genève (Suisse) et l'arbitrage aura lieu en langue française.

         Le Tribunal Arbitral devra trancher le litige en application du droit français.

Fait à LYON, le 19 mars 2019, en deux (2) exemplaires originaux

**SPINEWAY SA**[1]
*Le Cessionnaire*

Par : Monsieur Stéphane LE ROUX

**STRATEGOS GROUP LLC**[2]
*Le Cédant et Garant*

Par : Monsieur Luc GERARD

---

[1]   Le Cessionnaire doit faire précéder sa signature de la mention manuscrite « *Bon pour acceptation de promesse de vente de Parts dans les termes ci-dessus* ».

[2]   Le Cédant doit faire précéder sa signature de la mention manuscrite « *Bon pour promesse de vente de Parts dans les termes ci-dessus* ».

25

**Annexe 1**
**Répartition du capital du Fonds à la date des présentes et Organigramme**



* Company in process of being transfered to SMS Strategic Solutions Limited, Chipre




26

| Identité des titulaires de Parts | Nombre de Parts | % de détention |
|---|---|---|
| Strategos Group LLC | 55.000 parts A | 68,75% |
| Tupson Invest S.L.U. | 25.000 parts B | 31,25% |
| | | |
| Nombre total de Parts | 80.000 | 100,00% |
| Valeur nominale (en euros) | 1.000 | |
| Capital social (en euros) | 80.000.000 | |

27

**Annexe 8.6.1**
**Comptes de Référence et Bilan du Fonds**

**LATIN AMERICAN NATIONAL CLINICS - LA NATIONAL LLC.**

**Estados de Situación Financiera**

*Cifras expresadas en USD*

| | Año terminado al 31 de diciembre 2018 |
|---|---|
| **Activos** | |
| **Activos no corrientes** | |
| Inversiones | $ 7.882.118 |
| **Total activos** | $ 7.882.118 |
| | |
| **Patrimonio** | |
| Capital social | 7.407.932 |
| Resultado de ejercicios anteriores | (5.814) |
| **Total patrimonio** | $ 7.882.118 |

**ANGELA M. LUNA M.**
Apoderado

**S.A.S. STRATEGIC MEDICAL SOLUTIONS LIMITED**

**Estados de Situación Financiera**

*Cifras expresadas en USD*

|  | Año terminado al 31 de diciembre 2018 |
|---|---|
| **Activos** | |
| Inversiones | 1.707.124 |
| **Total activos** | $ 1.707.124 |
| | |
| **Patrimonio** | |
| Capital social | 1.124 |
| Prima en colocación de inversiones | 1.706.000 |
| **Total patrimonio** | $ 1.707.124 |

ANGELA M. LUNA M.
Apoderado

**EXHIBIT 4**



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK )
)     ss:
COUNTY of NEW YORK )

### **_CERTIFICATE OF ACCURACY_**

This is to certify that the attached document, "Certification of Stephane Le Roux" --
originally written in *French*-- is, to the best of our knowledge and belief, a true,
accurate, and complete translation into *English*.

Dated: 12/16/2022

Sworn to and signed before ME
this 16th day of December, 2022



_____

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Notary Public

Your
legal
translation
partner

SPINEWAY

Ecully, December 15th, 2022

I the undersigned, Stephane LE ROUX, of age, sound in body and mind, currently President and Chief Executive Officer of the anonymous corporation SPINEWAY, certifies in good faith that:

1. On March 19th, 2019, the companies Spineway SA and Strategos Group LLC entered into a bilateral promise to sell and purchase under suspensive conditions, combined with a unilateral promise to sell (the "Contract").
2. A certified copy of the Contract is attached in Appendix A.

Certificate delivered to the applicable party for all intents and purposes.

[signature]

President and CEO          Stephane LE ROUX

SPINEWAY
7 allé Moulin Berger
69130 Ecully – France
Tel.: +33(0)4 72 77 01 52
SA with a capital of €440,526
SIRET 484 163 985 00035

SPINEWAY SA – Technoparc, bâtiment 7, Allée Moulin Berger – 69130 ECULLY – FRANCE
Tel.: +33(0)4 78 38 10 17 – email: info@spineway.com – www.spineway.com
company registered under RCS No. 484 163 985 00035



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK )
                   )        ss:
COUNTY of NEW YORK )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "Certification of Stephane Le Roux" --
originally written in *French*-- is, to the best of our knowledge and belief, a true,
accurate, and complete translation into *English*.

Dated: 12/16/2022

Sworn to and signed before ME
this 16th day of December, 2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Notary Public



Your
legal
translation
partner

# EXHIBIT A



100 Park Avenue, 16ᵗʰ Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK        )
                         )        ss:
COUNTY of NEW YORK       )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "Promesse Synallagmatique De Vente
D'Achat Sous Conditions Suspensives Assortie D'Une Promesse Unilaterale De Vente"
-- originally written in *French*-- is, to the best of our knowledge and belief, a true,
accurate, and complete translation into *English.*

Dated: 12/8/2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Sworn to and signed before ME
this 8ᵗʰ day of December, 2022

Notary Public



Your
legal
translation
partner

New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong

Lamy-Lexel
Associate Lawyers

**BILATERAL PROMISE OF SALE AND PURCHASE UNDER CONDITIONS PRECEDENT COMBINED WITH
A UNILATERAL PROMISE OF SALE**

**DATED 19 MARCH 2019**

**Between**

**STRATEGOS GROUP LLC**
*in the capacity of Transferor and Guarantor*

**and**

**SPINEWAY SA**
*in the capacity of Transferee*

## TABLE OF CONTENTS

1.  DEFINITIONS – INTERPRETATION
2.  OBJECT OF THE PROMISE
3.  EFFECT OF THE PROMISE
4.  PERIOD OF THE PROMISE
5.  EXERCISE OF THE PROMISE
6.  EXECUTION OF THE TRANSFER OF UNITS
7.  TRANSFEREE'S REPRESENTATIONS
8.  GUARANTOR'S REPRESENTATIONS AND WARRANTIES
9.  SUNDRY PROVISIONS
10. APPLICABLE LAW – DISPUTES

## LIST OF ANNEXES

Annex 1         Distribution of the Fund capital at the date hereof and organization chart
Annex 8.6.1     Reference accounts

**THIS PROMISE OF SALE IS CONCLUDED BTWEEN THE UNDERSIGNED:**

1. **STRATEGOS GROUP LLC**, a company of Delaware State (USA) whose registered office is situated at 2701 Centerville Road, Wilmington, 19808 Delaware, USA, registered under no. 6859944, represented by Mr Luc GERARD, born on          in Boende (Democratic Republic of the Congo), of Belgian nationality, resident at Carrera 2 # 11-7, Bogota, Colombia;

   Acting both in its own name and in the name and on behalf of all the holders of 100% of the A units and 100% of the B units issued by the fund National Clinics as defined below;

   Hereinafter referred to as the "**Transferor**" or the "**Guarantor**";

<div align="right">

**OF THE ONE PART**

</div>

AND

2. **SPINEWAY**, a limited company incorporated under French law with a capital of €2,684.406.60, whose registered office is situated at 7 Allée du Moulin Berger Bâtiment 7, 63130 Ecully, entered in the Lyon Trade and Companies Register under no. 484 163 985, represented by Mr Stéphane LE ROUX, duly authorized for the purposes hereof, on resolutions passed by the Board of Directors on 11 March 2019;

   Hereinafter referred to as the "**Transferee**";

<div align="right">

**OF THE OTHER PART**

</div>

   The Transferor and the Transferee shall hereinafter be referred to individually as a "**Party**" and jointly as the "**Parties**".

**RECITALS**

(A) Under the terms hereof, the Transferor must hold 55,000 A units and 25,000 B units, representing all the units issued by the fund National Clinics, a securitization fund in the course of formation, established under Luxembourg law within the meaning of the law of 22 March 2004 on securitization (the "**Fund**"), or any legal person substituting for it if the Parties identify a legal vehicle producing the same legal, economic and tax results as the creation of the Fund holding the interests of the companies LA National LLC and SM, represented by its management company, the company National Clinics Management Company, a limited company established under Luxembourg law, in the course of formation, represented by Mr Luc Gerard, in the capacity of founder and economic beneficiary (the "**Management Company**").

(B) Compartment A of the Fund shall hold 100% of the shares in the company Latin American National Clinics – LA National LLC, a company of Delaware State (USA) with a capital of US$ 7,887,932, whose registered office is situated at 2701 Centerville Road, Wilmington, 19808 Delaware, USA, registered under no. 6911127 ("**LA National LLC**"), representing 100% of the share capital and voting rights of LA National LLC at the date hereof, according to the organization chart attached in **Annex 1**.

(C) Compartment B of the Fund shall hold 100% of the shares in the company S.M.S. Strategic Medical Solutions Limited, a company incorporated under Cypriot law with a capital of €1,000, whose registered office is situated at 2-4 Arch. Makarios III Avenue Capital Center – 9th Floor 1505 Nicosia,

Cyprus, entered in the Nicosia Trade Register under no. HE 161675 ("**S.M.S.**"), representing 100% of the share capital and voting rights of S.M.S. at the date hereof, according to the organization chart attached in **Annex 1**.

(D) The Transferee has expressed its interest in acquiring at least 52% and at the most 100% of the units in the Fund, or in any legal person substituting for it in the event indicated in paragraph (A) above, from the Transferor and the Transferor has declared its interest in transferring at least 52% and at the most 100% of the units in the Fund to the Transferee.

(E) At the date hereof, the Transferee does not have the finance enabling it to acquire 100% of the Units (as such term is defined in Article 1.1 below) from the Transferor and wished to benefit from a transfer undertaking relating, initially, to 52% of the Units, which may be exercised more than once, within a period of three (3) years with the possibility of extending it by a maximum period of one (1) year, and subsequently, based on the Parties' agreement regarding a transfer and/or a contribution of the remaining 48% of the Units, subject, in the event of a contribution, to the favorable vote of the Transferee's shareholders at an extraordinary shareholders' meeting, within a period of two (2) years as from the initial acquisition of 52% of the Units.

(F) The Parties have thus agreed to conclude this (a) bilateral promise of sale and purchase regarding 52% of the units and (b) unilateral promise regarding the remaining 48% of the Units (the "**Promise**") in order to define the terms and conditions under which (i) the Transferor undertakes to transfer at least 52% and at the most 100% of the Units to the Transferee and (ii) the Transferee undertakes, subject to observance of the Conditions Precedent set out below, to acquire at least 52% of the Units and shall benefit from an option to purchase the balance corresponding to 48% of the Units from the Transferor.

## AS A RESULT OF WHICH, IT HAS BEEN AGREED AS FOLLOWS:

## 1.  DEFINITIONS – INTERPRETATION

### 1.1 Definitions

For the purposes of this Promise, the terms beginning with a capital letter and indicated below shall have the following meaning:

| | |
|---|---|
| "**Affiliate**" | designates, with regard to any person or entity (a "**Person**"), any person Controlling that Person, Controlled by that Person or under the Control of a person or entity Controlling that Person. |
| "**Article**" | designates an article of the Promise. |
| "**Authority**" | designates any international, European, Moroccan, multinational or transnational body, government, State, region, department, municipality, local authority or any other political or administrative subdivision and any other person or authority exercising, where appropriate by delegation, an executive, legislative, judicial, regulatory or administrative power. |
| "**Fund Balance Sheet**" | designates the opening balance sheet (assets / liabilities) of the Fund at the date hereof attached in Annex 8.7.1. |

| | |
|---|---|
| **"Transfer"** | designates any transfer of Units by the Transferor to the Transferee on Exercise of the Promise. |
| **"Reference Accounts"** | designates the accounts (balance sheet, income and expense account and notes) drawn up by LA National LLC at the most recent date, the accounts (balance sheet, income and expense account and notes) drawn up by S.M.S. at the most recent date, and the accounts (balance sheet, income and expense account and notes) drawn up by each of the Subsidiaries at the most recent date. |
| **"Condition(s) Precedent"** | has the meaning attributed to it in Article 3.1 hereof. |
| **"Control"** | designates the control exercised by one or more persons over a person or entity within the meaning of article L. 233-3 of the French Commercial Code, and the verb **"to Control"** shall be interpreted accordingly. |
| **"Normal Course of Business"** | designates, for each Target Company, the management by the aforesaid Target Company of its activities within the scope of routine management and according to previous customs and practices. |
| **"Total Expiry Date"** | designates 19 March 2024 (5 years as from the Date of the Promise), including the possible Extension of the Period of Exercise under the conditions referred to in Article 5.3. |
| **"Partial Expiry Date"** | designates 19 March 2022 (3 years as from the Date of the Promise), subject to adjustment in the event of Extension of the Period of Exercise under the conditions referred to in Article 5.3. |
| **"Date of the Promise"** | designates the date hereof, as indicated on the signature page of the Promise. |
| **"Transfer Date"** | has the meaning attributed to it in Article 6.1 hereof. |
| **"Representations"** | has the meaning attributed to it in Article 8 hereof. |
| **"Initial Exercise of the Promise"** | designates the initial exercise of the Promise necessarily relating to 2,860 A Units of the Fund and to 1,300 B Units of the Fund, as provided for by Article 5 hereof. |
| **"Related Exercise of the Promise" or "Exercise of the Promise"** | designates any exercise after the Initial Exercise of the Promise necessarily relating to 90% of the Initial Units of the Fund as provided for by Article 5 hereof. |
| **"Financial Year"** | designates the Fund's financial year ending 31 December each year. |

6

| | |
|---|---|
| **"Subsidiaries"** | designates all the entities held directly or indirectly by LA National LLC and/or S.M.S. mentioned in the organization chart attached in **Annex 1**. |
| **"Fund"** | has the meaning attributed to it in paragraph (A) of the preamble hereto. |
| **"Guarantor"** | has the meaning attributed to it regarding the persons appearing in this Promise. |
| **"Group"** | designates, with regard to a person (the **"Person"**), the aforesaid Person and all its Affiliates. |
| **"Taxes"** | designates (i) any duty, tax, fee, taxation, charge, deduction, withholding at source, contribution or expense of any nature whatsoever and any social security contribution (whether payable by the employee or employer) imposed by any Authority or any other competent body, whether payable directly or by withholding or otherwise, including any corporation tax, income tax, land tax, customs duty, VAT, taxes on wages, contributions or social security charges in respect of the social security authority or any equivalent body, family allowances, and the various pension and unemployment bodies, as well as any interest, fine or penalty relating thereto; and (ii) any payment or reimbursement made in favor of any Fund in its capacity as the head Fund of a consolidated tax group. |
| **"Business Day"** | means any day other than a Saturday, Sunday or any other public holiday in France or in Luxembourg. |
| **"LA National LLC"** | has the meaning attributed to it in paragraph (B) of the preamble hereto. |
| **"Notification of Transfer"** | has the meaning attributed to it in Article 9.3 hereof. |
| **"Notification of Exercise"** | has the meaning attributed to it in Article 5.4 hereof. |
| **"New Transferee"** | has the meaning attributed to it in Article 9.2 hereof. |
| **"Units"** | designates the Initial Units and, where appropriate, any Fund Securities substituting for them or added thereto as provided for by Articles 2.2 to 2.4 hereof. |
| **"A Units"** | designates the 55,000 A Units issued by Fund compartment A. |
| **"B Units"** | designates the 25,000 B Units issued by Fund compartment B. |
| **"Units Transferred"** | designates all the Fund Units that the Transferee shall acquire from the Transferor on Exercise of the Promise, according to the terms of the Promise. |

| | |
|---|---|
| **"Units Concerned"** | designates, for each Related Exercise of the Promise, the number of Units referred to in the Notification of Exercise equal to one thirty-second of the A Units and one thirty-second of the B Units (minus the A and B Units transferred during the course of Initial Exercise of the Promise), subject to adjustment in the event of Extension of the Period of exercise under the conditions referred to in Article 5.3. |
| **"Initial Units"** | designates 28,600 (twenty-eight thousand six hundred) A Units and 13,000 (thirteen thousand) B Units in the Fund, representing 52% of the Fund share capital owned by the Transferor at the date hereof, according to the distribution shown in **Annex 1**. |
| **"Penalty"** | has the meaning attributed to it in Article 5.5 hereof. |
| **"Period of Exercise"** | has the meaning attributed to it in Article 5.2 hereof. |
| **"Period of Suspension"** | has the meaning attributed to it in Article 6.4 hereof. |
| **"Person"** | designates any natural or legal person and any collective investment undertaking, equity fund, trust or foundation, or any other entity of any nature whatsoever, with or without legal personality. |
| **"Accounting Principles"** | designates, with regard to the company accounts of the Fund or LA National LLC or S.M.S. or any of the Subsidiaries, the accounting principles, rules and methods applicable in the jurisdiction concerned. |
| **"Price per Unit"** | means an amount equal to the ratio between (i) the Initial Total Price and (ii) the number of Initial Units, that is €1,000 (one thousand) as may be adjusted as provided for by Article 2.2 hereof. |
| **"Partial Price"** | designates the price to be paid by the Transferee to the Transferor in the event of Exercise of the Promise for a number of Units Concerned, calculated as follows:<br><br>Price per Unit * number of Units Concerned |
| **"Initial Total Price"** | designates the price to be paid by the Transferee to the Transferor solely for the Initial Units, that is €41,600,000 (forty-one million, six hundred thousand euros) for 28,600 A Units and 13,000 B Units in the Fund, that is 52% of the Fund share capital. |
| **"Extension of the Period of Exercise"** | has the meaning attributed to it in Article 5.3 hereof. |
| **"Execution"** | designates the transfer by the Transferor to the Transferee of ownership of the Units Transferred on the first Exercise of the Promise. |
| **"Target Companies"** | has the meaning attributed to it in Article 8 hereof. |

| "S.M.S." | has the meaning attributed to it in paragraph (B) of the preamble hereto. |

**"Management Company"**     has the meaning attributed to it in paragraph (A) of the preamble hereto.

"Surety"     designates any lien, security, pledge with or without dispossession, any other real or personal security, clause on reservation of ownership, trust, pre-emptive or preferential right, mortgage, whether voluntarily incurred or resulting from the application of the law, including, without limitation, any agreement consenting to any of the foregoing items, any contract of conditional or potential sale, or any other agreement on the retention of title, including any retention right or a lease of that nature.

"Securities"     designates, with regard to a given entity, the Units or units in the entity, whatever the category thereof, and any security, right or transferable security, granting the right, on an immediate or deferred basis (including usufruct or bare ownership of Units in that entity), by conversion, subscription, option or by any other possible means, to a financial right or to a voting right in the aforesaid entity, including, in particular, any subscription bond for Units issued by that entity, as well as any preferential subscription right within the scope of an issue of Securities in the aforesaid entity.

## 1.2 Interpretation

**1.2.1** Any reference to the Promise shall be deemed to mean the Promise and its annexes, which form an integral part thereof, and the references made to the preamble, articles, paragraphs and annexes shall be deemed to mean the preamble, articles, paragraphs and annexes of the Promise.

**1.2.2** The headings are only provided to facilitate reading and must not affect the interpretation of this Promise.

**1.2.3** References in the singular shall include references in the plural and vice versa, unless the context requires or permits otherwise, and words presenting a particular gender shall include all genders.

**1.2.4** Unless the context requires otherwise, any reference to a legal provision shall be deemed to mean the provision as it exists and applies on the day of conclusion of the Promise.

**1.2.5** Any reference to another document shall be deemed to mean this document as it exists on the day of conclusion of the Promise.

**1.2.6** The examples given after the terms "include", "including", "particularly", "in particular" and all other terms having the same meaning shall not be restrictive.

## 2. OBJECT OF THE PROMISE

**2.1** The Transferor expressly and irrevocably undertakes to transfer to the Transferee, and the Transferee expressly and irrevocably undertakes to purchase from the Transferor, in several

installments, within an initial period of 36 months and a maximum period of 48 months, in the event of Extension of the Period of Exercise, the Initial Units, that is at least 28,600 A Units in the Fund and at least 13,000 B Units in the Fund representing 52% of the Fund Units (the number of which shall be indicated in the Notification of Exercise referred to in Article 5.4 below), when the latter so requests, under the conditions of this Promise and in exchange for Payment of the Partial Price for each Exercise of the Promise, as adjusted pursuant to Article 2.2, where appropriate, according to the terms of payment referred to in Article 6.3 below.

On acquisition of the balance of the Units relating to 48% of the Fund share capital (by purchase or contribution), the Transferor has granted a unilateral promise of sale to the Transferee, with the option for the latter not to exercise it.

As from acquisition of all the Initial Units, the Parties shall meet within ninety (90) days of the Partial Expiry Date with a view to agreeing on the transfer and/or contribution of the balance of the Transferor's interest in the Fund (i) based on the same Price per Unit and (ii) based on an average stock market price of the Spineway share to be determined between the Parties and iii) according to a schedule to be agreed between them. In the event of a contribution in kind, subject to the agreement of the Transferee's shareholders at an extraordinary shareholders' meeting, the Transferee shall expressly undertake to acquire, within a maximum period of 12 months as from the Partial Expiry Date, the balance of the Units, that is 48% of the Fund, by means of an increase in capital by means of a contribution in kind of the Units with elimination of the shareholders' preferential right in favor of the Transferor.

**2.2** This Promise shall thus relate to the Initial Units and to all the Securities issued by the Fund in addition to or replacing the Initial Units or the Units, where appropriate.

In particular, if, between the Date of the Promise and any Transfer Date:

(a) The Fund arranges an increase in capital by the incorporation of reserves, profits or issue premiums, the new units of which the Transferor shall become the owner on account of the holding of Units shall be added to its Units, it being stipulated that, in such event, the Price per Unit applicable to Exercises after the increase in capital considered shall be equal to the ratio between (i) the difference between the Initial Total Price and the sum of the Partial Prices paid by the Transferee to the Transferor prior to the increase in capital considered and (ii) the number of Units held by the Transferor after the increase in capital considered;

(b) The Fund arranges an increase in capital by the incorporation of reserves, profits or issue premiums and an increase in the nominal value of the Fund Units, the nominal value of the Units shall thus be increased, without any change in the Price per Unit;

(c) The Fund alters the composition of its capital by the grouping or division of Units, the Promise shall then relate to all the Securities attributed or delivered, following such transactions, in exchange for the Units still held by the Transferor, it being stipulated that, in such event, the Price per Unit applicable to Exercises after the grouping or division considered shall be equal to the ratio between (i) the difference between the Initial Total Price and the sum of the Partial Prices paid by the Transferee to the Transferor prior to the grouping or division considered and (ii) the number of Securities held by the Transferor after the grouping or division considered;

(d) The Fund pays dividends in Units, the Promise shall then also relate to the new Units of which the Transferor becomes the owner (owing to the holding of Units) following payment of such dividend, it being stipulated that, in such event, the Price per Unit applicable to Exercises after

the payment of dividends in Units considered shall be equal to the ratio between (i) the difference between the Initial Total Price and the sum of the Partial Prices paid by the Transferee to the Transferor prior to the payment of dividends in Units considered and (ii) the number of Units held by the Transferor after the payment of dividends in Units considered.

**2.3** If the Fund makes one or more cash increases in capital (either directly or following the exercise of subscription bonds or all types of compound transferable securities granting access to the Fund capital), any Units subscribed by the Transferor shall also form the subject of the Promise at a price equal to the portion of their subscription price actually paid up by the Transferor.

**2.4** In the event of an exceptional transaction concerning the Fund (other than those referred to in Articles 2.2 to 2.3 above), such as, in particular, an increase in capital by means of a contribution in kind, reduction in capital (by reducing the number of Units or reducing the nominal value of the Units), merger, demerger, transformation of the Fund into another form of fund or entity, or partial contribution of assets, the Transferor shall notify the Transferee without delay, under the conditions laid down by Article 9.3, of the proposed exceptional event, the characteristics thereof, the consequences thereof on the Fund capital and the distribution thereof, as well as the means which the Transferor proposes to implement to preserve the Transferee's interests with regard to the Promise to the extent that they are affected by the aforesaid transaction.

The Transferee shall have a period of twenty (20) Business Days as from the notification referred to in the previous paragraph to notify the Transferor, under the conditions laid down by Article 9.3, of its acceptance of the measures proposed by the Transferor. In the event of the Transferee's refusal, the latter shall inform the Transferor of its observations on the measures proposed and the justification for its observations, as well as the measures whose implementation is requested by the Transferee to preserve its interests in respect of the Promise.

If the Transferor fails to accept implementation of the measures proposed by the Transferee and if the Parties fail to reach an agreement on the measures to be implemented to preserve the Transferee's interests in respect of the Promise, they shall submit their disagreement to an expert. The expert shall be appointed by mutual consent of the Parties. Failing the Parties' agreement on the appointment of the expert within a period of ten (10) Business Days, or if the expert thus appointed refuses the task, an expert shall be appointed at the request of the more diligent party, by the International Centre for Expertise according to the provisions on the appointment of experts of the Rules for Expertise of the International Chamber of Commerce.

Following an examination of the measures proposed by the Transferor and the Transferee's comments, the expert shall be responsible for determining the measures to be implemented to preserves the Transferee's rights in respect of the Promise. The expert's conclusions shall be submitted within a maximum period of twenty (20) Business Days as from the appointment thereof and shall be final and, as such, shall not be subject to any appeal. The expert's expenses and fees shall be borne equally between the Transferor and the Transferee.

## 3. EFFECT OF THE PROMISE

**3.1** The Promise shall take effect within a period of one (1) Business Day as from the date of execution, within a period of forty-five (45) days as from the Date of the Promise, under the following conditions ("**Condition(s) Precedent**"):

- The satisfactory conclusion of a legal, accounting and financial audit performed at the Transferee's request on the value of the Fund and specifically on the value of the Fund assets and liabilities, it being agreed between the Parties that the satisfactory conclusion of the audit

is defined as an audit performed by Cabinet Mazars (or one of its correspondents) resulting in a valuation of the Fund of not more than 15% less than the valuation adopted to fix the Initial Total Price of the Fund Units, that is €80,000,000.

- The Transferee's obtaining an agreement in principle by one or more private investors on the financing of the Partial Price corresponding to the Initial Exercise of the Promise, that is the sum of four million one hundred and sixty thousand euros (€4,160,000) and its actual availability to the Transferee in accordance with any necessary resolution passed by the shareholders' general meeting and/or the board of directors and its actual, immediate or future contribution, throughout the Period of Exercise.

**3.2** Failing performance of the audit on the sole account of the Transferee following a period of forty-five (45) days as from the Date of the Promise, the Promise shall take effect, subject to fulfilment of the other Condition Precedent stipulated in Article 3.1 above.

**3.3** If (i) the audit performed at the Transferee's request results in a valuation of the Fund of more than 15% less than the valuation adopted to fix the Initial Total Price of the Fund Units and/or (ii) if the Conditions Precedent listed in Article 3.1 above are not lifted, the Promise shall become null and void, without any indemnity on either part, unless the Parties jointly decide to extend the aforesaid period by thirty (30) days.

**3.4** As a condition subsequent of the Promise, the Parties agree to conclude, within six (6) months from the date of the Promise, the Parties agree to enter into a commercial partnership agreement for the distribution of the Transferee's products in the Transferor's business areas. Failing actual conclusion of this agreement, for reasons other than the Transferee's simple refusal to sign the balanced partnership agreement proposed by the Transferor, within the period of six (6) months (unless this period is extended by mutual agreement between the Parties), this Promise will be terminated and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, all without any indemnity on either part.

## 4. PERIOD OF THE PROMISE

The Promise shall be granted as from the Date of the Promise and shall remain in force up to the Total Expiry Date.

## 5. EXERCISE OF THE PROMISE

### 5.1 Exercise

The Promise shall be exercised by the Transferee (i) within a period of one (1) Business Day following the lifting of the Conditions Precedent pursuant to Article 3.1, by an Initial Exercise of the Promise and (ii) on the last Business Day of each month as from 1 August 2019, by a Related Exercise of the Promise, until the Transferee has exercised the Promise for 52% of the Units held by the Transferor.

The partial payment resulting from the Initial Exercise of the Promise shall be staggered in four (4) payments planned on the following dates:

- On the first Business Day following the lifting of the Conditions Precedent: €1,000,000;

- On the last Business Day of the month following the lifting of the Conditions Precedent: €1,000,000;

- On the last Business Day of the second month following the lifting of the Conditions Precedent: €1,000,000;

- On the last Business Day of the third month following the lifting of the Conditions Precedent: €1,160,000.

### 5.2 Period of Exercise

For the Transfer of the Initial Units, the Promise shall be exercised by the Transferee, on thirty-six (36) occasions, over a period of three (3) years (the "**Period of Exercise**") commencing as from the lifting of the Conditions Precedent referred to in Article 3.1, subject to adjustment in the event of Extension of the Period of Exercise under the conditions referred to in Article 5.3 below.

### 5.3 Extension of the Period of Exercise

During the course of the Period of Exercise and provided the Transferee has acquired at least the 2,860 A Units and the 1,300 B Units in respect of the Initial Exercise of the Promise, for an amount at least equal to the overall sum of four million one hundred and sixty thousand euros (€4,160,000), the Transferee may, at its discretion, ask the Transferor to extend this Period of Exercise for a maximum period of 12 months as from notification thereof under the conditions referred to in Article 9.3 ("**Extension of the Period of Exercise**").

In such event, the number of Initial A and B Units remaining to be transferred on Exercise of the Promise shall be adjusted based on the following formulae:

Where: $N_A = \dfrac{A}{M}$

- o  "$N_A$" is defined as the number of A Units Concerned;
- o  "A" is defined as the Balance of the Initial A Units remaining to be transferred;
- o  "M" is defined as the Number of months remaining up to the Partial Expiry Date.

Where: $N_B = \dfrac{B}{M}$

- o  "$N_B$" is defined as the number of B Units Concerned;
- o  "B" is defined as the Balance of the Initial B Units remaining to be transferred;
- o  "M" is defined as the Number of months remaining up to the Partial Expiry Date.

### 5.4 Terms of Exercise of the Promise

The Promise shall be exercised on notification issued by the Transferee to the Transferor, for the first Notification of Exercise, on the first Business Day following the lifting of the Conditions Precedent; for subsequent Notifications of Exercise, on the last Business Day of each month, during the course of the Period of Exercise, and under the conditions laid down by Article 9.3, of its Exercise of the Promise (the "**Notification of Exercise**"); the Notification of Exercise shall indicate the number of Units Concerned for which the Promise is exercised in respect of the Notification of Exercise considered.

### 5.5 Penalty

If the Transferee has finance for the balance of the Initial Price remaining to be paid, that is the overall sum of thirty-seven million four hundred and forty thousand euros (€37,440,000) and has not exercised the Promise within the periods and according to the terms stipulated by Article 5.4 hereof, and after a period of 30 days during which the Transferee shall be invited by the Transferor, by any means, to regularize it obligation to Exercise the Promise, the Transferee shall pay the Transferor a penalty equal to (i) €4,160,000 (four million one hundred and sixty thousand) minus the payments made by the Transferee to the Transferor after the Date of the Promise up to the day of full payment of the Units in respect of the Initial Exercise – the aforesaid sums paid by the Transferee being converted on account of this article into pure and simple indemnity in favor of the Transferor included in the penalty of €4,160,000 (four million one hundred and sixty thousand) – to which shall be added (ii) a sum equal to 10% of the Partial Price which should have been paid by the Transferee to the Transferor in respect of the Exercise not forming the subject of a Notification of Exercise accompanied by payment of the Partial Price within the periods and according to the conditions provided for by Article 5.4 hereof ("**Penalty**").

The foregoing paragraph shall not apply in the event of a Period of Suspension under the conditions referred to in Article 6.4 below.

The Penalty shall be paid within a period of 8 days as from the last Business Day of the month following the month in which the Transferee has failed to give notice of Exercise of the Promise, by transfer to the Transferor's bank account (details of which shall be notified to the Transferee).

Failing payment by transfer within the aforesaid period, the Penalty shall be deemed to be a certain claim of a fixed amount which the Transferor may demand from the Transferee, which may be used by the Transferor for the payment of new shares to be issued by the Transferee.

### 5.6 Contribution in kind

The Parties shall meet within ninety (90) days of the Partial Expiry Date with a view to agreeing the transfer and/or contribution of the balance of the Transferor's interest in the Fund capital based on the same Price per Unit and based on a Schedule to be agreed between them. In the event of a contribution in kind, subject to the agreement of the Transferee's shareholders at a shareholders' general meeting, the Transferor shall undertake to contribute to the Transferee (i) 48% of the A Units in the Fund and 48% of the B Units in the Fund, all (i) based on the same Price per Unit, (ii) based on an average market price of the Spineway share to be determined between the Parties and (iii) based on a schedule to be agreed between them.

### 6. EXECUTION OF THE TRANSFER OF UNITS

#### 6.1 Transfer Date

On each Exercise of the Promise pursuant to Article 5 above, the Units Concerned shall be transferred to the Transferee at the latest on the tenth (10th) Business Day following the date of the Notification of Exercise, on a date known as the "**Transfer Date**".

On the Transfer Date, the Transferor shall transfer to the Transferee, and the Transferee shall acquire from the Transferor, the Units Concerned, free from any Surety, with all the rights and obligations attached thereto, it being agreed that the Transferee shall have the right to the dividends on the Units Concerned whose Transfer Date falls during the course of any Financial Year N, as from the Financial Year N, it being stipulated that the aforesaid dividends shall be

distributed during the course of the Financial Year N+1. As an exception, the Transferor shall maintain a portion of the dividends attached to the Financial Year N relating to such Units Concerned which shall be distributed during the course of the Financial Year N+1, calculated *pro rata temporis*. In such event, the amount of the aforesaid dividends to be paid to the Transferor ("**Dc**") shall be determined by applying the following formula:

$$Dc = Dt \times \frac{(T)}{(365)}$$

Where:

- o  "**Dt**" is defined as the total amount of the dividends attached to the Financial Year N relating to the Units Concerned that shall be distributed during the course of the Financial Year N+1;
- o  "**T**" is defined as the total number of days elapsing between the first day of the Financial Year N and the Transfer Date.

### 6.2 Documents to be submitted following Exercises of the Promise

Following each Exercise of the Promise, the following deeds and transactions shall take place in the following order on the Transfer Date of the Units Concerned:

(i)    The Transferee shall pay the Partial Price, under the conditions referred to in Article 6.3 below;

(ii)   The Transferor shall submit to the Transferee two (2) original copies, duly signed by the Transferor and authenticated, of the notice of transfer relating to the transfer of the Units Concerned to the Transferee;

(iii)  The Transferee shall submit to the Transferor one (1) original copy, duly signed by the Transferee and authenticated, of the notice of transfer relating to the transfer of the Units Concerned to the Transferee;

(iv)   The Transferor shall ensure that the Management Company enters the transfer of the Units Concerned in the Transferee's name in the Fund transfer register;

(v)    The Transferor shall ensure that the Management Company submits to the Transferee a true certified copy of the Fund transfer register (updated following the transfer of the Units Concerned to the Transferee).

### 6.3 Terms of payment of the Partial Prices

The Transferee shall pay the Partial Prices in cash and (i) in euros by transfer to the Transferor's bank account (details of which shall be notified to the Transferee prior to the Transfer Date considered) or (ii) by offsetting against any claims held by the Transferee against the Transferor.

### 6.4 Transfer of ownership

Subject to the observance of Articles 6.2 and 6.3 above and to full payment of the Partial Price, the Parties expressly agree that, as from the Transfer Date relating to each Exercise of the Promise, the Transferee shall have full ownership of the Units Concerned in the event of Exercise of the Promise, which shall be acquired with all the rights and obligations attached thereto, subject to

the distribution of dividends in respect of the Units Concerned whose Transfer Date falls during the course of a Financial Year N and which shall be paid during the Financial Year N+1, which shall be distributed *pro rata temporis* between the Transferor and the Transferee as provided for by Article 6.1 above.

In the following cases:

1. If (i) the Transferee has failed to obtain the finance requested for payment of the balance of the Initial Price payable, that is the sum of thirty-seven million four hundred and forty thousand euros (€373,440,000) and if (ii) the Transferee has acquired at least the 2,860 A Units and the 1,300 B Units in respect of the Initial Exercise of the Promise for an amount at least equal to the overall sum of four million one hundred and sixty thousand euros (4,160,000);

2. If, for technical reasons beyond its control (fall in the price of the SPINEWAY share falling below the nominal value or the contractual value provided for in the finance agreement, lack of liquidity on the price making it impossible to execute the finance agreement, lack of quorum and/or of a majority during the course of the Transferee's shareholders' general meetings, suspension of the price decided by the supervisory authorities, etc.), the Transferee is unable to obtain (i) the continuation of the finance requested for payment of the balance of the price of the Initial Units minus the sum of €4,160,000 (four million one hundred and sixty thousand), that is the sum of thirty-seven million four hundred and forty thousand euros (€37,440,000), (ii) the finance requested for the partial payment resulting from the Initial Exercise of the Promise, and (iii) the actual availability thereof throughout the Promise;

the Promise of Transfer shall automatically be suspended for a maximum period of six (6) months as from notification thereof by the Transferee to the Transferor under the conditions laid down by Article 9.3 ("**Period of Suspension**").

During this Period of Suspension, the Penalty stipulated in Article 5.5 shall not apply.

During the course of this Period of Suspension, the Parties shall endeavor to:

- look for the finance requested for payment of the balance of the partial payment resulting from the Initial Exercise of the Promise and for payment of the Initial Price payable, that is the sum of thirty-seven million four hundred and forty thousand euros (€37,440,000) from one or more private investors in order to resolve point 1 above;

- look for a solution to resolve the technical difficulty/ies referred to in point 2 above.

If no suitable, long-term solution is found following this six-month Period of Suspension for objective reasons beyond the control of the Parties, the transfer of the Units Concerned and of the balance of the Units remaining under the Promise of Transfer shall be cancelled, and the Promise shall become forfeit, without any indemnity on either part.

With regard to the Units already acquired by the Transferee under the Promise, the Parties undertake in good faith to make reasonable efforts to find liquidity for the interest held in the Fund capital by the Transferee.

### 6.5 Management Company shares

The Transferor undertakes to transfer to the Transferee (i) 50% of the Management Company shares as soon as the Transferee has acquired 80% of the 55,000 A Units in the Fund, that is 44,000 A Units in the Fund, and 80% of the 25,000 B Units in the Fund, that is 20,000 B Units in the Fund, within the scope of the Promise and (ii) the balance of 50% of the Management Company shares as soon as the Transferee has acquired all the Fund Units within the scope of the Promise.

The Management Company shares shall be transferred based on a unit price of €1 (one) per share, that is an overall price for 100% of the Management Company shares of €100 (one hundred).

It is expressly agreed that, as soon as 50% of the Management Company shares have been transferred to the Transferee, both the Management Company and the Fund shall be managed by the Transferor and the Transferee so that (i) all the decisions voted by the shareholders in the Management Company and all the decisions taken by the director or directors of the Management Company and (ii) all the decisions on management of the Fund or relating to the composition of the Fund capital or to the Fund's indebtedness are systematically taken by all the shareholders in the Management Company, specifically the Transferee and the Transferor.

As from the acquisition of at least 28,600 A Units in the Fund and at least 13,000 B Units in the Fund representing 52% of the Fund Units resulting from the payment made in respect of the Initial Exercise of the Promise, the Transferee shall benefit from the enhanced information rights, particularly in terms of reporting, information, consultation or veto rights on certain important decisions within the Transferor's operating companies under the conditions to be agreed between the Parties, without being able to contravene existing provisions of the articles of association or other provisions.

This provision shall constitute a shareholders' agreement between the Transferor and the Transferee and shall govern relations between the Transferor and the Transferee within the Management Company in this respect and on behalf of the Fund until a new shareholders' agreement is formalized between them.

## 7. TRANSFEREE'S REPRESENTATIONS

**7.1** The Transferee declares to the Transferor that the Promise does not contravene any undertaking or obligation by which it is bound.

**7.2** The Transferee declares to the Transferor that signature of this Promise and fulfilment of the obligations resulting herefrom have been validly authorized by the Transferee's corporate bodies and no other authorization or formality is required for this purpose. This Promise constitutes a valid undertaking, having mandatory force against it in accordance with the terms hereof.

## 8. GUARANTOR'S REPRESENTATIONS AND WARRANTIES

The Guarantor, as a direct and indirect shareholder in the Fund, LA National LLC, S.M.S. and the Subsidiaries (the "**Target Companies**"), represents and warrants that the representations stipulated in this Article 9 (the "**Representations**") are accurate and true (i) at the date of the Promise or, with regard to any Representation made specifically on a certain date, at that date and (ii) except for the Representations made specifically on a certain date, which shall only be accurate and true on that date, on each Transfer Date (as long as, after the aforesaid Transfer Date, the Transferee's interest in the Fund capital does not exceed 50%) as if they had also been made on each of such Transfer Dates. The Guarantor recognizes that the Representations constitute a decisive aspect of the Transferee's consent to any Transfer.

### 8.1 Capacity

The Guarantor has the power and the capacity to conclude this Promise and to fulfil the obligations resulting herefrom. The Guarantor's signature of this Promise and fulfilment of the obligations resulting herefrom have been validly authorized and no further authorization or formality is required of the Guarantor for this purpose. This Promise constitutes a valid undertaking, having mandatory force against it in accordance with the terms hereof.

## 8.2 Absence of conflict

The Promise does not contravene any undertaking or obligation by which it is bound.

## 8.3 Shareholding in the Fund – Ownership and free transferability of the Units Transferred

**8.3.1** At the date hereof, the 55,000 A Units and the 25,000 B Units issued by the Fund represent all the units issued by the Fund.

**8.3.2** The Units Transferred have been validly issued and subscribed and are fully paid up. The Units Transferred are all the Units in the same category, conferring the same rights and obligations on their holders.

**8.3.3** At the date hereof, there are no Fund Securities other than the Initial Units and, except for the Promise, there is no undertaking or agreement conferring on any person whatsoever any right to acquire or subscribe for or to be attributed or to issue any Fund Security and, apart from the Guarantor on the Units, no-one holds any right to the Fund's profits or liquidation surplus. No decision has been taken by the Fund's corporate bodies to issue or attribute Securities. The Fund has not issued any bonds or debt securities.

**8.3.4** The Guarantor has full ownership of all the Units Transferred, free from any Surety and freely transferable to the Transferee, and the Transferee shall have, as from the Execution, full ownership of all the Units Transferred and of all the rights attached thereto, subject to the provisions of Article 6.4. No disputes or claims exist regarding the Guarantor's rights to the Units Transferred or the Guarantor's capacity or rights to transfer the Units Transferred and no-one is likely to claim ownership of the Units Transferred or any other right to the Units Transferred.

## 8.4 Target Companies

**8.4.1** Each Target Company has been regularly formed, is duly registered and validly exists according to the Laws and Regulations applicable thereto and has the power and the capacity to carry out its activities in the manner in which they are currently carried out or in which it is currently envisaged that they will be carried out.

**8.4.2** No Target Company is or has been in a state of suspension of payments. No resolution has been approved and no meeting has been called to dissolve or liquidate a Target Company. No Target Company is or has been the object of a conciliation or safeguarding procedure (including accelerated safeguarding), receivership or compulsory liquidation or other similar procedure, including any preventive procedure or measure and amicable settlement of business difficulties, pursuant to the Laws and Regulations applicable to similar matters, and no claim, request or declaration with a view to the opening of such procedure has been made. No Target Company has concluded an agreement or initiated or envisages initiating discussions with its creditors with a view to writing off or rescheduling all or part of its debts.

**8.4.3**  The Fund has full ownership, free from any Surety, of Securities in LA National LLC representing 100% of the capital and voting rights of LA National LLC at the date hereof.

**8.4.4**  The Fund has full ownership, free from any Surety, of Securities in S.M.S. representing 100% of the capital and voting rights of S.M.S. at the date hereof.

**8.4.5**  LA National LLC has full direct and indirect ownership, free from any Surety, of Securities in the Subsidiaries mentioned in the organization chart attached in **Annex 1**.

**8.4.6**  S.M.S. has full direct and indirect ownership, free from any Surety, of Securities in the Subsidiaries mentioned in the organization chart attached in **Annex 1**.

**8.4.7**  Apart from the Securities in LA National LLC and the Securities in S.M.S. held by the Fund, and apart from the Securities in the Subsidiaries held by LA National LLC and/or by S.M.S., the latter does not hold, either directly or indirectly, any interest in any other Person.

**8.4.8**  No undertaking or agreement exists conferring on any person whatsoever any right to acquire or subscribe for or be attributed or issue Securities in LA National LLC and/or in S.M.S. (including with regard to plans for the allocation of options to subscribe for or acquire shares or for the allocation of free shares or similar plans) and, apart from the holders of the Securities issued by LA National LLC and/or S.M.S., no-one holds any right to the profits, liquidation surplus or voting rights within LA National LLC and/or S.M.S. Neither LA National LLC nor S.M.S. has issued bonds or debt securities.

**8.4.9**  The Securities issued by each Target Company have been validly issued and fully paid up and are all shares or other ordinary capital securities, in the same category, conferring the same rights and obligations on their holders, and there are no Securities in a Target Company other than these shares or other capital securities. All the contributions in kind in favor of the Target Companies have been duly paid up. No decision has taken by the corporate bodies of a Target Company to issue or to allocate Securities, or to authorize the issue or allocation thereof, after the date of this Promise. None of the Target Companies has issued shares with multiple voting rights and there are no limitations to the voting right attached to the shares issued by the Target Companies pursuant to their articles of association or pursuant to the applicable Laws and Regulations.

**8.4.10**  No Target Company holds Securities or is a member of or participant in any person other than another Target Company or is or may be subject to any obligation to acquire such Securities or to become a member of or participant in such a person. No Target Company (i) holds or has held Securities or has been a member of or participant in any person in which the liability of the shareholders, partners, members or participants is indefinite and/or joint and several, or is or may be subject to any obligation to acquire or to become a member of or participant in such a person; (ii) is or has been a company representative or *de facto* manager of any other person (including another Target Company).

## 8.5 Effects of the Transfer

The signature and execution of this Promise shall not affect either the legal position or the rights and obligations of the Target Companies, or the capacity of the Target Companies to pursue their activities, and shall not more particularly give rise to any of the following consequences:

(a) The obligation for a Target Company to pay any sum of any nature whatsoever or any penalty or indemnity or the questioning or reduction of a subsidy, a financial benefit or any other aid granted to a Target Company;

(b) The amendment or cancellation of an agreement to which a Target Company is a party or benefiting a Target Company or the applicability or inapplicability of any term of such agreement or early repayment of the contractual obligations of a Target Company;

(c) The possibility for anyone to assert a right or to be released from an obligation in respect of a Target Company, particularly the possibility for a third party to make use of or demand the granting of a guarantee, a surety or any other undertaking having an equivalent effect or to be released from a guarantee, surety or any other undertaking having an equivalent effect issued in favor of a Target Company;

(d) The amendment, cancellation, suspension, withdrawal or non-renewal of an Authorization required for the regular exercise of their activities by the Target Companies;

(e) A change in the situation of the employees and/or corporate representatives of the Target Companies;

(f) Any obligation to pay a Tax or any change in taxes for a Target Company, including the impossibility for a Target Company to use its tax deficits and tax credits or any effect whatsoever on the tax deficits and credits already allocated.

## 8.6 Reference Accounts – Books and registers

**8.6.1** A full copy of the Reference Accounts and the Fund Balance Sheet and of the auditors' reports thereon is provided in **Annex 8.6.1**. The Reference Accounts have been drawn up in accordance with the applicable Laws and Regulations and the Accounting Principles and have been certified without any reservations by the respective auditors of the Target Companies. The way in which the Accounting Principles have been applied by each Target Company is described accurately and fully in the notes on the Reference Accounts of that Target Company and these Accounting Principles have been applied on a constant and consistent basis from one financial year to the next, subject to the information provided in the notes to these Reference Accounts.

**8.6.2** The Reference Accounts and the Fund Balance Sheet and regular are true and (i) with regard to the Reference Accounts consisting of consolidated accounts, provide a true and fair view of the assets and financial position of the Target Company concerned and of the persons included within its scope of consolidation at the date of such Reference Accounts; (ii) with regard to the Reference Accounts consisting of statutory accounts, provide a true and fair view of the assets and financial position of the Target Company concerned at the date of such Reference Accounts and of its result for the financial year ended at the date of such Reference Accounts; or (iii) with regard to the Fund Balance Sheet, provide a true and fair view of the Fund's assets and of its financial position at the date of the Fund Balance Sheet.

**8.6.3** Save as indicated or provided for in the Fund Balance Sheet or Reference Accounts or indicated in the notes to the Reference Accounts, no Target Company has any existing, conditional or potential debt or obligation except for the debts and obligations incurred after the date of the Reference Accounts during the Normal Course of Business.

**8.6.4**  The Books and Registers are complete, accurate and up-to-date and have been kept in accordance with the Laws and Regulations and with all due diligence. The Books and Registers are available and under the control of the Target Companies.

### 8.7 Events after the date of the Promise

As from the closing date of the Target Companies' last financial year and up to the date of Execution:

(a) The Target Companies have carried out their activities with all due diligence and in the Normal Course of Business; and

(b) No Target Company has performed any of the following transactions or has undertaken to perform such a transaction:

- Decide to distribute, or pay, any dividend or other form of distribution (in cash or in kind), or to buy back or cancel all or some of the Securities of any of the Target Companies;

- Subscribe to or guarantee a loan, or any other form of indebtedness of any nature whatsoever, except for any contribution to current accounts or shareholder loans required to finance the activities of the Target Companies, or grant a Surety affecting the Securities of any of the Target Companies, or any assets of any of the Target Companies;

- Conclude a contract for an amount exceeding five hundred thousand (500,000) euros (or the equivalent value in the currency used) excluding tax, or representing an undertaking made by any of the Target Companies exceeding five hundred thousand (500,000) euros (or the equivalent value in the currency used) excluding tax;

- Participate in a merger or a partial contribution of assets;

- Acquire, assign or otherwise transfer all or some of the Securities of any person;

- Acquire, assign or otherwise transfer a business or property or any substantial asset required for the construction and/or operation of any of the Target Companies;

- Undertake pre-litigation or litigation proceedings, whether judicial, administrative or arbitration proceedings.

## 9. SUNDRY PROVISIONS

### 9.1 Confidentiality

Neither Party shall disclose or allow the disclosure of all or some of the content of the Promise to a third party without the prior consent of the other Party. Such undertaking shall not, however, restrict the possibility for either Party to communicate this Promise in any way within the scope of market practices:

(i)  For the Transferee, to its managers, directors, employees, financial institutions and advisors concerned, or to the managers, directors or employees of the companies within its Group and to the directors of its Group, if it considers it useful or necessary within the scope of exercising its rights, provided that they undertake to observe this confidentiality clause (or are bound by such confidentiality by the ethics applicable thereto);

(ii)  For the Transferor, to its advisors, provided that they undertake to observe this confidentiality clause (or are bound by such confidentiality by the ethics applicable thereto);

(iii)  To the competent authorities under a legal or regulatory obligation applicable or a legal decision or even within the scope of judicial implementation of the provisions of this Promise, it being stipulated that the Parties shall endeavor to agree on the content of such communication and that any communication shall be preceded by notification to the other Party if that is permitted by the competent authority and the law or regulation applicable;

(iv)  Within the scope of the periodic reports or presentations to the Transferor's financial analysts or investors, or as otherwise required to satisfy its legal or regulatory obligations as a listed Fund;

(v)  To a potential purchaser of Securities, or to any person that is a party to a document relating to finance provided for the Fund or for LA National LLC or for S.M.S., provided that they undertake to observe this confidentiality clause;

(vi)  If the information concerned has already been regularly brought to the knowledge of the public.

### 9.2 Successors and beneficiaries

This Promise shall apply for the benefit of the Parties, and shall be binding on them and on their successors, and respective beneficiaries, it being stipulated however, that the Transferor may not transfer or delegate any of its rights and obligations under the terms of this Promise without the Transferee's prior, written consent, and that the Transferee may not transfer or delegate any of its rights and obligations under the terms of this Promise without the Transferor's prior, written consent.

### 9.3 Notifications

**9.3.1**  For execution of the provisions of the Promise:

(i)  All notifications shall be sent to each of the Parties by registered letter with a request for acknowledgment of receipt, by extrajudicial deed, by courier or by email confirmed by registered letter with a request for acknowledgment of receipt (or any equivalent process for international notifications), sent to the address and for the attention of the addressee mentioned in Article 9.3.3 (or any other address or for the attention of any other person as notified by the addressee to the other Party in accordance with the provisions of this article);

(ii)  All periods shall be clear and, unless indicated otherwise, counted in calendar days and shall run from receipt of notifications (the postmark providing evidence).

**9.3.2**  For the purposes hereof:

(i)  Any change of a Party's address or representative for the purposes of the Promise shall be notified by the person concerned to the other Party as provided for above;

(ii)   Notifications sent by courier shall be presumed to have been sent on their date of delivery to the addressee, as certified by the delivery receipt;

(iii)  Notifications sent by registered letter with acknowledgment of receipt shall be presumed to have been sent on the date of their first presentation at the address of the addressee;

(iv)   Notifications sent by email shall be presumed to have been sent on the date of transmission of the email, subject to confirmation by registered letter with acknowledgment of receipt (or any equivalent process for international notifications) dispatched on that same day.

**9.3.3**   For the purposes of the Promise, the Parties' addresses are as follows:

-   For the **Transferor**:
    FAO: Luc GERARD
    Avenida Calle 82 # 12-18 Of. 804, Bogota, Colombia
    Email: luc.gerard@tribeca.com.co

-   For the **Transferee**:
    SPINEWAY
    FAO: Stéphane LE ROUX
    7 Allée du Moulin Berger, Bâtiment 7, 69130 Ecully
    Email: slr@spineeway.com

### 9.4 Inside information – Market abuse

The Parties recognize that this Promise constitutes inside information within the meaning of article 7 of European Regulation No. 596/2014 of 16 April 2014 (hereinafter "MAR") (that is, specific information that has not been made public, directly or indirectly concerning SPINEWAY or one or more of its financial instruments, and that, if it were made public, would be likely to considerably influence the price of the financial instruments concerned or the price of the financial instruments connected therewith) (hereinafter, "**Inside Information**"), whose communication must be made public as soon as possible.

In the event of the deferred communication of Inside Information by the Transferee, observing the conditions referred to in article 17.4 of the MAR, namely: (i) the immediate publication is likely to affect the issuer's legitimate interests; (ii) a delay in publication is not likely to mislead the public; and (iii) the issuer is able to ensure the confidentiality of the aforesaid information, pursuant to article 14 of the MAR, any person having a knowledge of the aforesaid Inside Information shall not, until the information loses its privileged nature:

-   Engage in or attempt to engage in out insider dealing;

-   Recommend that another person engage in insider dealing or induce another person to engage in out insider dealing; or

-   Unlawfully disclose inside information, that is, such information to any other person, except when such disclosure takes place "in the normal course of the exercise of an employment, profession or duties".

Insider dealing shall be understood broadly by article 8 of the MAR and shall cover the following in particular:

- The fact that a person holding Inside Information uses it "by acquiring or disposing of, for its own account or for the account of a third party, directly or indirectly, financial instruments to which that information relates"; and

- The fact of using the recommendations or inducements made by a person holding Inside Information if that person knows, or ought to know, that it is based on inside information.

In the event of violation of these rules on abstention, the AMF may impose a fine on offenders which may amount to up to 100 million euros or, if profits have been made, to ten times the amount thereof.

The Transferee undertakes to draw up a list of insiders with regard to Inside Information in the format defined in articles 18 of the MAR and 2.5 of Commission Implementing Regulation (EU) 2016/347 of 10 March 2016.

Finally, the Parties note that transactions constituting market manipulation within the meaning of article 12 of the MAR are also prohibited.

### 9.5 Amendment to the Promise

This Promise may only be amended by means of a written document duly signed by each of the Parties.

### 9.6 Absence of waiver

No tolerance, lack of action or inertia by either Party may be interpreted as waiver of its rights under the terms of the Promise.

### 9.7 Inapplicability of the provisions

If one or more of the provisions of the Promise is or becomes invalid, illegal or judged inapplicable for any reason whatsoever, the validity, legality or applicability of any other provision of the Promise shall not be affected or altered in any way, unless such other provisions form an integral part of or are clearly indissociable from the provisions invalidated or judged inapplicable.

In the event off such invalidity, illegality or inapplicability, the Parties shall endeavor in all good faith to reach an agreement on the amendments to be made to the Promise in order to give it an effect corresponding to their common intention, as expressed by the Promise, insofar as is possible.

More generally, if any of the provisions of the Promise cannot be applied for any reason whatsoever, the Parties undertake to consult each other and to renegotiate the provision concerned in order to achieve the same economic objectives while maintaining an identical contractual balance.

### 9.8 Costs

Each of the Parties shall bear all the costs and expenses incurred by it in respect of this document and the transactions provided for herein, particularly the fees and expenses of any third party whose services have been used by the aforesaid Party.

### 9.9 Whole agreement

This Promise constitutes the whole agreement between the Parties over the provisions forming the subject hereof. Consequently, it cancels and replaces any agreement, convention, exchange of letters or verbal agreement reached between the Parties prior to the date hereof and relating to the same object.

### 9.10 Copies

This Promise is concluded in more than one copy, each copy to serve as original and all of which having to be deemed to constitute one and the same document.

### 10. APPLICABLE LAW – DISPUTES

**10.1** The Promise shall be governed and interpreted in accordance with French law.

**10.2** Any dispute resulting from or relating to this Promise will be resolved via a final decision issued in accordance with the Mediation and Arbitration Rules of the Geneva International Chamber of Commerce by one (1) arbitrator appointed in accordance with these Rules (such arbitrator being hereinafter referred to as the "**Arbitral Tribunal**").

The Arbitral Tribunal shall sit in Geneva (Switzerland) and arbitration shall take place in the French language.

The Arbitral Tribunal shall settle the dispute pursuant to French law.

Done at LYON on 19 March 2019 in two (2) originals.

SPINEWAY SA[1]                              STRATEGOS GROUP LLC[2]
*Transferee*                               *Transferor*
*[Signature]*                              *[Signature]*
Mr Stéphane LE ROUX                        Mr Luc GERARD

---

[1] The Transferee's signature must be preceded by the handwritten words "*Good for acceptance of the promise of sale of Units under the foregoing terms*".

[2] The Transferor's signature must be preceded by the handwritten words "*Good for promise of sale of Units under the foregoing terms*".

**Annex 1**
**Distribution of the Fund capital at the date hereof and Organization chart**



*Company in process of being transferred to SMS Strategic Solutions Limited, Chipre

| Identity of the Unit holders | Number of Units | % held |
|---|---|---|
| Strategos Group LLC | 55,000 A units | 68.75% |
| Tupson Invest S.L.U. | 25,000 B units | 31.25% |
| | | |
| Total number of Units | 80,000 | 100.00% |
| Nominal value (in euros) | 1,000 | |
| Share capital (in euros) | 80,000,000 | |

**Annex 8.6.1**
**Reference Accounts and Fund Balance Sheet**

**LATIN AMERICAN NATIONAL CLINICS – LA NATIONAL LLC**

**Statements of financial position**

*Figures expressed in USD*

|  | Year ended 31 December 2018 |
|---|---|
| Assets | |
| Non-current assets | |
| Investments | $7,882,118 |
| Total assets | $7,882,118 |
| | |
| Equity | |
| Share capital | 7,407,932 |
| Profit/loss from previous financial years | (5,814) |
| Total equity | $7,882,118 |

*[Signature]*
**ANGELA M. LUNA M.**
Representative

**S.A.S. STRATEGIC MEDICAL SOLUTIONS LIMITED**

**Statements of financial position**

*Figures expressed in USD*

|  | Year ended 31 December 2018 |
|---|---|
| Assets |  |
| Investments | $1,707,124 |
| Total assets | $1,707,124 |
|  |  |
| Equity |  |
| Share capital | 1,124 |
| Premium on placement of investments | 1,706,000 |
| Total equity | $1,707,124 |

*[Signature]*
**ANGELA M. LUNA M.**
Representative

# EXHIBIT 5



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK          )
                           )          ss:
COUNTY of NEW YORK   )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "an October 16, 2019 letter from
Stephane Le Roux to Luc Gerard" -- originally written in *French*-- is, to the best of our
knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 12/8/2022

Sworn to and signed before ME
this 8th day of December, 2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Notary Public



Your
legal
translation
partner

New York, NY | Washington DC | Houston, TX | San Francisco, CA | Hong Kong



STRATEGOS GROUP LLC

FAO: Mr Luc GERARD

Avenida Calle 82 # 12-18 Of. 804

Bogotá, Colombia

Email: luc.gerard@tribeca.com.co

Ecully, 16 October 2019

BY EMAIL AND REGISTERED LETTER WITH ACKNOWLEDGMENT OF RECEIPT

### RE: BILATERAL PROMISE OF SALE AND PURCHASE – LACK OF A COMMERCIAL PARTNERSHIP FOR THE DISTRIBUTION OF SPINEWAY PRODUCTS ON THE NATIONAL CLINICS MARKETS

Good day Luc,

Further to our latest discussions, I am sending you this letter in connection with the undertakings made in respect of the bilateral promise of sale and purchase under conditions precedent combined with a unilateral promise of sale dated 19 March 2019, concluded between Strategos Group LLC and Spineway and amended by amendments dated 3 May 2019 and 16 May 2019 (hereinafter, the "**Promise**").

As a reminder, during the course of our discussions we decided to proceed with a merger of Spineway's capital into the National Clinics fund, replaced by the Integral Medical Solutions Fund fund, 100% held by Strategos Group LLC, in order to pool our expertise, particularly in commercial development on the main markets of the Integral Medical Solutions Fund.

In view of this essential point, we agreed under article 3.4 of the Promise on a condition subsequent as follows:

"3.4 *As a condition subsequent of the Promise, within six (6) months of the date of the Promise, the Parties agree to enter into a commercial partnership agreement for the distribution of the Transferee's products in the Transferor's business areas. Failing actual conclusion of this agreement, for reasons other than the Transferee's simple refusal to sign the balanced partnership agreement proposed by the Transferor, within the period of six (6) months (unless this period is extended by mutual agreement between the Parties), this Promise will be terminated and the Parties will revert to their initial status. Any purchase of Units that took place during that period will be cancelled and any amounts paid by the Transferee will be returned by the Transferor, all without any indemnity on either part.*"

In recent months, within the scope of our numerous meetings and discussions, we have endeavoured to reach such an agreement. To our great dismay, no specific proposal has made it possible to reach such an agreement within the period indicated in article 3.4 of the Promise.

SPINEWAY SA · Technoparc, bâtiment 7, Allée Moulin Berger · 69 130 ECULLY - FRANCE · Tel: +33 (0)4 72 77 01 52 · Fax: +33 (0)4 78 38 10 17 email: info@spineway.com · www.spineway.com · A limited company with a capital of €440,526 euros · alternext mnemonic "ALSPW" · SIRET 484 163 985 00035



Consequently, noting the lack of a draft commercial partnership agreement for the distribution of Spineway products in the business areas of the Integral Medical Solutions Fund, in the capacity of Spineway's legal representative, I regret to have to implement the aforesaid article 3.4 and to notify you of termination of the Promise.

On 23 October 2019, Spineway will sign the transfer orders seeking to transfer ownership of the 2,250 A units and 750 B units in the Integral Medical Solutions Fund already acquired and corresponding to the first three payments of €1,000,000 (€3,000,000 in total) made. Despite the payment of the sum of €1,160,000 made in respect of the partial payment provided for by article 5.1 of the Promise, Spineway has not received the transfer orders for the A and B units relating thereto.

Please transfer the €4,160,000 corresponding to all the sums paid in respect of the partial payment resulting from the Initial Exercise of the Promise, pursuant to article 5.1 of the Promise, to Spineway's bank account as from 23 October 2019, and by 6 November 2019.

Regards.

*[Signature]*

STEPHANE LE ROUX
CHAIRMAN AND MANAGING DIRECTOR

SPINEWAY SA · Technoparc, bâtiment 7, Allée Moulin Berger · 69 130 ECULLY - FRANCE · Tel: +33 (0)4 72 77 01 52 · Fax: +33 (0)4 78 38 10 17 email: info@spineway.com · www.spineway.com · A limited company with a capital of €440,526 euros · alternext mnemonic "ALSPW" · SIRET 484 163 985 00035

**EXHIBIT 6**



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK    )
                           )     ss:

COUNTY of NEW YORK  )

### **_CERTIFICATE OF ACCURACY_**

This is to certify that the attached document, "an October 16, 2019 email from Luc Gerard to Stephane Le Roux" -- originally written in _French_-- is, to the best of our knowledge and belief, a true, accurate, and complete translation into _English_.

Dated: 12/8/2022

Sworn to and signed before ME
this 8th day of December, 2022

_S Dahl_

**Stephanie Dahl**
**Senior Projects Manager**
**Consortra Translations**

_James G Mamera_

Notary Public



Your
legal
translation
partner

New York, NY | Washington DC | Houston, TX | San Francisco, CA | Hong Kong

## Re: Spineway Strategos/IMS Termination

Luc Gerard Nyafe <luc.gerard@me.com>

Wed 10/16/2019 6:44 PM

To: Stéphane Le Roux <slr@spineway.com>
Cc: Gerard Luc <luc.gerard@tribeca.com.co>;Siegrist David <finance.dsg@spineway.com>

Well received Stephane,

We are replying to your email. Our project has been interrupted and the route to be followed
for the future of Spineway is no longer the one agreed. As I told you on the phone, and as
you have also told me, I respect your decision but I refuse, as your letter seems to indicate,
to take responsibility for Spineway's change of direction. We will be sending you our reply
shortly. In the meantime, the current projects naturally remain open and the partnership may
take other forms.

Regards

On Oct 16, 2019, at 10:10, Stéphane Le Roux <slr@spineway.com> wrote:

Good evening Luc,
Please find attached the letter I am sending by registered post/acknowledgment of receipt and
Express Courier, as I said yesterday on the phone. Let us remain in contact to develop other projects.
Regards

Stephane

**Dr Stéphane Le Roux**
Chairman & Managing Director
slr@spineway.com
Mobile: +33 (0)6 15 05 44 01

Meet us at SPNC Pre Congress - Spinal Pathologies, October 30-31, 2019, Lima

<CourrierLRARLuc GERARD191016.pdf>

address: 7 allée Moulin Berger, 69130 Ecully France
tel: +33 (0)4 72 77 01 52 | fax: +33 (0)4 78 38 10 17
website: www.spineway.com

# EXHIBIT 7



100 Park Avenue, 16ᵗʰ Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK    )
                     )        ss:
COUNTY of NEW YORK   )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "Arbitrage no 300515-2020 -
Spineway SA contre Strategos Group LLC - Information aux Parties"-- originally
written in *French*-- is, to the best of our knowledge and belief, a true, accurate, and
complete translation into *English*.

Dated: 11/02/2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Sworn to and signed before ME
this 2ⁿᵈ day of November, 2022

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong

Thu 1/20/2022 10:11 AM

| | |
|---|---|
| **From:** | CARRON Blaise <blaise.carron@unine.ch> |
| **Sent:** | Thursday, January 20, 2022 10:11 AM |
| **To:** | Romain Canonica; ebertrand@lamy-lexel.com; luc.gerard@tribeca.com.co |
| **Subject:** | Arbitration no. 300515-2020 - Spineway SA vs. Strategos Group LLC - Information for the Parties |

Dear Sirs,

I inform you that I have notified the parties of the judgment today by DHL.

I am not sending you an electronic version thereof for the time being, to ensure that the date of notification is unequivocal.

Yours faithfully,

Blaise Carron, sole arbitrator



**Prof. Dr Blaise Carron, LL.M.**
**(Harvard)**
Lawyer
Faculty of Law / Université de Neuchâtel
http://www2.unine.ch/blaise.carron

1

# EXHIBIT 8



100 Park Avenue, 16ᵗʰ Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK          )
                           )          ss:
COUNTY of NEW YORK         )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "Spineway - attestation de non-reours du 01.03.2022 du TF (00515208)" - Information aux Parties"-- originally written in *French*-- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 11/02/2022

Sworn to and signed before ME
this 2ⁿᵈ day of November, 2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Notary Public



JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong

*[Stamped]*
RECEIVED 2 MARCH 2022

Federal Court

La Chancellerie centrale
CH-1000 Lausanne 14
Case 221.14_01
DOCID 3761972

VP Canonica Valticos de Preux
+ Associés
Me Romain Canonica
Lawyer
Rue Pierre-Fatio 15
Case postale
1211 Geneva 3

**INFORMATION**

Lausanne, 1 March 2022

**Certificate**

In reply to your request of 28 February 2022, we would inform you that the Federal Court only certifies the entry into force of its own judgments.

However, we can certify that to date no appeal has been registered with us against the final arbitration judgment issued by the Arbitral Tribunal sitting in Geneva on 20 January 2022 (proceedings 300515-2020) in the case SPINEWAY SA vs STRATEGOS GROUP LLC.

Federal Court Chancellery
*[Stamp]*
SWISS FEDERAL COURT

# EXHIBIT 9



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK     )
                      )          ss:
COUNTY of NEW YORK    )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "20220304 Lt Demanderesse_sentence finale" -- originally written in *French*-- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 11/02/2022

Stephanie Dahl
Senior Projects Manager
Consortra Translations

Sworn to and signed before ME
this 2nd day of November, 2022

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

# Swiss Arbitration Centre

**Me Romain Canonica**
Canonica Valticos de Preux + Associés
15, rue Pierre-Fatio
1204 Geneva
Switzerland
rcanonica@cvpartners.ch
(by email and by post)

4 March 2022

**Case no. 300515-2020**

## Spineway SA (Claimant) vs Strategos Group LLC (Defendant)

Dear Sir,

We refer to the Claimant's email of 23 February 2022 and to the final judgment issued on 20 January 2022 within the scope of the above case.

We would hereby remind you that the final judgment is final and is imposed on the parties, pursuant to article 32(2) of the Swiss Regulations.

We remain at your disposal for any further request and assure you of our full consideration.

Shanaize Yahiaoui
Legal Counsel
Secretariat of the Arbitration Court

Swiss Arbitration Centre Ltd.
centre@swissarbitration.org
T. +41 22 819 91 57

Geneva office
Boulevard du Théâtre 4, 1204 Geneva, Switzerland
swissarbitration.org/centre  F. +41 22 310 37 31